UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DANIEL AND KATHY HAGGART, *et al*, For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 09-103 L |
| | ) | |
| vs. | ) | Judge Charles F. Lettow |
| | ) | *Electronically filed on September 5, 2012* |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**SUBCLASS TWO PLAINTIFFS' RESPONSE TO UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO UNITED STATES' RESPONSE IN FURTHER SUPPORT OF THE SUBCLASS TWO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   THE DEFENDANT COMPLETELY IGNORES AND FAILS TO ACKNOWLEDGE THAT TRAIL USE/RAILBANKING EXCEEDS THE SCOPE OF THE RAILROAD PURPOSES EASEMENTS.............................................7

    A.  All the Original Railroad Deeds in this Case are Easements, as Stipulated by the Parties, and are Limited to Railroad Purposes...........................................7

    B.  Binding Precedent Dictates that Trail Use/Railbanking Exceeds the Scope of the Railroad Purposes Easements and, thus, Defendant is Liable for a Taking ...........8

    C.  Pre-NITU Abandonment is Irrelevant as a Matter of Law .........................10

    D.  Defendant's Bad Faith Argument and Misstatements Regarding the Lack of Liability for Decisions Made by Third Parties ...........................................17

III.  THE SOUND TRANSIT EAST LINK LIGHT RAIL PROJECT HAS NO IMPACT ON THE FEDERAL GOVERNMENT'S TAKINGS LIABILITY.................21

    A.  The Federal Circuit's Authority is Clear and Well-Settled─ the Land Interest "Taken" is Plaintiffs' Reversionary Right ...................................................23

    B.  Under Binding Washington Precedent, Authorization for Trail Use Exceeds the Scope of an Easement Limited to Railroad Purposes, a Taking Occurred when the NITU was Issued, and the Possibility of Light Rail has Absolutely No Impact on 24.35 Miles of the Corridor ..................................................26

    C.  The Potential for Light Rail Over a 1.1 Mile Portion of the Abandoned Corridor at Some Time in the Indefinite Future is Railbanking all Over Again and the 10 Parcels of Land in Subclass Two on that 1.1 Mile Portion of the Corridor are Entitled to Just Compensation Too .......................................29

IV.  AS STIPULATED BY THE PARTIES, THE PLAINTIFFS OWN LAND ADJACENT TO AND ABUTTING THE FORMER RAILROAD EASEMENTS AND, THUS, IT IS PRESUMED THAT THE PLAINTIFFS OWN THE UNDERLYING FEE UNDER WASHINGTON LAW ...................................................37

    A.  Public Policy and Reasoning Behind the Centerline Presumption.............................38

    B.  Defendant's Newly-Raised "Title Issues" Related to One Identified Parcel is Without Merit .........................................................................................42

C. 11 Parcels in Subclass Two Have an Intervening Street Between the Parcel and the Right-of-Way Such That the Centerline Rule Still Applies but the Landowners Own Only 20 Feet of the Right-of-Way ................................................. 45

V.    THE INTEREST THAT THE DEFENDANT TOOK WAS PLAINTIFFS' REVERSIONARY INTEREST—THE PLAINTIFFS' RIGHT TO THEIR LAND UNENCUMBERED BY ANY EASEMENT ................................................................. 48

VI.   CONCLUSION ........................................................................................................ 54

TABLE OF AUTHORITIES

*Adkins v. United States*, Case No. 09-503, Order dated July 20, 2012 ....................................17, 53

*Angelo v. Biscamp*, 441 S.W.2d 524 (Tex. 1969) ........................................................................40

*Anna F. Nordhus Family Trust v. United States*, 98 Fed. Cl. 331 (Fed. Cl. 2011) ......................16

*Anna F. Nordhus Family Trust v. United States*, 2012 WL 2989967
    (Fed. Cl. July 20, 2012) ..........................................................................................................11, 52

*Barclay v. United States*, 443 F.3d 1373 (Fed. Cir. 2006) ............................2, 9, 24-26, 49-50, 53

*Beres v. United States*, 2012 WL 1606254 (Fed. Cl. Apr. 5, 2012) ..........................1, 9-10, 12-13

*Biery v. United States*, 99 Fed. Cl. 565 (2011) ............................................................................11

*Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189 (1910) .................................26, 48

*Burmeister v. Howard*, 1 Wash. T. 207 (1867) ............................................................................46

*Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) ..........2, 3, 8, 11, 18, 24-25, 49-50, 53

*Capreal, Inc. v. United States*, 99 Fed. Cl. 133 (Fed. Cl. 2011) ....................11, 16, 34-35, 51-52

*Carolina Plating Works, Inc. v. United States*, 102 Fed. Cl. 555 (Fed. Cl. 2011) .......................51

*Christian v. Purdy*, 808 P.2d 164 (Wash. App. 1991)..............................................................5, 45

*Cook v. Hensler*, 107 P. 178 (Wash 1910) ..................................................................................45

*Ellamae Phillips Co. v. United States*, 564 F.3d 1367 (Fed. Cir. 2009) ...................1-2, 11-12, 53

*Farmers Cooperative v. United States*, 98 Fed. Cl. 797 (Fed. Cl. 2011) ........................12, 18, 20

*Finch v. Matthews*, 443 P.2d 833 (Wash. 1968)............................................................................46

*Furlong v. United States*, Case No. 09-367L ................................................................................42

*Glosemeyer v. United States*, 45 Fed. Cl. 771 (Fed. Cl. 2000)...............................................16, 53

*Grantwood Village v. United States,* 55 Fed. Cl. 481 (Fed. Cl. 2003)..........................................53

*Hanson Industries v. County of Spokane*, 58 P.3d 910 (Wash. App. 2002)....................................7

*Howard v. United States*, 2012 WL 355451 (Fed. Cl. Aug. 16, 2012) .............................11, 33, 53

*Illig v. United States*, 67 Fed. Cl. 47 (Fed. Cl. 2005 ...................................................... 53

*Ingram v. United States*, 2012 WL 1943128 (Fed. Cl. May 24, 2012) .................................. 50, 53

*Jenkins v. United States*, 102 Fed. Cl. 598 (Fed. Cl. 2011) ................................................ 17-20, 54

*Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*,
    126 P.3d 16 (Wash. 2006) ........................................................................ 7, 39-41, 44

*Ladd v. United States*, 630 F.3d 1015 (Fed. Cir. 2010) ................................ 2-3, 25-26, 49, 51, 53

*Lawson v. State*, 730 P.2d 1308 (Wash. 1986) .................................... 1, 3, 9-11, 15-16, 26, 28, 37

*Longnecker v. United States*, 2012 WL 1606330 (Fed. Cl. Apr. 30, 2012) ...................... 1, 3, 8-11

*Macy Elevator, Inc. v. United States*, 97 Fed. Cl. 708 (Fed. Cl. 2011) ......... 5, 8, 17, 31, 35, 40, 42

*Macy Elevator v. United States*, 2012 WL 2368523 (Fed. Cl. June 21, 2012) ............................ 11

*Miller v. United States,* 67 Fed. Cl. 542 (Fed. Cl.  2005) ............................................................ 53

*Moody v. Allegheny Valley Land Trust*, 601 Pa. 655 (Pa. 2009) .................................................... 8

*Moore v. United States*, 61 Fed. Cl. 73 (Fed. Cl. 2004) ........................................................... 52-53

*Morsbach v. Thurston County*, 278 P. 686 (Wash. 1929) ............................................................. 7

*Navajo Nation v. United States*, 631 F.3d 1268 (Fed. Cir. 2011) ................................................ 18

*Neitzel v. Spokane International Ry. Co.*, 141 P. 186 (Wash. 1914) ............................................ 13

*Neitzel v. Spokane International Ry. Co.*, 117 P. 864 (Wash. 1911) .............................................. 7

*Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283 (Wash. App. 1993) .......... 5, 39, 45

*Paine v. Consumers' Forwarding & Storage Co.*, 71 F. 626 (6th Cir. 1895) .......................... 39-40

*Preseault v. United States*, 494 U.S. 1 (199) ...................................................... 2, 18-19, 23, 26, 53

*Preseault v. United States*, 100 F.3d 1525
    (Fed. Cir. 1996) ............................................. 1-4, 8-12, 15-20, 23-28, 31-32, 34, 37, 50, 52-53

*Puget Sound Alumni of Kappa Sigma, Inc. v. City of Seattle*, 422 P.2d 799 (1967) ................... 46

*Raulerson v. United States*, 99 Fed. Cl. 9 (Fed. Cl. 2011) ................................................. 11, 52-53

*Rhutasel v. United States*, 2012 WL 2373253 (Fed. Cl. June 22, 2012) ................................ 18, 53

*Roeder Co. v. Burlington Northern, Inc.*, 716 P.2d 855 (Wash. 1986) .................... 5, 37-39, 43-47

*Rogers v. United States*, 90 Fed. Cl. 418 (Fed. Cl. 2009) ..................................... 11, 13, 17, 52-53

*Rogers v. United States*, 101 Fed. Cl. 287 (Fed. Cl. 2011) ............................................................. 11

*Schneider v. United States*, 2003 WL 25711838 (D. Neb. Aug. 29, 2003) .................................. 49

*Schwede v. Hemrich Bros. Brewing Co.*, 69 P. 362 (1902) ............................................................. 46

*Smith v. Smith*, 622 A.2d 642 (Del. 1993) ...................................................................................... 41

*Stuart v. Fox*, 129 Me. 407, 152 A. 413 (Me. 1930) ..................................................................... 40

*Swan v. O'Leary*, 225 P.2d 199 (Wash. 1950) ................................................................................ 7

*Thomas v. United States*, Case Nos. 10-54L and 10-459L
    Order dated Aug. 29, 2012 ..................................................................................... 18, 30-31

*Toews v. United States*, 376 F.3d 1374 (Fed. Cir. 2004) .................... 2, 4, 9, 12, 18-19, 28-29, 32

*Toscano v. United States*, Case No. 08-910L ............................................................................ 36-37

*Troha v. United States*, 692 F. Supp. 550 (W.D. Pa. 2010) ............................................................ 8

*United States v. Reynolds*, 397 U.S. 14 (1970) ............................................................................. 26

*Vaughn v. Fitzgerald*, 511 P.2d 1148 (Ok. App. 1973) ................................................................. 44

*Whispell Foreign Cars, Inc. v. United States*, 100 Fed. Cl. 529 (2011) ...................................... 53

*Whispell Foreign Cars, Inc. v. United States*, Case No. 09-315
    Order dated Aug. 22, 2012 ....................................................................................... 2, 11-13

*Ybanez v. United States*, 102 Fed. Cl. 82 (Fed. Cl. 2011) ................................................... 11-12, 52

## I.    INTRODUCTION

The Defendant continues to boldly misstate the law despite numerous directives and precedents from the Federal Circuit.  Even though two recent decisions from the Court of Federal Claims involving Rails-to-Trails cases under Washington law have now completely affirmed the Plaintiffs' interpretation of the effect and impact of the Trails Act and Washington state law applicable to this case,[1] the Defendant continues to bury its head in the sand in an attempt to circumvent 15 years of Trails Act jurisprudence.[2]  *Beres* and *Longnecker* have now flatly rejected the Defendant's basic arguments that have again been made before this Court.  It is simply incredible.  Apparently, every court must not understand and apply the law correctly according to the Defendant because the Defendant has apparently decided to ignore binding precedent.

The correct legal framework for Trails Act takings cases was set by the Federal Circuit in *Preseault II*[3] and was then affirmed in *Ellamae Phillips*.  Under binding precedent, cases under the Trails Act present three primary questions:

(1) Who owned the strips of land involved, **specifically did the Railroad… acquire only easements**, or did it obtain fee simple estates;

(2) If the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails;

**or, in the alternative,**

(3) Even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

---

[1]  *See Beres v. United States*, 2012 WL 1608254 (Fed. Cl. Apr. 5, 2012); *Longnecker v. United States*, 2012 WL 1606330 (Fed. Cl. Apr. 30, 2012).

[2]  The attempted arguments advanced by the government in this care are so attenuated and specious, and more importantly so vastly contrary to the unmistakable binding precedent from the Federal Circuit and the Supreme Court of Washington, that any reasonable party or ethical attorney would justifiably fear asserting such a clear misreading of authority for fear of sanctions entered against them by the trial court.

[3]  Defendant incredibly states that "no easement in the corridor has been abandoned, as discussed above, and neither *Lawson* nor *Preseault II* apply."  *See* Def.'s Br., D.E. 108, at p. 31.  That is truly incredible.

*Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (hereinafter "*Preseault II*"); *see also Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009); *Toews v. United States*, 376 F.3d 1374 (Fed. Cir. 2004).   In sum, if the railroad received only a railroad purposes easement under prong 1 of *Preseault II*, and if the recreational trail use and railbanking authorized by the NITU exceed the scope of that easement under prong 2 of *Preseault II*, such that the landowners' reversionary interests were blocked from vesting, then a taking has occurred.   *Preseault II*; 100 F.3d at 1533; *Toews*; 376 F.3d at 1376; *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004); *Barclay v. United States*, 443 F.3d 1373 (Fed. Cir. 2006); *Ladd v. United States,* 630 F.3d 1015, 1019 (Fed. Cir. 2010);

The Defendant repeatedly argues that the federal government is not liable for a taking because the corridor was never abandoned.   The Defendant continues to completely ignore the scope of the easement issue under prong 2 of *Preseault II* and argues that abandonment of the easement (prong 3) is somehow relevant to a liability determination under prong 2 (the scope of the easement) because railbanking shows the railroad's intent to preserve the rail corridor.   *See* Def.'s Br., D.E. 108, pgs. 2-4, 8-10, 16-43.   That argument is contrary to <u>binding precedent</u> and has been rejected every time it has been made before the United States Supreme Court, the Federal Circuit, and this Court regardless of what state law may apply.   *Preseault v. United States*, 494 U.S. 1 (1990) (hereinafter "*Preseault I*"); *Preseault II*, 100 F.3d at 1373; *Toews*, 376 F.3d at 1376; *Whispell Foreign Cars, Inc. v. United States*, Case No. 09-315, Judge Hewitt Order dated August 22, 2012, p. 11-12, attached as Exhibit A (holding that once the first two prongs of *Preseault II* are met, liability is established, then the railway easement was abandoned or would have been abandoned as a matter of law).   If the scope of the railroad purposes easement is

exceeded by trail use/railbanking, then a taking has occurred and abandonment is irrelevant to the issue of whether a taking has occurred.[4]

The first inquiry under *Preseault II* is whether the Railroad held an easement or fee, not whether the Plaintiffs owned the fee, and the Defendant's newly-raised and legally baseless argument stating that the Plaintiffs must first prove they own the underlying fee is without merit. Plaintiffs have established that they own the underlying fee under Washington law pursuant to the centerline presumption. Further, as affirmed in another Washington Trails Act case under the Federal Circuit's framework, the first inquiry is **specifically** the nature of the railroad's interest in the land. *Longnecker*, 2012 WL 1606330, *10 (Fed. Cl. Apr. 30, 2012).[5]

The parties have stipulated that each of the original conveyance documents to the railroad were easements. Each easement conveyance contains language limiting the easement to railroad purposes, specifically "for the construction, operation and maintenance" of the railroad, each conveyance is limited to the railroad's "right-of-way over, across and through" the grantor's land, and the railroad can utilize the right-of-way only "so long as the same shall be used for railroad purposes." Under Washington law, the easements are limited to **railroad** purposes, despite the Defendant's arguments to the contrary.

Further, the Defendant simply ignores and refuses to acknowledge that trail use exceeds the scope of a railroad purposes easement as dictated by the binding precedent of the Washington Supreme Court's holding in *Lawson v. United States*, 730 P.2d 1308 (Wash. 1986). Trail use and railbanking are not separate, but contingent upon each other—they go hand in hand. Once

---

[4]  *See* discussion of the scope of the easement issue under Washington law pursuant to *Lawson v. State*, 730 P.2d 1308 (Wash. 1986) in Section II.B *infra*, and the discussion that the issue of abandonment is absolutely irrelevant in Section II.C *infra*.

[5]  Defendant also selects portions of the *Caldwell* and *Ladd* opinions, out of context, to attempt to state the first inquiry under *Preseault II* is whether the Plaintiff owned a fee interest instead of the nature of the interest owned by the railroad. Def.'s Br., D.E. 108, p. 16, citing *Caldwell*, 391 F.3d 1226, 1233-34 and *Ladd*, 630 F.3d 1015, 1024. The language cited by the Defendant in *Caldwell* and *Ladd* involved the accrual of a claim and whether, on the date of the NITU, the Plaintiff owned land adjacent to the right-of-way, which has been established here.

again, the Defendant also asserts that railbanking is a railroad purpose despite binding precedent that railbanking is NOT a railroad purpose.   The government's repeated argument despite continual rulings from the courts rejecting the railbanking argument is incredulous.   Railbanking is not a railroad purpose under any state or federal law.

The Defendant also argues that potential "light rail" use is a railroad purpose.   Defendant is wrong.   The government argued in *Preseault II* that both recreational trail use and "railbanking" were railroad purposes within the scope of the easement.   The Federal Circuit rejected the argument and specifically held that they could find no support for the proposition "that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."   100 F.3d at 1530.   The Federal Circuit has also likewise already rejected the Defendant's argument concerning light rail.   Speculative or potential use for light rail is simply not a railroad purpose.   *See Toews*, 376 F.3d at 1381.

There is no question that the issuance of the NITU by the STB <u>authorized</u> the use of a privately-owned railroad easement to be used for a public recreational trail.   That alone triggered the taking.   Here, it is difficult to imagine that either party to the original transfers would have allowed or imagined that a private commercial easement for railroad purposes—freight transportation, specifically coal—would possibly be converted to a local public transportation easement for light rail use, which is akin to bus or subway *public* transportation.   Specifically, at the time of BNSF's petition for exemption of abandonment, light rail use was purely speculative and it still is today.   The Federal Circuit has already rejected the notion of potential use for light rail use as a "railroad purpose" in *Toews*.[6]

---

[6]  *See* discussion of *Toews* in Section III.B and III.C *infra*.

Plaintiffs have shown that they own land adjacent to and abutting the former right-of-way and it is presumed that they own the underlying fee under Washington law.[7]   It is the Defendant's burden to rebut the presumption, which it did not.   *See Macy Elevator, Inc. v. United States*, 97 Fed. Cl. 708, 719-721 (Fed. Cl. 2011).   On October 24, 2011, the parties entered into stipulations that formed the basis for the eventual Subclasses.   The parties stipulated that an agreement had been reached for Subclass Two defining Subclass Two as those claimants who own property adjacent to the right-of-way in the "easement" category and where the government, subject to its reservation of rights to raise the issue should **additional information** come to light, has not challenged the Plaintiffs' property interest in the right-of-way based upon any language in the Plaintiffs' deeds.   *See* D.E. 70 (emphasis added).

The parties stipulated that all of the Subclass Two Plaintiffs have no metes and bounds clearly indicating a railroad right-of-way as the boundary of the parcel in the ownership deeds of the Plaintiffs.   *See* Joint Motion to Establish Subclasses, D.E. 74.[8]   Under Washington law, a deed granting land which is bounded by a railroad right-of-way will generally give the grantee title to centerline of the right-of-way **unless the grantor has expressly reserved the fee** to the right-of-way or the grantor's intention not to convey the fee is clear.   *See Roeder Co. v. Burlington Northern, Inc*, 716 P.2d 855, 861 (Wash. 1986) ("*Roeder II*").   There are no express reservations of the fee underlying the former railroad right-of-way in any of the Subclass Two Plaintiffs' ownership deeds.   Moreover, ownership deeds referencing "lots" benefit from the centerline presumption under Washington law.   *See Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283 (Wash. App. 1993); *Christian v. Purdy*, 808 P.2d 164, 166 (Wash. App.

---

[7]   All of the Subclass Two Plaintiffs have language in their ownership deeds that benefit from the centerline presumption under Washington law, as stipulated by the parties.   *See* D.E. 70 and Section IV *infra*.
[8]   Further, as the parties stipulated, this is possibly an issue for Subclass One and Subclass Three Plaintiffs and should not be addressed here.

1991).[9]  Plaintiffs have met their burden that the Plaintiffs in Subclass Two own the underlying fee to the centerline of the railroad right-of-way and the burden then shifts to the Defendant to provide evidence otherwise.[10]

Additionally, the Defendant attempts to absolve the government from liability by asserting it is not liable for trail use entered into by third parties.  That argument fails and has been rejected every time it has been made.  The Trails Act specifically authorizes trail use by third parties and the Defendant's argument is a desperate attempt to avoid liability.[11]

Finally, Defendant has also inappropriately and inaccurately attempted to address the methodology to determine damages based on their incorrect analysis of the abandonment issue. The measure of damages utilized must value "what" was taken—which was the Plaintiffs' reversionary interest—the right to their land unencumbered by any easement.  Based on binding precedent from the Federal Circuit and Washington law, the Defendant cannot avoid liability for a taking of Plaintiffs' reversionary interests—the right to their land unencumbered by any easement, period.[12]

---

[9]  After stipulating that no deeds in Subclass Two have metes and bounds descriptions referencing the right-of-way as a boundary, in an effort to defeat the centerline presumption they admit exists, the Defendant attempts to argue that all landowners "must come forward with evidence showing that they received that property from the fee owner."  Def.'s Br., D.E. 108, at p. 38.  That is totally wrong.  Then, the Defendant mistakenly cites one parcel (Claim No. 239) that allegedly contains a metes and bounds description in a plat map that does not identify the railroad right-of-way as a boundary.  *See* Plaintiffs' discussion in Section IV.B *infra*.

[10]  The Defendant also correctly identifies 11 parcels with an intervening street taken from Plaintiffs' Chart in Plaintiffs' Memorandum and, after stating that these parcels "more appropriately fit the definition of Subclass Six," the Defendant goes on to state that "these Plaintiffs must also show that they own the fee interest in the right-of-way." Def.'s Br., D.E. 108, at p. 15.  That is true, and Plaintiffs do just that in Section IV.C *infra*.

[11]  *See* discussion concerning authorization for trails use under the Trails Act in Section II.D *infra*.

[12]  *See* discussion concerning "what" Plaintiffs lost as a result of the taking and the appropriate standard and methodology to determine damages in Section V *infra*.

## II.   THE DEFENDANT COMPLETELY IGNORES AND FAILS TO ACKNOWLEDGE THAT TRAIL USE/RAILBANKING EXCEEDS THE SCOPE OF THE RAILROAD PURPOSES EASEMENTS

### A.   All the Original Railroad Deeds in this Case are Easements, as Stipulated by the Parties, and are Limited to Railroad Purposes

The Defendant concedes and stipulates that all of the original source conveyances applicable to the Subclass Two Plaintiffs conveyed an easement.  Under Washington law, the easements are limited to **railroad** purposes.  All of the easement deeds specifically state that they are "for the construction, operation and maintenance" of the railroad, are limited to the railroad's right-of-way "over, across and through the grantor's land" and that the railroad can utilize the right-of-way only "so long as the same shall be used for railroad purposes."  *See, e.g.*, Lake Washington Belt Line stipulated easement deed, Pls.' FOF Ex. 1, D.E. 89, at 19.  These deeds are clearly limited to railroad purposes <u>only</u> under a long and continuous line of cases from the Washington courts.  *See Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*, 126 P.3d 16, 25-26 (Wash. 2006); *Swan v. O'Leary*, 225 P.2d 199 (Wash. 1950); *Morsbach v. Thurston County*, 278 P. 686 (Wash. 1929); *Hanson Industries v. County of Spokane*, 58 P.3d 910, 915 (Wash. App. 2002).

Moreover, all of the condemnations, including the Delfel condemnation, are easements limited to railroad purposes.  Under Washington law, including the law applicable to the Delfel condemnation, the power of eminent domain limits the appropriated land to the purpose for which it was taken.  "Our conclusion is that the fee simple will not vest in the condemning corporation, in the absence of express statutory direction…property acquired by the right of eminent domain cannot, unless the absolute fee has passed, be devoted to any purpose other than that for which it was taken..."  *Neitzel v. Spokane International Ry. Co.*, 117 P. 864, 867-68 (Wash. 1911).

The Defendant's reliance on *Troha v. United States*, 692 F. Supp. 550, 560, 564 (W.D. Pa. 2010) or *Moody v. Allegheny Valley Land Trust*, 976 A.2d 484, 491-93 (Pa. 2009) to somehow say that the deeds in this case do not contain limitations in the grant is misleading, has nothing to do with Washington law, and is totally misplaced and without merit. *See* Def.'s Br., D.E. 108, at 29. *Moody* involved Pennsylvania deed construction and the grant to the railroad granted a right-of-way and did not contain additional language relating to the use or purpose to which the land was to be put or in other ways limit the estate conveyed. *Troha* is a total "outlier" as noted by Judge Horn in *Longnecker* (Judge Horn noted that *Troha* has no bearing on a Rails-to-Trails case involving Washington law regarding deed construction). *Longnecker*, 2012 WL 1606330, at *21. Therefore, neither *Moody* nor *Troha* have any application to any of the Subclass Two Plaintiffs.[13]

### B. Binding Precedent Dictates that Trail Use/Railbanking Exceeds the Scope of the Railroad Purposes Easements and, thus, Defendant is Liable for a Taking

Even though all of the deeds are easements limited to railroad purposes under Washington law, the Defendant disputes that the scope of the easement has been exceeded. Instead, Defendant has chosen to exhaustively brief, many times inaccurately, the irrelevant and misguided lack of abandonment under prong 3 of *Preseault II* and "potential future rail and trail" use.

If the scope of the easement does not include interim trail use/railbanking then a takings occurs under *Preseault II*. The law is actually well-settled. Under longstanding precedent from the Federal Circuit, the blocking of the adjacent landowners' reversionary interests that would otherwise result under state law constitutes a taking. *Preseault II*, 100 F.3d at 1552; *Caldwell*,

---

[13]  For a thorough discussion and total emaciation of *Moody*, see Judge Firestone's Opinion in *Macy Elevator*, 97 Fed. Cl. at 724-727. For a list of the 27 cases with a contrary result, *see* Plaintiffs' Memorandum, D.E. 89, at pages 10-11.

391 F.3d at 1229: *Toews*, 376 F.3d at 1376; *Barclay*, 443 F.3d at 1373; *see also Beres*, 2012 WL 1606254 (applying Washington law); *Longnecker*, 2012 WL 1606330 (applying Washington law).  The Defendant simply ignores and refuses to acknowledge that trail use exceeds the scope of a railroad purposes easement as dictated by the binding precedent of the Washington Supreme Court's holding in *Lawson*, 730 P.2d 1308.

An outrageous and egregious example of the Defendant's continuing attempts to mislead this Court is found in Defendant's brief, D.E. 108, page 30, footnote 8.  The Defendant states that "in *Beres*, Judge Horn discussed *Lawson*, but did not apply it when holding that trail use exceeds the scope of the easements at issue in that case."  In *Beres*, applying Washington law, on page 33, Judge Horn absolutely analyzed *Lawson* regarding the scope of an easement and whether it allows a different public use and did hold the Defendant liable for a taking.  *Beres*, 2012 WL 1606254, *33 (Fed. Cl. Apr. 5, 2012).

Moreover, in *Longnecker*, an opinion the Defendant was well aware of and that was issued in April of 2012, 7 months prior to Defendant's argument here, Judge Horn specifically stated this about *Lawson*:

> Regardless of the posture of the case before the State of Washington Supreme Court, the basic position of the State of Washington Supreme Court on the scope of railroad easements is clear, subject to application of the specific facts of each case.  The *Lawson* court enunciated important guidance for rails to trails cases involving Washington State property, guidance which was then adopted by the United States Court of Appeals for the Federal Circuit in *Preseault II*, as follows: "[d]efendants argue that under Washington law a railroad is a perpetual public easement.  They contend that a railroad right of way easement does not terminate upon a change from one transportation use to another transportation or recreation use, or any other consistent public use. We disagree."  *Id*. at 1311.
>
> Moreover, in *Lawson v. State*, the Washington case which comes closest to addressing the issue before this court, the State of Washington Supreme Court **rejected** the proposition that an easement granted for railroad purposes could be used for any public transportation purpose and indicated that under State of

> Washington law a recreational trail is outside the scope of a railroad purpose
> easement.  *See Lawson*, 730 P.2d at 1312.
>
> The *Lawson* reasoning is relevant to decisions in this court  because it was
> adopted by the United States Court of Appeals for the Federal Circuit in *Preseault
> II*, as a case "on all fours with the case before us," **therefore, is not only
> relevant, but binding on the decisions issued by this court, which must follow
> the Federal Circuit directives**.

*Longnecker*, 2012 WL 1606330, *18, *19, *17 (Fed. Cl. Apr. 30, 2012) (emphasis added)

(citation pages identified respectively).

*Lawson* controls.  The Federal Circuit was clear that *Lawson* "is an example of a case

practically on all fours with" *Preseault II*.  100 F.3d at 1543.  The bottom line is this—the

easements in this case were limited to railroad purposes and trail use/railbanking exceed the

scope of the railroad's easement.  Just as the Court held in *Longnecker* and *Beres*, binding

precedent dictates that the Defendant is liable for a taking and the Defendant's misapplication of

the law should once again be flatly rejected.

### C.  Pre-NITU Abandonment is Irrelevant as a Matter of Law

Abandonment of a railroad easement is irrelevant as a matter of law when a railroad's

easement is limited to railroad purposes and trail use/railbanking exceeds the scope of the

easement.  When the scope of the railroad purposes easement is exceeded, a taking occurs,

period.  A taking occurs under binding Federal Circuit precedent whether the railroad has

actually or formally abandoned the right-of-way before the NITU is issued or not.  As Judge

Wheeler recently held in a Trails Act takings case, underline abandonment is irrelevant if the scope of the

easement is exceeded by trail use/railbanking, stating:

> The Government's argument—that Plaintiffs must show that abandonment
> occurred before issuance of the NITU—runs contrary to the operation of the
> Trails Act.  One of the principal purposes of the Amendments to the Trails Act is
> to ensure that abandonment, when contemplated by a railroad, does not in fact
> occur.

*Anna F. Nordhus Family Trust v. United States*, 2012 WL 2989967, at *3-4 (Fed. Cl. July 20, 2012) (citing *Caldwell*, 391 F.3d at 1229); *see also Ellamae Phillips*, 99 Fed. Cl. at 487; *Longnecker*, 2012 WL 1606330 (Fed. Cl. Apr. 30, 2012); *Rogers*, 90 Fed. Cl. 418, 432; *Whispell*, Case No. 09-315, Order dated August 22, 2012, Exhibit A.

Yet, despite overwhelming binding precedent, Defendant continues to maintain that BNSF never intended to abandon its easement in the railroad right-of-way, but rather intended to preserve the corridor for future railroad use. This <u>exact</u> argument has been rejected time and time again and NOT once has this Court, the Federal Circuit or the United States Supreme Court ever accepted the Defendant's argument.[14]

Defendant completely fails to acknowledge that, under both *Preseault II* and *Ellamae Phillips*, if it is first determined that trail use/railbanking exceeds the scope of the original railroad purposes easement, abandonment is irrelevant and a takings occurs. Moreover, contrary to Defendant's misguided argument, the Washington Supreme Court has actually conclusively ruled that converting a railroad purposes easement to a trail <u>constitutes</u> abandonment of the easement under state law! *See Lawson*, 730 P.2d 1308. Railbanking, which is the potential reactivation of rail use, is NOT a railroad purpose and exceeds the scope of the original easement. Here, the railroad specifically and expressly agreed to transfer the easement for interim trail use.

Although contrary to established law, the Defendant continues to attempt to distinguish trail use from railbanking under the Trails Act. But, as the courts confirm, interim trail use and

---

[14] *See, e.g., Whispell*, Order dated August 22, 2012 (Exhibit A); *Howard v. United States*, 2012 WL 355451, at *21 (Fed. Cl. Aug. 16, 2012); *Anna Nordhus Family Trust v. United States*, 2012 WL 2989967, at *3 (Fed. Cl. July 20, 2012); *Ybanez v. United States*, 102 Fed. Cl. 82, 87 (Fed. Cl. 2011); *Rogers v. United States*, 101 Fed. Cl. 287, 293-94 (Fed. Cl. 2011); *Raulerson v. United States*, 99 Fed. Cl. 9, 11-12 (Fed. Cl. 2011) *Biery v. United States*, 99 Fed. Cl. 565, 579-80 (Fed. Cl. 2011); *Capreal v. United States*, 99 Fed. Cl. 133, 146 (Fed. Cl. 2011); *Macy Elevator v. United States*, 2012 WL 2368523, at *2 (Fed. Cl. June 21, 2012).

railbanking are one in the same, "go hand-in-hand under the Trails Act," and are part and parcel and not separate. *See, e.g., Farmers Cooperative v. United States*, 98 Fed. Cl. 797 (Fed. Cl. 2011). Meaning, if a railroad wants to reap the benefits of the Trails Act and decides to enter into a trail use agreement, it must also agree to railbanking—this is compulsory. By entering into an agreement for trail use/railbanking under the Trails Act, the railroad does not show "intent" to preserve the right-of-way for railroad purposes but, rather, indicates or carries out its previously expressed intent to discontinue railroad operations (if railroad operations are not already ceased), and relinquish all interest, liability, and responsibility in the right-of-way. That is exactly what happened in this case in August, 2008 with BNSF's request to abandon the line. *See* Petition for Exemption, Pls.' FOF Exhibit A-1.

In *Beres*, as here, the lack abandonment issues were fully briefed and Judge Horn chastised the Defendant for raising the arguments:

> [T]he defendant's first argument in its cross-motion for partial summary judgment states that "the operative question is not the scope of the easement, but rather whether the issuance of the NITU blocked abandonment under state law," and defendant's abandonment argument covers almost one-third of the total arguments in the defendant's opening brief. As previously indicated to the parties, however, the court will direct its attention to the third and final part of the rails to trails takings inquiry, abandonment, only if indicated by the results of the current scope of the easements inquiry. *See Whispell Foreign Cars, Inc. v. United States*, 100 Fed. Cl. 529, 541 (2011) (footnote omitted) ("Because the court has determined that recreational trail use is not within the scope of the easement, the court need not determine at this time whether the easement was abandoned under Florida law."); *see also Ybanez v. United States*, 102 Fed. Cl. 82, 87 (2011) ("Where the scope of a new easement exceeds the original grant, a determination of whether abandonment occurs is unnecessary.") (citing *Preseault II*, 100 F.3d at 1533 and *Toews v. United States*, 376 F.3d at 1381). Similarly, when interpreting the 1875 Act, a Judge of the Court of Federal Claims noted: "Defendant raises several arguments concerning abandonment. Since we have determined that trail use exceeds the scope of the easement, we have no need to address the contingent issue of abandonment." *Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 487 (2011).

*Beres*, 2012 WL 1606254, *13 (Fed. Cl. Apr. 5, 2012) (emphasis added).  Judge Horn held that railbanking is not a railroad purpose and the issue of abandonment was irrelevant to the Defendant's liability for a taking because the scope of the easement was exceeded by trail use/railbanking.[15]

The Defendant cites to *Neitzel v. Spokane International Ry. Co.*, 141 P. 186 (Wash. 1914) as support for its "lack of abandonment" argument.  Def.'s Br., D.E. 108, p. 33.  However, *Neitzel* provides no support whatsoever for the Defendant's conclusion.  *Neitzel* involved a case where the railroad was still actively operating trains over the right-of-way and <u>leased</u> lots in exchange for the lessee company's agreement to construct a two-story building and route all its business over the railway company's road—and the railroad company anticipated that it would in the "near future" need and expect to devote the grounds for terminal use and use the new buildings as more superior freight houses.  Not only was the railroad still active and running trains over the land next to the lots, the court held that the use was concurrent with and did not exclude the railroad's occupation, and was consistent with railroad purposes.  *Neitzel*, 141 P. 186.  *Neitzel* provides absolutely no support for the Defendant's argument that railbanking is a railroad purpose.

The Defendant also provides two unsworn and inadmissible declarations attempting to show that BNSF did not intend to abandon the right-of-way when it railbanked the right-of-way.[16]  For instance, Ms. Odom, a BNSF employee since 2007, makes the following statement:

> "although BNSF initiated what are termed abandonment proceedings pursuant to these regulations, it at no time intended to abandon any easement to use the corridor for railroad purposes under Washington law … This is plain from the

---

[15] Despite the binding law, the Defendant, in basically its entire brief, attempts to persuade this Court that railbanking is evidence of the lack of intent to abandon the line.

[16] Plaintiffs have moved to strike the declarations of Craig R. Watson and Susan Odom on a variety of grounds just as Judge Williams did in *Rogers v. United States*, 101 Fed. Cl. 287, 292 (Fed. Cl. 2011) and Judge Hewitt did in *Whispell*, attached as Exhibit A.

facts that BNSF agreed not to remove any track or track related structures, and did not remove any."  (Odom Decl., ¶ 18).

This statement lacks foundation, runs contrary to documents filed by BNSF documenting its intent to transfer the easement for trail use, misstates the agreements and reasoning for leaving the track (which was because the Port was undecided regarding potential uses of the corridor), is inadmissible speculation, and borders on the nonsensical.  This is like selling your house but saying you did not "intend" to sell it.  By documents recorded in the King County Recorder's Office and filed with the STB, BNSF did in fact rid itself of, and disclaimed any interest in, the former railroad right-of-way easement.  (Odom Decl., ¶21).

Further, Ms. Odom made the statement that:

> "King County also agreed to have the NITUs vacated to the extent necessary to allow BNSF to reactivate rail service."  (Odom Decl. ¶ 21).

This statement is ridiculous when offered to somehow support BNSF's lack of intent to abandon.  That is a requirement under the Trails Act to "railbank" the line and provides no "intent to pursue" the line whatsoever.

Mr. Watson also wandered into the realm of the bizarre and stated that:

> "the Port of Seattle mainly acquired the entire Corridor to preserve it in the long term for future freight service, consistent with its mission …  Any other use of the corridor is subject to the right to reactivate freight rail service."  (Watson Decl., ¶ 6).

That statement is laughable, self serving, irrelevant here, and is exactly what "railbanking" is as required under the Trails Act.

Mr. Watson goes further and states that the Interlocal Agreement makes:

> "it clear that the Corridor would be used for multiple purposes, including both trail and rail use."  (Watson Decl., ¶13).

14

That is flatly false.  In the agreement, trail use is <u>expressly</u> stated as the intention for the corridor use, but there is not one mention of rail service, period.  Mr. Watson's statement regarding the Interlocal Agreement between Port of Seattle and King County has nothing to do at all with BNSF's "intent" to abandon its easement.  Moreover, the Interlocal Agreement indeed mentions no removal of tracks during the "planning period" while the "Regional Process" considers the appropriate uses of the Property (again, no mention of rail or light rail use).  (Watson Decl., Exhibit E, p. 2).  Mr. Watson's statement that the Port of Seattle made clear that the track and fixtures should not be removed provides nothing at all.  (Watson Decl., ¶ 9).  Salvage of railroad track is routinely left to the trail user as a valuable monetary asset.

Again, *Lawson* controls.  The Federal Circuit was clear that *Lawson* "is an example of a case practically on all fours with" *Preseault II*.  100 F.3d at 1543.  There are and never have been any plans to reactivate this railroad corridor even prior to the issuance of the NITU (the line has not had any train traffic since at least 2006).  The petition for exemption to abandon the corridor and request for and the issuance of the NITU was to convert the corridor to interim trail use.  BNSF specifically stated that there had "been no recent demand for rail service on the line and to the best of BNSF's knowledge **there is no prospect that rail service will be required in the foreseeable future**."  BNSF conclusively shut the door on any hypothetical need for future rail service when it specifically told the STB that the STB "**should reject any speculation about future traffic as a basis for denying the proposed abandonment**" and that "**mere speculation about future traffic is not a sound basis upon which to deny an abandonment**."  *See* Petitions for Exemption, August 5, 2008 and August 8, 2008, PFOF Exhibits A.1 and A.3.

Even the documents attached to the unsworn declarations (that are inadmissible and irrelevant) expressly document the fact that the corridor was being transferred and proposed to be

used for a hiking and biking trail.  *See* Odom Decl., Exhibit D, E, F, and Watson Decl., Exhibits

C, D, E attached to Defendant's Cross Motion for Summary Judgment (D.E. 108.)   A use

inconsistent with railroad purposes constitutes abandonment of the easement under Washington

Law.  *See Lawson*, 730 P.2d 1308.  As stated by the Federal Circuit, "possible resumption of

railroad operations at some undefined time in the future [is] of course self-serving and not

indicative of the facts and circumstances" at the time of the taking, and does not defeat

abandonment.  *See Preseault II*, 100 F.3d at 1548.

This Court has always rejected the argument that railbanking preserves the railroad

purposes easement:   "There is no question that this potentiality, insofar as these particular

easements are concerned, exists purely in the realm of the hypothetical.   No evidence was

offered of a present intent to reinstate rail service in the future. Cases discussed in connection

with abandonment seem to make it clear that such contingent possibilities do not forestall

abandonment."  *Glosemeyer v. United States*, 45 Fed. Cl. 771, 780 (Fed. Cl. 2000) (holding "[i]n

sum, neither component of railbanking the preservation of the rail line for future use nor the

'interim' use of the easement as a recreation trail-constitutes a railroad purpose under Missouri

law").

Courts have <u>always</u> declined to find that railbanking is a railroad purpose or even a

relevant consideration for analysis of a claim for a Trails Act taking. *See, e.g.*, *Preseault II*, 100

F.3d at 1554 (Rader, J., concurring) (rejecting the railbanking argument as a "vague notion,"

incapable of overriding the present use of the property as a recreational trail); *Capreal, Inc. v.*

*United States*, 99 Fed. Cl. 133, 146 (Fed. Cl. 2011) (interpreting Massachusetts law, where the

court stated "that railbanking is too hypothetical and unlikely to serve as a railroad purpose");

*Anna Nordhus Family Trust v. United States*, 98 Fed. Cl. 331, 339 (Fed. Cl. 2011) (interpreting

Kansas law where the court stated "[i]n the present case, there is no evidence of any plan to reactivate the rail service but simply a speculative assertion by Defendant that some resumed rail service could occur in the future); *Macy Elevator*, 97 Fed. Cl. 708, 730 (Fed. Cl. 2011) (interpreting Indiana law and relying on *Preseault II* to deem railbanking "irrelevant to the question of whether a taking has occurred"); *Rogers v. United States*, 90 Fed. Cl. 418, 432 (Fed. Cl. 2009) (interpreting Florida law and indicating, "[h]ere, as in *Preseault II*, the use of the right-of-way as a public trail while preserving the right-of-way for future railroad activity was not something contemplated by the original parties to the Honore conveyance back in 1910"). Defendant's relentless argument that railbanking provides evidence of BNSF's intent to preserve a railroad right-of-way instead of abandonment while allowing the right-of-way to be used for interim trail use fails as a matter of law.

### D.  Defendant's Bad Faith Argument and Misstatements Regarding the Lack of Liability for Decisions Made by Third Parties

The Defendant's arguments are inconsistent (and all legally wrong by the way).  The Defendant first attempts to rely on the actions of third parties for its argument that it is not liable for a taking because the Port (trail user) intends to use the corridor for light rail in the future (which is inaccurate and speculative).  The Defendant then argues that it is not liable for trail use because the Port intends to use the corridor as an interim trail?  What?  The Defendant intentionally distorts and completely misstates the law arguing that "Because the STB does not authorize or require interim trail use on the corridor, the United States should not be held liable for imposing any trail use easement, even if the scope of the easement is exceeded."  Def.'s Br., D.E. 108, at 36.

This exact same argument has been flatly rejected every time the argument has been made.  *See Jenkins*, 102 Fed. Cl. at 616-18; *Adkins v. United States*, Case No. 09-503, Order

17

dated July 20, 2012, p. 23 (attached as Exhibit B); *Thomas v. United States*, Case No. 10-054,

Order dated August 29, 2012, p. 34-35 (attached as Exhibit I).   In *Rhutasel v. United States*,

Judge Smith flatly rejected the Defendant's argument stating:

> Lastly, the Government argues that that neither the Trails Act nor the NITU issued, authorized any specific interim use, including trail use.   Simply, the Government argues that Plaintiffs cannot present evidence that the Government was involved in creating the public trail because there was no coordination between the STB and either Union Pacific or the trail council.   The Government's argument is like that of an individual accused of shooting a person. "I only fired the gun. The bullet could have gone anywhere. I'm only guilty of firing the gun, not shooting anyone!"

*Rhutasel v. United States*, 2012 WL 2373253, at \*9 (Fed. Cl. June 22, 2012) (emphasis added).

Defendant not only totally ignores the Supreme Court's holding as to WHAT interest is

taken from a landowner in a Trails Act taking, the Defendant also now tries to resurrect some old

losing argument that because the federal government didn't implement the trail, a third party did,

it cannot be held liable.   Incredibly, the Defendant asserts that the STB does not authorize or

require interim trail use on the corridor and that subsequent actions by third parties do not give

rise to a taking.   Defendant cites *Navajo Nation v. United States*, 631 F.3d 1268 (Fed. Cir. 2011)

as purported support.   Unbelievable.   The Federal Circuit in *Navajo Nation* held that the

plaintiffs' claim did not accrue upon the actions of a third party, but rather, its claims accrued

upon the governmental action, citing *Caldwell* and its holding that a takings claim accrues on the

issuance of the NITU!!

Trail use and railbanking are absolutely linked by the legislative history and actual

wording of the Trails Act, the Supreme Court's opinion in *Preseault I*, and the subsequent

opinions by the Federal Circuit in *Preseault II* and *Toews*.   *See*, H.R. Rep. No. 98-28, at 8-9

(1983); *Farmers Cooperative*, 98 Fed. Cl. 797; *Jenkins*, 102 Fed. Cl. at 614-615.   Thus, the

Defendant is liable because the Trails Act <u>authorizes</u> trail use/railbanking by public or private entities.  *Id.*

Judge Firestone in *Jenkins*, correctly held that "The government's taking liability for blocking plaintiffs' right to unencumbered property extends to all of the actions authorized by the government in the NITU."  *Jenkins*, 102 Fed. Cl. at 617.  The court based the decision on the language and history of the Trails Act, the Federal Circuit's decisions in *Preseault II* and *Toews,* and the actual language of the NITU:

> <u>Yet, the government's narrow interpretation of the Trails Act divorces the language of the Act from its history, purpose, and regulatory scheme</u>.  The Trails Act scheme does not, as the government contends, authorize only that the railway right-of-way will not be deemed abandoned for railroad purposes if the corridor is railbanked.  <u>The preemption of abandonment, which gives rise to the taking, is expressly conditioned on a trail operator reaching an agreement with the railroad for trail use, as well as the trail operator's consent to railbanking</u>.  *See* 49 C.F.R. § 1152.29(d)(1).  The Trails Act regulations clearly mandate this link between interim trail use and railbanking.  If a trail use agreement cannot be reached, railbanking is not separately permitted.  Rather, without a trail use agreement, the railroad will be allowed to abandon the line, and the federal government will lose its jurisdiction over the right-of-way. *Id.*
>
> The fact that the Trails Act authorizes the federal government to preempt state abandonment laws during negotiations for an interim trail use agreement does not alter the extent of the government's liability in the event a trail use agreement is eventually reached.  In the instance where no agreement is reached, the scope of the government's liability is limited to the period of the negotiation.  <u>In those cases where an agreement is reached, the government's liability for a taking includes the foreseeable consequences of the agreement between the railroad and trail operator to railbank the corridor and operate a trail</u>.  This regulatory scheme is consistent with the language and legislative history behind the Trails Act, from its inception as an act to promote the nation's recreational trails to its present dual purpose in preserving rail corridors for future rail use and encouraging recreational trail development.  *See Preseault I,* 494 U.S. 1, 10, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990).  This intention is affirmed by the Federal Circuit's interpretation of the Trails Act in the context of Fifth Amendment takings actions, to which the court now turns.

*Jenkins*, 102 Fed. Cl. at 615 (emphasis added).

Here, just like in *Jenkins*, the Defendant boldly asserts to this Court that the Defendant is not liable for imposing any trail use easement on the corridor.  Again, the Defendant continues to attempt to distinguish trail use from railbanking, but they are one in the same and "go hand-in-hand under the Trails Act."  *See*, *e.g.*, *Farmers Cooperative,* 2011 WL 2508242 at *7; *Jenkins*, 102 Fed. Cl. at 616-18.

If there is a taking, the Defendant is liable upon issuance of the NITU because interim trail use is AUTHORIZED by the TRAILS ACT STATUTE—specifically authorizing interim trail use by a governmental entity, or private entity.  As the Defendant correctly notes, events arising after issuance of the NITU, including conversion of a rail corridor to a recreational trail, cannot be elements of a taking claim under the Trails Act, but this is actually because under the law, it is the mere **<u>authorization</u>** for such use by issuance of the NITU that amounts to the taking if the prongs of *Preseault II* are met (railroad holds an easement and trail use/railbanking exceed the scope of the easement or the easement was abandoned prior to issuance of the NITU).  *See Preseault II*, 100 F.3d at 1525.

Furthermore, the Trails Act specifically encourages and authorizes a qualified private group to enter into a trail use/railbanking agreement to preserve the railroad corridors and, therefore, prevent the landowners' reversionary interests from vesting.  The Trails Act actually authorizes a public or private entity to negotiate and enter into a trail use/railbanking agreement in each and every paragraph mentioning a state or local governmental agency as a trail user.  *See* 16 U.S.C. § 1247 (a)-(d), attached hereto as Exhibit C.

The Defendant's reference to the Policy Statement on Rails to Trails Conversions is equally disingenuous, intentionally leaving out the complete policy statement made by the STB.  The Policy Statement specifically states:

> Section 1247(d) permits preservation of rights-of-way that would otherwise be abandoned.  If a local government or private organization agrees to maintain the right-of-way for possible future railroad use (and to assume all liability in connection with the trial use and responsibility for the corridor, including paying taxes), it may use the right-of-way on an interim basis as a trail. Section 1247(d) expressly provides that "such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." Thus the Trails Act retains the property as a possible future rail line—this is described as "rail banking"—while **allowing it to be used in the interim as a recreational trail**.

*See* S.T.B. Policy Statement on Rails to Trails Conversions, 1990 WL 287255 at *2, attached as Exhibit D (emphasis added).  As dictated by the Supreme Court, Congress' enactment of the Trails Act is constitutional and the government can take land, but the taking constitutionally requires the payment of just compensation to the landowners under the Fifth Amendment.

Specifically, in this case, the FEDERAL Governmental Agency, the STB, issued the NITU under the Trails Act and blocked the vesting of the Plaintiffs' reversionary interest to use their land unencumbered by any easement and authorized the BNSF and the Port of Seattle to negotiate and enter into a trail use/railbanking agreement.  When the agreement was then reached, the line was permanently railbanked and trail use was authorized to be "**implemented**." *See* NITU attached as Exhibit E (emphasis added).  The Defendant's attempted argument to somehow absolve the government of liability for not authorizing trail use is meritless and lacks candor to the Court.

## III.    THE SOUND TRANSIT EAST LINK LIGHT RAIL PROJECT HAS NO IMPACT ON THE FEDERAL GOVERNMENT'S TAKINGS LIABILITY

Defendant attempts to defeat liability for a Trails Act taking because BNSF did not have the "intent" to abandon the corridor.  That argument fails as a matter of law.  *See* discussion in Section II *supra*.  Defendant then attempts to expand the "lack of abandonment" position by stating that the potential use for light rail in the future is a railroad purpose such that light rail is

not beyond the original scope of the easements which were limited to railroad purposes. Defendant's argument that liability does not attach for the entire 25.45 miles of the corridor where trail use was authorized and exceeds the scope of the original railroad purposes easements fails as a matter of law because railbanking is **<u>NOT</u>** a railroad purpose and BNSF did not transfer the line for light rail use. Defendant's argument that liability is defeated for the 1.1 mile portion of the corridor where Sound Transit is going to <u>potentially</u> utilize the corridor for light rail in 2023 also fails. The bottom line is that BNSF transferred the right-of-way to be used expressly for trail use, period.

Since the issuance of the NITU, specifically, within the last year, there has been a considerable amount of discussion in Seattle about developing a potential light rail system called the East Link Project. The developer for the East Link Project is Sound Transit and, as presently contemplated, the East Link Project would conceptually utilize a 1.1 mile portion of the 25.45 mile right-of-way that was previously utilized by the BNSF. The 1.1 mile portion of the former railroad purposes easement potentially impacted by the East Link Project exists on Map 39 of the Axxion maps and potentially impacts 10 of the 134 parcels in Subclass Two.[17] However, it should be noted from the outset that speculative light rail use is not a railroad purpose and has no effect on the Defendant's liability for a taking because BNSF transferred the easement for interim trail use, a use that exceeded the scope of the easement and the taking accrued and occurred in 2008. *See* Exhibit C to Def.'s Br., D.E. 108, noting "preferred alternative routes."

The Defendant now argues that even though the railroad originally received an easement for railroad purposes, they are not liable for a taking with respect to these 10 parcels because the potential light rail project impacting a 1.1 mile stretch of the former railroad purposes easement

---

[17] The 10 parcels are all traced to the Zwiefelhofer original source deed to the railroad as identified in Plaintiffs' chart on page 16 of Plaintiffs' Memorandum in Support of the Subclass Two Plaintiffs' Motion for Partial Summary Judgment on Liability (D.E. 89). The 10 parcels are 24.A, 24.B, 85, 94, 176.A, 176.B, 261, 339, 397, and 412.

amounts to a continuation of the original railroad purposes easement.  The Defendant somehow ignores the fact that the railroad, BNSF, relinquished all right, title and interest in the corridor and transferred it to Port of Seattle for "trail use" in 2008—so the easement was at that time extinguished.  Defendant's position is contrary to longstanding binding precedent from the Federal Circuit.  The Federal Circuit has repeatedly determined that a taking occurs when the NITU is issued, that the NITU is the only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way, and that the adjacent landowners have lost their rights to unencumbered and unfettered use of their land.

## A. The Federal Circuit's Authority is Clear and Well-Settled—the Land Interest "Taken" is Plaintiffs' Reversionary Right

The Defendant wants to ignore that it is the federal government's **<u>authorization</u>** of the inconsistent use that causes a taking.  Quite simply, the railroad purposes easements **<u>would have been extinguished</u>** and Plaintiffs thereby would have unencumbered land but for the federal NITU.  It is elementary law that if the federal government (here, the STB) uses or authorizes an existing railroad easement for purposes and in a manner not allowed by the terms of the original grant of the easement, the government has taken the landowners' property for the new use.  This rule of law flows directly from the United States Supreme Court, which recognizes that the relevant takings analysis in any rails-to-trails case is to determine "what interest Petitioners **<u>would have</u>** enjoyed under [state] law, in the absence of the ICC's recent actions [i.e., the issuance of the NITU]." *Preseault I,* 494 U.S. at 21.

After reviewing the Supreme Court's opinion in *Preseault I*, the Federal Circuit acknowledged the importance of application of state law as to the scope of easements and the impact of exceeding the scope. *Preseault II*, 100 F.3d at 1533.  As Judges Rader and Lourie so

ably and aptly noted in their concurrence in *Preseault II,* the speculative possibility of railbanking in the future does not override the present use of the easement inconsistent with the railroad purposes easement originally granted:

> The vague notion that the State may at some time in the future return the property to the use for which it was originally granted, does not override its present use of that property <u>inconsistent with the easement</u>.   That conversion demands compensation.   Moreover, the United States facilitated that conversion with its laws and regulatory approval.

*Preseault II*, 100 F.3d at 1554 (emphasis added).

The Federal Circuit has repeatedly applied the standards developed in *Preseault II.*   In *Caldwell*, the Court held that the date a takings claim accrues is upon issuance of the NITU.   The Court specifically stated that "Section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment—property laws that '***would result in extinguishment of easements for railroad purposes*** and reversion of rights-of-way to abutting landowners.'"   391 F.3d at 1229 (emphasis added).   The Federal Circuit further noted that:

> The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when <u>state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting</u>. The question, then, is in the context of an exemption proceeding, when are state law reversion interests forestalled by operation of Section 8(d) of the Trails Act?

*Id.* at 1233 (emphasis added) (citations omitted).

The Federal Circuit reaffirmed its 2004 holding in *Caldwell* in 2006 in *Barclay*.   In *Barclay*, the Federal Circuit relied on its holding in *Caldwell* and reiterated that a Trails Act taking "occurs when state law <u>reversionary</u> property interests that would otherwise vest in the adjacent landowners are <u>blocked</u> from so vesting."   443 F.3d at 1373 (emphasis added).   The facts in *Barclay* involved a trail where the railroad had not abandoned the line and was, in fact, still using the right-of-way.   The Federal Circuit concluded that "state law reversion was still

delayed by the issuance of the NITU, and the claims still accrued with the issuance of the NITU."  443 F.3d at 1374.

The Federal Circuit reviewed and reaffirmed its decision in *Caldwell* and its decision in *Barclay* in *Ladd* in 2010.   The Federal Circuit confirmed that "it is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action <u>destroys</u> state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement."  630 F.3d at 1019.   That is exactly what occurred in this case.   Further, the landowners in *Ladd* argued that the Federal Circuit had created a bright-line rule in *Caldwell* and *Barclay* that a taking occurs when the STB issues a NITU and the Federal Circuit specifically and bluntly rejected the government's arguments in opposition:

> Whether we agree with the *Caldwell* bright-line rule, it is settled law.   A **taking** occurs when state law reversionary property interests are blocked.   *Caldwell*, 391 F.3d at 1233-34; *Barclay*, 443 F.3d at 1374 ("The barrier to reversion is the NITU, not physical ouster from possession.")  <u>The NITU is the government action that prevents the landowners from possession of their property unencumbered by the easement</u>.   We are bound by our prior decisions that when the NITU is issued the claim has accrued and the statute of limitations period commences.   "Having determined that the appellants' takings claim accrued on the date when the NITU was issued, we must now determine if the six year statute of limitations bars *Caldwell's* claim in this case."  *Caldwell*, 391 F.3d at 1235.   "The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action' accrual is not delayed until a trail use agreement is executed or the trail operator takes physical possession of the right-of-way."  *Barclay*, 443 F.3d at 1373.

630 F.3d at 1023-1024 (emphasis added).

Whether the Trails Act "effectively eliminates" the fee owners' reversionary interest in the land as stated in *Caldwell*, perpetually "precludes" the fee owners' reversionary interest in land as set forth in *Barclay*, or "destroys" the fee owners' reversionary interest in land as stated in *Preseault II*, the taking occurs upon the destruction of the fee owners' reversionary interest

when the STB issues a NITU which invokes § 1247(d) of the Trails Act.  The landowners' rights

to unencumbered use of their property, held in fee simple, has thus effectively been destroyed

when the Trails Act acts to eliminate the fee owners' reversionary interest in land by issuing a

NITU that <u>authorizes</u> <u>recreational</u> <u>trail</u> <u>use</u>.  *Preseault I*, 494 U.S. at 22; *Preseault II*, 100 F.3d at

1533; *Caldwell*, 391 F.3d at 1229; *Barclay*, 443 F.3d at 1374; *Ladd*, 630 F.3d at 1023-1024.

The Fifth Amendment provides that private property shall not be taken for public use

without just compensation and just compensation means the full monetary equivalent of the

property taken.  *United States v. Reynolds*, 397 U.S. 14, 16 (1970).  The owner is to be put in the

same position monetarily as he would have occupied if his property had not been taken.  *Id.*  As

Justice Holmes noted long ago when determining what interest is taken in takings cases, the

question is "what has the owner lost, not what has the taker gained."  *Boston Chamber of*

*Commerce v. City of Boston*, 217 U.S. 189 (1910).  Here, all of the landowners in Subclass Two

lost their "reversionary interest"—the right to the use and enjoyment of their land without any

easement—and they lost that reversionary interest when the NITU was issued.

### B. Under Binding Washington Precedent, Authorization for Trail Use Exceeds the Scope of an Easement Limited to Railroad Purposes, a Taking Occurred when the NITU was Issued, and the Possibility of Light Rail has Absolutely No Impact on 24.35 Miles of the Corridor

The Supreme Court of Washington has already ruled on the scope of the easement issue.

*See Lawson*, 730 P.2d 1308.  *Lawson* specifically ruled that trail use exceeds a railroad purposes

easement under Washington law.  The Defendant first attempts to defeat liability in general

because there was no intent to abandon because light rail was a possibility in the future.  The

potential for light rail or any reactivation of the railroad has no bearing on the issue of whether a

taking of the Subclass Two Plaintiffs' "reversionary rights" occurred after the NITU date

26

because trail use exceeds the scope of the easement under Washington law and the potential for light rail over 24.35 miles of the corridor does not even exist.[18]

In *Preseault II*, the Federal Circuit found that the terms of the easements at issue did not contemplate the use of land as public trails.  The Federal Circuit explained:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century specifically for transportation of goods and persons via railroad, <u>could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained?  We think not.  Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different.  In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation.  In the other, the easement belongs to the public,</u> and is open for use for recreational purposes, which happens to involve people engaged in the exercise or recreation on foot or on bicycles.  It is difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

*Preseault II*, 100 F.3d at 1542-43 (emphasis added).

The government argued in *Preseault II* that both recreational trail use and "railbanking" were railroad purposes within the scope of the easement.  The Federal Circuit rejected the argument and specifically held that they could find no support for the proposition "that the scope of an easement limited to railroad purposes should be read to include public recreational hiking and biking trails."  100 F.3d at 1530.  The concurring opinion by Judge Rader went even further:

> Realistically, nature trails are for recreation, not transportation.  Thus, when the state sought to convert the easement into a recreational trail, it exceeded the scope of the original easement and caused a reversion … [T]he State's transparent attempt to retain property condemned for a narrow transportation use crumbled when it converted that property to a recreational use … [T]he United States and Vermont have converted a right to use the landowners' land for a railroad into a right to hold the land in perpetuity.  <u>The vague notion that the State may at some time in the future return the property to the use for which it was originally</u>

---

[18]  Although it is still speculation, the Sound Transit Project involves 1.1 miles of the 25.45 mile corridor such that Defendant's argument does not apply at all to 24.35 miles of the corridor.  See discussion concerning the 1.1 mile portion of the corridor potentially to be utilized for light rail in Section III.C *infra*.

> granted, does not override its present use of that property inconsistent with the easement.  That conversion demands compensation.

100 F.3d at 1554 (emphasis added).

Moreover, in *Preseault II*, the Federal Circuit specifically analyzed and affirmed in the context of Rails-to-Trails, the holding and reasoning of the Supreme Court of Washington as set forth in *Lawson*.  *Preseault II*, 100 F.3d 1525, 1543, 1550.  The *Lawson* opinion should be totally dispositive that trail use/railbanking exceeds the scope of the original conveyances for all of the Subclass Two landowners except for the fact that Defendant has now introduced the potential implications of light rail.  But, despite Defendant's attempt to convert a "railbanking" argument into a "lack of abandonment" argument, the Federal Circuit has already rejected Defendant's position in *Toews*.

The abandoned railroad corridor in *Toews* was in Clovis, California.  The railroad wanted to abandon the corridor and a NITU was issued.  The City of Clovis, along with the City of Fresno and the County of Fresno, agreed that the corridor would be developed as a pedestrian and bike trail in the short term but that the long term plan was designed to accommodate "local rail, light rail, or other transit modes."  *Toews*, 376 F.3d at 1374.  The Federal Circuit analyzed the prospect of light rail and specifically rejected any potential impact on the federal government's takings liability:

> We have concluded that the trial court correctly found the scope of the easement not to encompass the new use as a recreational trail.  As a result of the imposition of the recreational trail and linear park, the easement for railroad purposes was converted into a new and different easement.  The references in the ICC's and the City of Clovis's various documents to railbanking and the possibility that one day the railroad easements might be used for a light rail system do not change the analysis.  There is a reality test in takings law.  It is clear from the record that for the foreseeable future these lands will be used for the recreational trail project. Whether there ever will be a light rail system or other railroad service over these paved routes in Clovis is a matter of speculation about the distant future, based on uncertain economic and social change, and a change in government policy by

<u>managers not yet known or perhaps even born.  Such speculation does not provide</u>
<u>a basis for denying protection to existing property rights under the Constitution</u>.

*Toews*, 376 F.3d at 1381 (emphasis added).

The situation in *Toews*, addressed by the Federal Circuit, is the exact same situation present in this case for 24.35 miles of the corridor.  The NITU in this case was issued in 2008 and now, 4 years later, King County is purportedly going to utilize a 1.1 mile portion of the trail for a light rail project <u>that is supposed to be completed in 2023</u>.  As the Federal Circuit stated in *Toews*, "there is a reality test in takings law" and it is only a "possibility that one day the railroad easements might be used for a light rails system."  In fact, King County has no plans whatsoever to utilize 24.35 miles of the corridor for a light rail system.  As the Federal Circuit stated in *Toews*, "such speculation does not provide a basis for denying protection to existing property rights under the Constitution" for all of the landowners in Subclass Two.  They are entitled to just compensation for their land.

> **C.  The Potential for Light Rail Over a 1.1 Mile Portion of the Abandoned Corridor at Some Time in the Indefinite Future is Railbanking all Over Again and the 10 Parcels of Land in Subclass Two on that 1.1 Mile Portion of the Corridor are Entitled to Just Compensation Too**

The speculation of possible light rail use by Sound Transit over a 1.1 mile section of the 25.45 mile corridor does not change the analysis of whether trail use exceeds the scope of the railroad purposes easements.  In this case, just like all the cases that have said railbanking is not a railroad purpose, possible use of the abandoned corridor by Sound Transit is still speculative in nature.  Possible use by Sound Transit is not the reactivation of the railroad pursuant to the original railroad purposes easement and, in fact, neither BNSF or the STB have anything to do with it.  Moreover, there is no plan to reactivate rail use that would be subject to federal jurisdiction under the railbanking provision of the Trails Act.  <u>The railbanking provision</u>

envisions potential reactivation of interstate railroad uses, subject to federal jurisdiction, not local uses for public transportation that are not subject to federal jurisdiction.

The potential use of a 1.1 mile portion of the abandoned corridor by Sound Transit is an attempt, at least 15 years after the NITU has been issued, to change a private commercial railroad purposes easement for railroad freight (coal) to a public light rail easement for public transportation outside the jurisdiction of the STB.  The railbanking provision in the Trails Act still exists today, 4 years after the NITU, and will exist 15 years into the future and, in fact, the public light rail easement will still be subject to the railbanking provision of the Trails Act.  It simply does not matter that Sound Transit may possibly utilize a small portion of the abandoned rail corridor for light rail at some point in time in the speculative future ─ a taking occurred when the NITU was issued, the abutting landowners have lost their "reversionary" rights to the use of their land, and they are entitled to "just compensation."

These fundamental principles of railbanking were discussed and analyzed by Judge Firestone within the last week.  *Thomas v. United States*, Case Nos. 10-54L and 10-459L, Opinion and Order on August 29, 2012, D.E. 102, attached hereto as Exhibit I.  In a similar rails-to-trails case in Tennessee, the CSX railroad abandoned a corridor and specifically attempted to retain certain rights, including the right to institute light rail or commuter service on the right-of-way, when the right-of-way was transferred to the trail operator.  Judge Firestone correctly concluded that a takings occurred when the NITU was issued because trail use is still beyond the scope of the railroad purposes easements even though light rail service could be implemented at some later time by the railroad:

> Here, CSXT sought to abandon the corridor, and under the Trails Act transferred its interest in the rail corridor to a third-party trail operator. While the corridor was also railbanked, and CSXT retained some rights to reinstitute commuter rail service, these actions, while perhaps made in the

interest of CSXT, do not amount to the "maintenance" necessary for the continued operation of CSXT's rail service under Tennessee law. <u>Rather, CSXT's transfer of the corridor affirmatively precludes railroad operations along the corridor without permission of the non-railroad third party trail operator should these operations interfere with trail use, or until the STB, under the Trails Act, decides to reactivate rail service, abandon the property, or otherwise exercise its jurisdiction over the corridor.</u>  Def.'s FOF, Ex. E.  The court therefore concludes that, under Tennessee law, the railbanking here exceeds the scope of the railroad purpose easements obtained through condemnation, prescription, and voluntary conveyance…

*Thomas*, Opinion and Order of August 29, 2012, D.E. 102, at 38-39, attached hereto as Exhibit I (emphasis added).  This is precisely correct.  As Judge Firestone pointed out, the right-of-way is still railbanked, the transfer of the corridor precludes railroad operations along the corridor, and the right-of-way is still going to be railbanked until the STB, under the Trails Act, decides to reactivate federally regulated rail service.  Thus, even in a situation where the railroad who abandons the easement is possibly going to pursue light rail or commuter rail service in the future, a situation even closer than when a third party public entity might do it 15 years later, railbanking exceeds the scope of a railroad purposes easement.

Railbanking has always been rejected by every Court considering the topic because a taking has already occurred when the NITU was issued and railbanking is not a railroad purpose.  The Federal Circuit explained in *Preseault II* that such a consideration is irrelevant to the question of whether a taking has occurred: "The fact that restoration of [a] portion of the line would be technically feasible tells us little.  The question is not what is technically possible to do in the future, but what was done in the past."  *Preseault II*, 100 F.3d at 1547.  The taking arises because recreational trail use does not fall within the scope of the original railroad easement and the possibility that light rail occurs on a 1.1 mile segment of the corridor, whether in 2023 or ever, is still speculation and does not change the fact that a taking occurred when the NITU was issued.  *Macy Elevator*, 97 Fed. Cl. at 730.  As a result, the issue presented with respect to the

1.1 mile segment of the corridor is, in actuality, no different than the speculation addressed and rejected by the Federal Circuit in *Toews*.

There is a fundamental difference between the private commercial easements originally granted for the transportation of coal and a public easement for the transportation of people. Although a private commercial easement for the transportation of coal might be expanded in scope in some fashion to serve the original purposes of the original grants, the law does not permit a change in use not reasonably foreseeable at the time of the establishment of the original easements.  As the Federal Circuit stated in *Preseault II*:

> When the easements here were granted to the Preseaults' predecessors in title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which is bargained?  We think not.  <u>Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different.  In the one case, the grantee is a commercial enterprise using the easement in its business, the transport of goods and people for compensation.  In the other, the easement belongs to the public, and is open for use for recreational purposes, which happens to involve people engaged in exercise or recreation on foot or on bicycles.</u>  It is difficult to image that either party to the original transfers had anything remotely in mind that would resemble a public recreational trail.

*Preseault II*, 100 F.3d at 1542-43 (emphasis added).

In this case, even if light rail usage is not deemed to be speculative, it is still beyond the scope of the original easements granted to the railroad.  Just as in *Preseault II*, the federal government is attempting to avoid liability under the guise of railroad purposes even though the nature of the potential light rail usage is "clearly different."  The original railroad purposes easements were granted to the predecessors of the BNSF for its private "commercial enterprise" and now, utilizing the Trails Act, the federal government has authorized trail use and King

County is attempting to convert that private commercial easement for railroad purposes into an easement that "belongs to the public" for local "public transportation."

It is not only difficult to imagine, it is impossible to imagine, that either party to the original transfers had anything remotely in mind that would resemble a light rail system, which is a public transportation system akin to a street for horses and buggies. As Judge Horn clearly set forth in *Howard*, once the NITU has been issued and trail use is beyond the scope of the easements, a taking occurs and, whether by trail use or light rail use, the landowners have lost their reversionary rights:

> In this case, trail use has been determined as beyond the scope of the easements, resulting in a taking. Whether described as railbanked or not abandoned, <u>the property would appear to be lost to the fee holder for all intents and purposes in perpetuity</u>, since, most likely, trail use will continue or the easement interest could revert to the railroad. Although a theoretical possibility exists that the trail use could be permanently discontinued, the easement returned for railroad use, and then the railroad easement abandoned by the railroad under common law, with the property rights returned to the fee holders, a circumstance not addressed in the Indiana Statute, there is no real prospect that the property owners will ever again have unencumbered use of their property. <u>The government seeks to have the best of all worlds, effect the conversion of the Plaintiffs' property to trail use by the issuance of the NITU, and avoid having to pay just compensation for the taking and conversion of the Plaintiffs' property.</u>

*Howard*, 2012 WL 355450 at *19 (Fed. Cl. Aug. 16, 2012) (emphasis added). The Defendant cannot simply rely on or blame some state actor, in this case either the Port of Seattle or King County, for the creation of a public trail or for the speculative future use of a portion of the corridor for light rail because, if it had not been for the federal NITU, if it had not been for the Trails Act in the first place, none of this would have or could have occurred under state law. The federal government pushed the first domino when they issued the NITU which allowed all of this to possibly occur.

A similar issue arose in *Capreal*, 99 Fed. Cl. 133 (2011) which involved a Fifth Amendment takings case under the Trails Act involving land in Massachusetts where the federal government attempted to avoid liability by arguing that the Commonwealth of Massachusetts was actually responsible for the damages because they were utilizing the abandoned right-of-way and because they actually condemned the railroad purposes easement pursuant to state law.  The federal government also argued that the railroad purposes easement had not actually been abandoned under state law or federal law because the agreement to acquire the right-of-way was still subject to the terms of the NITU and was now being utilized for a public purpose pursuant to state law.  Judge Wheeler, after reviewing Federal Circuit precedent, rejected the government's attempt to transfer responsibility to the state because Massachusetts was acting pursuant to authorization from the federal government in the form of the NITU and because the federal government puts into play a series of events which result in a taking of private property, "the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions."  *Capreal*, 99 Fed. Cl. at 137 (*citing Preseault II*, 100 F.3d at 1551).

Judge Wheeler ruled that the federal government was liable for a taking due to the issuance of the NITU and that the abutting landowners are entitled to just compensation:

> The Court does not question the Commonwealth's right to acquire railroad rights-of-way for use for any public purpose, while also compensating any abutting landowners for the taking.  The power to take land through eminent domain is an inherent power of the state and all private property is subject to the power of the state to take it by eminent domain….  Defendant, however, argues that on August 24, 2004, the Commonwealth acquired the Southbridge Second Track right-of-way pursuant to some reserved right to acquire the land for any public purpose without compensation.  <u>The Court categorically rejects the proposition that the Commonwealth could take the reversionary property interest under state law with no compensation to abutting landowners.  Thus, absent the federal involvement, the Commonwealth could have purchased the right-of-way much like it did, but it must have compensated Plaintiffs for the taking.</u>

34

*Capreal*, 99 Fed. Cl. at 136 (emphasis added) (citations omitted).

Similarly, because light rail use fundamentally burdens the landowners' fee in a manner totally different from the original bargained-for use, the Defendant cannot avoid liability simply because King County now possibly wants to utilize a portion of the railroad corridor for light rail. The original purpose of the grant to transport coal for a private commercial railroad still technically exists because the line is still railbanked and, even though King County has the right to utilize the corridor for light rail, their actions are not without consequences to the property owners. Just as Judge Firestone addressed the scope of the easement issue in *Macy Elevator*, here, the passing of the original railroad purposes easement to King County and the Port of Seattle, even if light rail is ever implemented, requires just compensation:

> One can hardly fault the State government for complying with its law. However, the statute does not say that such actions are without consequences to the property owners, nor does it say that the property owners will not, or must not, be compensated for such actions. The statute is in fact wholly silent on the question of compensation. <u>Obviously the State could not simply by enactment of a statute immunize itself from the salutary provisions of the Fifth Amendment. The issue is not whether the State or Federal governments had the power or obligation to do what they did, but whether the Constitution requires that just compensation be paid as a consequence.</u>

*Macy Elevator*, 97 Fed. Cl. at 730-731 (emphasis added).

King County, or any state actor, should not be criticized because they actually possess the power and authority to take land for their eminent domain uses. But, the fact that King County is possibly going to utilize a small portion of the abandoned corridor for light rail while the corridor is still railbanked does not impact anything with respect to the landowners' rights to just compensation under the Fifth Amendment and the Trails Act. King County, or any state actor, cannot obtain the ability or right to use the abandoned corridor for light rail under the Trails Act and avoid compensation, in essence accomplishing through the back door what it would have to

pay for in the first instance if it acquired the property for light rail purposes through its power of eminent domain.

In addition, the Defendant cannot attempt to slice out a 1.1 mile portion of the 25.45 mile easement and attempt to say that they are liable for 24.35 miles potentially but not the 1.1 miles potentially used for public transit.  That issue has already arisen in *Toscano v. United States*, Case No. 08-910L.  During oral argument (no opinion has been issued yet), the attorney for the government, Mr. Atwood, attempted to divide the original railroad purposes easement into two categories, a 25 foot strip for freight activities and the remainder for a public recreational trail. Mr. Atwood and Judge Bruggink had the following conversation:

> MR. ATWOOD:  Well, I mean, I think under state law it would be a question of causation.  If you have two easement holders, one of whom misuses his easement, I don't think that would affect the other easement holder's right to use that easement.  The cause of action would be against the misuse.

> THE COURT:  I'm not sure you're right on that.  I mean, there's a single easement that's created in the first instance.  If it's misused, why would the landowner be subject to any possible potential number of slices of interest that the purchaser decides to set up and the purchaser is suddenly not responsible for having turned loose some contrary use?

> MR. ATWOOD:  Yes, I believe that's right.  I mean, to use the classic analogy of the bundle of sticks, the bundle of sticks being this railroad right-of-way where I have the right to run trains, any type of train I want, and I can turn around and assign part of it, a subset, some of those sticks, to someone else so they can operate theirs.  And as occurred here, that easement has passed hands numerous times to different railroads and then finally it has been subdivided, so it's something that the parties haven't briefed.  I'm not sure that –

> THE COURT:  If slicing up one easement into two easements carried with it the right for that second easement to exercise a use that would be contrary to the first overall easement without jeopardizing the overall easement, then you've created an entirely new interest in law that wasn't contemplated by that initial bundle of rights.  Do you understand?  Do you follow?

> MR. ATWOOD:  No, I understand what you're saying.

> THE COURT:  All right.

*Toscano* transcript of oral argument, page 47, line 2 through page 48, line 12, attached hereto as Exhibit F.

The issuance of the NITU "blocks" or "destroys" the abutting landowners' reversionary property rights. A taking has occurred under *Preseault II* and *Lawson* and the federal government cannot avoid liability by blaming any state actor like the Port of Seattle or King County. The Defendant cannot avoid liability for a taking by arguing that a public use such as light rail is a railroad purpose or by attempting to divide the corridor between recreational trail use and light rail. The landowners' reversionary rights have been blocked or destroyed under either scenario and they are entitled to just compensation. As the Federal Circuit stated in *Preseault II*, "the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government…the Federal Government authorized and controlled the behavior of the State in this matter, and the consequences properly fall there." 100 F.3d at 1531. The Defendant must now be attempting to regurgitate the argument that light rail use is consistent with the original railroad purposes easement, a new refrain of the railbanking is a railroad purposes easement, that has been repeatedly rejected by the Federal Circuit.

**IV.    AS STIPULATED BY THE PARTIES, THE PLAINTIFFS OWN LAND ADJACENT TO AND ABUTTING THE FORMER RAILROAD EASEMENTS AND, THUS, IT IS PRESUMED THAT THE PLAINTIFFS OWN THE UNDERLYING FEE UNDER WASHINGTON LAW**

The centerline presumption applies in Washington and Plaintiffs receive the benefit of the presumption that they own the underlying fee in the railroad corridor to the centerline. It is the Defendant's burden to rebut the presumption, which it did not. *Roeder Co. v. Burlington Northern., Inc*., 716 P.2d 855, 861 (Wash 1986) ("*Roeder II*"). Although the Defendant has had all the documents related to the Plaintiffs' parcels for more than two years, including their deeds

of ownership, the Defendant did not lodge <u>any</u> lack of ownership in the underlying fee in the railroad right-of-way for any Subclass Two Plaintiff or parcels.

Now, in its cross-motion for summary judgment, Defendant argues that <u>one</u> Subclass Two Plaintiff has not proven his ownership interest underlying the former right-of-way based on language in a plat map referenced in his ownership deed.  Def.'s Br., D.E. 108, at 39.  The Defendant complains that Plaintiff Kolesar's (Claim No. 239) deed describes a lot referencing a plat and that the plat contains metes and bounds and somehow defeats the centerline presumption.  The Defendant's argument fails.  Under Washington law, the conveyance of a lot with a reference to a plat, whether the plat contains metes and bounds or not, benefits from the centerline presumption.  Furthermore, it should also be noted that even in the referenced plat there is <u>no</u> reference to the railroad right-of-way as a clear boundary and, thus, even if the plat was incorporated by reference and relied upon for the property description, under *Roeder II*, the centerline presumption still applies.  The Defendant only identifies one Plaintiff with a purported "metes and bounds" in a plat, which is irrelevant, and has failed to provide any legal basis to defer a ruling on the scope of the easement issue and the Defendant's liability as to all Subclass Two Plaintiffs.

### A.  Public Policy and Reasoning Behind the Centerline Presumption

Since our founding fathers, property laws and rules of construction have been developed over 200 years in order to protect and promote efficient ownership in land.  To identify fee ownership in a right-of-way easement, you have to start somewhere and the place to start is the centerline presumption, which in turn, is subject to rebuttal.

The centerline presumption is a rule of construction that developed to promote efficiency, while at the same time, intending to honor the grantors' most likely and probable true intent—to

include the underlying fee in a strip adjacent to the parcel of land sold or gifted.  The reasoning

can be found in the longstanding "strip and gore" doctrine, applied by almost every state.  When

a deed conveys a tract adjoining a street or railroad right-of-way easement or other small strip of

land, any ownership rights of the grantor pass to the grantee.  The standard justification for the

doctrine is two-fold.  First, efficient use of land is promoted by keeping the title to both parts

unified—rarely would the grantor find a way to devote a small and narrow retained strip of land

to productive use, especially where, as here, the small strip is only one or two small parcels of

land over multiple miles.  *See, e.g.*, *Kershaw Sunnyside Ranches*, 126 P.3d 16.  Second,

including the strip comports with the parties' probable intent.  *See, e.g.*, *Roeder II,* 716 P.2d 855,

followed in *Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283 (Wash. App. 1993).

The longstanding strip and gore doctrine was long ago discussed in *Paine v. Consumers'*

*Forwarding & Storage Co.*, 71 F. 626, 632 (6th Cir. 1895), a case dealing with platted lots and

streets and a determination of the owner of the fee in the streets.  The *Paine* Court, in an opinion

by Justice Taft, discussed the reasoning behind the strip and gore doctrine and the determination

that adjacent lot owners held the fee to the centerline of streets.  The Court noted:

> And in this state, where the rule is so firmly established that a boundary on a
> running stream carries the land to the middle or thread thereof, principles of
> analogy afford strong grounds for applying it to nonnavigable lakes.  The reasons
> for the rule in one case apply equally to the other.  The existence of 'strips or
> gores' of land along the margin of nonnavigable lakes, to which the title may be
> held in abeyance for indefinite periods of time, is as great an evil as are 'strips and
> gores' of land along highways or running streams.  The litigation that may arise
> therefrom after long years, or the happening of some unexpected event, is equally
> probable, and alike vexatious in each of the cases, and that public policy which
> would seek to prevent this by a construction that would carry the title to the center
> of a highway, running stream, or nonnavigable lake that may be made a boundary
> of the lands conveyed applies indifferently, and with equal force, to all of them.  It
> would seem, also, that whatever inference might arise from the presumed
> intention of the parties against the reservation of the land underlying the water
> would be as strong in one case as in either of the others.

*Paine*, 71 F. at 629-630 (emphasis added).

The public policy behind the rule is based upon a presumption that a conveyance reflects an intention to carry with it the valuable rights and privileges appurtenant to the property at the time of the conveyance.  The doctrine is based upon the rationale that the grantor must not have intended to retain something that could be of no use to him.  Historically, the doctrine is applied to strips in which the fee benefits the grantee but is of little advantage disconnected with the ownership of the grantor's adjoining tract.  Thus, the doctrine applies to conveyances of parcels of land and lots adjoining strips subject to public use when use of those strips is so essentially connected with the lot itself that grantors have deemed it unnecessary, as a rule, to mention them as being included within the terms of the deed.  As a practical matter, the doctrine is an expression that it is against public policy to leave title of a long narrow strip or gore of land in a grantor conveying a larger tract adjoining or surrounding this strip, and has been extended where it avoids isolated ownership of narrow strips.[19]

The Washington Supreme Court in *Kershaw Sunnyside Ranches* upheld the majority rule in this Country that the centerline presumption applies even when a deed is described by a lot, or by metes and bounds referencing a railroad right-of-way, or contains an exception of the railroad right-of-way.  The majority rule is based on the longstanding construction of law involving the strip and gore doctrine and sound public policy:  (1) the law's abhorrence of unknown ownership in property leading to extracted and prolific litigation; (2) the law favors a construction of instruments which avoids such prolific litigation because the law will presume that the grantor had no intent to retain property then burdened with a railway use and therefore having no immediate value to him; and (3) that the presumption should be indulged because the ownership

---

[19] *See, e.g.*, *Stuart v. Fox*, 129 Me. 407, 152 A. 413, 414 (Me. 1930); *Angelo v. Biscamp*, 441 S.W.2d 524, 526 (Tex. 1969); *Macy Elevator*, 97 Fed. Cl. at 719.

of the fee under the railway carries with it valuable rights appurtenant to the property expressly conveyed.  *See, e.g., Kershaw Sunnyside Ranches*, 126 P.3d at 25-26; *see also Smith v. Smith*, 622 A.2d 642, 647-48 (Del. 1993).

During oral argument in another Trails case, without any legal authority as has been done in this case, the government raised the exact flawed argument it raises here—that Plaintiffs do not benefit from the centerline presumption applicable under New York law, arguing that Plaintiffs have to show they have an interest in the right-of-way.  DOJ (Ms. Held) and Judge Block had the following conversation:

> **THE COURT:**  Okay, let me try to put this another way.  Okay, so you're saying that the Plaintiffs have not shown a prima facie case, and since they haven't shown a prima facie case you don't have to rebut it.  They lose.  At least they have the burden of showing a prima facie case, and they haven't done that here.  Is that what you're arguing?
>
> **MS. HELD:**  Close, Your Honor.
>
> **THE COURT:**  But that's what you should argue.
>
> **MS. HELD:**  Yes, and I acknowledge that in Mahone the Court did say that, you know, there is a silent presumption in New York.  But our position here is that in takings cases the presumption is not enough for Plaintiffs to rely upon to show that they have.
>
> **THE COURT:**  Okay, why is a takings claim different?
>
> **MS. HELD:**  Because whether Plaintiffs have an interest in the land that they allege taken, that is a threshold issue to determine whether the Court has jurisdiction, Your Honor.
>
> **THE COURT:**  You're saying that federal takings jurisprudence somehow vitiates the centerline presumption even when the Plaintiffs have shown a prima facie case.  Is that what you're arguing?
>
> **MS. HELD:**  Yes, Your Honor, that's what I'm arguing.
>
> **THE COURT:**  Okay, fair enough.  What cases do you have that would show that?

**MS. HELD:**  I don't have any cases, Your Honor.

**THE COURT:**  Okay, perfectly fine.

*Furlong v. United States*, Case No. 09-367L, Transcript of Oral Argument, page 18, line 5 through page 19, line 11, attached hereto as Exhibit G.  This line of argument, completely ignoring the centerline presumption, is consistently made by the Defendant and is continually rejected.

In *Macy Elevator*, another Trails case, the government also argued that the centerline presumption was inapplicable and that the Plaintiffs failed to establish that they had a presently cognizable property interest in the right-of-way.  Judge Firestone noted Indiana's policy disfavoring "the alienation of strips of land from abutting estates" and "the alienation of [railroad rights-of-way] from … the primary or parent bodies from which they are severed … generally operates adversely to the normal and the best use of land."  *Macy Elevator*, 97 Fed. Cl. at 720. Judge Firestone held that the centerline presumption applied to property adjoining the right-of-way and that "Indiana law does not impose a burden on a plaintiff to prove the non-existence of any other deed including the description of the railroad right-of-way," and that "someone challenging the adjoining landowner's interest in the fee would have the burden of showing that a deed including the right-of-way exists"—meaning it is Defendant's burden.  *Id.* at 720.  The same is true in this case.

> **B.     Defendant's Newly-Raised "Title Issues" Related to One Identified Parcel is Without Merit**

The Defendant wrongly complains that one landowner, Kolesar (Claim No. 239), does not own the underlying fee.  Def.'s Br., D.E. 103, at 39.  The Defendant misstates the law because when the deed does not contain an express reservation of the fee or the grantor's intent is indicated clearly by a reference to the right-of-way as a boundary without <u>clearly</u> indicating

that the side of the right-of-way is the boundary, it is presumed that the grantor intended to convey title to the center of the right-of-way. *Roeder II*, 716 P.2d 855. The Defendant misstates the holding in *Roeder II* and ignores numerous cases that state that the conveyance of a lot benefits from the centerline presumption. The Defendant also provides selected quotes taken out of context. The only deeds that implicate issues with metes and bounds referencing the railroad right-of-way are those Subclass One and Subclass Three Plaintiffs.

Incredibly, the Defendant attempts to mislead this Court and states the "The *Roeder* court concluded that the 'presumption that the grantor intended to convey title to the center of the right-of-way *is inapplicable where the adjoining landowner presents no evidence of having received his or her property from the owner of the right-of-way*.'" Def.'s Br., D.E. 108, at 38. That statement is taken totally out of context and has no bearing on this case. Actually, the *Roeder II* court noted that the Davis plaintiffs did not present any deed as evidence of their ownership, i.e. a warranty deed showing the language that the grantor used when conveying the property (to see if the grantor expressly excluded the fee in the railroad right-of-way) and, thus, the Davis' were not presumed to own to the centerline of the right-of-way simply because they owned land abutting the right-of-way. *Roeder II*, 716 P.2d at 862. Here, none of the deeds with the legal descriptions of the Subclass Two Plaintiffs' property contain metes and bounds descriptions referencing the railroad's right-of-way as the boundary and all of the landowners are the successors in interest to the original grantors of the right-of-way to the railroad.

Even though there is no express language in any of the deeds to reserve the right-of-way from the grant of abutting land to each Plaintiff, and there are no metes and bounds clearly identifying a railroad right-of-way as the property line boundary in the Subclass Two Plaintiffs' deeds, the Defendant now attempts to raise an issue regarding other documents even though the

deeds are unambiguous.  The Defendant's argument fails.  Under Washington law, as the Supreme Court ruled when analyzing the Kershaw conveyances in *Kershaw Sunnyside Ranches,* a conveyance of land identified as lying north, south, east or west of a railroad right-of-way, or which is bounded by a railroad right-of-way, will generally give the grantee title to the centerline of the right-of-way even if the grantor expresses an exception of the right-of-way in the grant, unless the grantor's intent is clearly expressed in the deed to exclude from the grant the fee in the railroad right-of-way.  *Kershaw Sunnyside Ranches*, 126 P.3d at 26.

The bottom line is that the grantor's intent controls and it is presumed that the grantor conveys all title to the centerline.  The existence of narrow strips of land distinct in ownership from the adjoining land would create a prolific source of litigation.[20]  The public policy behind the centerline presumption recognizes that the law favors a construction of instruments which abhors such a situation, recognizes that it should be presumed that the grantor had no intent to retain property then burdened with a railway use that has no immediate value to him, and recognizes that the presumption should be indulged because the ownership of the fee underlying the railway carries with it valuable rights appurtenant to the property expressly conveyed.  *See, e.g. Roeder II*, 716 P.2d at 861; *Vaughn v. Fitzgerald*, 511 P.2d 1148, 1151 (Ok. App. 1973).  If a plaintiff's ownership deed does not contain express terms reserving the fee unto the grantor, or does not contain metes and bounds clearly expressing the grantor's intention to reserve the fee unto himself with clear language referencing a railroad right-of-way as THE boundary, then the centerline presumption applies, period.

---

[20]  It is interesting to note that Defendant is not saying that the railroad owns the corridor in fee, the Defendant is merely saying that it is not clear that these Class Members own the underlying fee because it is possible someone else does.  Since the statute of limitations in this case does not even run until October of 2014, Plaintiffs could find the "alternative" owners before the statute of limitations runs.  Thank goodness that should not be necessary because the centerline presumption was developed to avoid that exact possibility, the litigation between competing landowners, and Washington adopted the centerline presumption.

Moreover, ownership deeds referencing "lots" benefit from the centerline presumption under Washington law. *See Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283 (Wash. App. 1993); *Christian v. Purdy*, 808 P.2d 164, 166 (Wash. App. 1991). When a conveyance is of a lot or a block of land, a "description of the block by metes and bounds or courses and distances would be subordinate to the description of the block by its number, and would have to give way in case of conflict." *Cook v. Hensler*, 107 P. 178, 180 (Wash 1910). The ownership deed controls when conveying a lot and the plat map of the lot, whether containing metes and bounds descriptions or not, does not rebut the centerline presumption. *Id.*

In sum, the Subclass Two Plaintiffs have established their initial burden showing that the railroad only held an easement, the Defendant stipulated that it did not challenge the Subclass Two Plaintiffs' interest in the fee underlying the former railroad right-of-way and, thus, Plaintiffs own the underlying fee. It was the Defendant's burden to provide evidence to the contrary, which it cannot. The centerline presumption in Washington, without any applicability of *Roeder II* or any rebuttal of the presumption, establishes that all Subclass Two landowners own the underlying fee.

    **C.**    **11 Parcels in Subclass Two Have an Intervening Street Between the Parcel and the Right-of-Way Such That the Centerline Rule Still Applies but the Landowners Own Only 20 Feet of the Right-of-Way**

There are 11 parcels in Subclass Two that have an intervening street between the parcel and the right-of-way.[21] Since these parcels were included in the parties' stipulations that created Subclass Two, Plaintiffs address these parcels here and now in this motion. In each instance, the intervening street, just like the right-of-way, is an easement under Washington law. In each instance, then, the applicable parcel abuts an intervening street that is 60 feet wide, the right-of-way is then adjacent to the intervening street which is 100 feet wide, and then another parcel

---

[21] The 11 parcels are 105, 186, 193.A, 193.B, 212.A, 212.B, 239, 287, 318, 450, and 495.

exists on the other side of the right-of-way.   Since the centerline presumption applies in

Washington, and the total width of the combined easements between parcels is 160 feet, each

landowner adjacent to an intervening street owns a total of 80 feet of the 160 feet of combined

easement between parcels, which includes 20 feet of fee underlying the railroad's right-of-way.

There is a long line of authority from the Washington courts establishing the fact that the

underlying fee in a public street remains in the owner of the adjacent land.   Since the owner of

the adjacent land owns the fee, the public acquires only an easement.   The Supreme Court of

Washington confirmed the longstanding rule in *Finch v. Matthews*, 443 P.2d 833 (Wash. 1968);

> Since *Burmeister v. Howard*, 1 Wash. T. 207 (1867), <u>this Court has not departed
> from the rule established in that case, that the fee in a public street or highway
> remains in the owner of the abutting land, and the public acquires only the right of
> passage, with powers and privileges necessarily implied in the grant of the
> easement</u>.   *Puget Sound Alumni of Kappa Sigma, Inc. v. City of Seattle*, … 422
> P.2d 799 (1967).   This rule was applied specifically to a street dedicated to the
> public through the recording of a plat in *Schwede v. Hemrich Bros. Brewing Co.*,
> … 69 P.362 (1902).   <u>Therefore, the only property right which either the city of
> Seattle, or King County ever acquired in the tract of land in controversy, was an
> easement for passage and use for street purposes</u>.

*Finch*, 443 P.2d at 838 (emphasis added) (citations omitted).   The rule in Washington that the

abutting landowner continues to own the fee in a public street and the public only receives an

easement has been the rule since 1867 and was specifically applied to a street dedicated through

the recording of a plat in 1902.

The centerline presumption provides that abutting landowners' title extends to the

centerline of an abandoned street or railroad right-of-way.   The centerline presumption has been

adopted by the Supreme Court of Washington.   Under Washington law, "the conveyance of land

bounded by or along a highway carries title to the center of the highway unless there is

something in the deed or surrounding circumstances showing an intent to the contrary."   *Roeder*

*II*, 716 P.2d at 861.   This "centerline presumption" also applies to abandoned railroad rights-of-

way under *Roeder II*.  In general, the conveyance of land adjacent to a railroad right-of-way "will give the grantee title to the center line of the right-of-way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right-of-way, or the grantor's intention to not convey the fee is clear."  *Id*.

The centerline presumption applies to the 11 parcels in Subclass Two but in a slightly different fashion.  A chart of the 11 parcels, with their Axxion map reference and the name of the intervening street, is as follows:

| Parcel | Axxion Map | Intervening Street |
|--------|-----------|-------------------|
| 105 | 55 | Lake Washington Boulevard |
| 186 | 55 | Lake Washington Boulevard |
| 193.A | 17 | Willows Road N.E. |
| 193.B | 17 | Willows Road N.E. |
| 212.A | 56 | Lake Washington Boulevard |
| 212.B | 56 | Lake Washington Boulevard |
| 239 | 55 | Lake Washington Boulevard |
| 287 | 13 | N.E. 124th Street |
| 318 | 55 | Lake Washington Boulevard |
| 450 | 13 | Willows Road N.E. |
| 495 | 38 | 115th Avenue N.E. |

In each instance, for each parcel, the intervening street is 60 feet wide.  For example, parcels 105, 186, 212.A, 212.B, 239, and 318 have Lake Washington Boulevard intervening between the parcel and the railroad's right-of-way.  Lake Washington Boulevard was originally platted as part of the Hillman Garden of Eden Plats at the same time the railroad's right-of-way

was platted, with all of the lots in the area.  *See* Hillman Garden of Eden plats, attached as Exhibit H.[22]  As a result, Lake Washington Boulevard is an easement 60 feet wide adjacent to the railroad's easement which is 100 feet wide, for a total of 160 feet separating each parcel in this category from a corresponding parcel on the other side of the railroad's right-of-way.  Since both easements were created at the exact same time by the Hillman plats, the centerline presumption mandates a finding that abutting landowners on either side own 80 feet to the centerline of the combined easements which total 160 feet.  As a result, all landowners on the opposite side from the intervening street own the fee to 80 feet of the railroad's right-of-way and all of the landowners in this category where an intervening street exists own the 60 feet of fee under the intervening street and 20 feet of the railroad's right-of-way.

## V.   THE INTEREST THAT THE DEFENDANT TOOK WAS PLAINTIFFS' REVERSIONARY INTEREST—THE PLAINTIFFS' RIGHT TO THEIR LAND UNENCUMBERED BY ANY EASEMENT

The Defendant asserts that **if** a "taking" has occurred, it is then only liable for an incremental burden.  The fundamental flaw with the Defendant's argument is that if the railroad's easement has not extinguished or abandoned upon the NITU, then there could be no taking at all because the railroad purposes easement still exists!  Once liability for a takings is established, the railroad's abandonment of the easement is irrelevant as a matter of law because the valuation of damages must be measured by **what** the Defendant took from the Plaintiffs, not what the Defendant gained (an easement for trail use).  This is pursuant to the Fifth Amendment and binding precedent from the Supreme Court.  As Justice Holmes noted long ago when determining what interest is taken in takings cases, the question is "what has the owner lost, not what has the taker gained."  *Boston Chamber of Commerce*, 217 U.S. 189.

---

[22]   There are 3 plats from C.D. Hillman along Lake Washington, No. 1, No. 2 and No. 3.  All of the lots, the right-of-way, and the intervening street are shown on the 3 plats.  Lake Shore Boulevard, as shown on the 3 plats, became Lake Washington Boulevard.

Here, the Subclass Two Plaintiffs have lost their "reversionary interest"—the right to the use and enjoyment of their land without any easement. *Ladd*, 630 F.3d at 1023. Despite binding precedent, Defendant asserts that the Subclass Two Plaintiffs have lost an interest in the difference between the value of a railroad purposes easement and a trail use/railbanking easement. That is flat wrong. Under binding and well-settled precedent, the Plaintiffs have lost the state law "reversionary interest" to have their land back free and clear of any easements once train operations ceased.

In support of its "incremental damages" theory, the Defendant continues to rely on *Schneider v. United States*, No. 8:99-CV-315, 2003 WL 25711838 (D. Neb. Aug. 29, 2003). Not one court has ever held "incremental damages" were appropriate as just compensation under the Fifth Amendment for a Trails Act taking, aside from the unpublished interlocutory decision in *Schneider*, which was decided before several cases decided by the Federal Circuit (*Caldwell*, *Barclay* and *Ladd*). This court has rejected the applicability of the *Schneider* opinion each and every time it has been raised.

In a recent Trails Act case addressing damages, Judge Horn flatly rejected the Defendant's argument that incremental damages were proper based on *Schneider*:

> Defendant also cites to the trial court decision of *Schneider v. United States*, (citations omitted) an unpublished decision issued by the United States District Court for the District of Nebraska. Defendant argues that the *Schneider* case addressed the issue of compensation to plaintiffs for a taking, "when a railroad easement burdened Plaintiffs' property at the time the NITU was issued." Defendant quotes *Schneider* as finding that a railroads' adherence to "'the discontinuance procedure outlined in the [Trails Act] cannot constitute the decisive acts necessary to establish an intent to abandon an easement under state law.'" *Id*. at *5. Defendant points out the District Court for the District of Nebraska declined to rule that the railroad abandoned its interest before the STB issued the NITU." (quoting *Schneider v. United States*, 2003 WL 25711838, at *5). The *Schneider* trial court decision, however, **does not express the prevailing view on abandonment and is not binding on this court**.

*Ingram v. United States*, 2012 WL 1943128, *23 (Fed. Cl. May 24, 2012); *Nordhus Trust*, 2012 WL 2989967 (July 20, 2012) (holding that abandonment is irrelevant and the proper measure of damages is the value of the plaintiffs' land unencumbered by any easement and the plaintiffs' land encumbered with an easement for trail use with the potential reactivation of a railroad).  The Defendant has raised its "incremental damages" argument numerous times and thus far, each and every time it has been raised, it has been rejected by this Court.

The Federal Circuit has repeatedly and consistently described the taking that occurs when the fee owner's reversionary interest is blocked or destroyed.  In *Preseault II*, the Federal Circuit specifically stated that "when state-defined property rights are <u>destroyed</u> by the Federal Government's preemptive power and circumstances such as those here before us, the owner of those rights is due just compensation." *Preseault II*, 100 F.3d at 1552 (emphasis added).  The Federal Circuit revisited and reiterated this same property law concept in *Caldwell* in 2004 and *Barclay* in 2006.  In *Caldwell*, the Federal Circuit stated that "we have previously held that a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are <u>effectively eliminated</u> in connection with a conversion of a railroad right-of-way to trail use." 391 F.3d at 1228 (emphasis added).

In *Barclay*, the Federal Circuit relied on its holding in *Caldwell* and reiterated that a Trails Act taking "occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are <u>blocked</u> from so vesting." *Barclay v. United States*, 443 F.3d, 1373 (Fed. Cir. 2006) (emphasis added).  The facts in *Barclay* involved a trail where the railroad had not abandoned the line and was, in fact, still using the right-of-way.  The Federal Circuit concluded that "state law reversion was still delayed by the issuance of the NITU, and the claims still accrued with the issuance of the NITU." 443 F.3d at 1374.  This is binding

precedent, which the Defendant simply ignores.  In *Ladd*, the Federal Circuit concluded that the issuance of <u>the NITU operates to prevent statutory abandonment</u> and thus operated to preclude the vesting of state law reversionary interests in the right-of-way that <u>amounted to a taking, a taking of the Plaintiffs' right to their land unencumbered by an easement</u>.  630 F.3d at 1020.

The Defendant, incredibly, asserts that the issue of abandonment relating to the Subclass Two Plaintiffs' interest taken "has not been squarely addressed in many of the cases relied upon by Plaintiffs, and it is an issue that the Court of Federal Claims is examining in several pending cases." (Def. Br., D.E. 108, at 22).  That is a flat misstatement.  In fact, in six of the seven cases addressing this issue in the past year, the Court has affirmed that abandonment is irrelevant to the measure of damages.  In the seventh case, a South Carolina Trails Act case, *Carolina Plating Works, Inc. v. United States*, 102 Fed. Cl. 555 (2011), the Court did not rule on the issue, it was basically deferred, damages were set for trial, and the case was then settled (even though two other Judges have ruled in South Carolina Trails Act cases that converting the railroad easement to a trail use/railbanking easement legally constitutes abandonment or extinguishment of the easement, and "abandonment" is irrelevant to the measure of damages).

In *Capreal*, Judge Wheeler specifically rejected the government's incremental damages theory in a Rails-to-Trails case, as follows:

> Defendant suggests that, even if the Court finds recreational trail use to exceed the scope of the easement, the Court still should find that railbanking is a permissible use under the easement. **If true, the extent of Defendant's liability would be limited to the incremental burden imposed by the trail use on the existing easement.** (Def.'s Reply Mot. Summ. J. Liability 10.)  The Court finds, however, that railbanking is too hypothetical and unlikely to serve as a railroad purpose….Other courts reviewing railbanking have similarly concluded that the remote possibility of rail service being restored in the future is insufficient to constitute a railroad purpose.  (citations omitted).

*Capreal*, 99 Fed. Cl. at 145-146 (emphasis added).   Thus, *Capreal* squarely rejected the government's incremental damages theory in the context of the scope of the easement issue alone.   Judge Margolis and Judge Wheeler, in *Raulerson* and *Nordhus Trust*, correctly held and recently confirmed both the law of "what" was taken and that the proper methodology to determine just compensation was the difference between the Plaintiff's land unencumbered by any easement and an easement authorizing trail use with the potential reactivation of a railroad. *See Raulerson v. United States*, 99 Fed. Cl. 9, 11-12 (Fed. Cl. 2011); *Anna Nordhus Family Trust*, 2012 WL 2989967.

In *Rogers*, Defendant attempted to interject "abandonment issues" in a case where the railroad held an easement and the scope of the easement did not include trail use/railbanking (thus, a taking under Prong 2 of *Preseault II*).   Regarding Defendant's abandonment argument, as attempted in this case, Judge Williams correctly held abandonment was irrelevant as a matter of law when trail use/railbanking exceed the scope of the railroad's easement.   *Rogers v. United States*, 101 Fed.Cl. 287, (Fed. Cl. 2011) (holding that "the issue of common law abandonment is a red herring" and irrelevant); *see also*, *Ybanez v. United States*, 98 Fed. Cl. 659 (Fed. Cl. 2011) (holding that the "timing of abandonment is irrelevant" because "Plaintiffs' compensatory taking resulted from the NITU's grant of a use that exceeds the scope of the original easements. But for the NITU, plaintiffs who had property interests in the corridor would be enjoying their land unburdened").

In fact, long ago, this court addressed the issue of damages in *Moore v. United States*, 61 Fed. Cl. 73, 74 (Fed. Cl. 2004), holding the method to determine damages is the difference in the value of the land unencumbered by any easement and encumbered by a trail use/railbanking easement.   In *Moore*, Judge Bruggink held that the government was liable for a taking of

plaintiffs' land under the Trails Act.  61 Fed. Cl. at 74.  The court noted that the parties presented their calculations of the value of the property taken through competing expert witnesses.  Both experts used a "before and after" methodology to determine compensation.  "This requires 'a determination of the fair market value of the entire affected parcel **as if the easement did not exist** and then another determination in light of the taking.'"  *Id.* (*citing Moore v. United States*, 54 Fed. Cl. 134, 747, 749 (2002) (emphasis added)).  "The figure resulting from a proper application of a before and after analysis includes the value of the part actually taken, together with any severance damages affecting the value of the remaining parcel."  The proper damage valuation model, including the "before" analysis that assumes land is **unencumbered** by a railroad easement, was also applied in *Illig*,[23] *Glosemeyer*,[24] *Miller v. United States*,[25] and *Grantwood Village v. United States*.[26]

Each and every time the Defendant has asserted its "incremental damages" theory, it has been rejected.  The rule of law is clear <u>and</u> well-settled, it is the reversionary interest that is taken, which is the right to their land unencumbered by any easement.  Just as the Supreme Court held in *Preseault I*, the Federal Circuit held in *Preseault II*, *Caldwell*, *Barclay*, *Ellamae Phillips* and *Ladd*, and the various judges of the CFC have held in *Raulerson*, *Ingram*, *Howard*, *Whispell*, *Rogers*, *Rhutasel*, and *Adkins*, Judge Firestone correctly affirmed binding precedent that the interest taken from the landowner in any Rails to Trails case is the landowner's reversionary interest, "the ability of the underlying fee owners to reclaim their property free of any railroad

---

[23]  67 Fed. Cl. 47 (Fed. Cl. 2005).
[24]  45 Fed. Cl. 771.
[25]  67 Fed.Cl. 542, 543 (Fed. Cl.  2005)
[26]  55 Fed.Cl. 481 (Fed. Cl. 2003).  Both *Miller* and *Grantwood Village* involved the same rail line as *Illig*.  The Court held a takings occurred, the railroad did not find abandonment of the line prior to the NITU, and the property was valued in the "before" state unencumbered by a railroad easement.

easement," that is the interest taken that requires just compensation.  *See Jenkins*, 102 Fed. Cl. at 619.

## VII.    CONCLUSION

Despite the Defendant's continual misstatements and misapplication of the law, the Subclass Two Plaintiffs have conclusively established that a taking of Plaintiffs' property has occurred because the railroad originally obtained easements for its right-of-way through the original conveyance documents and the terms of the railroad's easements were limited to railroad purposes only.  Recreational trail use/railbanking, including speculative light rail use, are beyond the scope of the easement for railroad purposes. BNSF's pre-NITU or common law abandonment of the easement is irrelevant regarding the Defendant's liability for a taking of the Subclass Two Plaintiffs' reversionary interest—the right to their land unencumbered by any easement—and thus, the Defendant is liable for just compensation under the Fifth Amendment.  Accordingly, Plaintiffs request that the Court issue an Order declaring there was a compensable taking of Plaintiffs' reversionary property interest.

Date:  September 5, 2012          Respectfully submitted,

BAKER STERCHI COWDEN & RICE, L.L.C.

By  */s/ Thomas S. Stewart*
Thomas S. Stewart
Elizabeth McCulley
2400 Pershing Road, Suite 500
Kansas City, MO 64108
(816) 471-2121
(816) 472-0288 (facsimile)
stewart@bscr-law.com
mcculley@bscr-law.com

and

54

Steven M. Wald
J. Robert Sears
1010 Market Street, Suite 950
St. Louis, MO 63102-1708
(314) 231-2925
(314) 231-4857 (facsimile)
wald@bscr-law.com
sears@bscr-law.com
**Attorneys for Plaintiffs**


### CERTIFICATE OF SERVICE

 I hereby certify that the above and foregoing was filed with the Clerk of the Court via ECF on this 5th day of September, 2012, with a copy of the same being served via electronic mail (ECF) by the Clerk of the Court on this same day, to:

BRUCE K. TRAUBEN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0238
Facsimile: (202) 305-0506
E-mail: bruce.trauben@usdoj.gov
**ATTORNEY FOR DEFENDANT**


    */s/ Thomas S. Stewart*
    ATTORNEY FOR PLAINTIFFS