UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DANIEL AND KATHY HAGGART, *et al,* | ) | |
| For Themselves and As Representatives of | ) | |
| A Class of Similarly Situated Persons, | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 09-103 L |
| | ) | |
| vs. | ) | Judge Charles F. Lettow |
| | ) | *Electronically filed on* |
| THE UNITED STATES OF AMERICA, | ) | *September 19, 2012* |
| | ) | |
| Defendant. | ) | |

_____

SUBCLASS FOUR B PLAINTIFFS' HISTORICAL CONTEXT RESPONSE
TO UNITED STATES' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY TO UNITED STATES' RESPONSE IN FURTHER SUPPORT
OF THE SUBCLASS FOUR B PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT

The Lewis/Kittinger ("Kittinger")`
Railroad Right of Way Deed

In 1903, the Northern Pacific Railway sought out the owners of Lake Washington's eastern shore lands north of Renton and south of Woodinville, Washington, in order to obtain railroad right of ways to complete the Lake Washington Belt Line track which was planned to transport commercial freight including the most valuable commodity in the region: coal.

As will be explained below, the Northern Pacific's request was made to Seattle Establishment property owners, including  J. R. Lewis, former Chief Justice of the Washington Territorial Supreme Bench, who was an out-spoken and determined advocate against the Northern Pacific, which

had declared "war" against the citizens of Seattle in 1873.  This brief recounting of the history between the parties to this railroad right of way deed will explain why these Seattle Establishment property owners would not give and did not give their "ancient enemy" anything more than the barest railroad right of way/easement which was the most the railroad could obtain from a King County Superior Court through eminent domain in 1903.  Under the Washington State Constitution, Article 1, Section 16 and Washington case law, *Reichenbach v. Washington Short-Line Ry. Co.,* 10 Wash. 357, 38 P. 1126 (1894), a railroad right of way deed granted only an easement, not fee.  In *Reichenbach,* like the right of way deed from Lewis/Kittinger, the grantors retained crossing rights and all riparian rights; these right of way deeds conveyed easements only.  *Reichenbach, supra* at 360.

The Lake Washington Belt Line had been long derailed by both the second bankruptcy of the Northern Pacific Railroad in October 1893 and Northern Pacific President Thomas Oakes' earlier announcement in March 1890 that

> It is not profitable to locate and build a line
> on either side of Lake Washington that would
> be acceptable to the Northern Pacific Company's
> high standard of construction....we have just now

decided to abandon the building of the line.

*Seattle Daily Post-Intelligencer,* March 25, 1890.  The truth may have been that the railroad simply could not afford to purchase the necessary easements and build the line, because "in 1887, when the newly constructed division to Tacoma was completed, the prospects of the Northern Pacific had not been bright.  The road was then barely earning its fixed charges and its debt was increasing..." Grodinsky, Julius, *Transcontinental Railway Strategy 1869-1893,* University of Pennsylvania Press (1962) at 408.  It is likely that the railroad had depleted its resources with the construction of the transcontinental railroad line from Duluth, Minnesota, to Tacoma, Washington, by the end of 1887.

> Certainly before the depression of 1893 appeared on the financial horizon, the Northern Pacific was a bankrupt road *de facto* if not *de jure.* . .the Northern Pacific had tried to expand too rapidly without regard to the fundamental weakness of its capitalization, and the result had been failure. The first adverse wind that came along found the house of cards more than ready to topple.

Campbell, E. G., *The Reorganization of the American Railroad System 1893-1900,* Columbia University Press (1938) at 60-61.  By 1896, Northern Pacific's Lake Washington Belt Line Company was dissolved.

In 1903, when the Northern Pacific wanted to resurrect the Lake

Washington Belt Line, it only needed an easement over and across the Kittinger property for the sole purpose of grading and laying in track, as it had been surveyed in the 1890s. The railroad, which could only obtain an easement by way of condemnation, would not expect to pay more than the minimum needed to obtain the easement to complete this line in order to capture the substantial freight revenue that could be had from hauling coal out by rail, instead of by barge, from the coal-rich fields of Newcastle and Coal Creek, just east of this belt line.

What follows is a brief history between the parties to the 1903 Kittinger right of way deed, to assist the Court in understanding the intentions of the parties.

### The Northern Pacific Had A Thirty-Year War
### With the Seattle Establishment [1873-1903]

By 1903, there had been an on-going thirty-year warring feud between the Northern Pacific Railroad and the Seattle Establishment. Historians describe this feud as being particularly hostile. Grant in his *History of Seattle* (1929) at 179 writes that "Seattle and the [Northern Pacific] railroad company were avowedly hostile." Judge Cornelius Hanford noted in his *Seattle and Its Environs, Volume 1* at 180 that "Seattle was grieved" by the Northern Pacific and its unearned land grant

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--5

> withdrawing lands from settlement hung like a black cloud
> over the territory.  That condition could not be endured quietly;
> it  provoked hostility to the Northern Pacific Company which
> grew into a popular demand for forfeiture of the entire land
> grant.

Hanford, *supra* at 190.

Accounts of the warring feud between the Northern Pacific and the

citizens of Seattle repeatedly refer to "the Northern Pacific" as Seattle's

"ancient enemy".  *See* Bagley, Clarence B., *History of King County,*

*Washington,* Volume 1, S. J. Clarke Publishing Co. (192) at 322. There was

"an unrelenting hatred of the Northern Pacific" by the citizens of Seattle

that gave them a "unity of purpose".  Nesbit, Rober C., " *He Built Seattle*":

*A Biography of Judge Thomas Burke,* Seattle: University of Washington

Press (1961) at 162.   As Bagley summarized in his history of Seattle:

> . . .all the power and all the resources of the selfish inner
> group [of the Northern Pacific] so interested in townsite
> speculation rather than railroading were turned against
> the community of less than 2,500 souls.  The fight was
> carried largely and was won by Orange Jacobs, J.R. Lewis,
> John J. McGilvra, William H. White and John Leary, backed
> by Henry L. Yesler, Arthur A. Denny, David T. Denny, James
> M. Coleman, and George Kinnear, the latter all men of
> substance and of the high public spirit that held them to the
> fight.

Bagley, Volume 1, at 582.  Even when Seattle successfully opposed the

Northern Pacific's plans to build a waterfront terminal in 1899, it was Judge

Jacobs who publicly remarked that

> in the future if I should desire to go to the waterfront to catch a tom cod, I might be charged more passing over private property than the fish would be worth.

Bagley, Volume 1, at 324.  There was still a deep distrust of and antipathy toward the Northern Pacific at the turn of the century.  Seattle's steadfast opposition to the Northern Pacific was a form of payback for the decades of discrimination against Seattle by the Northern Pacific which "seemed determined to crush out its future prospects and it is now a gratification to the old settlers of the city that the company must ask favors of Seattle." *A Volume of Memoirs and Geneology of Representative Citizens of the City of Seattle and County of King, Waashington* re. J.J. McGilvra, Lewis Publishing Company (1903) at 723.  As the following discussion illustrates, this was the prevailing attitude toward the Northern Pacific for thirty years from 1873 when the "ancient enemy" started its war against Seattle.  This was the prevailing attitude in 1903.

### Seattle Was Ordained To Be
### The Western Terminus of
### The  Transcontinental Railroad

The reasons for this warring feud were clear: Seattle, with its deep, safe harbor at Elliot Bay and its closer access to the Pacific Ocean and to

the very substantial Coal Creek and Newcastle coal deposits, was ordained to be the terminus of a Lake Superior to Puget Sound transcontinental railroad. This was conclusion by the famous surveyor and Washington Territorial governor General Isaac Stevens in his thirteen-volume landmark survey of "the Most Practicable and Economic Route for a Railroad from the Mississippi River to the Pacific Ocean 1853-1854", published by the United States War Department 1855-1861.

Even Governor Stevens' assistant, Captain George McClellan, wrote that

> both [Isaac Stevens and George McClellan] agreed on Seattle. I have mentioned Seattle as the proper terminus of the road whether it crosses the mountains by the main Yakima or by the Columbia Pass," McClellan wrote in his summation. "This place....is by far superior to any other harbor on the eastern shore of Puget Sound....It is easily entered with any of the prevailing winds, is secure from heavy seas, and has a most excellent holding-ground of blue clay and good depth of water....The banks are suitable for a town; the deep water comes so near the shore that but very short wharves will be required.  Semi-bituminous coal has been found within fourteen miles by water up the D'Wamish. The harbor can be defended by permanent fortifications."

> Stevens concurred, and reported to [Secretary Jefferson] Davis that "Seattle combines the greatest number of advantages" of all the sound locations.  It was the ideal terminus.

Kurt E. Armbruster, *Orphan Road* (Washington State University Press,

1999) 12-13.  Governor Stevens even took the time to write to Arthur A. Denny, a founding Seattle pioneer, to let him know of Steven's "Northern Pacific Railroad Exploration and Survey".  Armbruster at 6.

Denny settled Seattle with the belief that Seattle would be the terminus, i.e. that Seattle would be "It".  Seattle pioneer Arthur A. Denny wrote that he "came to the coast with the belief that a railroad would be built across the continent to some point on the northern coast within the next fifteen or twenty years and located on the Sound with that expectation".  Armbruster, *Orphan Road*, Washington State University Press (1999) 1, quoting from Arthur Denny's autobiography, *Pioneer Days on Puget Sound.* Seattle: C. B. Bagley, 1888; reprint, Fairfield, Washington: Ye Galleon Press, 1979. Denny gambled everything on Stevens' Northern Pacific Railroad Survey and the conclusion that Seattle was going to be the terminus.  Denny settled Seattle on Elliot Bay, and as the Washington Territorial delegate to the U. S. House of Representatives in 1866, he openly supported the newly chartered Northern Pacific Railroad which referenced Seattle as the end point of the railroad in its publicly circulated materials, including its presentations to Congress.

Thousands of Seattle citizens also staked their fortunes on the

inevitability of  the transcontinental railroad coming to Seattle.  Grantor Mary Carrol Terry Kittinger, a daughter of Seattle pioneer shopkeeper and real estate investor Charles Terry, who owned 90% of downtown Seattle and 40% of King County, according to HistoryLink.org, was heavily invested in King County real estate as was her friend, Justice J. R. Lewis. Bagley writes that "they had an insatiable hunger for land".  Bagley, Volume I, at 70.

Even Abraham Lincoln's friend and legal colleague, John J. McGilvra, reflected that he decided to settle at Seattle, after

> Having read Gov. Isaac I. Stevens's report of his surveys and explorations in 1852-1853 for a railroad by the northern route, and obtained such information as was to be had about the distant country, I determined to explore it myself, and set out on the expedition early in the spring of 1861.  It is perhaps only fair to state that there was an additional inducement in the shape of a commission from President Lincoln as United States attorney for Washington Territory.

King County Bar Association, *Addresses Upon the Life and Character of John J. McGilvra,* (Lowman and Hanford, Seattle, 1904) 69.

The Seattle Establishment committed itself to settle at Seattle in part because Seattle would be the hub of commerce and wealth creation when the northern transcontinental railroad became a reality.

Drawing upon the same Stevens and McClellan conclusions relied

upon by Denny, Terry, McGilvra, and literally thousands of other Seattle settlers, Congress chartered the Northern Pacific transcontinental railroad and established a generous 50,000,000 acre-to-be-earned land grant which was signed into law by President Lincoln on July 2, 1864.

*Oregonian* editor Clark P. Crandall wrote in 1871 that Seattle's "citizens deem it rank treason to even doubt the eventual ordination of Seattle as the great depot whence the railroad systems of the continent and commercial navies of the world are to dump their cargoes".  Kurt E. Armbruster, *Orphan Road,* Washington State University Press (1999) 29.

Historian Armbruster noted that

> Of course, Seattle had known for some time that she would be "It".  Isaac Stevens [FN] and *Harper's* magazine said so, and as early as 1868, the opening of the [downtown Seattle] Western Terminus Hotel and the Railroad Lodging House demonstrated Seattle's boundless self-confidence. Town lots that went for $50 in 1869 commanded $200– even $500–a year later.  It was all part of being the "natural and lawful terminus of the Northern Pacific [transcontinental railroad line].

*Ibid.*

To further insure Seattle's selection as the terminus of the transcontinental railroad, the Seattle Establishment, led by Arthur Denny, even pledged a generous inducement package to the Northern Pacific:

$50,000 in gold bullion
4,800 waterfront acres along Elliott Bay
6,500 additional acres, including half of
        Arthur Denny's extensive land holdings
450 town lots; and
riparian rights free and clear on the vast tide flats of
the Duwamish River emptying into Elliott Bay.

Armbruster at 36.

Unfortunately for the Seattle Establishment, the Northern Pacific Railroad preferred to engage in and benefit from their own land speculation; in the case of the Northern Pacific, railroad greed trumped sound judgment. The Northern Pacific and its director, Charles Barstow Wright, through his Tacoma Land Company, had bought up all the land within the six-mile deep perimeter surrounding Tacoma's Commencement Bay in order to reap vast profits from land speculation that could be had from making Tacoma's Commencement Bay, rather than Seattle's Elliot Bay, the terminus of the northern transcontinental railroad. Historian Richard White, in his recent book, *Railroaded: The Transcontinentals and the Making of Modern America,* W. W. Norton & Company (2011) at 156 observed that American transcontinental railroads "allocated speculative profits to corporate officers and board members" so they could take advantage of closely held information as to the route the transcontinental

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--12

would be built.

So, instead of building the transcontinental line to Seattle with the largest and deepest safe harbor on Puget Sound, the Northern Pacific and its Philadelphia director Charles Barstow Wright diverted the proposed transcontinental line south to Tacoma where they would capitalize on their vast land purchases made through their Tacoma Land Company by selling lots to Tacoma settlers and businesses which would expect to thrive in the railroad terminus town. Wright's Tacoma Land Company proved to be extremely profitable, reaping upwards of 100 times Wright's investment in the purchased land. Wright arrogantly vowed that "No locomotive will ever turn its wheels in Seattle." William C. Speidel, *The Sons of Profits,* Nettle Creek Publishing, Seattle, (1967) 165.

Against this background of Tacoma land speculation, the Northern Pacific Railroad and its Tacoma Land Company could well afford to spurn Seattle and the Seattle Establishment's generous gifts of land and gold bullion. On July 14, 1873, Arthur Denny received a terse telegram which opened the hostilities between Northern Pacific and the Seattle Establishment:

<em>We have located terminus on Commencement Bay.</em>

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--13

Armbruster describes this as "The Telegram that opened Seattle's 'War' with Northern Pacific Railroad". Armbruster at 37.

In *Railroaded,* Richard White noted that business "was never just business in the late nineteenth century: it was deeply personal, involving judgments of manhood and character." *Supra* at 395. As Richard White concluded in *Railroaded,* "For hubris, grandiosity, and repeated failure, few corporations could surpass the Northern Pacific." Illustration 14. The Northern Pacific made it personal and the citizens of Seattle took the railroad's spurning personally.

## Once War Was Declared, Seattle Fought Back

Northern Pacific's rejection of Seattle was not well received by the Seattle Establishment; it "raised a storm of disappointment and anger which would result in war", Armbruster at 39. The war would last more than thirty years; the Northern Pacific's war with the Seattle Establishment lasted until May 1911 when the Northern Pacific ran a scheduled transcontinental steamer train into and out of Seattle. Armbruster at 249.

During the thirty plus years from the Northern Pacific's rejection of Seattle in 1873, Seattle fought back and Chief Justice J. R. Lewis, an owner of the subject property, played a prominent role:

1.      **Seattle Succeeds In Pushing Through Its Narrowly Tailored 1873 Northern Pacific Land Grant Forfeiture Resolution Forfeiting 5,000,000 Acres of Prime Puget Sound Land North of Tacoma's Commencement Bay and West of the Cascade Mountains.**

The Seattle Establishment did not take Northern Pacific's spurning sitting down; a standing room only assembly at Yesler's Pavillion in downtown Seattle at First and Cherry vowed to fight back.  If the Northern Pacific was not going to use the land grants surrounding Seattle and towns to the Canadian border, west of the Cascade Mountains, to build the preordained transcontinental railroad terminus to Seattle's Elliott Bay, then Northern Pacific should not continue to hold these "unearned" land north of Tacoma's Commencement Bay.  As Armbruster recounts in *Orphan Road*:

> Arthur Denny had few illusions...Seattle must not
> rely on a nearly bankrupt corporation whose intentions
> were now clear; he lectured his colleagues; they must
> do for themselves...He gaveled to order another mass
> meeting at Yesler's Pavillion, this time to bring down
> Seattle's curses upon the Northern Pacific and adopt
> a resolution, which was promptly mailed to the secretary
> of the interior and the federal land commissioner,
> demanding immediate forfeiture of all the NP's
> "general route" land grants north of Pierce
> County [Commencement Bay].

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--15

Armbruster at 40.

This Land Grants Forfeiture Resolution was fully supported by the Seattle townspeople.  And it succeeded. Former Washington Territorial Chief Justice Orange Jacobs and Seattle attorney John J. McGilvra  were resourceful and successfully guided the land grant forfeiture resolution through Congress. [McGilvra had been a confidant of Abraham Lincoln, who  appointed McGilvra U.S. Attorney for the Washington Territory. Armbruster, *supra* at 40.  Lincoln and McGilvra shared law office space in Springfield, Illinois and served together in the Illinois Legislature. It is reported that, in order to defeat the measure that was about to pass the Illinois state legislature, McGilvra and Lincoln together leapt out an open window in the legislative chamber just before the vote was taken, denying their opponents a *quorum* to pass the bill.]

Through McGilvra's resourcefulness, perseverance, and years of lobbying Congress, Seattle's 1873 retaliatory land grant forfeiture resolution succeeded and passed both the House and Senate in 1877. Seattle's resolution cost the Northern Pacific millions of dollars worth of prime King County/Puget Sound acreage; Northern Pacific lost 5 million acres of land grant lands north of Commencement Bay, fully 1/10th of the

entire original land grant which established the Northern Pacific in 1864. [The Northern Pacific declared bankruptcy for the first time in 1873 while the forfeiture resolution was pending in Congress.] Years later, in 1894, while speaking to the Pioneer Association of *Tacoma*, Judge McGilvra reflected on the "inborn and enterprising spirit of the pioneer" who "can testify to the long and weary waiting and watching we had for the time to come for the rapid development and improvement".  King County Bar Association, *Addresses on the Life and Character of Judge John J. McGilvra,* pages 69-71 [1904].  Judge McGilvra, Judge Burke, and Chief Justice Lewis epitomized what became known as "the Seattle Spirit".

2.       **Judge J. R. Lewis Becomes Part of The Seattle Establishment Opposing The Northern Pacific Railroad and Is A Leader of Seattle's Opposition to the Northern Pacific.**

1875 was an eventful year in Seattle's war with the Northern Pacific: not only was Seattle succeeding with its Northern Pacific land forfeiture resolution, returning five million acres to the public domain for settlement, but in the spring of 1875, the Seattle Establishment warmly welcomed the law and order Judge J. R. Lewis, the newly appointed Chief Justice who arrived in Seattle to hear cases before the Supreme Bench; they sent him a

congratulatory telegram upon his arrival.

Judge Lewis was a no-nonsense man with unimpeachable integrity who descended from George and Martha Washington's family. He was born in 1829, and practiced law in Washington, Washington County, Iowa, until he was selected by President Grant to be Chief Justice of the Idaho Territorial Supreme Court in 1869. After restoring justice to the Idaho Territory, Judge Lewis was the President's choice to be associate justice of the Washington Territorial Court in Walla Walla, and then was later appointed as Chief Justice of the Washington Territorial Supreme Bench in 1875. Seattle historian Clarence B. Bagley wrote in his *History of Seattle, Volume I,* (1916, 1921) at 295 that J. R. Lewis had a "great natural force of character". Bagley noted that Judge Lewis exhibited "inflexible impartiality" and that had a "fearless, outspoken manner" and "unchangeable purpose in making no compromise with the violators of the law." Bagley, *History of Seattle, Volume III* (1921) 886-887. As will be obvious in this brief to the Court, Chief Justice J. R. Lewis was fearless and unchangeable in his opposition to the Northern Pacific Railroad.

Chief Justice Lewis' reputation for steadfastness of purpose was noted by Seattle's Charles T. Conover, who knew Judge Lewis well and worked for him as his land agent, described him as "staunch and

unswerving in what he believed to be right and just" in the Seattle Times Profile: "Judge J. R. Lewis Led Seattle Thought and Action", *Seattle Times,* March 2, 1950.

After moving to Seattle, Chief Justice Lewis became an integral part of the Seattle Establishment and rallied Seattle to push back against the Northern Pacific Railroad and its inequities.  Judge Lewis became an outspoken opponent of the railroad monopoly and its greed; he even organized the Seattle commercial interests' opposition to the Northern Pacific and to the efforts of its director Charles Barstow Wright to choke the throat of Seattle's development;  Judge Lewis established the Seattle Chamber of Commerce, serving as its first President, in 1882.

When the Northern Pacific Railroad refused to build the Cascade route for the transcontinental railroad to connect Seattle with its Eastern Washington neighbors like Walla Walla and Yakima where Lewis had founded the First National Bank of Yakima, Judge Lewis and several of his Seattle Establishment friends took action: Judge Lewis incorporated the Seattle, Walla Walla & Baker City RR in 1882 to build the Cascade track that should have been built by the Northern Pacific.  Judge Lewis' railroad planned to take the track east through Snoqualmie Pass in the Cascade

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--19

Mountains, the same route that was  proposed by  Surveyor/Territorial Governor Stevens in 1854 and anticipated by the Congressional charter of the Northern Pacific in 1864. Walla Walla wheat farmers were eager to have their wheat economically transported from Eastern Washington to Seattle's Elliott Bay for convenient sailing transport to San Franciscan and Japanese consumers.

In 1883, when Wells Fargo was sued by the Northern Pacific, Wells Fargo retained retired Chief Justice J. R. Lewis to defend it against claims brought by the railroad. Judge Lewis defeated the Northern Pacific in that case. *Northern Pacific Railroad Company v. Wells Fargo & Co.*, 2 Wash. Terr. 303 (1884).

During this same year he was defeating the Northern Pacific's claims in the courts, Judge Lewis forcefully argued in public forums that the Northern Pacific should forfeit the remaining unearned lands back to the government. Judge Lewis and the citizens of Seattle met  at Yesler's Pavilion on March 22, 1884, to consider his all encompassing anti-Northern Pacific land forfeiture resolution that went far beyond the 1873 narrowly tailored, successful 5,000,000 acre forfeiture occurred in 1877.  J. R. Lewis and the leaders of Seattle were demanding that Congress forfeit the balance

of all Northern Pacific's unused and "unearned" land grant acreage which was retarding further development of the Northwest, the Puget Sound region, and particularly the city of Seattle. Together with Judge Thomas Burke, Judge Lewis galvanized the fight against this violator of the letter and spirit of Congress' and President Lincoln's very generous 1864 transcontinental land grant law.

Judge J. R. Lewis, in his role as Chairman of the Northern Pacific Land Grant Forfeiture Committee, presented the following forfeiture resolutions to the citizens of Seattle:

WHEREAS, On July 2d, 1864, Congress granted to the Northern Pacific Railroad Company lands to aid such company in the construction of a railroad from Lake Superior to Puget Sound; and

Whereas, The original grant was large and valuable enough to have constructed the entire line of road within the time specified in the granting act, without other help, had the grant and franchise been administered by responsible, honest, and prudent men of even ordinary business capacity; and

Whereas, Nearly twenty years have elapsed since said grant was made, and not one mile of road has been built west of the Cascade range that was, or is, honestly intended to be a part of said line of road as originally chartered, or, in fact, has any road at all been built by said company in the Territory of Washington, west of Wallula, except small local roads of no practical benefit to the Government or the people of this Territory; and

Whereas, Said company has at no time, during said period of twenty years, made any effort in good faith to construct its

chartered lines of road in this Territory according to the intent of Congress, but on the contrary, has pursued a policy that has been, and is, a constant menace to any other companies desiring to build roads in said Territory; and said grant has been continuously used by said company, by favor of the Interior Department, as an instrument to retard the settlement, growth and development of the Territory, by floating its grant over about three-fourths of the Territory by the filing of maps of "general route," "trial lines," "proposed lines" and "amended lines," a compliant Department without warrant of law making withdrawals of lands for forty miles on each side of the lines as laid down on in those several filings; and

Whereas, millions of acres of the public domain are withheld from entry and settlement along the constructed and unconstructed line of said railroad, to which it has no equitable claim not having earned them in accordance with either the letter or spirit of the granting act—lands worth more than $7,000,000 being so withheld in this county alone, claimed to have been earned by the building of thirty-one miles of road, the major part of which cannot be named as part of the Cascade branch line, and wht whole of which was in fact built as a local coal road, and is entirely within the limits of lands claimed to be earned by the building of the line from Tacoma to Kalama; and

Whereas, Said Northern Pacific Railroad Company, in selling its so called earned lands, has always made, and continues to make, reservations in its deeds of rights and privileges in itself, and imposes upon the settler conditions which must prove a serious drawback to the settlement and continued prosperity of the country within and far beyond the granted limits; these obnoxious and insufficient deeds reserve to said company the right to build [ ] and railroad lines over the land, reserving for the latter a strip of land 400 feet wide and requiring the purchaser to fence along said railroad lines; they also reserve all the minerals and the right to mine the same, and provide that should the

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--22

purchaser fail in any respect to comply with the conditions therein he shall forfeit the land, giving him but a shadow of title, of no commercial value.  By so reserving all the minerals the company controls absolutely the entire said deposits along its line, andprevents a wholesome competition in an article of absolute necessity to the whole people. and

Whereas, Congress intended in granting such a magnificent empire of land to the company to gain some corresponding compensation to the people by opening up and developingthe country and securing the benefits, through competition of just and reasonable rates of transportation, which any corporation so generously and magnificently endowed could richly afford to give; and

Whereas, immediately upon the institution of through traffic over its line, the Northern Pacific Railroad Company entered into an agreement with the managers of the two other transcontinental roads for the avowed purpose of avoiding competition, and of adopting and perpetuating the discriminating and extortionate freight and passenger tariffs heretofore established and maintained by said companies, thus affording no relief to citizens of the Pacific Coast, and defeating the said beneficent intent of Congress, and

Whereas, The said Northern Pacific Railroad Company has added to this injustice by adopting a system of tariffs at once oppressive, discriminating and destructive to the establishment and extension of trade and manufacturing along its line, by charging at all interior points through traffic rates to its termini plus local rates back to the place of consignment, thus compelling payment of the larger sum for the lesser service, a policy and practice manifestly inequitable and injurious, and

Whereas, On or about the 12th day of February, the accredited agent of the Northern Pacific Railroad came to this city, and after two days of earnest labor with, and solicitation of the members of the Chamber of Commerce, induced them to reluctantly, against their convictions, adopt resolutions against the forfeiture of the grant to

said Company,
and

Whereas, Said resolutions were not then, and are not now, expressive of the sentiments of the people of this city and county, or indeed of the members of said Chamber, as is evidenced by the fact that nearly all of the members thereof are active participants in this meeting, and endorse the sentiments of these resolutions, and

Whereas, there is traffic enough to pay a very large percentage upon the fair and reasonable cost of any sensibly located road, from Puget Sound across the Cascade range to Eastern Washington and Idaho, and any company would be munificently recompensed for building such road, without any subsidy whatever in lands or money, therefore, be it

*Resolved by the people of Seattle and King county, in mass meeting assembled,* That we repudiate the resolutions adopted at the instigation and solicitation of the Northern Pacific Railroad Company by the Seattle Chamber of Commerce on the 13th day of February, 1884, and affirm that said resolutions were contrary to the almost unanimous sentiment of the people of this city and county.

*Resolved,* That we heartily approve of the forfeiture bill reported favorably by the majority of the Committee on Public Lands of the House of Representatives, and ask that it become a law and that Congress be requested a resolution directing the Secretary of the Interior to restore to the public domain and to declare open to entry and settlement all of the lands illegally withdrawn on the line of the coal road running from Tacoma thirty-one miles eastwardly.

*Resolved,* That Congress should by appropriate legislation forbid said company from imposing discriminating and extortionate rates and should regulate the price at which all these lands to which it shall be determined the company has title shall be sold, and forbid the impositions of conditions by it which can in any way interfere with the free and untrammeled alienation of the entire and absolute

fee thereof by the grantees.

*Resolved,* That the people of Seattle and King county hereby pledge themselves to build, or cause to be built, a railroad across the Cascade range to the Columbia River, without any subsidy in lands or money, provided such forfeiture bill becomes a law.

*Resolved,* That copies of these resolutions be forwarded to the President and to each Senator and Representative in and Delegate to Congress, the Secretary of the Interior and the Commissioner of the General Land Office.

*Seattle Daily Post-Intelligencer,* March 23, 1884.

Armbruster reports that

> Chief Justice J. R. Lewis raised a hearty laugh in his counseling: "We had better take our bearings and our latitude, provided the parallels have not been stolen," and he recited a bit of doggerel:
>
> > "Railroad, railroad, ichry am, Northern Pacific Railroad, you we dam!"
>
> Lewis urged the gathering to appoint a delegate to go to Congress and demand forfeiture.  "I'll be one of twenty, or one of fifty, to put up the money!".

Kurt E. Armbruster, *Orphan Road,* Washington State University Press,

(1999) 87.  Historian Bill Speidel noted that

> Judge Lewis expressed the prevailing sentiment with a little poem that wouldn't have won a Pulitzer Prize, but brought down the house.

Speidel, William, *Sons of the Profits*, Nettle Creek Publishing Co., at 189.

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--25

Judge Lewis successfully fought back against the Northern Pacific Railroad; the standing-room crowd of citizens at Yesler's Pavilion passed his forfeiture committee's resolutions unanimously, as reported the next day in the *Seattle Daily Post-Intelligencer*:

> Of the meeting, it may truthfully be said that it was a representative assemblage, comprising every element of the business interests in this city, and representing the almost universal sentiment of our people.  The preamble and resolution were adopted without a dissenting vote.
>
> We are confident that they express the honest sentiments and desires of 90 per cent of the people of Washington Territory.  Letters received during the past few weeks from readers of this paper in every part of the Territory upon this question submitted to the meeting last evening denote a striking unanimity of public sentiment.
>
> For the people of the city of Seattle and King county we declare that they are in earnest.  This is the largest city in Washington Territory.  The action last night was not had upon the impulse of the moment, nor under stimulus either of anger or petty disappointment.  It is the deliberate expression of a people representing one-tenth the population and one-fifth the taxable property of Washington Territory.  Our citizens promise that if the lands granted to the Northern Pacific Railroad Company are restored to the public domain, they will see to it a railroad is built across the Cascade range of mountains without aid of government subsidy in lands, money or credit.  They mean business.  The ways and means of doing this great work have been carefully discussed.  They will be presented in due time.  It is enough now to say that Seattle will keep her pledges in the future as in the past.
>
> The time is coming and we hope it is near at hand,

when the grip of this, with other huge monopolies, shall be loosened from a large portion of the people's heritage, improvidently granted and inequitably claimed.  Washington Territory, more than any other, is shadowed by such claims. They retard her growth; they menace her future.  Her citizens should, for their own self-protection, unite with us in demanding justice and relief.

*Seattle Daily Post-Intelligencer*, March 23, 1884.

On the 27th of March, 1884, Chief Justice Lewis, speaking to another land grant forfeiture assembly,

was next on his feet, brandishing a "Black Cloud" map and raising hoots of angry laughter by suggesting the territory simply be renamed: "Northernia Pacifica Railroadia."

He elaborated: "The Northern Pacific Railroad Company. . . have attempted to steal the name of our grand old mountain, and are trying to gobble up all our land without having earned an acre, and I would not be surprised to find them attempting to steal the air we breathe!"

Judge Thomas Burke cleared his throat and jerked to his feet. . . "If we make this fight, he barked, "we must remember that we a facing a corporation of great wealth, which is vastly unscrupulous and selfish." . . .

Burke's voice rose another notch as he thundered: "The Northern Pacific Railroad Company despises the people of Washington Territory, and much talking and hard works will not frighten them a bit. . .If we make a strike, let us strike with effect!".

Armbruster, *Orphan Road,* Washington State University Press, (1999) 87-88.

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--27

With the unanimously passed resolutions in hand, Chief Justice Lewis put up $50 and passed his hat to collect $727 in travel expenses to send William "Warhorse" White to Washington to press the forfeiture issue to Congress against the immense lobbying effort being waged by the Northern Pacific against forfeiting lucrative, unearned lands.

White was partially successful: the House passed the forfeiture bill by a wide margin, but the conference bill was blocked in the Senate by staunch Northern Pacific allies such as Senator William Tecumseh Sherman.

In 1885, Judge Lewis ran for a seat on the Washington Territorial Legislature promising to do one thing and one thing only: to oppose the Northern Pacific's efforts to manipulate Washington laws.  He was elected by a landslide and he kept his campaign promise. Judge Lewis served on the Washington Territorial Constitutional Convention to draft the Constitution for what would become, in 1889, the new state of Washington.  He was instrumental in making sure Article 1, Section 16 made it through the Constitutional Convention:

> Private property shall not be taken for private use. . .
> Whenever an attempt is made to take private property
> for use alleged to be public, the question whether the
> contemplated use be really public shall be a judicial

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--28

question, and determined as such without regard to any
legislative assertion that the use is public.

Judge Lewis' distrust of the railroad and its ability to influence legislators

is evident in this constitutional provision regarding eminent domain.  Under

Washington law, a railroad cannot obtain fee simple ownership through

eminent domain proceedings.

The war between the Northern Pacific and the Seattle Establishment

continued unabated.  The Northern Pacific retaliated by closing down the

only rail from the Tacoma terminus up to Seattle despite the fact that the

run was quite profitable before stopping operation.   Grant's History of

Seattle recounts that

> The [Northern Pacific Railroad] company, apparently,
> through pure malice, refused to operate the road
> between Seattle and Tacoma, and for more than
> a year the rails were permitted to rust and the ties
> to rot, while on the entire road not a wheel was turned.
> This spiteful refusal to operate a road whose operation
> would unquestionably have been profitable, is probably
> without a parallel in the history of railroading.

Grant, *History of Seattle*, (1921) 178-79.

In 1893, after the Northern Pacific emerged from its second

bankruptcy in 20 years, the Northern Pacific reorganized itself into the

Northern Pacific Railway Company.  The Seattle Establishment did not let

Lewis/Kittinger 1903 Railroad Right of Way Deed Analysis--29

the newly named railway off the hook.  In 1899, the Northern Pacific's request to vacate streets in the Seattle waterfront so it could build its grand waterfront rail terminal on Elliott Bay was resoundingly defeated 12-1 against, with the lone aye vote changing to nay to make it unanimous.

The anti-Northern Pacific sentiment was alive and well in the hearts of the Seattle Establishment which could not forgive the railroad's efforts to choke the economic life out of Seattle.  It was no different when in 1903 the Northern Pacific came calling on the Seattle Establishment land owners of the large Kittinger parcel for a right of way to resurrect its Lake Washington Belt Line which the railroad had refused to build in 1890 allegedly because it could not be built to the Company's "high standard of construction", Northern Pacific President Oakes' March 1890 statement set forth on page 3 *infra.*

By 1903, the Northern Pacific had been excluded from earning substantial revenue from the burgeoning coal trade being conducted immediately east of the eastern shore of Lake Washington and it now wanted part of that freight revenue.  Coal mining which had grown from 35,000 tons in 1873 was now approaching 200,000 tons by the year 1900. McDonald, Richard K. and Lucille, *The Coals of Newcastle: A Hundred*

*Years of Hidden History* (A Washington State Centennial Project by Issaquah Alps Trails Club in cooperation with the Newcastle Historical Society, 1987) 55. Judge J. R. Lewis' father, Colonel Phillip H. Lewis, had discovered coal on the eastern lands adjacent to Lake Washington in 1863 and was actively involved in establishing his coal mining claims. McDonald at 6. Lewis Creek, Coal Creek, & Newcastle were established by Colonel Lewis and his coal mining friends. *Ibid.* So, it was natural that his son, the former Chief Justice and ardent  opponent of the Northern Pacific, would specifically exclude, from the right of way grant, all rights to mine coal, the most valuable property right of all the  valuable rights retained and excluded from the 1903 right of way.

Judge Lewis and his fellow landowners ensured that the Northern Pacific received the barest right of way necessary for the sole purpose of constructing, maintaining, and operating its new Lake Washington Belt Line railroad.  The 1903 Lewis/Kittinger Right of Way Deed to the Northern Pacific specifically acknowledged that the Northern Pacific's intent was only to obtain a right of way

> to construct its railroad over and across said lands
> on the westerly side thereof near to and along the
> shores of said lake and has made a survey for said line
> of rail road and staked the same out, and wishes to

> secure for such purpose the right of way over and
> across said lands....

Lewis/Kittinger ["Kittinger"] Right of Way 1903.

The Northern Pacific which had recently emerged from its second bankruptcy only needed this easement to satisfy its sole purpose of completing its Lake Washington Belt Line railroad

Chief Justice Lewis and his co-owners, including land baroness Mary Terry Kittinger and her husband, real estate attorney George Kittinger, were familiar with Washington law as it existed in 1903.  Railroad right of ways were easements in Washington.  The 1894 case of *Reichenbach et al v. Washington Short-Line Ry. Co.*, 10 Wash. 357, 38 P. 1126 is illustrative and instructive.  The Washington Supreme Court found that parties with the purpose of building a railroad "over, across, and along" the land described intended a grant of an easement, particularly where significant property rights were excluded and retained by the fee simple owners.  This is the case law which assured these grantors that they were only granting a limited purpose easement to the "ancient enemy" and that they retained the economic potential of their property.

These owners specifically protected their valuable property rights from the Northern Pacific.  Certainly, J. R. Lewis did not forget the long-

standing mistreatment by the Northern Pacific and was not kindly disposed

to give the Northern Pacific anything more than the barest minimum that

the Northern Pacific would have obtained through a long and costly

eminent domain proceeding.  After all, this was the "steadfast" judge who

led the anti-Northern Pacific Land Grant Forfeiture Campaign of 1884 and

who was openly contemptuous of the railroad ["Northern Pacific railroad,

you we dam[n]"].  Retired Chief Justice Lewis made sure that the Northern

Pacific only received what the company could obtain by eminent domain:

a right of way/easement, a private way of necessity.

Not only do the Whereas clauses in the Lewis/Kittinger grant indicate

that it is only for railroad right of way purposes, but the retention of every

valuable right by the owners negates the federal government's current claim

that these owners intended a fee simple conveyance, rather than an

easement.

The retention of these valuable property rights had special

significance to these owners:  by controlling these valuable rights, they

controlled the economic potential of the land:

1)      By retaining "all littoral and riparian rights appurtenant to the

lands herein conveyed [the 100' wide strip on top of the land],

Judge Lewis and his fellow owners controlled the lake access which was extensively utilized by barges in the commercial coal trade.   Undoubtedly, Chief Justice Lewis and his co-owner real estate attorney George Kittinger were well acquainted with Gould on Water, the bible on the law of waters, then in its third edition as of 1885, which noted in Chapter V, Section 179 that:

> Riparian owners upon navigable *fresh* rivers and lakes may construct, in the shoal water in front of their land, wharves, piers, landings, and booms in aid of and not obstructing the navigation.  This is a riparian right, being dependent upon title to the bank and not upon title to the river bed.

[Original emphasis.] Gould, John M., *A Treatise on the Law of Waters, including Riparian Rights*, Callaghan and Company, Chicago, (Third Edition, 1900) 348-49.   The retention of riparian rights also gave these owners continued control of the abundant fresh  river and spring water which was accessible in this land tract.  Judge Lewis had practical hands-on experience with the value of tapping spring water from his days establishing Seattle's first commercial spring water supply on Seattle's hills, the Spring Hill Water System.

Judge Lewis also knew the value of pumping water directly out of Lake Washington, Washington's second largest lake with 22,163 acres, which his water system company initially sold  for drinking water and later sold for irrigating lands abutting the lake.  With these valuable riparian rights, Judge Lewis and his co-owners could tap into the hillside springs and could pump water directly from the lake. [These riparian rights are still considered valuable property rights as the cost of providing city water has continued to rise over the decades.]

Judge Lewis and his co-owners were not only aware of the value of access rights to transport Newcastle coal to Seattle, but they were undoubtedly aware of plans to make it possible to navigate from Lake Washington to world ports via the Pacific Ocean by means of the proposed Lake Washington Ship Canal.  A prominent promotional brochure entitled "*Lake Washington: Resources of the Region Tributary to its Eastern Shores and the Belt Line Railroad*", published by Lowman and Hanford in Seattle, in 1891, discussed the details of the access to the Pacific project including the substantial lowering of

Lake Washington, creating new shorelands, and a lock system making it possible for ocean bound vessels to access the lake twenty-four hours a day, seven days a week.  The report noted that "the canal to Lake Washington is assured" and touted the costs saving of having a fresh water harbor on Lake Washington.

> But above all there are the advantages which will be gained by bringing shipping within easy reach of the region of timber, coal, iron, limestone, granite, marble, potter's clay, plumbago, and so many natural resources, and to a point where best these products can be brought together for manufacture–the eastern shore of Lake Washington.

> Already this location has been taken advantage of, and there is now being built at Kirkland works for the greatest manufacturing enterprise not alone of Washington, but of the entire Northwest–the extensive works of the Great Western Iron & Steel Company.

"*Lake Washington: Resources of the Region Tributary to its Eastern Shores and the Belt Line Railroad*", Lowman and Hanford, 1891, at page 17.  This 1891 Eastern Shore of Lake Washington Report was underwritten and promoted by James McNaught who earlier had the thankless task of representing the "ancient enemy", the Northern Pacific Railroad, in its war

with the Seattle Establishment, butting heads with retired Chief Justice J. R. Lewis. *See also* Wong, Adam, Images of America, The Ballard Locks, page 22, map depicting the subject property in relation to the "Improvement of Waterway Connecting Puget Sound with Lake Union and Washington" prepared by the U. S. Engineer Office in 1902.

The forecasted Lake Washington Ship Canal was constructed in 1917; the lowering of Lake Washington exposed additional land on which most of the Kittinger claimants today have their waterfront homes. The additional land also provided the site for the 1920s schoolhouse on Lakehurst Lane attended by the coal miners' children.

In addition to retaining control over all littoral and riparian rights in this 100' wide right of way, Judge Lewis and his co-owners retained control of this strip across their land by specifically retaining:

2)      "the right of a highway crossing over and across the said lands granted," [the 100' strip to construct, maintain, and operate the Lake Washington Belt Line] "to and from the lake shore to the land lying next easterly of the lands herein

granted"; control of these crossing rights insured the owners

unfettered access and, consistent with these retained rights, the

rail line was not fenced;

3)   "reserving the right to mine coal, and reserving also the right

to build an overhead crossing upon and over said property and

tunnel under the same" demonstrated the owners' knowledge

of their valuable coal rights and preserved control of accessing

the lake shore with the coal production which could be barged

as an alternative to future unfair price gouging by the railroad

with its monopolistic freight tariffs; Judge Lewis and his co-

owners made sure that they could tunnel under the rails to

extract their coal and could cross over the rails to transport

their coal to the lakeshore.  Coal was "King" and these owners

were not about to give up these valuable land rights, either

expressly or implicitly, to an unscrupulous railroad company

that had along history of abusing the citizens of Seattle. By

retaining these valuable rights, Judge Lewis and his co-owners

controlled the future economic value of the right of way land

and preserved their options to participate in the lucrative coal

industry. As of 1903, Newcastle was one of the largest coal deposit on the West Coast of the United States and yielded the highest quality coal with optimal BTUs. McDonald, *infra.* Before oil, it was coal which fueled the engines, businesses, and homes of the industrial age.  Judge Lewis made sure that these valuable coal mining and coal transportation rights remained with grantors and did not go to the Northern Pacific; he ensured that he and his co-owners controlled the economic potential of this right of way strip.

When the Lewis/Kittinger right of way deed was executed in 1903 , the controlling case law on railroad right of ways in Washington made it explicitly clear that where there is limiting language expressly excluding from the conveyance certain property rights or there is an expressed purpose of providing a railroad right of way, then only an easement is granted to the railroad, consistent with an easement being the most that the railroad could obtain by eminent domain.   Article 1, Section 16, Washington State Constitution; *Reichenbach v. Washington Short-Line Ry. Co., infra.*

Considering Washington law and the hostile history between the

Northern Pacific and the Seattle Establishment leading citizens including Judge J. R. Lewis, there is no way that the Northern Pacific would ever expect to receive more than an easement from Judge Lewis and the Kittingers. The language of the 1903 deed reflects this reality that only a limited private right of way [easement] was granted to accomplish the stated purpose that the Northern Pacific "wishes to construct its railroad over and across said lands" which "lie next to and front upon the eastern shore of Lake Washington".  Even the imprecise description of the right of way as "has made a survey for said line of rail road and staked the same out" further reflects the parties' intention that the grant was merely an easement, not a fee where a precise property description would be expected .

Since that time, Washington courts,  with the *Swan* presumption that an easement was granted, apply the *Kershaw Farms/Brown* factors analysis to determine the intention of the parties.  Here, the Lewis/ Kittinger right of way deed, expressly sets forth the railroad construction, maintenance, and operational purpose of the right of way.  This clear purpose, combined with the express intention of the grantors to retain valuable riparian, coal mining, tunneling, crossing, and overhead crossing rights in the 100' wide right of way strip, compel the conclusion that only an easement was

granted, especially considering the "avowedly hostile" thirty-year history between the grantors and the grantee.

The Northern Pacific's ultimate successor in interest, King County, as the Rails-to-Trails developer/manager analyzed this Kittinger deed to determine the nature of the conveyance and determined that the status of the 1903 conveyance was not in dispute; King County determined that the 1903 Kittinger right of way deed clearly conveyed an easement, as reflected on King County's Eastside Rail Corridor Maps 50 & 51, where the County clearly labeled Kittinger an "easement", not "fee simple" or "in dispute".

The only entity to ever claim that this 1903 right of way deed is somehow a fee simple conveyance is the United States government in this lawsuit. The government's claim of "fee" is not supported by the facts and flies in the face of the "avowedly hostile" history between the conveying parties, the deed's language limiting the purpose to railroad right of way, the grantors retaining their valuable property rights in the right of way, and the reality of Washington law, both as it existed in 1903 and has continued to the present, that private railroad right of ways are just limited purpose easements.

As Judge Horn pointed out in her 2011 *Beres v. United States*

decision on fee versus easement deed interpretation, "contemporaries near the time the source deeds were executed understood the phrase right of way to indicate an easement and not a fee". *Supra* at 55. Does anyone really think that former Chief Justice Lewis did not understand the law or that his 1903 right of way grant was more than merely an easement?

When the Northern Pacific obtained this easement over a narrow strip of the Lewis/Kittinger property in June 1903, its Belt Line between Renton and Woodinville was already under construction, which began in April 1903 and concluded in October 1904. *See* Armbruster, *Orphan Road* (Washington State University Press, 1999) at 159.  When the Northern Pacific's successor, Burlington Northern and Santa Fe, put this right of way/easement into interim trail use in 2008 and stopped using it for railroad purposes, the adjoining property-owner successors to Judge Lewis and the Kittingers obtained their reversionary interest rights in accordance with well-established Washington law.

Respectfully presented this 19th day of September, 2012

> s/ Steven Wald by
> s/Gordon Woodley, Washington State Bar No. 7783,
> & the United States Court of Federal Claims Bar
> Of Counsel for Kittinger Deed Claimants in Subclass
> Four B

512 Sixth Street South Suite 101
Kirkland, WA 98033
(425) 453-2000
(425) 658-7202 (facsimile)
woodley@gmail.com