## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

DANIEL and KATHY HAGGART, *et al.*    )
    )
    Plaintiffs,    )
    )
    v.    )    No. 09-103L
    )
THE UNITED STATES OF AMERICA,    )    Judge Charles F. Lettow
    )
    Defendant.    )
_____)

## THE UNITED STATES' REPLY IN SUPPORT OF ITS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING SUBCLASS TWO

## I.    INTRODUCTION

This is not a rails *to* trails case.  Rather, this is a rails *with* trails case.  The undisputed facts show that corridor is slated for dual rail with trail use.  Plaintiffs cite no contrary facts. Plaintiffs accuse the United States of ignoring the law and purportedly binding precedent.  But each case is to be decided upon its facts, and it is the facts of this case that the Plaintiffs ignore. The rights of way at issue are intended for rail use with trails, and on this basis alone it is distinguishable from all of the cases relied upon by Plaintiffs.  Dual use of the corridor changes the analysis, because those parts of the right of way which were burdened by an easement for rail use, remain burdened by that easement.

Plaintiffs now argue that the easement held by the railroad was limited to "freight rail (coal)" (Subclass Two Pls.' Resp. to United States' Cross-Motion at 30 (ECF No. 119)), but they cite no evidence or rule of law that supports limiting any easement at issue to freight rail service, only.  Nor is there any limitation in any deed or court decree at issue granting only the right to use the right of way for freight rail service.  Commuter rail service still involves running trains

over tracks.  There is no basis to limit an easement granted to a railroad  to only certain types of rail service, as Plaintiffs suggest.

Additionally, Plaintiffs use the term "abandon" loosely.  In the context of the Surface Transportation Board's regulations, "abandonment" means to discontinue common carrier service and nothing more – it does not mean an abandonment of any easement to use the land.  In this case, the evidence shows that there was no intent to abandon the easement in the corridor, although there is no dispute that Burlington Northern intended to discontinue service and sell its interest in the corridor, including the easements.  Indeed, all of the granting documents at issue contemplate that the railroad may convey the right of way by expressly including "successors and assigns" in the grant or decree.

The question the Court should ask is, given the facts presented, what did the NITU do? The NITU merely allowed time for the railroad, King County, and Port Seattle to complete their negotiations, and close the sale.  Burlington Northern was authorized to either discontinue its common carrier service obligations (a regulatory abandonment), or enter into a railbanking and trail use agreement with King County and transfer its common carrier right to reactivate rail service to the County.  The NITU did not grant or nullify any property rights whatsoever, and the United States did not acquire any interest in any property when the NITU issued.  Nor did the United States take any "reversionary rights" that Plaintiffs may have in the corridor.  The rights of way were burdened by easements granted to a railroad before the NITU issued, and after the NITU issued.

II.     **ARGUMENT**

A.     **Plaintiffs Erroneously Argue that Abandonment is Irrelevant**

This case involves the intended dual use of the corridor.  Sound Transit has an easement in the corridor for commuter rail, and King County has an easement for trail use and holds Burlington Northern's common carrier rail reactivation rights.  *See* Watson Decl., ¶¶ 15, 16 & Exs. I, J (ECF No. 110).  No other rails to trails case presents similar facts, so this case is unique and of first impression.  Consequently, cases such as *Preseault*, *Toews*, *Ellamae Phillips Co.*, and *Lawson*, which Plaintiffs rely upon, are inapposite on the issue of abandonment.

In *Preseault II*, the court found that the rail line had been abandoned more than 10 years before the City of Burlington entered into a lease with the State of Vermont Agency of Transportation and the Vermont Railway to use the corridor for recreational trail use.  *Preseault v. United States*, 100 F.3d 1525, 1549 (Fed. Cir. 1996) ("*Preseault II*"); *see also id.* at 1547 ("[T]he purpose of the Railroad's actions leading up to the track removal in 1975 was to abandon this stretch of rail line.").  Thus, *upon abandonment*, the Preseaults held the property in fee simple, "free of the encumbrance."  *Id.* at 1549 (emphasis added).  Trail use therefore created *a new easement upon unencumbered land* held in fee, resulting in a taking.  *Id.* at 1550-52 (emphasis added).

Additionally, the Supreme Court in *Preseault* did not consider and reject the arguments now asserted by the United States, as Plaintiffs contend.   *See* Subclass Two Pls.' Resp. United States' Cross-Motion at 2 (ECF No. 119) (citing *Preseault v. United States*, 494 U.S. 1 (1990)

("*Preseault I*").[1]  In fact, the Supreme Court did not even reach the merits of a Fifth Amendment

takings claim in *Preseault*: "In sum, petitioners' failure to make use of the available Tucker Act

remedy renders their takings challenge to the ICC's order premature.  *We need not decide*

*whether a taking occurred in this case*."  *Preseault I*, 494 U.S. at 18 (emphasis added).

Consistent with Justice O'Connor's concurring opinion in *Preseault I*, the Federal Circuit

in *Barclay*, *Caldwell* and *Ladd*, focused on what property interests a plaintiff would have had

under state law, absent the issuance of the NITU.  *See Preseault I*, 494 U.S. at 21 ("Determining

what interest petitioners would have enjoyed under [applicable state] law, in the absence of the

ICC's recent actions, will establish whether petitioners possess the predicate property interest

that must underlie any takings claim.") (O'Connor, J., concurring); *Barclay v. United States*, 443

F.3d 1368, 1371 (Fed. Cir. 2006) ("In *Preseault II*, we established that the elimination of

adjacent landowners' state law reversionary interests when *abandonment is suspended* under the

Trails Act constitutes a Fifth Amendment taking." (emphasis added)); *Caldwell v. United States*,

391 F.3d 1226, 1233 (Fed. Cir. 2004) ("The taking, if any, when a railroad right-of-way is

converted to interim trail use under the Trails Act occurs when state law reversionary property

interests that would otherwise vest in the adjacent landowners are blocked from so vesting.");

*Ladd v. United States*, 630 F.3d 1015, 1020 (Fed. Cir. 2010) (Trails Act gives rise to a takings

claim when state law reversionary rights are forestalled).  Thus, "events arising after [the NITU

---

[1] In other sections of their brief, Plaintiffs argue that the United States Supreme Court has
rejected the United States' arguments, but they fail to provide any citation to a pertinent Supreme
Court case, because none exist.  *See* Subclass Two Pls.' Resp. United States' Cross-Motion at
11.

issues]- including entering into a trail use agreement and converting the railway to a recreational trail- cannot be necessary elements of the claim." *Ladd*, 630 F.3d at 1024.

In *Toews*, after the NITU issued, but before any agreement for trail use was reached, the railroad began to remove "tracks, ties, and equipment from the rail corridor[,] [and] [b]y July 1995 all tracks and ties, except those in street crossings, had been removed." *Toews v. United States*, 376 F.3d 1371, 1374 (Fed. Cir. 2004). Apparently soon after acquiring the right of way the City of Clovis began to develop the trail, which was describe as "a twelve-foot wide paved path along the former railroad right of way . . . lined with trees planted on both sides . . . [with] park benches, water fountains, and bicycle racks." *Id.* Thus, the *Toews* court found it speculative whether the paved trail would ever be used for light rail. *Id.* at 1381. In contrast, in this case, the rails, ties and equipment were left in place by the railroad expressly to preserve the corridor for future rail use. *See* Odom Decl., ¶15; Watson Decl., ¶ 9. Indeed, since portions of a light rail project are now under construction (*see* Def.'s Resp. Opp'n Subclass Two Pls.' Mot. Partial Summ. J. and Cross-Motion Partial Summ. J., Ex. 1 & 2 (ECF No. 108)), it is clear that rail use is not speculative.

The Federal Circuit in *Ellamae Phillips Co.*, clarified that its prior decision in *Hash* that there was a "taking rested on the prior conclusion that the railway abandoned the right-of-way." *See Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) ("*Phillips I*"). Additionally, the Federal Circuit noted that in *Preseault II*, it "also held that abandonment was a question of 'fact, and the fact that the question relates to a right of way taken by a railroad company does not make it one of law.'" *Id.* (quoting *Preseault II*, 100 F.3d at 1546). Thus, the Federal Circuit held in *Ellamae Phillips Co.*, that the conversion of an 1875 Act right of way into

a trail is not abandonment, *per se*.  On remand, Plaintiffs conceded that the right of way had not

been abandoned upon operation of the Trails Act, rendering the issue moot, so the court did not

consider the issue.  *Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 487 (2011).

Moreover, unlike in this case, dual rail with trail use of the corridor was not at issue in *Ellamae*

*Phillips Co.*

In *Lawson*, "King County requested the ICC to impose a public use condition *upon*

*abandonment* of the 4.8-mile long right of way, pursuant to 49 U.S.C. § 10906 and 49 C.F.R §

1152.28." *Lawson v. State*, 730 P.2d 1308, 1309 (Wash. 1986) (emphasis added).  King County

thus sought the issuance of a public use condition after the railroad abandoned the right of way.

Consequently, "Burlington Northern [may have] had no interest to convey to the County: upon

abandonment of the right of way the land automatically reverted to the reversionary interest

holders." *Id.* at 1316.  The United States further distinguishes *Lawson* in its opening brief (*see*

Def.'s Resp. Opp'n Subclass Two Pls.' Mot. Partial Summ. J. and Cross-Motion Partial Summ.

J. at 19-21), but that case also did not involve dual, rail with trail, use, and is inapposite.

Thus, the question is whether state law abandonment was suspended so that the Plaintiffs

would have had use of the right of way unburdened by an easement.  Indeed, even Plaintiffs

argue that "the railroad purposes easements **would have been extinguished** and Plaintiffs

thereby would have unencumbered land but for the federal NITU."  Subclass Two Pls.' Resp.

United States' Cross-Motion. Summ J. at 23 (emphasis as in original).  But the easements would

only have been extinguished if abandoned.  So Plaintiffs' own arguments at least in part are

based on abandonment, whether they admit it or not.  Under the facts of this case, however,

Plaintiffs' so-called reversionary interests were not blocked or suspended because, under

Washington state law, there was never an intent to abandon the easement in the right of way. *See* Def.'s Resp. Opp'n Subclass Two Pls.' Mot. Partial Summ. J. and Cross-Motion Partial Summ. J. at 17-19.

Because Plaintiffs' property would have been burdened by an easement granted to the railroad before and after the NITU issued, the NITU did not effect a taking. At most, if the United States has any liability here it is limited to the additional burden, if any, imposed by a trail use easement on the existing easement granted to the railroad, as the United States argues in its opening papers.

### B. Abandonment under STB Regulations Means Discontinuance of Service - Not Abandonment of an Easement to Use the Right of Way

Plaintiffs throughout their papers use the term, "abandonment," loosely, suggesting that by filing a petition to abandon a line, means that the railroad intended to abandon its easement in the right of way. A railroad, however, may seek permission from the STB to terminate its service over a corridor through an "abandonment proceeding." But such a proceeding means that the rail line is removed from the national transportation system and the STB's jurisdiction generally comes to an end, if authority to abandon is granted by the STB, and if the railroad "consummates" the abandonment. *Hayfield N. R.R. v. Chic. & N.W. Transp. Co.*, 467 U.S. 622, 633 (1984); *Preseault I*, 494 U.S. at 6 n.3; *Birt v. STB*, 90 F.3d 580, 585 (D.C. Cir. 1996). It does not necessarily follow that the railroad abandoned its right to use a corridor – the easement – although it no longer is operating as a common carrier subject to the STB's jurisdiction.

Through railbanking, a railroad also is authorized to discontinue service over a corridor, but retains the right to resume future common carrier rail service, under the STB's jurisdiction. *See Neb. Trails Council v. STB*, 120 F.3d 901, 903 n.1 (8th Cir. 1997) ("'Rail banking' refers to

the preservation of railroad corridor for future rail use."); *Caldwell v. United States*, 57 Fed. Cl. 193, 194 (2003) (under the railbanking process, "[t]he right-of-way is 'banked' until such future time as railroad service is restored"), *aff'd*, 391 F.3d 1226 (Fed. Cir. 2004).  In the context of railbanking and interim trail use, it also does not necessarily follow that a petition to discontinue common carrier service within the STB's jurisdiction means that the railroad intended to abandon any easement to use the corridor – they simply are two separate issues.

> C.      **Plaintiffs Assert Inaccuracies of Fact and Set Up Strawman Arguments that the United States Does Not Make**

Plaintiffs contend that it is "flatly false" that the Interlocal Agreement (*see* Watson Decl., Ex. E) contemplates multiple uses of the corridor, including rail and trail use.  Subclass Two Pls.' Resp. to United States' Cross-Motion at 14-15.  But that Agreement plainly states:

> Whereas, the Parties intend that the Property will be put to use for regional recreational trail and for other public transportation use, *including but not limited to rail* or other transportation purposes other than interstate freight service ("Transportation Use"), and that the *intended trail use will not prevent Transportation Use* on the Property, *but rather will be designed and developed to accommodate Transportation Use* on the Property.

Interlocal Agreement, at 1 (Watson Decl. Ex. E) (emphasis added); *see also* Public Multipurpose Easement, Port of Seattle, grantor, King County, grantee, ¶ 4 (Watson Decl., Ex. I).  So not only does this Agreement contemplate rail use, but it makes clear that any trail use must be designed so as to not interfere with that "Transportation Use."  Plaintiffs' statement that "there is not one mention of rail service, period," in the Interlocal Agreement is incorrect.  Subclass Two Pls.' Resp. to United States' Cross-Motion at 15.

Additionally, unlike in *Thomas*, there is no evidence that the use of the corridor is precluded absent "permission of the non-railroad third party trial operator."  *See Thomas v.*

*United States*, No. 10-54L & 10-459L, 2012 WL3800764 at *19 (Fed. Cl. Aug. 29, 2012).  Just

the opposite, here King County must submit its plans for a trail to Port Seattle for review and

approval to coordinate "the proposed Trail Development with any then current or reasonably

foreseeable Transportation Uses or other uses by Grantor on the Property."  Public Multipurpose

Easement, ¶ 2.1.7.  Additionally, King County may construct "crossing over, under, or across

any railroad tracks or other transportation facilities on the Property, *provided* that such

crossings . . . shall not interfere with any Transportation Uses on the Property . . . ."  *Id.*, ¶ 2.1.6.

      In this case, the use of the corridor for rail purposes trumps trail use.  Port Seattle and

King County agreed that the trail may need to be relocated, if it is necessary "to change the grade

or location of any railroad infrastructure or other Transportation Use facilities in the Trail

Area . . . then Grantor . . . may make such change in its facilities in the Trail Area, and Grantor

and Grantee will jointly determine a new Trail Area location to replace the affected portion of

the Trail Area and any Trail or Trail-related improvements."  *Id.*, ¶ 2.2.2.  So *Thomas* is

distinguishable on its facts, and of no avail to Plaintiffs.

      Plaintiffs argue that the United States relies upon *Troha* and *Moody* for the proposition

that the deeds at issue in this case "do not contain limitations in the grant."  Subclass Two Pls.'

Resp. to United States' Cross-Motion at 8 (citing *Troha v. United States*, 692 F. Supp. 550, 560,

564 (W.D. Pa. 2010); *Moody v. Allegheny valley Land Trust*, 976 A.2d 484, 491-93 (Pa. 2009)).

However, the United States cites these cases in support of its contention that railbanking and

interim trail use preserve the corridor for future rail use and thereby serve a railroad purpose.

*See* Def.'s Resp. Opp'n Subclass Two Pls.' Mot. Partial Summ J. at 29.  The United States

plainly does not argue that these cases "say that the deeds in this case do not contain limitations

in the grant," as Plaintiffs argue.  Subclass Two Pls.' Resp. To United States' Cross-Motion at 8.

Rather, these cases make clear that railbanking and interim trail use serve a railroad purpose by

preserving the right of way in a rail ready state.  *See* Def.'s Resp. Opp'n Subclass Two Pls.' Mot.

Partial Summ J. at 29.   Plaintiffs thus create a strawman argument that the United States does

not assert, and then knock it down.

Similarly, Plaintiffs contend that the United States stipulated "that an agreement had been

reached for Subclass Two defining Subclass Two as those claimants who own property adjacent

to the right-of-way in the 'easement' category and where the government, subject to its

reservation of rights to raise the issue should additional information come to light, has not

challenged the Plaintiffs' property interest in the right-of-way based upon any language in the

Plaintiffs' deeds."  Subclass Two Pls.' Resp. to United States' Cross-Motion at 5 (citing D.E. 70)

(emphasis omitted).  Plaintiffs further contend that "[a]ll of the Subclass Two Plaintiffs have

language in their ownership deeds that benefit from the centerline presumption under

Washington law, as stipulated by the parties." *Id.*, at 5 n.7 (citing D.E. 70).

Docket Entry No. 70, however, is a Joint Status Report and contains no stipulations.

That Status Report reflects that "in order to administer the claims in this large complex case as

efficiently as possible, the parties have agreed . . . to divide the current class into sub-classes.

Specifically, the parties *are contemplating the following sub-classes for case management and*

*briefing purposes* . . ."  Joint Status Rep., filed Oct. 24, 2011, ¶ 3 (ECF No. 70) (emphasis

added).  The United States added its statement that it "believes that Plaintiffs have the

affirmative duty of coming forward and establishing a property interest in the right-of-way, and

have failed to do so in certain instances because, for example, the metes and bounds of certain

-10-

Plaintiffs' deeds do not include the right-of-way." *Id.* Plainly, the United States did not stipulate and agree that the centerline presumption applies to all of the Subclass Two Plaintiffs' property as Plaintiffs now suggest.  In fact, the United States makes clear in its opening brief that Plaintiffs have not met the threshold requirements of the centerline presumption under *Roeder*. *See*  Def.'s Resp. Opp'n Subclass Two Pls.' Mot. Partial Summ. J. and Cross-Motion Partial Summ. J. at 37-43 (citing, among other cases, *Roeder Co. v. Burlington Northern, Inc.*, 716 P.2d 855, 861 (Wash. 1986)).

**III.     CONCLUSION**

For the reasons stated above, and in its opening brief, given the facts presented in this case, the United States is entitled to partial summary judgment as to the Subclass Two properties.

Respectfully submitted,

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division

By:      *s/ Bruce K. Trauben*
         BRUCE K. TRAUBEN
         United States Department of Justice
         Environment & Natural Resources Division
         Natural Resources Section
         Post Office Box 7611
         Washington, DC 20044
         Tel. (202) 305-0238/ Fax (202) 305-0506
         bruce.trauben@usdoj.gov

*Attorneys for the United States*

Dated:  September 19, 2012