UNITED STATES
COURT OF FEDERAL CLAIMS

---

```
DANIEL HAGGART, et al.,        )
                               )
              Plaintiffs,      )
                               )
v.                             )   Docket No.:  09-103L
                               )
UNITED STATES,                 )
                               )
              Defendant.       )
```

Pages:   1 through 105

Place:   Washington, D.C.

Date:    October 10, 2012

---

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C.  20005-4018
(202) 628-4888
contracts@hrccourtreporters.com

IN   THE   UNITED   STATES   COURT   OF   FEDERAL   CLAIMS

```
DANIEL HAGGART, et al.,      )
                             )
                Plaintiffs,  )
                             )
v.                           )   Docket No.:  09-103L
                             )
UNITED STATES,               )
                             )
                Defendant.   )
```

Courtroom 6, Room 507
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday,
October 10, 2012

The parties met, pursuant to notice of the

Court, at 10:00 a.m.

BEFORE:  HONORABLE CHARLES F. LETTOW
         Judge

APPEARANCES:

For the Plaintiff:

THOMAS S. STEWART, Esquire
ELIZABETH MCCULLEY, Esquire
Baker Sterchi Cowden & Rice, LLC
Crown Center
2400 Pershing Road, Suite 500
Kansas City, Missouri  64108
(816) 448-9368

For the Defendant:

BRUCE K. TRAUBEN, Esquire
U.S. Department of Justice
Environment & Natural Resources Division
601 D Street, N.W.
Washington, D.C.  20004
(202) 305-0238

1                     P R O C E E D I N G S

2                                           (10:00 a.m.)

3             THE CLERK:  All rise.  The United States

4     Court of Federal Claims is now in session, the

5     Honorable Charles Lettow presiding.

6             THE COURT:  Please be seated.  Good morning.

7     The case before the Court this morning is Daniel &

8     Cathy Haggart, et al. v. United States, No. 09-103L.

9     Will counsel for the Plaintiff please introduce

10    himself for the record and his colleague?

11            MR. STEWART:  Yes, Your Honor.  My name is

12    Tom Stewart, class counsel for the Seattle landowners.

13    This is my partner Elizabeth McCulley.

14            THE COURT:  All right.  Welcome.

15            MS. MCCULLEY:  Thank you.

16            THE COURT:  And Mr. Trauben, would you

17    please introduce yourself as counsel for the

18    government?

19            MR. TRAUBEN:  Yes.  Good morning, Your

20    Honor, Bruce Trauben for the United States.

21            THE COURT:  All right.  Thank you.  We, as

22    far as the Court can tell, have five motions, all

23    related to Subclasses Two and Four and largely in

24    preparation for a trial that's scheduled for Seattle

25    in the springtime. Mr. Stewart, is that your understanding?

1            MR. STEWART:  Yes it is, Your Honor.

2            THE COURT:  All right.

3            MR. STEWART:  The trial is actually set in

4      June, Your Honor.

5            THE COURT:  Yes.  Well, I still count that

6      as springtime, although it's barely springtime.  Mr.

7      Trauben, is that your understanding?

8            MR. TRAUBEN:  Does the fifth motion include

9      the motion to strike?

10            THE COURT:  Yes, that's the fifth one.  I'm

11      sorry?

12            MR. TRAUBEN:  I was going to suggest perhaps

13      that should be taken up first.

14            THE COURT:  Well, it's a tagalong to the

15      others as far as the Court is concerned.  So I'd

16      rather just take that in the course of the argument

17      and just plug along with the exercise.  Now I guess I

18      have a question for counsel.  Do you want to argue the

19      class, Subclass Two issue separately from the Subclass

20      Four issues?  Mr. Stewart?

21            MR. STEWART:  Your Honor, we have no

22      preference actually.  We're prepared to go either way.

23      So whatever Mr. Trauben wants to do or whatever is

24      most convenient for the Court, we don't really care.

25            THE COURT:  All right.  They're largely

1   overlapping issues to some extent.  But in any event,

2   Mr. Trauben, do you have a preference?

3          MR. TRAUBEN:  Actually I do, Your Honor.  I

4   think that it may be a cleaner record if we argue the

5   Subclass Two motion and then conclude with that and

6   then move on to the Subclass Four motion.

7          THE COURT:  Well, that's fine with me.  Mr.

8   Stewart, are you ready to proceed with the argument on

9   their motion for partial summary judgment regarding

10  Subclass Two?

11         MR. STEWART:  I am, Your Honor.

12         THE COURT:  Please.

13         MR. STEWART:  I do need some help maybe with

14  the Elmo here to make sure it is on.

15         THE COURT:  Well, we'll try.

16         (Whereupon, a brief recess was taken.)

17         THE COURT:  Mr. Stewart?

18         MR. STEWART: Thank you, Your Honor.  May it

19  please the Court.  It has been 22 years since the

20  Supreme Court decided Preseault I in 1990.  It's been

21  16 years since the Federal Circuit decided Preseault

22  II in 1996.  And since then in actuality the law is

23  actually pretty well settled now.  The only issue with

24  respect to Subclass Two is the scope of the easement

25  and the only issue then really under Subclass Four,

1    once the Court determines the scope of the easement

2    issue under subclass two will be whether the deeds to

3    the railroad conveyed a fee or an easement.

4         Now what I put on the screen, Your Honor, is

5    the test or standard that the Federal Circuit

6    enunciated in Preseault II back in 1996 and the

7    Federal Circuit asked three primary questions.  The

8    first one is who owned the land involved.

9    Specifically, did the railroad acquire only easements

10   or did it acquire fee simple estates?

11        The second question is if the railroad

12   acquired only easements, were the terms of the

13   easements limited to use for railroad purposes or did

14   they include future use as public recreational trails?

15   And that prong, prong two, of that Preseault II test

16   is the scope of the easement question.

17        Or alternatively, number three, even if the

18   grants of the railroad's easements were broad enough

19   to encompass recreational trails, the court asked had

20   these easements terminated such that the adjacent

21   landowners owned the fee in the railroad right-of-way

22   before the NITU was issued.

23        Now this standard is enunciated by the

24   Federal Circuit in Preseault II has been repeated time

25   and time again by the Federal Circuit, most recently

1    in the <u>Ellamae Phillips</u> case in 2009.  And under this

2    standard, there are two separate and distinct ways for

3    a takings to occur.  The first is if the railroad

4    received an easement under prong one and if trail use

5    and railbanking is beyond the scope of the easement

6    under prong two.  That's the first way.

7            The second way is, is that even if the

8    grants of the easements were broad enough to encompass

9    recreational trails under prong three, if they were

10   nonetheless abandoned prior to the date of the

11   issuance of the NITU, a takings occurs under prong

12   three.

13           Now the Defendant apparently wants to argue

14   that abandonment is a prerequisite to a liability

15   determination rather than merely an alternative path

16   to finding that a taking has occurred.  So if the

17   railroad received an easement under prong one, which

18   has been stipulated to by the government with respect

19   to Subclass Two, and if recreational trail use is

20   beyond the scope of the easement under prong two, then

21   a takings has occurred and that's exactly what we have

22   in this case.

23           Now in Subclass Two, and I think we're going

24   to talk about that first, so I'll limit my

25   conversation at this point to Subclass Two.  In

1    Subclass Two, the government has stipulated that the

2    railroad received an easement under prong one.  So the

3    only question with respect to a liability

4    determination on Subclass Two is the scope of the

5    easement question under prong two and that question

6    has already exclusively and conclusively been answered

7    by the Washington Supreme Court in the Lawson opinion.

8         So what I'd like to do with respect to

9    Subclass Two, first, Your Honor, is talk about the

10   scope of the easement issue under prong two and then

11   just briefly touch on the fact that the Defendant's

12   entire defense on Subclass Two is based on the

13   irrelevant issue of abandonment prior to the NITU,

14   which is actually prong three of Preseault II.

15        Now there is no dispute that Washington law

16   controls on the issue of the scope of the easement.

17   But the scope of the easement under prong two of

18   Preseault II should begin and end with the Washington

19   Supreme Court's opinion in Lawson.  And let me put up

20   here, Your Honor, here is just a sampling of what the

21   Washington Supreme Court said in the Lawson opinion.

22        First, "We first address the issues raised

23   in light of common law principles.  Defendants argue

24   that under Washington law, a railroad is a perpetual

25   public easement.  They contend that a railroad right-

1   of-way easement does not terminate upon a change from

2   one transportation use to another transportation or

3   recreation use or any of consistent public use.  We

4   disagree."

5       The Supreme Court of Washington went on to

6   say "that in addition to outright abandonment of a

7   right-of-way, there may be a change in use of the

8   right-of-way, which is inconsistent with the purpose

9   for which the right-of-way was granted."

10      They also went on to say, Your Honor, and

11  this actually answers the scope question in its

12  entirety, "Clearly the hiking and biking trail is not

13  encompassed within a grant of an easement for railroad

14  purposes only."  They went on to say that "Applying

15  common law principles, we hold that a change in use

16  from rails-to-trails to trails constitutes abandonment

17  of an easement which was granted for railroad purposes

18  only."  And finally, Your Honor, they say, "Put

19  simply, abandonment by the railroad is a necessary

20  predicate to use as a recreational trail."

21      Now this standard was actually in 1986 by

22  the Washington Supreme Court in Lawson was actually a

23  precursor 10 years later to the Federal Circuit's

24  standard in the Preseault II case.  And the Defendant

25  miraculously attempts to ignore the Washington Supreme

1    Court's ruling in <u>Lawson</u>.  This is what the Defendant

2    says.  "But <u>Lawson</u> does not overrule longstanding

3    Washington common law on the abandonment of easements

4    that require a showing of a clear and unequivocal

5    intent to abandon.  <u>Lawson</u>, therefore, provides

6    absolutely no guidance and has no application to the

7    facts of this case."

8         That's miraculous, Your Honor, because

9    really they attempt to ignore the <u>Lawson</u> opinion from

10   the Washington Supreme Court because the Washington

11   Supreme Court opinion is controlling not only on the

12   issue of scope under prong two, which was later

13   codified, if you will, in the <u>Preseault II</u> opinion,

14   but it's also controlling on the issue of abandonment.

15   And if it isn't bad enough for the Defendant to ignore

16   the Washington Supreme Court's opinion in <u>Lawson</u>, they

17   basically try to ignore what the Federal Circuit said

18   about <u>Lawson</u> in <u>Preseault II</u>.

19        Here's what the Defendant says about that.

20   "But here no easement in the corridor has been

21   abandoned as discussed above and neither <u>Lawson</u> nor

22   <u>Preseault II</u> apply," which is really incredible, Your

23   Honor, because in <u>Preseault II</u>, in 1996, 10 years

24   later, after the <u>Lawson</u> opinion, the Federal Circuit

25   specifically said, "<u>Lawson v. State</u> is an example of a

1    case practically on all fours with the case before

2    us."  They went on to also say, they quoted the Lawson

3    opinion at length.  And so the court, the Washington

4    Supreme Court, went on to hold that a hiking and

5    biking trail is not encompassed within a grant of an

6    easement for railroad purposes.  The court thus

7    concluded that King County cannot acquire the right-

8    of-way from Burlington Northern without payment of

9    just compensation to the reversionary interest

10   holders.

11          Now the fact of the matter is, is that the

12   Supreme Court of Washington in Lawson in 1986 got it

13   exactly right.  The Federal Circuit in Preseault II in

14   1996 quoted the Lawson opinion at great length.  And

15   you really have to even wonder whether the Lawson

16   opinion was actually the foundation for the Federal

17   Circuit's opinion in Preseault II.

18          Now on the scope question, Your Honor, not

19   only has it been answered by the Federal Circuit --

20   and I apologize this is so small, Your Honor -- in

21   Preseault II, the reality is, is that these are 24

22   cases from this Court, almost all of which over the

23   last 18 months, except the first two or three, that

24   apply the same basic common law principles that the

25   Washington Supreme Court followed in Lawson, followed

1    the standard as set forth by the Federal Circuit in

2    Preseault II.  And everyone of these 24 cases found

3    that the conversion of a railroad purposes easement to

4    a hiking and biking trail is beyond the scope of the

5    easement under prong two of Preseault II.

6         Now not only does every one of these cases

7    say that, ordinarily what landowners all over the

8    country are confronted with in the face of this is the

9    government will say, well, if we have a case in Iowa,

10   you can't cite the Lawson opinion for the proposition

11   that hiking and biking trail is beyond the scope

12   because Lawson involves the State of Washington law.

13   Or if we have a case in South Carolina, the government

14   will say you can't cite the Lawson case for the

15   proposition that trail use is beyond the scope because

16   that involves Washington law.

17        Here, Your Honor, they can't say that

18   because this case, the Lawson case, is a specific case

19   from the jurisdiction at question and not only found

20   that fair use is beyond the scope of the easement, but

21   it was also approved specifically by the Federal

22   Circuit in Preseault II.  And miraculously in addition

23   to these 24 cases, the government wants to ignore two

24   cases from this Court interpreting Washington law

25   decided by Judge Horn on this exact topic, where the

1    court found that trail use is beyond the scope of a

2    railroad purposes easement under Washington law.

3              Here is what Judge Horn says about the

4    Lawson opinion in the Longnecker case, said "The

5    Lawson court enunciated important guidance for rails-

6    to-trails cases involving Washington State property,

7    guidance which was then adopted by the United States

8    Court of Appeals for the Federal Circuit in Preseault

9    II."  Judge Horn went further and said "Washington

10   Supreme Court rejected the proposition that an

11   easement granted for railroad purposes could be used

12   for any public transportation purpose and indicated

13   that under State of Washington law a recreational

14   trail is outside the scope of a railroad purposes

15   easement."  And then Judge Horn went further and said

16   "The Lawson reasoning is relevant to decisions in this

17   Court because it was adopted by the United States

18   Court of Appeals for the Federal Circuit in Preseault

19   II as a case on all fours, therefore is not only

20   relevant, but binding on the decisions issued by this

21   Court, which must follow the Federal Circuit

22   directives."

23             So in the face of a ruling by the Washington

24   Supreme Court, in the face of binding authority from

25   the Federal Circuit, in the face of two opinions from

1    this Court on Washington law involving this exact

2    issue, in the face of 24 other opinions from this

3    Court that trail use is beyond the scope of a railroad

4    purposes easement, the Defendant attempts to distance

5    itself from the Lawson opinion.  And why?  Because the

6    Defendant asserts that the railroad purposes easement

7    was never abandoned, which is prong three, which has

8    nothing to do with it in the first place, which is not

9    the standard anyway, and which is contrary to 16 years

10   of binding authority from the Federal Circuit on this.

11          And, Your Honor, quite frankly, this has got

12   to stop.  This reminds me -- you just entered an

13   opinion in the Sikorsky Aircraft case where the

14   government tried to reconsider things four times.  And

15   I loved it because you said at the very end of that

16   "Perhaps the first instance might have been

17   understandable.  The fourth manifestly is not."  The

18   fourth attempt in this happened about 18 months ago.

19   This is now at least the 25th attempt by the

20   government in these cases to claim that abandonment is

21   relevant on the issue of whether a takings occurred

22   and it's got to stop.

23          Let me turn my attention to the issue of

24   abandonment first because the Defendant's entire

25   defense is based on the fact that the railroad

1    allegedly did not abandon this easement prior to the

2    NITU.  Pre-NITU abandonment is irrelevant as a matter

3    of law if a taking occurs because the railroad

4    received an easement under prong one and trail use and

5    railbanking is beyond the easement under scope two --

6    under prong two.

7          Abandonment under the Preseault II test, and

8    every time the Federal Circuit has said it, is an

9    alternative path to liability.  It is not a

10    prerequisite to liability.  And the Defendant

11    continues to ignore the facts and the law and

12    completely fails to acknowledge the fact that a NITU

13    cannot be issued until all of the conditions for

14    abandonment have already been met.

15          So when a NITU is issued the railroad's

16    intent to abandon is established by law, but the

17    actual implementation of abandonment is blocked by the

18    NITU.  If there was no intent to abandon and all of

19    the conditions for abandonment had not been met, a

20    NITU could not have been issued in the first place.

21          Now it is possible in the face of

22    overwhelming binding authority to the contrary and

23    giving defense counsel every benefit of the doubt that

24    they think or Mr. Trauben thinks that every judge on

25    the Federal Circuit and every judge on this Court

1    simply got it wrong.  But here is what Judge Baskir

2    said about that.  This is in the Ellamae Phillips

3    case, Your Honor, where the defendant tried this same

4    argument, that abandonment prior to the NITU was a

5    prerequisite.

6        Judge Baskir said, "Defendant raises several

7    arguments concerning abandonment.  Since we have

8    determined that trail use exceeds the scope of the

9    easement, we have no need to address the contingent

10   issue of abandonment.  Moreover, Plaintiff no longer

11   relies on abandonment.  Thus this issue is moot and we

12   need not consider Defendant's argument respecting the

13   abandonment issue.  Finally, to the extent the

14   government takes issue with other conclusions of the

15   Federal Circuit, those arguments are best addressed to

16   that court."

17       Now despite clear opinions from the Federal

18   Circuit in Preseault II, Ellamae Phillips, and Toews

19   that abandonment is merely an alternative path to

20   liability, the Defendant comes in front of this Court

21   and basically offers the only defense that abandonment

22   is a prerequisite to liability in the face of all of

23   that binding Federal precedent.  Here are a few of the

24   government's false, misleading, and outrageous

25   statements, and it is impossible -- I've got five of

1     them here, Your Honor.  It's impossible for me to go

2     through all of them in their briefs.  So I'll only

3     cite five, but they will illustrate the point.

4          "Plaintiffs cannot demonstrate that the

5     railroad abandoned any easements in the railroad

6     corridor."  Wrong legally and factually.

7          "The facts show, however, that BNSF did not

8     abandon any easement in the corridor under Washington

9     law."  Wrong legally and factually.

10         "To be able to meet Port Seattle's interest

11    in the corridor, BNSF could not have abandoned and did

12    not abandon any easement for the trail use for rail

13    use."  NITU could not have been issued if they did not

14    abandon it, Your Honor.

15         Actually I lied, I said there were five.  I

16    actually have six.  "Where the railroad held an

17    easement interest in the corridor, the Court must

18    determine whether as a matter of applicable state law

19    in the absence of the operation of the Trails Act, the

20    easement would have been deemed abandoned," which is

21    false, first of all, but also it was already to be

22    deemed abandoned under the Washington Supreme Court's

23    holding in Lawson.

24         Fifth, "there can be no genuine dispute that

25    BNSF did not contemplate abandonment of the rail line,

1    rather BNSF took affirmative steps to ensure that an

2    abandonment did not occur."  That's wrong factually

3    and legally.

4          And sixth, "Finally, consequently cases such

5    as Preseault, Toews, Ellamae Phillips, and Lawson,

6    which Plaintiffs rely upon, are inapposite on

7    abandonment."  Wow, Your Honor, the government's

8    argument here on abandonment is so attenuated and so

9    specious and frankly so contrary to Federal Circuit

10    binding authority that it is simply incomprehensible

11    that anyone can come before this Court seriously and

12    in good faith and entertain the notion, let alone

13    argue that pre-NITU abandonment was a prerequisite or

14    that if it was not abandoned prior to the NITU, that

15    somehow absolved the government from liability for a

16    taking.

17          Now if there's any question about it still

18    remaining, let's look at what the Federal Circuit said

19    in the Toews opinion.  Toews was a case from

20    California.  NITU was issued in 1995.  Trail use

21    agreement was signed in 1997.  Judge Bruggink held as

22    a matter of law that trail use was beyond the scope of

23    the easement under California law. Also held, though,

24    that although it was abandoned prior to the NITU, that

25    finding was irrelevant to a conclusion that a taking

1    occurred because the NITU authorized trail use, which

2    was an inconsistent use on a railroad purposes

3    easement.  And the Federal Circuit took that case and

4    affirmed the finding not only that trail use was

5    beyond the scope of the easement, but that abandonment

6    was unnecessary for a finding that at taking occurred.

7            Here is what the Federal Circuit said.

8    "However, just" -- I'll ready this whole thing --

9    "After consideration of these factors, the trial court

10   concluded that" -- this is Judge Bruggink -- "as a

11   factual matter, the railroad's management had acted in

12   an unequivocal and decisive manner clearly showing an

13   intention to abandon that section of the line.  Given

14   the relevant factors, it is difficult to say that the

15   trial court's conclusion is erroneous.  It is not

16   difficult to say that the government's argument to the

17   contrary is less than persuasive.  However, just as

18   the trial court itself indicated that its conclusion

19   in this matter was not necessary to the result

20   reached, for the reasons that follow, we need not

21   definitively decide this issue either."

22           Now, the court declined to definitively

23   address the question of whether or not there had been

24   an abandonment because they didn't need to under the

25   standards set forth by Preseault II because a taking

1    occurred under the first two prongs of Preseault II.

2    And the court went on to say that the defining issue

3    in this case is the question of the scope of the

4    easements originally granted to the railroad.  And

5    when looking at the scope question, Your Honor, the

6    court said "that it appears beyond Cavil that use of

7    these easements for recreational trail is not the same

8    use made by the railroad, that different uses create

9    different burdens."  The fact that a different burden

10   is created is what causes the extinguishment just

11   like, exactly like the Supreme Court of Washington

12   said in the Lawson opinion.

13        Now Preseault II had two alternative and

14   independent grounds for a taking.  But the finding in

15   Toews is squarely and unmistakably based on only one

16   ground and that is it's beyond -- trail use is beyond

17   the scope of the easement.  It is actually

18   intellectually dishonest in our opinion, Your Honor,

19   for the government to argue or imply that abandonment

20   was a material factor in the Toews decision or that

21   abandonment is a necessary factor to determine that a

22   taking occurred.

23        Now as I pointed out in those 24 cases that

24   I put up there before, the judges of the Court of

25   Federal Claims have repeatedly and unanimously

1    concluded that abandonment of a railroad purposes

2    easement is irrelevant as a matter of law when a

3    taking occurs because trail use is beyond the scope of

4    the easement.  And it would be impossible for me to go

5    through all 24 of those, Your Honor, but I would like

6    to go through two or three of them just to put this

7    issue in perspective for you.

8           This is Judge Wheeler in the <u>Anna Nordhaus</u>

9    <u>Family Trust</u> case when the government attempted this

10   same argument.  "When the scope of a railroad purposes

11   easement is exceeded, a taking occurs.  A taking

12   occurs under binding Federal Circuit precedent whether

13   the railroad has actually or formally abandoned the

14   right-of-way before the NITU is issued or not."  Now

15   he said, "The government's argument, the Plaintiffs

16   must show that abandonment occurred before issuance of

17   the NITU, runs contrary to the operation of the Trails

18   Act.  One of the principal purposes of the amendments

19   to the Trails Act is to ensure that abandonment when

20   contemplated by a railroad does not in fact occur."

21   That's the whole purpose of the NITU because it blocks

22   the abandonment that would otherwise occur.

23          Now Judge Wheeler cited <u>Caldwell</u> and the

24   <u>Anna Nordhaus Family Trust</u> case and said that the

25   "Federal Government by the issuance of the NITU causes

1     the first domino to fall, which thereby puts into play

2     a series of events which result in the taking of

3     private property.  And the NITU is the first act by

4     the federal government that makes them responsible and

5     makes them responsible for all of the immediately

6     foreseeable consequences of its actions as described

7     by the Federal Circuit in Toews."

8            Let me put up a second one, Your Honor,

9     because this actually involves a Washington case.

10    This is the Beres opinion by Judge Horn involving

11    Washington law.  And she said when the Defendant

12    attempted this same argument, "The Defendant's first

13    argument in its cross motion for partial summary

14    judgment states that the operative question is not the

15    scope of the easement, but rather whether the issuance

16    of the NITU blocked abandonment under state law and

17    Defendant's abandonment argument covers almost one-

18    third of the total arguments in Defendant's opening

19    brief."

20           I would suggest in this case, Your Honor,

21    their abandonment argument took more than one-third of

22    their briefing.  "As previously indicated to the

23    parties, however, the Court will direct its attention

24    to the third and final part of the rails-to-trails

25    taking inquiry, which is prong three under Preseault

1   II, abandonment only if indicated by the results of

2   the current scope of the easement's inquiry."

3        Now one last example, Your Honor, which

4   actually happens to be the most recent.  It was just

5   on August 22, about six weeks ago, by Chief Judge

6   Hewitt in the Whispell Foreign Cars case, where the

7   Defendant tried this same argument again.  Judge

8   Hewitt said, "Under the Federal Circuit's test, once

9   the first two Preseault II prongs are met, liability

10  is established and it is presumed that a Plaintiff's

11  reversionary interest is taken.  The Preseault II test

12  does not require any showing that the railway easement

13  would actually have terminated or that the reversion

14  would actually have occurred.

15       "By cutting off the possibility of

16  abandonment, which is exactly what the NITU does, the

17  issuance of the NITU before abandonment occurs

18  constitutes a taking.  The Trails Act amendments and

19  subsequent case law treat properties subject to the

20  NITU as abandoned but for the operation of the Trails

21  Act."  Precisely.

22       Abandonment, Your Honor, their entire

23  defense, the Government's entire defense to Subclass

24  Two is irrelevant as a matter of law and under binding

25  Federal Circuit precedent because trail use exceeds

1    the scope of the easement under prong two of <u>Preseault</u>

2    <u>II</u>.  <u>Lawson</u> is controlling as confirmed by the Federal

3    Circuit in <u>Preseault II</u> and that should actually be

4    the end of the discussion with respect to Subclass

5    Two.

6            Now I am happy to stop there, Your Honor,

7    and let the government respond, or there are some

8    other issues that do overlap, as you said, with

9    respect to Two and Four.  But I think at this point,

10   it would be better to hear the government's response.

11           THE COURT:  All right, thank you, Mr.

12   Stewart.  Mr. Trauben, I think this is the first time

13   the Court has heard an argument by a party and hasn't

14   asked a question.  You might take that to heart.

15           MR. TRAUBEN:  Which side might I take it to

16   heart, Your Honor?

17           THE COURT:  It's up to you.

18           (Pause.)

19           MR. TRAUBEN:  Good morning, Your Honor.

20   Very interesting what's missing from the Plaintiffs'

21   discussion here today and that is the facts of this

22   case.  I didn't hear any mention of those and the

23   facts of this case show that the railroad did not

24   intend to abandon the right-of-way -- it's easement in

25   the right-of-way.

1              And I want to make clear, we're talking

2     about different things.  When the Plaintiffs talk

3     about abandonment, they're talking about abandoning

4     the easement.  But in the regulatory process, the

5     Surface Transportation Board only has jurisdiction

6     over common carriers.  When a common carrier petitions

7     to abandon a right-of-way or it's actually petitioning

8     not to abandon an easement in the right-of-way, not

9     necessarily petitioning to abandon its easement,

10    that's an intent -- that depends on the railroad's

11    intent.

12             What it is asking the Surface Transportation

13    Board to do is to authorize it to stop common carrier

14    service.  That's a different question in whether or

15    not the railroad intended to abandon its easement in

16    the right-of-way.  So we're talking about different

17    things.

18             So when they say that all the conditions and

19    requirements for abandonment had to be met when the

20    railroad filed its petition for exemption, they're

21    talking about discontinuing service as common carrier

22    service obligations that are regulated by the Surface

23    Transportation Board.  The facts in this case show

24    that even though Burlington Northern filed the

25    petition to end its common carrier obligations, it did

1    not intend to abandon its easement in the right-of-

2    way, which is something else.

3            It conveyed that easement and the right-of-

4    way to Port Seattle.  Port Seattle then granted an

5    easement, a multipurpose easement to King County that

6    would include the right to King County to use the

7    right-of-way for trail use.  Port Seattle also

8    conveyed an easement to Puget Sound Transit, so that

9    Puget Sound Transit has an easement in the entire

10   corridor for commuter rail service.

11           Also another fact that Plaintiffs don't

12   mention is that there is no trail out there today.

13   Right now the tracks are still in place, except for a

14   small segment near Redmond.  That was removed because

15   the City of Redmond had a project going to install

16   some sewer pipes or water pipes under the right-of-way

17   and they removed some track.  There's no trail out

18   there.  There's no trail use.  But there are plans to

19   use this corridor for dual purpose.  It's a rail with

20   trail use.  That distinguishes this case.

21           I understand that the government has an

22   uphill fight here, but the Plaintiffs' reliance on

23   <u>Lawson</u> is misplaced.  And the reason is, is because --

24   for several reasons.  Number one, <u>Lawson</u> was decided

25   on a motion to dismiss.  The court assumed all facts

1    as true and one of the facts alleged by the plaintiff

2    in that case was that it was a railroad purpose's only

3    easement, railroad purposes only.  We don't know what

4    the status of the trail was at that time.

5          But the Lawson court also makes clear that

6    King County intended to use it upon abandonment of the

7    right-of-way and the Washington Supreme Court even

8    questioned whether or not Burlington Northern had any

9    interest remaining in the corridor to convey to the

10   county.  It's a fact which is not present here.  And

11   importantly, the Washington Supreme Court in Lawson

12   did not overrule longstanding Washington law on

13   abandonment.  Subsequent cases deciding the

14   abandonment issue, which we cite in our papers, apply

15   the longstanding test on the intent of the owner of

16   the easement, whether or not they intended to abandon.

17   It must be by clear, unequivocal decisive acts showing

18   intent to abandon.  That does not exist here.

19         Also Lawson did not involve the same

20   program.  The question before the Lawson court was the

21   constitutionality of a state statute.  And that

22   statute allowed King County to impose rail use on a

23   right-of-way without compensation and the Washington

24   Supreme Court in that case held that without potential

25   for compensation, the statute violated the state's

1    constitution.  That was the issue.  So this holding --

2              THE COURT:  That would be true under the

3    Fifth Amendment as well.  The fact that a statute

4    authorizes something doesn't mean it's immune from

5    just compensation under the Fifth Amendment, in fact,

6    to the contrary.

7              MR. TRAUBEN:  Right.  But it only addressed

8    the issue under the state's constitution.

9              There are many reasons why Lawson does not

10   apply here.  Also curiously absent from Plaintiffs'

11   discussion this morning is the deeds at issue.  They

12   rely on Lawson, which found that based on the

13   pleadings in that case, it was a railroad purpose's

14   only easement.  But the Court needs to undertake an

15   analysis of the deeds that granted the easement to the

16   right-of-way to determine whether or not the scope of

17   those easements conceivably can include a railbanking

18   and --

19             THE COURT:  I thought we had crossed that

20   bridge with the stipulation to set up the class.

21             MR. TRAUBEN:  I'm sorry, Your Honor?

22             THE COURT:  I thought we had crossed that

23   bridge as to this subclass.

24             MR. TRAUBEN:  That it's an easement.

25             THE COURT:  Yes.

1                MR. TRAUBEN:  Right.  But we have to discuss

2        the scope of the easement and for that you have to

3        look at the deeds.  In one case it's a condemnation

4        proceeding -- actually there were two condemnations,

5        one of them where we had the condemnation order and

6        that was for a public use for all corporate or other

7        purposes, other corporate purposes.  It was a very

8        broadly worded grant to the railroad by condemnation.

9                In one case there's a condemnation.  We

10       don't have the order of the granting -- I guess the

11       granting of the easement to the railroad in the Delfel

12       situation, but it did follow the same statute that was

13       issued -- under which the easement was granted to

14       Northern Pacific Railroad and we address that in our

15       papers.

16               So the condemnations are fairly broad.  And

17       I would refer the Court to Neitzel, 117 P. 861, which

18       analyzed whether or not -- in that case there was a

19       grant, a condemnation, and for a public purpose -- for

20       a public use for all corporate purposes.  And the

21       analysis in that case was whether or not the use of

22       part of the right-of-way for warehouses was considered

23       a public use such that it did not nullify the grant.

24       And there even though it was a warehouse being used by

25       a private company, it was incidental to the public use

1    of the railroad and the court there found that it was

2    allowed.

3         So there were two <u>Neitzel</u> cases.  The first

4    was 117 P. 861 (Washington, 1911) and then the other

5    one was -- that was on a motion to dismiss.  And then

6    the other <u>Neitzel</u> case -- let me get my -- was 80

7    Wash. 30 (1914) and that's the one where the court

8    held that including a warehouse within the right-of-

9    way did not nullify the public use easement granted by

10   condemnation, the point being that the analysis is

11   whether or not the use is a public use within the

12   scope of the easement granted by condemnation.  And in

13   this case, it is a public use.  There can be no

14   dispute that the uses intended for this corridor --

15   all the parties involved, King County, Puget Sound

16   Transit, and Port Seattle are public uses.

17        Now the deeds in this case were granted to

18   the railroad before the right-of-way was built.  It's

19   not always the situation, but it often is, and it

20   contemplated the proposed rail use.  So even though

21   there's not rail use there now and rail use is

22   contemplated, the Plaintiffs are in exactly the same

23   situation as the original grantors were to the

24   railroad in the -- who granted the deeds or conveyed

25   the easements to the railroad.  It's for a proposed

1    line of railroad to be constructed.  And actually the

2    track is still in place, so there's railroad

3    constructed.  So certainly the rail use that's

4    contemplated for this corridor, this rail use easement

5    is within the scope.  It can't really be disputed.

6    Railbanking is one of those within the scope.

7              I understand that the Court might not agree

8    with all the arguments that the government is going to

9    make.  But one thing that the government is steadfast

10   and certain of is that if there is any liability in

11   this case, that the liability of the government should

12   be limited to any additional burden imposed on the

13   corridor by trail use with an existing rail use

14   easement.  The rail use easement was never abandoned.

15   It's still there.  They intend to use it.  And so if

16   the Court disagrees with the other arguments of the

17   government and should find the government liability in

18   this situation, it's liability should be limited to

19   only the additional burden imposed by a nonconforming

20   use.

21             So the government does focus on abandonment

22   in its papers and the reason being is that cases such

23   as Caldwell, Barkley, and Ladd, all relating to when a

24   takings claim accrues focus on the issuance of the

25   NITU.  And what happens when the NITU issues?  Taking

1     our clue from the Supreme Court in the <u>Preseault</u> case

2     is the issuance -- the question then is whether the

3     Trails Act prevents what they call a reversion, using

4     a shorthand language for lifting the burden of an

5     easement, whether a reversion that otherwise would

6     occur was blocked by issuance of the NITU.  That's the

7     question.  That's the question addressed or identified

8     in <u>Caldwell</u>, <u>Ladd</u>, and <u>Barkley</u>, the issuance of the

9     NITU prevent a reversion that otherwise would have

10    occurred.

11          And the answer to that question in this case

12    is no, it did not.  The NITU really had no effect on

13    the Plaintiffs' property interest in this case.  The

14    NITU allowed the parties to negotiate railbanking and

15    trail use agreement.  They had already been in

16    negotiations.  They had already reached an agreement

17    before Burlington Northern ever petitioned for an

18    exemption for abandonment, for abandonment of its

19    common carrier obligations.  They had agreed in May

20    2008 what their plans were for the corridor and those

21    plans included rail with trail use.

22          There was never an intent to abandon -- the

23    facts shown in the Watson & Odom declarations make

24    clear, they never intended -- it was a question of

25    intent and there was no abandonment of the easement.

1    When the NITU issued, nothing changed.  There was an

2    easement for rail use before it issued.  There is an

3    easement for rail use after it issued.

4           The Plaintiffs argue that the NITU did more

5    than it did.  They argued that the NITU wiped out any

6    existing easement that there was on the corridor

7    without setting any of our precedent that supports

8    that argument.  The NITU does not have that much

9    power.  It allows the parties to negotiate trail use.

10          THE COURT:  Mr. Trauben?

11          MR. TRAUBEN:  Yes, Your Honor?

12          THE COURT:  I did think that part of the

13   focus of your argument was going to be on the parcels

14   where there's an intervening road.

15          MR. TRAUBEN:  Yes, Your Honor.

16          THE COURT:  And I haven't heard anything

17   about that.

18          MR. TRAUBEN:  Right.  What the Plaintiffs

19   are contending, Your Honor, is that where there is a

20   Plaintiffs' parcel and a road and then beyond on the

21   other side of the road the right-of-way, they're

22   claiming ownership of the entire road to half of the

23   railroad easement or some percentage of the railroad

24   easement.  So --

25          THE COURT:  Usually the center line.  But in

1    any event --

2              MR. TRAUBEN:  The center line.

3              THE COURT:  -- we'll pass --

4              MR. TRAUBEN:  They may have adjusted that in

5    one of their replies.  But the center line presumption

6    only gets them to the center line of the road.  There

7    is no presumption of ownership of the entire road.

8    There's no case out of Washington that holds that an

9    owner takes the entire road and half the easement on

10   the other side of it.  There's just -- I have not seen

11   any precedent and they don't cite any.  So the center

12   line presumption is just that.  It's a presumption

13   that --

14             THE COURT:  Well, they do make an argument

15   that the easement that is conveyed for the road

16   basically covers the entire road where there's not --

17   well, there would be a different situation if there

18   were an adjoining or abutting property on the other

19   side, but that's not what they say is happening here.

20   They say the easement granted to the railroad is on

21   the other side and the underlying fee is still for the

22   road and to the center line of the rail right-of-way

23   is still held by the property owner that's adjacent or

24   abutting.

25             MR. TRAUBEN:  There are a lot of factual

1    issues there that need to be worked out and I don't

2    think that it's clear from the papers what the

3    situation is with those properties, that there is no

4    other claimant on the other side or that --

5              THE COURT:  Well, on the other side of the

6    road let alone the railroad.

7              MR. TRAUBEN:  On the other side of the road.

8              THE COURT:  Yes.

9              MR. TRAUBEN:  But also it goes to the

10   classification issue.  When we discussed how we were

11   going to classify these properties, actually we

12   classified properties whether there's an intervening

13   road in category six.

14             THE COURT:  Yes, exactly.  And I was

15   prepared for that.  But you're saying there are 11

16   properties that have an intervening road that are in

17   Subclass Two?

18             MR. TRAUBEN:  That the parties failed to

19   move over into Subclass Six.  In my view, it was an

20   oversight I would think.

21             THE COURT:  Okay.

22             MR. TRAUBEN:  Interestingly, I want to just

23   point this out, that the Plaintiffs quote Preseault II

24   and they put up this language quoting from Preseault.

25   There's only one problem.  The words "or,

1      alternatively" do not appear in the opinion.  What the

2      opinion says is "The determinative issues in the case

3      then are three:  (1) who owns the strips of land . . .

4      (2) if the railroad acquired only easements, were the

5      terms of the easements limited to use for railroad

6      purposes or did they include future use as public

7      recreational trails and (3) even if the grant of the

8      railroad easements were broad enough to encompass

9      recreational trails had these easements terminated

10     prior to the alleged taking."  So I just want to make

11     clear that "or, alternatively" is not there.  That

12     language was added.

13           Now it's true we have not had much success

14     making the argument that railbanking and trail use

15     conserves the corridor in a rail ready state

16     consistent with the use of a railroad purpose

17     easement.  But there are examples of courts that held

18     just that and that was out of Pennsylvania and the

19     Pennsylvania Supreme Court Moody and the western

20     district of Pennsylvania in the Troha case, and the

21     point being that when the trail use -- the trail use

22     means that the corridor must be preserved in a rail

23     ready state.

24           The fixtures must be maintained, such as

25     culverts, overpasses, things like that.  They cannot

1    obstruct the right-of-way to prevent -- that would

2    prevent railroad use, future railroad use.  They have

3    to preserve it, a requirement of the statute and the

4    regulations.

5         And they understand that rail use can be

6    reactivated.  And we're talking about freight rail use

7    in this situation because we're talking about STB's

8    authorizing use.  So this is only relating to freight

9    rail use or common carrier obligations that are

10   regulated by the Surface Transportation Board.  So

11   railbanking and trail use do serve a railroad purpose,

12   although that is based out of Pennsylvania.

13        Also the government does not authorize the

14   parties to -- but the government does not direct the

15   parties to enter into a trail use agreement.  The

16   government doesn't control or direct their actions.

17   When the NITU issues, there are two possible outcomes.

18   One of the outcomes is that -- possible outcomes is

19   that the railroad could decide not to enter into the

20   deal and it could go on and abandon it.  That's a

21   possibility.  It didn't happen in this case, but

22   that's a possibility.  The other possibility is that

23   the railroad may negotiate a trail use agreement,

24   which it did in this case with King County.  So the

25   NITU does not dictate the outcome once it's issued.

1            In this case, third parties decide what the
2    outcome is going to be.  It was negotiated by others.
3    And we believe that the government should not be held
4    liable when acts of third parties decide the fate of
5    the trail.  That is beyond the control of the United
6    States.  And I cite to Navajo Nation as a recent
7    example where the Federal Circuit held that acts of
8    third parties would not give rise to a takings claim
9    against the United States.
10           So I think I touched on the main points I
11   wanted to make regarding the Subclass Two claimants.
12   Unless Your Honor has any questions --
13           THE COURT:  No.  I do have a question for
14   Mr. Stewart.
15           MR. TRAUBEN:  Thank you.
16           THE COURT:  Mr. Stewart?
17           MR. STEWART:  Yes, Your Honor, thank you.
18   In all candor, Your Honor, the response from the
19   government was somewhat expected, but it's still
20   somewhat shocking that it is totally ignoring 22 years
21   of binding precedent.  And I don't even know where to
22   start, but let me start with the alternatively
23   language that he put up there from Preseault II, which
24   has been expanded on and elaborated on in Ellamae
25   Phillips and Toews in subsequent years and it's

1       clearly an alternative path to liability.

2             The government says that they have an uphill

3       fight because they've lost 24 times on this issue.

4       They actually have no fight at all because it was

5       abandoned as a matter of law.  Now he tries to focus

6       on the facts of this case, which is abandonment is

7       irrelevant anyway, so the facts that go to the issue

8       of abandonment are irrelevant as a matter of law.  But

9       as a practical matter, he continues to try to focus on

10      an agreement between the Port Authority and King

11      County.  And the railroad's intent has no impact or

12      bearing on that whatsoever.

13            If you look at the actual documents, the

14      BNSF represented that it had stopped using the rights-

15      of-way for the operation of a railroad and

16      specifically said there has been no local freight

17      traffic for more than two years.  This is back in

18      2008.  BNSF stated that it worked out a deal with Port

19      of Seattle and King County to convey BNSF's interest

20      to the Port, which would then allow the county to

21      build a recreational trail on the property subject to

22      possible future railroad reactivation, which is what

23      the Trails Act requires of them.  BNSF averred that

24      there had "been no recent demand for rail service on

25      the line and to the best of BNSF's knowledge, there is

1    no prospect that rail service will be required in the

2    foreseeable future."

3         And finally BNSF conclusively shut the door

4    on any hypothetical future need for rail service when

5    it advised that the STB "should reject any speculation

6    about future traffic as a basis for denying the

7    proposed abandonment."  It was actually abandoned,

8    Your Honor, even though that's an irrelevant legal

9    point.  Now --

10        THE COURT:  Well, let me ask a factual

11   question.  It really doesn't probably have anything to

12   do with the legal setting or framework for this case,

13   but the Court had the impression, and I don't know

14   where I got that impression either, that where there

15   was a trails agreement, there was some sort of time

16   limitation on implementation of the trails agreements.

17   That appears not to have happened here.

18        MR. STEWART:  No, the trails agreement --

19        THE COURT:  Am I missing something?

20        MR. STEWART:  No, there's no time limit for

21   the actual building of a trail and there is a time

22   limit initially set at six months for the negotiation

23   of a trail use agreement once the NITU is issued.  And

24   most often, if not in almost every case we've ever

25   seen, that six-month extension -- or six-month time

1    limit is extended and extended and extended.

2          Now that raises another point, Your Honor,

3    because Mr. Trauben said that the government has no

4    control over the actions of third parties and the NITU

5    doesn't have an outcome on this case.  That is

6    absolutely flatly false.  When the STB issues a NITU,

7    there are two possible outcomes.  One is a temporary

8    taking if they don't reach an agreement and one is a

9    permanent taking if they do because under either

10   scenario, the NITU blocks the reversionary property

11   interest.

12         THE COURT:  Under <u>Caldwell</u>.  There is no

13   doubt about that.

14         MR. STEWART:  Okay, thank you, Your Honor.

15         THE COURT:  I was curious in this case when

16   Mr. Trauben said the rails are still there.  I thought

17   this is four years later.  What are we doing?  But

18   anyway, it's irrelevant as a matter of law.

19         MR. STEWART:  Now Mr. Trauben also said or

20   attempted to distinguish the <u>Lawson</u> case based on the

21   fact that it was a different program.  Well, in

22   actuality that is totally untrue as well.  <u>Lawson</u> at

23   the time in 1986 was actually on a precursor of what

24   became the ultimate railbanking statute.  But in

25   <u>Lawson</u> it specifically says in a letter dated January

1    30, 1985, King County requested the ICC to impose a

2    public use condition upon abandonment of the 4.8 mile

3    long right-of-way pursuant to 49 U.S. Code section

4    10906, which was the aftermath of section 809 of the

5    4R Act.

6         It's the exact same public use condition by

7    the state as it would be under the Federal statute.

8    In fact, if you look at the actual NITU that was

9    issued in this case, it specifically refers to section

10   10906 and the 49 C.F.R. 1152.29, which is exactly

11   where that is codified.

12        Then he says that he wants to look at the

13   actual wording of the deeds and he apparently tries to

14   refer to a condemnation about the scope in Subclass

15   Two, which, you know, the Supreme Court, first of all,

16   nine times in Washington has said that a grant of a

17   strip of ground or a right-of-way to a railroad is for

18   a railroad purpose, most recently in Kershaw and in

19   Brown in 1996 and 2006.  And in fact in the Neitzel

20   opinions if you go all the way back in time and in the

21   Kershaw opinion it says a condemnation for a railroad

22   through imminent domain is a right-of-way easement as

23   a matter of law.

24        Then he talks about the intervening road,

25   Your Honor.  I want to touch on that just briefly.

1    There are 11 parcels in Subclass Two that have an

2    intervening road.  Plaintiffs actually have no qualms

3    whatsoever if the Court actually wanted to move those

4    to Subclass Six.  But the reality is it's unnecessary

5    in this situation because those 11 parcels are

6    adjacent to other class member's property on the other

7    side of the right-of-way.  So what you have is, is you

8    have a property owner on one side, a 60-foot easement

9    for the road, a 100-foot easement for the railroad

10   right-of-way, and another class member that were

11   platted at the same time under Washington law.  So you

12   basically have two easements.

13          Now the total width of that easement is 160

14   feet and the center line presumption is one owns the

15   80 feet and the other one owns 80 feet.  That's the

16   facts under Washington law.  Now it's probable and in

17   fact likely that the class member on the side of the

18   road who owns the fee underlying the road and 20 feet

19   of the easement, the claim's not going to be worth

20   that much money because that 20-foot strip is not

21   going to be very valuable to that class member.

22          THE COURT:  So you're saying on these 11

23   parcels, the total easement with a 60-foot road and

24   100-foot railway right-of-way totals 160 feet.  And

25   you say it goes to the center line of the two together

 1      --

 2                  MR. STEWART:  Yes.

 3                  THE COURT:  -- rather than the center line

 4      of the railway.

 5                  MR. STEWART:  Absolutely, because they were

 6      conveyed at exactly the same time.  And we have

 7      touched --

 8                  THE COURT:  That's what I was wanting to get

 9      to.

10                  MR. STEWART:  Yes.  We put in our materials,

11      Your Honor, the Hillman plats --

12                  THE COURT:  Yes.

13                  MR. STEWART:  -- that were - Hillman was a

14      gentleman who owned all this land back in the late

15      1880s and 1890s.  And when he platted the land, he

16      platted the road, Lake Washington Boulevard, and the

17      railroad right-of-way at exactly the same time when he

18      divided the lots on both sides.  Now there are --

19                  THE COURT:  Is there a difference of opinion

20      among the subclass members as to that interpretation?

21                  MR. STEWART:  Not that we're aware of, Your

22      Honor, and we've talked to them about this at great

23      length.  And we have had our experts out, looked at

24      this as well.  And so if and when this comes to trial

25      on that exact issue, we will have sufficient evidence

1      on that -- or at least an opinion to that effect.

2              THE COURT:  All right.  Now let me ask

3      another question.  Let's take the difference between

4      these 11 members of this subclass, that is those with

5      the intervening road, and the Subclass Six.  What's

6      the difference?

7              MR. STEWART:  We have not actually

8      investigated all of them in Subclass Six, Your Honor.

9      But I suspect if there is an intervening road and we

10     actually attached some cases in Washington that have

11     basically said a road in Washington is an easement

12     under Washington law going back before the 1900s

13     basically.

14             THE COURT:  Well, there's an old Florida law

15     and everybody seems to have picked up.  The Court

16     understands that.

17             MR. STEWART:  Okay.  So they will own,

18     depending on what's on the other side, and that's a

19     title question and Mr. Trauben referred to it, there

20     are some factual questions that will have to be

21     resolved in Subclass Six.  I do not believe -- and

22     some of them may even involve some change of title and

23     things to see when the grant was and when the road was

24     put in, et cetera, et cetera.  Those are issues that

25     we're prepared to confront when we do Subclass Six.

1          We haven't done them yet with respect to

2     Subclass Two or even with respect to Subclass Four

3     because I don't think they're really relevant at this

4     point with respect to Subclass Two or Subclass Four.

5     They're going to be relevant with respect to Subclass

6     Six.

7          THE COURT:  Okay, all right.

8          MR. STEWART:  Now I do want to talk --

9     before I get into Subclass Four, I do want to talk a

10    little bit about the Sound Transit East Link Project

11    because Mr. Trauben referred to the dual use and the

12    fact -- basically he made the statement that the

13    landowners, the class members haven't lost anything.

14    And I want to first put this issue in perspective

15    because it's unclear whether the government is

16    actually trying to argue that it somehow diminishes

17    the claim for 25.45 miles or it only diminishes the

18    claim for 1.1 mile.  At the end of the day, I don't

19    think it matters.

20         This is what the government says about the

21    dual use.  "Toward that goal of dual use, Port Seattle

22    conveyed a 1.1-mile segment of the corridor to Sound

23    Transit and an easement for potential future

24    development of high capacity transportation facilities

25    throughout."  And it goes on to say that

1     "approximately one mile segment" -- it's 1.1 miles --

2     "of the right-of-way is under construction" -- which

3     is actually not true, it's not under construction --

4     "by Sound Transit for its East Link Project, which is

5     slated to be completed in 2023."

6          Now the fact of the matter is, to put this

7     in perspective, Your Honor, that there are, as we

8     pointed out in our briefs, potentially 10 parcels out

9     of the 134 in Subclass Two and eight parcels out of

10    the 214 parcels in Subclass Four that are potentially

11    impacted by this 1.1-mile corridor that they are at

12    least tentatively right now planning to utilize.  But

13    the fact of the matter is that the government's

14    argument concerning Sound Transit has absolutely no

15    merit whatsoever and that even if 1.1 mile is

16    ultimately utilized and even if it's ultimately

17    constructed in 2023, it is still burdened with a

18    trails easement on it and it will be burdened with a

19    trails easement on it until the railroad petitions the

20    STB to come back in and take federal jurisdiction and

21    control over it.

22         Now the Federal Circuit, and this is what I

23    think is really missing in this, has already rejected

24    speculative light rail use as an intended use at the

25    time of the NITU in _Toews_ and this Court should do the

1    same thing.

2            Now before I get to Toews, I want to talk a

3    little bit about Preseault II and Caldwell and Barkley

4    and Ladd because I think there's just a total

5    misstatement or misunderstanding by the government as

6    to what those cases stood for.  The facts in Barkley

7    actually involved a corridor that was still in use

8    when the NITU was issued, had not been abandoned at

9    all.  And the Federal Circuit still concluded that

10   state law reversion was still delayed by the issuance

11   of the NITU and the claim still accrued at that time.

12           Now in Ladd most recently the Federal

13   Circuit, relying on Caldwell and Barkley, again

14   affirmed the fact that it was settled law that a

15   taking occurs when state law reversionary property

16   interests are blocked.  The NITU is the government

17   action that prevents the landowners from possession of

18   their property unencumbered by an easement.  So the

19   government simply cannot avoid liability for a taking

20   in this case when the issue was - NITU was issued in

21   October of 2008 pursuant to extensive binding

22   authority by the Federal Circuit.

23           Now let's look at Toews for just a minute,

24   Your Honor, because this is a case that the Federal

25   Circuit decided where the prospect of rail use was

1    actually at issue, light rail use.  This was a case I

2    referred to earlier that Judge Bruggink had.  It's a

3    case where the City of Clovis in California, along

4    with the City of Fresno and County of Fresno developed

5    a short-term plan for a hiking and biking trail and a

6    longer-term plan for possible light rail use.  And

7    they specifically said local rail, light rail, or

8    other transit modes.  And the Federal Circuit in Toews

9    analyzed the prospect of light rail and specifically

10   rejected it.

11          Here's what they said.  "The references in

12   the ICC's and the City of Clovis's various documents

13   to railbanking and the possibility that one day the

14   railroad easements might be used for a light rail

15   system do not change the analysis.  There is a reality

16   test in takings law."

17          Now the situation in Toews is the exact same

18   situation present in this case for at least 24.35

19   miles of the corridor because there's no plan

20   whatsoever to use 24.35 miles of it for light rail.

21   And when they said there's a reality test in takings

22   law, in fact, that's what we have here.  King County

23   has no plans whatsoever to utilize it for a light rail

24   system and it wouldn't make any difference if they did

25   because it's still railbanked.

1          Now there are at least five reasons why the

2     potential, and I say potential advisedly because it is

3     still potential as to what Sound Transit may

4     ultimately do.  They've gone through 15 different

5     designs of where this may go.  They've now apparently

6     settled on one design for a 1.1-mile portion of this

7     corridor as they actually cross it going to the east

8     because this basically runs to the north.  They're

9     going to use a little job of it for 1.1 mile possibly.

10    If they have the funds and if they can complete it, it

11    will be done by 2023.  But there are at least five

12    reasons why even on the 1.1 mile it doesn't matter.

13          First of all, it's still speculative.  And

14    as the court said in Toews, it doesn't change the

15    analysis.  Such speculation does not provide a basis

16    for denying protection to existing property rights

17    under the Constitution.

18          Second of all, it's not subject to federal

19    jurisdiction and that's a point that they seem to

20    miss.  It is not a railroad purpose under the federal

21    law as a matter of law.  It's merely railbanking all

22    over again because the railbanking provision envisions

23    potential reactivation of interstate railroad uses

24    subject to federal jurisdiction, not local uses for

25    public transportation that are not subject to federal

1    jurisdiction.

2           Three, it's a different use entirely.  They

3    are changing a private railroad easement to a public

4    easement.  And the possibility of reactivating a

5    private commercial railroad purposes easement over 1.1

6    mile is outside the jurisdiction of the STB, has no

7    bearing whatsoever.  It's akin of using for local bus

8    transportation basically.  And this fundamental

9    difference between a private commercial easement and a

10   public easement was actually discussed by the Federal

11   Circuit in Preseault II.  Although a public

12   recreational trail could be described as a roadway for

13   the transportation of persons, the nature of the usage

14   is clearly different.  That's exactly what Lawson

15   said.

16          In the one case, the grantee is a commercial

17   enterprise using the easement in its business, the

18   transport of goods and people for compensation.  In

19   the other the easement belongs to the public and is

20   open for use for recreational purposes, what happens

21   to involve people engaged in exercise or recreation or

22   foot, on bicycles.

23          Now these fundamental principles were

24   recently specifically addressed by Judge Firestone in

25   the Thomas opinion.  And this is exactly the sort of

1    thing that the government continuously attempts to

2    ignore.  The <u>Thomas</u> case was a case from Tennessee

3    where the CSX Railroad actually petitioned for

4    abandonment.  A NITU was issued and at the time of the

5    NITU specifically the railroad itself, not the trail

6    user, specifically petitioned for the possibility of

7    utilizing it for light rail in the future.

8           And Judge Firestone specifically said, "CSX

9    sought to abandon the corridor and under the Trails

10    Act transferred its interest to the rail corridor to a

11    third-party trail operator," just like we have in

12    Seattle.  "While the corridor was also railbanked, the

13    CSX retained some rights to reinstitute commuter rail

14    service.  These actions while perhaps made in the

15    interest of CSX do not amount to the maintenance

16    necessary for the continued operation of CSX's rail

17    service."  And she found that a taking occurred

18    despite the fact that CSX actually was talking about

19    using it for light rail in the future.

20           And Judge Firestone is precisely correct.

21    It's still railbanked and it's still going to be

22    railbanked until the STB under the Trails Act decides

23    to reactivate federally regulated rail service.  So

24    even in a situation where the railroad itself, instead

25    of a third party operator, petitions to possibly use

1    it for commuter rail service in the future,

2    railbanking exceeds the scope of the railroad purposes

3    easement.

4         Now the first three reasons where it's still

5    speculative.  The second reason is it's still not

6    subject to federal jurisdiction.  The third reason is

7    it's a different use, private to public.  The fourth

8    reason is, is that the taking occurred at the time the

9    NITU was issued in October of 2008 and the government

10   is now trying to have the best of both worlds.

11   They're trying to convert it to trail use without

12   paying for it.

13        And here's what Judge Horn said about that

14   in the Howard opinion.  "The government seeks to have

15   the best of all worlds, affect the conversion of the

16   plaintiff's property to trail use by the issuance of

17   the NITU and to avoid having to pay just compensation

18   for the taking and conversation of the plaintiff's

19   property."  They can't do that.

20        Now the fifth thing is that they cant' blame

21   some state actor.  They're always talking about, well,

22   we didn't do it.  We didn't authorize it.  All the

23   courts here have said specifically that the NITU is

24   the first domino and they're responsible for all the

25   foreseeable consequences of their actions.

1          Mr. Trauben stood up here today and tried to

2     make that same argument, which ironically after having

3     lost 24 of these arguments, they make this argument

4     now which is inconsistent with the argument they tried

5     to make before.  They said before, we're not liable

6     because some third party puts a trail on it.  It's the

7     acts of a third party.  We're not responsible for what

8     they do.  And now they say, we're not liable because a

9     third party may use it for a light rail.  We're not

10    responsible because of what they do do.  When the

11    reality is, is that it doesn't make any difference

12    anyway because the NITU is issued, a taking occurs, it

13    authorizes public trail easement, and it's on there

14    for 25.45 miles.

15         Now the federal government -- and I'm just

16    going to go through two of these quickly because we're

17    so tired of this argument about trying to blame some

18    other person for this action.  This is what Judge

19    Wheeler said in the Capreal opinion, which is a case

20    out of Massachusetts, and this is a case where they

21    tried to make the same argument.  This time they tried

22    to blame it on the State of Massachusetts.  And Judge

23    Wheeler said, "The court categorically rejects the

24    proposition that the Commonwealth, who was a trail

25    user, could take the reversionary property interest

1    under state law with no compensation to abutting

2    landowners.  Thus absent the federal involvement, the

3    Commonwealth could have purchased the right-of-way

4    much like it did, but must have compensated plaintiffs

5    for the taking."  I mean, therefore, the federal

6    government was required to compensate landowners

7    because it authorized the Commonwealth's acquisition

8    of the corridor, which is exactly the same situation

9    we have here.

10          And finally, Your Honor, on this topic yet

11   one other case where Judge Firestone, this time the

12   Macy Elevator opinion out of Indiana, where the

13   government tried this exact same argument, tried to

14   blame someone else.  And Judge Firestone said, "One

15   can hardly fault a state government for complying with

16   the law.  However, the statute does not say that such

17   actions are without consequences to the property

18   owners, nor does it say that the property owners will

19   not or must not be compensated for such actions."  And

20   then Judge Firestone went on to say, "The issue is not

21   whether the state or federal government had the power

22   or obligation to do what they did, but whether the

23   Constitution requires that just compensation be paid

24   as a consequence."  Precisely.

25          And we've gone full circle now because that

1    is exactly what the Supreme Court of Washington said

2    in the Lawson opinion.  I won't belabor that anymore,

3    Your Honor.

4         Let me, with the Court's indulgence, to

5    Subclass four, unless you some questions.

6         THE COURT:  No.  Mr. Trauben, is that

7    satisfactory?

8         MR. TRAUBEN:  Well, I would like to rebut

9    some of the things that were just said.

10         THE COURT:  All right.  Why don't you do

11    that.

12         MR. TRAUBEN:  And then perhaps take a break

13    before we go into Subclass Four.

14         THE COURT:  All right.  Let's finish on

15    Subclass Two.

16         MR. TRAUBEN:  Just a point of clarification.

17    I think Plaintiff's counsel may have misspoke, I'm

18    sure unintentionally, when he said that all of the

19    railroad right-of-way was not being used and had not

20    been used for two years prior to the petition for the

21    exemption, when in fact part of the railroad had been

22    used and was being used at that time.  This is the

23    notice of interim trail use, the decision and notice

24    of interim trail use relating to the part of the road

25    from 11.25 near Wilburton North to 23.8 Woodinville.

1    That's the north railbanking segment is what they call

2    it.

3            Anyway just to be clear, I don't know how to

4    zoom it in, but --

5            THE COURT:  That'll be fine.

6            MR. TRAUBEN:  All right.  BNSF states that

7    Safeway and Warehouser are shippers currently being

8    served on the line.  So I just wanted to make clear

9    that there were a couple users at the time.  That was

10   not entirely accurate with respect to the entire

11   corridor.

12           THE COURT:  But they are no -- well, no --

13           MR. TRAUBEN:  They're not using it now.

14           THE COURT:  Yes.

15           MR. TRAUBEN:  Another thing that's really

16   interesting is that the Plaintiffs denigrate the 1.1-

17   mile use by Sound Transit for the commuter rail, but

18   that is planned.  It is in fact going to be built.  It

19   does take time.  That East Link Corridor that is being

20   built is under construction, not necessarily at that

21   point.  But East Link itself -- and I believe that we

22   submitted an update on the status of the East Link

23   Corridor to the Court attached to our papers.

24           So there's no less speculative than trail

25   use.  There is zero trail out there now.  There is

1   only a plan for one mile in the City of Redmond.  It's

2   a connector trail using the Redmond Spur, the 1.1-mile

3   segment.  And I believe it's along some of the

4   disputed corridor that's at issue in Subclass Four.

5   But there is no plan by the King County for building a

6   trail, zero right now.  There's some plan for the City

7   of Kirkland has to construct some trail, but again

8   that's just a small segment within the confines of the

9   City of Kirkland.  That's the only trail use actually

10  on the boards.  So, you know, there's a reality check.

11  It goes both ways for trail use as well.

12          Now in _Toews_ -- and that distinguishes _Toews_

13  actually because in _Toews_ the trail was in use.

14  Tarmac had been laid, benches put in, trees planted, a

15  fence erected.  Mr. Toews, where he once had access to

16  the right-of-way, after the trail went in and they

17  fenced off the trail from his property, no longer had

18  access.  So those were definite factors in the

19  decision of the court in that case.  The facts do not

20  exist here.

21          Now I understand that there are all these

22  other decisions.  These are interlocutory decisions

23  and there are a number of them, but they are not

24  final.  Those cases are still pending.  There's been

25  no final judgment that I know of and there's still

1    potential for appeal unless the case is settled.  But

2    for most of those cases cited, they're still pending

3    and not final judgments.  So they're not binding

4    precedent for this Court.  Thank you, Your Honor.

5              THE COURT:  Now you, Mr. Trauben, would like

6    a 10-minute recess or something akin to that?

7              MR. TRAUBEN:  Something like that.

8              THE COURT:  Something like that.  Mr.

9    Stewart, Ms. McCulley, would you mind?

10             MR. STEWART:  I don't mind, Your Honor.

11             THE COURT:  All right.  Let's take a 10-

12   minute recess.

13             (Whereupon, a brief recess was taken.)

14             THE CLERK:  All rise.  The United States

15   Court of Federal Claims is now in session, the

16   Honorable Charles Lettow presiding.

17             THE COURT:  Mr. Stewart, we're back and this

18   time you're going to shift to Subclass Four.

19             MR. STEWART:  I am, Your Honor, thank you.

20             THE COURT:  Yes, indeed.

21             MR. STEWART:  The only issue really with

22   respect to Subclass Four, because I think we've

23   covered the scope question and we've covered most if

24   not all of the overlapping issues, is whether the

25   deeds to the railroad conveyed an easement or a fee.

1    And before I go into the specific deeds, I'd like to

2    give just a really quick brief history lesson on the

3    cases before the Washington Supreme Court on this

4    specific issue.

5         First and foremost there are nine cases in

6    the Washington Supreme Court dating all the way back

7    to 1893 that have interpreted deeds to railroads.  In

8    each and every situation, the court has recognized

9    that the critical issue is to ascertain the grantor's

10   intent.  And we believe that in almost all of these

11   Subclass Four deeds, if not all of them, just based on

12   the deed language itself, it is clear that the deeds

13   conveyed an easement only under Washington law.

14        Now the Plaintiffs originally cited seven

15   cases from the Washington Supreme Court dating from

16   1893 to 1996 and all of them reached the conclusion,

17   all seven of them reached the conclusion that the

18   railroad received an easement only.  The government

19   really attempted to ignore those seven cases

20   initially, but really can't because they were

21   specifically affirmed and confirmed by the Supreme

22   Court of Washington in Kershaw, which was the final

23   case that was rendered on this topic.

24        And then if you add the Brown opinion in

25   1996 and the Kershaw opinion in 2006, the seven cases

1       become nine that have been before the Washington

2       Supreme Court.  And in each and every case, the court

3       attempted to determine the grantor's intent at the

4       time of the execution of the deed.  And in each and

5       every case, all nine of them, unless the intention to

6       convey a fee simple interest clearly appears, the

7       court decided that a presumption of an easement

8       existed and the railroad required an easement only.

9       And in actuality in eight of the nine cases from the

10      Washington Supreme Court, from 1893 through the

11      Kershaw opinion in 2006, in eight of the nine, the

12      court found and explicitly held that the railroad

13      acquired an easement only.

14              The real only outlier is the Brown opinion,

15      which is 1996, and obviously the government tries to

16      rely on the Brown opinion extensively, if not almost

17      exclusively, and they try to rely on the Brown opinion

18      while ignoring the Kershaw opinion in 2006, 10 years

19      after Brown.

20              But it's our contention, Your Honor, that

21      the Brown opinion really offers no support whatsoever

22      for the proposition that a fee interest was conveyed

23      by the Subclass Four deeds and there are several

24      reasons why.  One is the deeds at issue in Brown were

25      in the form of a statutory warranty deed, which are

1    not like the most, if not all of the deeds in Subclass

2    Four.

3         Second, the deeds at issue in <u>Brown</u> did not

4    mention right-of-way anywhere in the deeds, unlike the

5    deeds in Subclass Four.  And in fact what <u>Kershaw</u> said

6    is that there's a presumption of an easement if it

7    mentions right-of-way in the deed.

8         And third and most importantly what seems to

9    be lost in this entire discussion is the Washington

10   Supreme Court was actually confronted with a deed that

11   actually granted it in fee simple title, fee simple

12   interest in the body of the deed itself, those exact

13   words.

14        So in essence what choice did the Supreme

15   Court of Washington have in <u>Brown</u> other than to reach

16   the conclusion that it was a fee simple conveyance.

17   So thus <u>Brown</u> is actually the only case ever decided

18   by the Washington Supreme Court that found that the

19   railroad received a fee simple interest.

20        Now the Defendant in addition to relying on

21   <u>Brown</u> while ignoring <u>Kershaw</u> really doubles down on

22   the <u>Brown</u> opinion by saying that the factors listed in

23   the <u>Brown</u> opinion applied to statutory warranty deeds

24   should somehow reach -- or should somehow lead you to

25   conclude, Your Honor, that the deeds in Subclass Four

1   were fee deeds.  But there are several things wrong

2   with that.

3           First, the argument is directly contrary to

4   the factors themselves as the Kershaw court pointed

5   out.  Secondly, it's directly contrary to the

6   Washington Supreme Court's pronouncement in Kershaw 10

7   years later that said that there's a presumption of an

8   easement if right-of-way is in the deed.  And it

9   totally ignores, and this is amazing too, Judge Horn's

10  conclusion to the contrary applying the Brown factors

11  to the exact deed in Subclass 4A and finding that

12  those factors led to the conclusion that it was an

13  easement rather than a fee.

14          So in essence it's simply incredible in

15  reality that the Defendant tries to solely rely on

16  Brown, but attempts to ignore Kershaw because Kershaw

17  in 2006 says first of all, specifically stated that

18  the Brown decision in 1996 had not overturned all of

19  the established precedent on railroad rights-of-way

20  established in those prior cases, like Morris Bach and

21  Swan and Veech and Roeder, but rather distinguish them

22  "on the limited basis that none of the deeds at issue

23  in Brown possessed language relating to the purpose of

24  the grant or limiting the state conveyed because they

25  granted specifically fee simple.  Brown in a nutshell

1      was different."

2           But the Supreme Court in Kershaw went even

3      further, however, and specifically said, "Where the

4      deed uses the right-of-way, it is a limitation and

5      does specify the purpose of the grant and generally

6      conveys an easement only."  And third and most

7      importantly, the Washington Supreme Court in Kershaw

8      determined that like the cases that found an easement,

9      those seven cases from 1893 to 1996, and unlike the

10     deeds in Brown, the grant of a right-of-way is not

11     only used to establish the purpose of the grant, it

12     presumptively conveys an easement interest only.

13          So with that in mind, let's look at the

14     Subclass 4A deeds.  This is the representative sample

15     for Subclass 4A.  It's the Jaderholm deed cited in our

16     briefs.  And Subclass 4A involves 15 deeds just

17     exactly like the Jaderholm deed and applies to 79

18     parcels in total.  And for Your Honor's convenience,

19     this deed is exactly like the deed at issue in the

20     Beres case that Judge Horn already decided, exactly.

21          So miraculously while attempting to rely on

22     Brown and to a lesser extent the Ray case, I guess,

23     the Defendant completely ignores the last

24     pronouncement on this subject by the Washington

25     Supreme Court in Kershaw, which is a -- you simply

1    cannot ignore Kershaw and/or analyze or attempt to

2    analyze these deeds without looking at Kershaw for two

3    reasons.  One, the primary reason is, is the Kershaw

4    opinion is the last pronouncement by the Washington

5    Supreme Court on this subject.  And two, the holdings

6    in Kershaw are right on point when looking at these

7    deeds.  Why?  The first reason is in Kershaw the

8    Washington Supreme Court reviewed all of the

9    historical precedent and stated that a presumption of

10   an easement exists if a right-of-way is granted.

11          Now the granting clause in all of the

12   Subclass 4A deeds specifically grants the right-of-way

13   and under Kershaw presumptively conveys an easement.

14   This is a specific grant of a right-of-way to the

15   railroad.  It should be the end of the discussion.

16          Kershaw goes further, however, and said that

17   the consideration of the "right to construct,

18   maintain, and operate a railway or railways over and

19   across the same" is clearly indicative of the

20   grantor's intent to convey an easement.  And all of

21   the deeds in Subclass 4A specifically say "in

22   consideration of the benefits and advantages to accrue

23   to me from the location, construction, and operation

24   of the railroad."

25          Now in the face of that, the Defendant tries

 1    to say that additional language other than the clear

 2    language of this deed is necessary to establish the

 3    purpose of the deed somehow.  But that has been

 4    rejected specifically by the Washington Supreme Court

 5    in Kershaw because they specifically said that the

 6    grant of a right-of-way is a limitation on the grant

 7    and does define the purpose of the grant.

 8         The other important thing in Kershaw is, is

 9    it enunciated the presumption in favor of an easement

10    and that presumption exists when the right-of-way is

11    used to establish the purpose of the grant.  Judge

12    Horn in the Beres opinion perfectly summarized the law

13    on that and correctly reached the conclusion that this

14    deed conveys a right-of-way easement to the railroad

15    only.  The phrase right-of-way in all of the Subclass

16    4A deeds is clearly used as a limitation on the

17    purpose of the grant and it actually not only appears

18    in the granting clause, but it also appears a second

19    time when it's describing the location across the

20    grantor's land.

21         And it's the Plaintiffs' position, Your

22    Honor, that this deed clearly on its face conveys an

23    easement to the railroad under Subclass 4A.  And

24    frankly, we do not believe under the Supreme Court

25    precedent in the Kershaw opinion there should really

1     be any discussion or dispute about it.

2          Let me turn to the Subclass 4B deed.  It's a

3     much longer deed, Your Honor, so I'll do it in two

4     pieces here.  This is the Kittinger deed, Subclass 4B,

5     and it applies to 27 parcels.  It is actually when you

6     read it in its entirety -- and I can't get it up here

7     on one screen, but I will put it up here in two pieces

8     -- is actually very similar at the end of the day to

9     the Jaderholm deed and very similar to the Kershaw

10    deed.  The deed conveys an easement for railroad

11    purposes because the grant is for the railroad's

12    right-of-way and it specifically says that it is for

13    such purposes.  In fact, as I said, the Kittinger deed

14    is very similar to the deed in Kershaw.

15         Now the Defendant attempts to make the same

16    arguments made with respect to Subclass 4A.  One, it

17    tries to utilize the Brown factors to show that

18    there's no limiting language in the deed.  Two, the

19    government argues that there is no language in the

20    deed limiting the use of this strip to any specific

21    purpose.  And three, it does not specify that the

22    grant is limited to the construction, operation, and

23    maintenance of a railroad.  All of those arguments

24    fail under the plain reading of this deed and the

25    Supreme Court of Washington's opinion in Kershaw.

1          So let me take them one at a time.  The

2     Kittinger deed specifically describes the purpose of

3     the railroad's acquisition by stating "that the

4     railroad wishes to construct its railroad over and

5     across said lands," "has made a survey for said line

6     of said road and staked the same out," and three,

7     "wishes to secure four such purposes the right-of-way

8     over and across said lands."  It couldn't have been

9     much clearer than that.

10          The granting clause itself states that the

11     grantors "hereby grant, bargain, sell, and convey onto

12     the said party in the second part the said strip,

13     piece, and parcel of land 100 feet in width as herein

14     before described."  And the grant that was "herein

15     before described" was "the right-of-way over said

16     lands."

17          Now the term right-of-way in this deed was

18     specifically used as a limitation on the grant to

19     specify the purpose of the grant.  And just like in

20     Kershaw where the deed uses the term right-of-way as a

21     limitation to specify the grant, that's exactly what

22     the Kittinger deed says.  And it confirms the fact

23     because it says the right-of-way is being acquired "to

24     secure for such purposes the right-of-way over and

25     across said lands."

1          Now if you compare this deed to the Kershaw

2   deed, it's remarkably similar.  The granting clause in

3   Kershaw granted a strip of land 75 feet wide in along

4   and through, over and through, to be used as a right-

5   of-way.  So you have in Kershaw a grant -- a strip of

6   land to be used as a railroad right-of-way and that's

7   basically exactly what you have in the Kittinger deed.

8          Any argument that the Defendant attempts to

9   advance that the Kittinger deed does not convey an

10  easement fails under the Kershaw analysis.  And

11  likewise, the Defendant's attempted argument that the

12  Kittinger deed does not specify that the grant is

13  limited to the construction, operation, and

14  maintenance of a railroad also fails under Kershaw

15  because the deed specifically states "wishes to

16  construct a railroad over and across said lands and

17  has made a survey for said line of said road and stake

18  the same out."  It's pretty clear that this deed is an

19  easement deed as well.

20         Now the presumption of an easement is

21  further established because of the several

22  reservations made by the grantors in the deed to the

23  railroad and the grantors specifically reserved all

24  littoral and riparian rights and the right to mine

25  coal and reserving also the right to build an overhead

1    crossing upon and over said property and tunnels under

2    the same.  And if the Court will look at the

3    Reichenbach opinion where there were similar

4    reservations of rights, it was clearly indicative of

5    an easement.  And the same thing is what Judge Horn

6    found and held in the Beres opinion as well.

7             Now finally, even though we believe the

8    Kittinger deed is unambiguous and clearly granted an

9    easement, if it is ambiguous in any regard, the

10   historical context of the time clearly demonstrates

11   that these grantors specifically knew that the

12   railroad was merely receiving an easement for railroad

13   purposes only.  And I won't dwell on it in any great

14   detail unless the Court has some specific questions

15   about it, but that historical context was actually in

16   both of our briefs and was also discussed by Judge

17   Horn in Beres in some detail.  And there shouldn't be

18   any dispute about the Kittinger deed, which is

19   Subclass 4B as well.

20            Now let me turn my attention, Your Honor, to

21   Subclass 4C, which is the Fagerberg deed and this

22   applies to nine parcels in Subclass Four.  And we

23   believe that this deed clearly conveyed an easement to

24   the railroad and the fact is that it was later even

25   confirmed by the grantor himself in a subsequent

1  release five years later.  Although the deed is

2  entitled "right-of-way deed," it does not contain

3  right-of-way specifically in the granting clause, but

4  it does refer to the right-of-way on two different

5  occasions in the body of the deed.

6        Now it appears from this deed that it was

7  actually meant to document a proposed change or

8  location in the road slightly from one location to

9  another.  And because the deed refers to the right-of-

10  way on two occasions, it says -- it refers to a strip

11  of land 100 feet in width "as the same as located,

12  surveyed, and staked out upon, across, over, and

13  through that portion" of Fagerberg's land "not

14  included in the present right-of-way" and then again

15  refers to the original right-of-way by stating that

16  the grant which is "not included in the present right-

17  of-way" contains 3.05 acres.

18        So this deed is slightly different than the

19  Jaderholm deed in Subclass 4A and the Kittinger deed

20  in Subclass 4B, but it is entitled "right-of-way deed"

21  and it mentions the original right-of-way on two

22  different occasions.  So it's our belief, Your Honor,

23  that this deed is actually not ambiguous and under the

24  authority from the Washington Supreme Court in <u>Kershaw</u>

25  clearly grants an easement to the railroad.  But if it

1      is ambiguous in any way because it's titled "right-of-

2      way deed" and mentions the original right-of-way on

3      two separate occasions, if it's ambiguous, both the

4      historical evidence and the subsequent release five

5      years later from this exact grantor should lead you to

6      conclude that the grant was an easement.

7           For example, in this prior deed, Your Honor,

8      this is the one, the original deed in 1903, and

9      grantor Fagerberg requires the railroad to make a

10     practical wagon road to connect with the northwest

11     corner of the grantor's premises.  Five years later he

12     releases the railroad from that responsibility of

13     constructing that practical wagon road.  And this

14     release five years later says, referring back to the

15     1903 deed, says "that said deed conveys a right-of-way

16     to the said railway company.  And since the intent of

17     the grantor is paramount, even though the wording of

18     the original 1903 deed should be sufficient to

19     establish the fact that Fagerberg intended to grant an

20     easement, the subsequent 1908 release should

21     conclusively establish that fact because it's in the

22     grantor's own words."

23          Now let me look briefly at Subclass 4D.

24     This is the Lunn deed, which is -- it's also fairly

25     long, Your Honor, so I'll put it up there in two

1      pieces.  There are four deeds in this category that

2      apply to seven parcels.  And the four deeds in this

3      category are all entitled "right-of-way deed" and all

4      say that the consideration is for the deed, the

5      benefits and advantages accruing from the location and

6      construction and operation of the railroad.

7            Now the Defendant attempts to oppose these

8      deeds because there is no stated limitation on the

9      purpose.  Here's the rest of the deed, Your Honor.

10     But these deeds specifically say, just like the deeds

11     in Kershaw, that the consideration for the location,

12     construction, and operation of the railroad is the

13     exact same consideration in the Kershaw deed where the

14     Washington Supreme Court specifically said that that

15     consideration clearly indicates the intent of the

16     grantor to convey an easement only.

17           Now the Defendant once again attempts to

18     rely on Ray without mentioning or applying the

19     decision in Kershaw that a presumption of an easement

20     exists.  And so if you examine this deed in Subclass

21     4D with the eye that a presumption of an easement

22     exists, we believe that you will find also that this

23     deed clearly grants an easement to the railroad.  But

24     if it is ambiguous, that ambiguity should be overcome

25     because there is a presumption of easement under

1    Kershaw and the grantor's intent based on the wording

2    of this deed was clearly meant to convey an easement

3    based on the historical context of the time.

4         One, the Lunn deed is to the SLS&E railroad,

5    which was the railroad basically formed by the

6    citizens of Seattle.  It is entitled "right-of-way

7    deed," which has to mean something.  Three, it cites

8    as consideration the benefits and advantages accruing

9    to Lunn from the location, construction, and operation

10   of a railroad just like the deed at issue in Kershaw.

11   Four, it cites that the railway is now located, staked

12   out, and established over and across Lunn's land.  And

13   five, allows the railroad to cut down trees on either

14   side of the tracks and requires two farm road

15   crossings as already located on the land.

16        Let me turn, Your Honor, to Subclass 4E,

17   which I believe is the most interesting category.

18   There are 32 deeds in this category, Your Honor, that

19   pertain to 116 parcels.  Each deed in this category,

20   although right-of-way is not specifically in the

21   granting clause, all of the deeds in this category are

22   entitled "right-of-way deed."  They all indicate that

23   the grant is 100 feet wide to the Northern Pacific "as

24   the same as located, staked out, and to be constructed

25   over and across" the grantor's land.  And then they

1    generally reserve some road crossings or cattle

2    crossings as well.

3         Now it's our position, Your Honor, that the

4    title of every deed in Subclass 4E, right-of-way deed,

5    simply has to mean something, particularly in the

6    historical context of the time.  We believe that the

7    grantors in Subclass 4E simply had no intention

8    whatsoever to grant a fee to the railroad.

9         Now if this Court determines that the

10   grantors in Subclass 4E do not benefit from the

11   presumption of an easement as the Washington Supreme

12   Court set out in <u>Kershaw</u>, then the historical context

13   provides the evidence of these grantors' true intent.

14   And the reason is fairly simple and obvious, Your

15   Honor.  It would simply make no sense to not use a

16   warranty deed and/or to title a deed "right-of-way

17   deed" if the deed was meant to convey a fee instead of

18   an easement.  That is not only illogical, it is

19   actually why Subclass 5 exists and was formed because

20   Subclass 5 contains the warranty deeds that are not

21   entitled "right-of-way deed."

22        Here, in all of the Subclass 4E deeds,

23   although not specifically in the granting clause, the

24   purpose of the grant was to convey a right-of-way as

25   explicitly stated in the title of each deed.  And so

1    not only is the purpose of the conveyance expressed in

2    the title, the purpose of each grant is explicitly

3    stated when the grantor says as the same as located,

4    staked out, and to be constructed over and across each

5    grantor's land.  In fact, the presumption of an

6    easement in Kershaw, a case that granted a strip, but

7    referred to the purpose as a right-of-way, is actually

8    almost exactly like the Subclass 4E deeds.  The only

9    difference frankly is that the Subclass 4E deeds have

10   the purpose of the deed in the title right-of-way deed

11   and the Kershaw deed had the purpose in the body of

12   the deed.

13          Now it's also important to look at the

14   language of over and across, which was very

15   significant at the time.  There would be no reason in

16   the world, and this is why Subclass 5 exists is to

17   grant land over and across to a railroad, if you were

18   just merely granting the land or the real estate

19   because then the coal that was underneath the ground

20   would be included in the grant.  And coal was

21   important to these landowners and so they specifically

22   wanted to retain stuff that was under the ground, not

23   over and across.  They gave them the strip of ground

24   over and across and they retained the fee and that's

25   what the over and across language had to refer to.

1           Now I would, because I honestly think that

2      the Subclass 4E deeds is frankly the only close

3      question, Your Honor, with respect to fee or easement,

4      I would encourage you to look at the dissent in the

5      Brown opinion written by Judge Alexander, 1996.  We

6      actually refer to it in our papers.  Judge Alexander

7      then became the chief judge of the Washington Supreme

8      Court in 2006 when Kershaw was written.  And in that

9      deed it specifically -- or in that opinion it

10     specifically goes through the history of the railroad

11     deeds in Washington.

12          And the significant difference that the

13     Defendant is missing in this discussion on Subclass 4E

14     is that they want to look at these deeds in Subclass 4

15     under the Brown lens, which says that these deeds are

16     presumptively a fee.  But what Kershaw says is that

17     these deeds are presumptively an easement.  And if you

18     look at the Subclass 4E deeds with the presumption of

19     an easement, I would challenge the Defendant to find

20     anything, anything in these Subclass 4E deeds that

21     would lead you to conclude that it was a fee.

22          And that is the significant difference

23     between Kershaw in 2006 and the Brown opinion in 1996.

24     And we believe the fact remains that the Brown opinion

25     is the only case in the history of the Washington

1      Supreme Court that found that a deed to a railroad,

2      whether a strip of ground or a right-of-way conveyed a

3      fee.  And as I said before, the deeds at issue in

4      Brown specifically said it conveyed it in fee simple.

5      What other choice did the court have?

6            So there is simply no way, Your Honor, given

7      the 25-year fight with the Northern Pacific, that any

8      of the grantors in Subclass 4E, who were influential

9      citizens at Seattle at the time based on a historical

10     context provided to the Court, intended to grant a fee

11     interest in their land to the Northern Pacific.  Thank

12     you, Your Honor.

13            THE COURT:  Thank you.  Mr. Trauben?

14            MR. TRAUBEN:  Your Honor, all these deeds

15     convey a fee interest to the railroad and it's plain

16     from the language of the deeds.  I want to correct one

17     thing that the Plaintiff's counsel said is that in

18     Brown -- Plaintiff's counsel argued that in Brown all

19     of the deeds at issue in Brown conveyed a fee simple

20     absolute and it said so in the body of the deed.  That

21     is not accurate.

22            One of the deeds was from Simpson and that

23     deed was discussed in the case of Roeder Company v.

24     K&E Moving, 4 P.3d -- excuse me, 4 P.3d 839 at 842.

25     It says of particular importance for our case, the

1    <u>Brown</u> court held that the Simpson deed, which is

2    similar in crucial respects to the deed involved here,

3    conveyed a fee interest.  Like the deed here, the

4    Simpson deed did not expressly grant a fee simple

5    interest, but did contain the words "right-of-way" in

6    its legal description.  The Simpson deed was also

7    captioned "right-of-way deed," exactly like the deed

8    in this case.  This was the <u>Roeder v. K&E</u> court

9    speaking.  The <u>Brown</u> court did not consider either the

10   absence of an expressed grant or the presence of the

11   caption, an impediment to holding that the deed

12   conveyed a fee simple interest.

13        So in <u>Brown</u>, there was at issue a deed

14   caption right-of-way.  It did not specifically convey

15   fee simple interest and was held to still convey a fee

16   interest to the railroad.  So I wanted to make clear

17   that there are other deeds at issue in <u>Brown</u> and we

18   mention this in my reply I believe also that there

19   were other deeds at issue in <u>Brown</u>, other than those

20   that conveyed fee simple, expressly conveyed fee

21   simple and this is one example discussed at length in

22   the <u>Roeder v. K&E</u> case.

23        Also <u>Kershaw</u> does not overrule <u>Brown</u>.

24   <u>Kershaw</u> applied the <u>Brown</u> factors.  <u>Kershaw</u> built on

25   <u>Brown</u>, but it didn't overrule it.  And most

1    importantly for our case, Your Honor, <u>Kershaw</u> -- the

2    Washington Supreme Court in <u>Kershaw</u> distinguished the

3    deed at issue in <u>Ray v. King County</u> before a deeded

4    issue here. Not the same deed, but the same language.

5    It distinguished it from the deed at issue in <u>Kershaw</u>.

6    It did so in footnote 11.

7            Now I'm really not at liberty to criticize

8    Judge Horn here in this Court.

9            THE COURT:  Yes, you are.  All of us are

10   susceptible to criticism.

11           MR. TRAUBEN:  Well, with that green light, I

12   think Judge Horn misconstrued some things in her

13   opinion.  First of all, it's the government's view

14   that she should have applied the holding of <u>Ray v.</u>

15   <u>King County</u>, whether she agreed with it or not, under

16   the Erie doctrine, that the court applies the law of

17   the state as it finds it.  But she didn't apply the

18   law as she found it.  She went on and interpreted it

19   in her own view, in view of the world.

20           Also and we cite these papers in our briefs

21   and we provide the proof, the Washington Supreme Court

22   had no fewer than four opportunities to review and

23   overturn the decision in <u>Ray v. King County</u> and each

24   time it refused.  I don't want to waste time going

25   through them all, but it had four opportunities and it

1    never overturned it.  In fact it distinguished it in

2    Kershaw in footnote 11.  The court there says, "While

3    the Ray deed did include the phrase right-of-way, it

4    did so only to the extent that it stated it was

5    conveying a right-of-way strip."  So this is the

6    reference to the 4A deeds and I'll go back to that in

7    a second.

8         But it goes on.  It says, "Thus, the Ray

9    court found no presumption in favor of an easement and

10   applied the Brown factors to reach its conclusion that

11   a fee interest was transferred."

12        So what does that mean looking at the 4A

13   deeds?  We can go to the other long deed as well.

14   We'll see if this works.  And this is what the Ray v.

15   King County court held on the grounds that Kershaw

16   distinguished it.  It said, "I hereby donate, grant,

17   and convey unto the Seattle Lakeshore and Eastern

18   Railroad Company a right-of-way 100 feet in width

19   through my land in said county described as follows to

20   wit."  It goes, "the north half, the southwest

21   corridor," et cetera, section nine -- I'm paraphrasing

22   -- "King County, such right of way strip to be 50 feet

23   in width."

24        Now such right of way strip is referring

25   back to the first use of right-of-way.  It means and

1    the Ray court interpreted this to mean that the

2    grantor in this case, in this situation is using the

3    phrase "right-of-way" to refer to land, such right-of-

4    way strip.

5         And it's long been held in the State of

6    Washington that right-of-way can mean two things.

7    Right-of-way can mean a right-of-passage or right-of-

8    way can mean a strip of land.  And in this situation

9    it is using the words "right-of-way" to mean a strip

10   of land.  And that is what the court in Ray v. King

11   County found and that is the basis on which the

12   Kershaw -- the Washington Supreme Court in Kershaw

13   distinguished the deed from the deed at issue in

14   Kershaw.  It conveyed a strip of land.

15        So the question in one of the Brown factors

16   is did the deed convey merely a right-of-passage, use

17   of the word "right-of-way" as a limitation to a right-

18   of-passage or is it using the phrase "right-of-way"

19   and conveying a strip of land?  And here it held

20   convey a strip of land.

21        The closest deed among all the cases that

22   the Plaintiff cites, the one that is best for them

23   that they could ever cite to is in the Veech case,

24   Veech v. Culp where there the court without much

25   discussion held that the use of the word "right-of-

1   way" in the granting clause, and that's significant

2   that the phrase is in the granting clause, were

3   granted a right-of-way, but it didn't say later such

4   right-of-way strip.  It didn't have that additional

5   language that we see in the 4A deeds.  It just

6   conveyed a right-of-way and the court there held it

7   conveyed an easement.  So there the use of the word

8   "right-of-way" was being used -- the phrase "right-of-

9   way" is being used as a right-of-passage.  So it

10  didn't have the additional language to indicate that a

11  right-of-way was being used as a strip of land.

12        And by the way, the consideration in Kershaw

13  was $1,000.  It wasn't for the benefits and advantages

14  to accrue to the grantors.  The deed described there

15  at 126 P.3d 16 at 18 identifies the consideration as

16  the sum of $1,000.  And the court in Kershaw held that

17  the consideration was not a factor.

18        So I attach as exhibits to our reply the

19  pertinent language from the different deeds so to make

20  it easier for the Court to review and compare the

21  language in the cases that the Plaintiffs cite and the

22  deeds at issue.  And I think then when you review

23  those charts and the pertinent language, it becomes

24  clear where the deed conveys an easement and where the

25  deed conveys a fee.

1          And one important consideration under

2     Washington law is that if the deed is in the statutory

3     warranty form or in the form of a bargain and sale

4     deed, then it conveys a fee simple interest.  And

5     that's the situation where a number of these deeds,

6     and I describe it in our paper, that a number of these

7     deeds are in the warranty form or in the bargain and

8     sale form.  And I include the statute that has the

9     form and also identify the deeds that are in that

10    form.  And as the Brown court found and the Roeder v.

11    K&E Moving, the fact that it says "right-of-way" in

12    the title is not a factor.  The Simpson deed at issue

13    there was in the bargain and sale form and the court

14    found conveyed a fee.

15         So going through these deeds and applying

16    the Brown factors, the number one question in the

17    granting clause, did it grant a strip of land.  And

18    they do.  The Ray court found that the 4A deeds

19    conveyed a strip of land because it said such right-

20    of-way strip made clear that it was conveying land.

21         The other deeds at issue are even clearer.

22    4B, "Hereby grant, bargain, sale, and convey unto the

23    said railway company the said strip, piece, and parcel

24    of land 100 feet in width as herein described."  And

25    then it describes the following strip, "the following

1    described strip piece and parcel of said land above

2    name, to wit, a piece, strip, piece, or parcel of

3    land."  It doesn't say a right-of-way.  It says

4    "land."  That signals the intent to convey a fee.

5         In the 4B deeds, there is no habendum clause

6    or reverter clause and they did reserve riparian

7    rights and the right to construct a crossing.  That

8    indicates the intend to grant a fee because if they

9    only intended to grant an easement, there would have

10   been no need for such a reservation, especially with

11   respect to their riparian rights.  Why would they have

12   reserved those rights if they were only granting an

13   easement?

14        The 4B deed, that's the one from J.R. Lewis

15   et al. -- sometimes we refer to it as the Kittinger

16   deed -- is the one where the Plaintiffs describe a

17   historical context.  They discuss J.R. Lewis, refer to

18   him as Judge Lewis, and that Judge Lewis never would

19   have granted a fee interest to the railroad because of

20   some longstanding dispute between the citizens of

21   Seattle and the Northern Pacific Railroad, a dispute

22   that dates back to 1873 when the Northern Pacific

23   Railroad decided to put its terminus in Tacoma and not

24   Seattle.  And because they decided to put their

25   terminal in Tacoma and not Seattle, everybody in

1    Seattle forever hated the Northern Pacific Railroad

2    and because of that they never would grant them a

3    right-of-way in fee.

4         Why would they grant them a right-of-way at

5    all if there was so much animus?  It doesn't explain

6    why they would only grant an easement and not a fee.

7    It doesn't explain -- and then he described at length

8    how Judge Lewis, J.R. Lewis -- and we don't know that

9    J.R. Lewis is indeed the same Judge Lewis.  They said

10   that Phillip H. Lewis was his father and that he

11   discovered coal and we later find out -- I got on the

12   Internet and I cite it in our papers, Phillip H. Lewis

13   had discovered coal near Lake Washington, I believe,

14   was a surveyor born in Illinois in 1828 and J.R. Lewis

15   was born in Ohio in 1829.  Phillip H. Lewis, who

16   discovered coal, was not his father.  So we don't even

17   know who these people are really.  They're jumping to

18   conclusions.  They're just assuming that Judge Lewis

19   who they say led these committees is the same J.R.

20   Lewis.

21        But even if he was, this dispute with the

22   railroad that they discuss by their own papers shows

23   that it was over 1890.  It lasted for 17 years, began

24   in 1873 and was over by 1890.  The grants were in

25   1903, over 13 years later.  By that time and the deed

1    states in the body of the deed, "J.R. Lewis of the

2    city of San Jose, State of California."  He wasn't

3    even living in the area at the time of this

4    conveyance.  Why would he -- it doesn't make sense --

5    their argument doesn't make sense that J.R. Lewis of

6    San Jose, California is going to withhold granting a

7    fee because of some dispute that had happened over 20

8    years ago -- or began over 20 years ago.

9           It also doesn't describe that this dispute

10   between the citizens of Seattle and the Northern

11   Pacific Railroad continued.  It doesn't explain why

12   others did not hesitate to grant fee. They even admit

13   granted fee interest to the railroad in the category

14   five deeds at the same time.

15          Anyway, nevertheless, it conveyed a strip of

16   land.  The precatory language, "the whereas," is not

17   limiting.  It's not in the granting clause.  The most

18   important clause in deeds is the granting clause.  The

19   precatory language is not in the granting clause.  The

20   description that they're referring to says "the

21   following described strip, piece, parcel of said land

22   above name, to wit, a strip, piece, or parcel of said

23   lands 100 feet."  I have some of my notes on here, but

24   I'll put this up here.

25          MR. STEWART:  Do you want to use mine

1    instead of using one --

2          THE COURT:  No, that's fine.  I can --

3          MR. TRAUBEN:  Okay.

4          THE COURT:  We don't have it in the record.

5    We can avoid that.

6          MR. TRAUBEN:  So it says --

7          THE COURT:  When I said we don't have it in

8    the record, we don't have your notes in the record.

9    So we'll just ignore them.

10         MR. TRAUBEN:  Okay.  It says, "Now,

11    therefore, said parties the first part for and in

12    consideration of the sum of $2,150 to the midhand

13    (phonetic) paid do hereby grant, bargain, sell, and

14    convey unto the said party of the second part the said

15    strip, piece, and parcel of land 100 feet in width as

16    herein before described."  Where is that description?

17    It's up here.  The parties of the first part, the

18    following described strip, piece, and parcel of said

19    land above name to wit.  A strip, piece, or parcel of

20    said lands 100 feet in width in, over, and across lots

21    one, two, three, et cetera.  It's describing -- the

22    description is this clause, not the whereas clause up

23    above that language here.  It's referring to the

24    description.

25         The deed conveys fee interest and a piece of

1    land.  It does not limit the purpose like the other

2    deeds that they cite.  It doesn't limit the purpose to

3    railroad use.

4         The Fagerberg deed similarly conveys a strip

5    of land.  This is in our papers.  I believe this is in

6    the warranty form and convey and warrant unto the

7    Northern Pacific Railway Company, a Wisconsin

8    Corporation, the real property situated in King

9    County, State of Washington described as follows:  a

10   strip of land 100 feet in width -- it goes on and

11   describes it -- containing 3.05 acres more or less

12   which present right-of-way is a strip of land 100 feet

13   in width on each side of center line of the road.  So

14   this is the one that -- they're not including --

15   excuse me, it says not included -- I misread it -- it

16   says not included in the present right-of-way across

17   said premises containing 3.05 acres, more or less,

18   which present right of way.

19        So what the Plaintiffs are doing is they're

20   trying to describe the conveyance not by what it

21   conveys, but what it doesn't convey.  And what it does

22   not convey is that other strip of land that they refer

23   to as the right-of-way.  What it's conveying is

24   described and then it says "not included in the

25   present right-of-way of the Northern Pacific Railway

1    across said premises," which present right-of-way is a

2    strip of land.  So it's describing -- it conveys a

3    strip of land and then it makes clear that the strip

4    of land being conveyed is not that other strip of land

5    where the railroad has already staked it off.

6          So this is the one with the release and

7    frankly I'm having trouble seeing the relevance of the

8    release.  The release relates to the wagon road and

9    that, you know, they were to build a practical wagon

10   road to connect certain premises west of the strip of

11   land.  And so then five years later then there's this

12   release and to identify the conveyance, which is

13   entitled "right-of-way deed" and it gives -- you know,

14   by book and page, it says -- you know, so they're

15   releasing the railroad from that obligation to put a

16   practical wagon road.

17         And it says "as provided for in a certain

18   deed given by the grantors herein to the said railway

19   company," bearing a date of May 7, 1903 and recorded

20   in bind 359 at page 166 of King County records, the

21   said deed conveys a right-of-way to the railway

22   through the northwest corridor, et cetera.  So what

23   it's doing is it's making clear what deed it's

24   referring to where the condition was imposed.  So it

25   doesn't limit -- that reference does not limit the

1       prior grant.

2               The Lunn deed also conveys grant -- "give,

3       grant, bargain, sell, and convey unto the said

4       Seattle, Lake Shore, and Eastern Railway Companies

5       successors and assigns forever the following described

6       strip of real estate situate in said County of King"

7       and it gives the description.  There are no

8       limitations and it conveys land.  And then it goes

9       through and it states all the things that go with a

10      warranty that they will defend title.

11              Andrew Lunn and Alfreda Lunn, his wife and

12      himself, et cetera, that they are the owners in fee

13      simple.  The above-described lands are the same and

14      free and clear of all encumbrances.  And they will and

15      forever warrant and defend the title of said strip of

16      land against all lawful claims whatsoever, just like

17      is done in a warranty deed.  This is one of the

18      covenants that are presumed to be conveyed with a

19      warranty deed by statute.  They just spelled it out

20      here.

21              And then when they want to give an easement,

22      they know how, and the said railway company,

23      successors and assigns shall have the right, just a

24      right, to go upon the land adjacent to the center line

25      on each side of the road and cut down all trees

1    dangerous to the operation of the railway.  So where

2    they give an easement to cut down trees, they specify

3    a right.  But in the conveyance it's clear, they're

4    giving more than just a right to use the land.

5    They're giving the land.

6         This is 4E.  And I find it very interesting

7    that Plaintiffs' counsel and I don't know where this

8    is coming from, but that -- he said that the language

9    "over and across said premises" indicates an intent to

10   reserve the coal.  There's no reservation.  Where does

11   that come from?  I don't know.  There's no mention of

12   coal in the grant.  I assume it's coming from his

13   little story about Phillip H. Lewis discovering coal

14   near Seattle, et cetera, the father of Judge Lewis, et

15   cetera, which we know he wasn't his father.  But any

16   way, there's no reservation.

17        You have to take the deed as it is and not

18   read words into it that are not there.  This deed

19   conveys a strip of land and no limitations on the use.

20   And it describes the boundary as the same or as it is

21   staked out over and across the land.  It's describing

22   the location as staked out.

23        THE COURT:  But this one refers

24   interestingly enough refers to the over and across.

25   And you say what about that form of words?

1          MR. TRAUBEN:  Over and across by itself does

2     not necessarily limit this conveyance to an easement.

3     It's discussed in Ray v. King County.  Sometimes the

4     over and across language can indicate an easement.

5     But here they're describing where it's staked out, the

6     thing is located and staked out and to be constructed

7     over and across the said premises.  I don't think

8     that's a limitation.  If they wanted to limit it, they

9     could have done so more explicitly than what is stated

10    here.  This grants a strip of land and it doesn't --

11    there's no habendum clause.  There's no reverter

12    clause.  It's in "pays, conveys, and warrants."  So it

13    conveys and warrants.

14          THE COURT:  Well, you started your argument,

15    Mr. Trauben, with the indication that a right-of-way

16    can be used in two ways, that is a strip of land --

17          MR. TRAUBEN:  Yes.

18          THE COURT:  -- or a right-of-passage.

19          MR. TRAUBEN:  Yes.

20          THE COURT:  And the over and across language

21    certainly would suggest at least, if not indicate, a

22    right-of-passage.

23          MR. TRAUBEN:  But it does not limit it to

24    any use either.  It doesn't say for railroad use or

25    any particular use.  If it said for railroad purposes

1    over and across or something like that, it would be a

2    stronger argument.  But there's no -- it conveys land

3    and it doesn't limit it to any specific use.  That is

4    a weak-- Your Honor, with all due respect --

5            THE COURT:  Yes.

6            MR. TRAUBEN:  -- it can indicate -- where

7    used in some deeds to convey an easement.  But in this

8    case, I don't think it can override the fact that the

9    form of the deed is in the warranty form and it

10   conveys a strip of land and it doesn't limit the use

11   of it to any particular purpose.  If it did that, it

12   would be a stronger argument, but it doesn't.

13           Looking at the language of the deeds, they

14   conveyed land without limitation.  Kershaw does not

15   overrule Ray.  It distinguishes Ray.  Kershaw does not

16   overrule Brown.  It uses the Brown factors.  It built

17   upon it.  And what is important in Kershaw is that it

18   looks at the granting clause.  When it talks about a

19   presumption, it's referring to --

20           THE COURT:  Well, now, you keep describing

21   Kershaw as not overruling --

22           MR. TRAUBEN:  Correct, Brown.

23           THE COURT:  -- Brown -- well, overruling

24   Ray.

25           MR. TRAUBEN:  That doesn't overrule Ray,

1    that's right.

2              THE COURT:  Well, Ray was by an intermediate

3    appellate court, as I understand it.

4              MR. TRAUBEN:  That's correct.

5              THE COURT:  And it might disapprove it.  It

6    would hardly overrule it.  You overrule one of your

7    prior decisions.  You disapprove a decision by a lower

8    court.

9              MR. TRAUBEN:  They easily could have said,

10   you know, that they disagreed with the holding of Ray.

11             THE COURT:  Yes, they could have.

12             MR. TRAUBEN:  They could have.  They didn't.

13   They distinguished it is what they did.

14             In Brown the court there, and we state this

15   in our papers, the purpose of the deed -- the fact

16   that it says "right-of-way deed" is not a factor.

17   It's understood that the railroad is buying the land

18   for a right-of-way.  Why else would it be buying the

19   land?  But that doesn't mean that it's a limitation to

20   an easement.  And Brown discusses that and we discuss

21   it in our papers.  The title of the deed is not an

22   indication.  The purpose of the deed is not an

23   indication.

24             In Kershaw the important language was in the

25   granting clause.  And there, it was very clearly

1   distinguishable from the language at issue here.

2   There, in the granting clause, it said "for the

3   purposes of railroad use" and that is language that we

4   don't have in any of the deeds at issue here.  In the

5   granting clause --

6           THE COURT:  Well --

7           MR. TRAUBEN:  -- it said "to be used by the

8   railway as a right-of-way for railway forever together

9   with a perpetual right."  This is an important clause

10   for the Kershaw court finding that this conveyed an

11   easement, "the perpetual right to construct, maintain,

12   and operate a railway or railways over and across the

13   same."

14           THE COURT:  Now the one area in which as I

15   heard Mr. Stewart, he would specifically disagree with

16   you as to purpose is with Subclass 4B, which is to

17   secure for such purposes a right-of-way --

18           MR. TRAUBEN:  Right.

19           THE COURT:  -- and as herein before

20   described.

21           MR. TRAUBEN:  And what he's doing is he's

22   importing into the granting clause the precatory

23   language up above.

24           THE COURT:  Well, isn't that what those

25   words do, though?  That's his point.

1           MR. TRAUBEN:  No, it doesn't limit the

2    grant.  It says what the purpose of the -- why the

3    railroad is entering into this contract.  It wants to

4    construct a railroad and so it's buying the land.  It

5    doesn't limit the grant to that purpose.  If they did,

6    they could have said, you know, instead of the

7    following described strip, piece, and parcel of land,

8    it could have said the following described right-of-

9    way for railroad purposes.  It doesn't say that.

10   Especially if this is Judge Lewis, the judge would

11   know how to grant an easement, but he didn't.  He

12   lives in San Jose, California and he wanted to sell

13   the land.  Under Washington law, it is improper

14   construction to import one clause into another.

15           THE COURT:  That might be true, but when you

16   have actually an incorporation, it might be different.

17           MR. TRAUBEN:  But I don't see the

18   incorporation.

19           THE COURT:  All right.  I understand.

20           MR. TRAUBEN:  All right.  Thank you, Your

21   Honor.

22           THE COURT:  Thank you, Mr. Trauben.  Mr.

23   Stewart?

24           MR. STEWART:  Thank you, Your Honor.  I'll

25   try to be brief.  I never thought I would cite your

1    Sikorsky order twice, but as --

2              THE COURT:  That was an unpublished order,

3    Mr. Stewart.

4              MR. STEWART:  I know.  As Justice Kennedy

5    said, "Reluctance to work with the basic meaning of

6    words in a normal manner undermines the legal process"

7    and we just witnessed it.

8              First of all, Kershaw conveys a strip for a

9    railroad purpose and Kershaw indicates that the

10   purpose, if a railroad purpose indicates an easement

11   over a fee.  That's the presumption of Kershaw.

12             Kershaw also instructs to look at the entire

13   deed to ascertain the grantor's intent.  Now the

14   Plaintiffs are the ones who actually cited the one

15   paragraph recount of the Simpson deed in the Brown

16   opinion.  And we went through the analysis of that

17   entire Simpson deed and we pointed out that the

18   dissent written by Judge Alexander in 1996 became the

19   majority in the Kershaw opinion in 2006 and that the

20   justice who wrote the opinion in Brown signed on to

21   the majority of the Kershaw opinion in 2006, as well

22   as Judge Sanders, who also dissented in Brown.  But

23   the fact of the matter is, is that Brown really, other

24   than that one paragraph on the Simpson deed, is not

25   really relevant to the issues in all of the Subclass

1    Four deeds.

2            Now the important thing that the government

3    seems to completely miss again is that the Kershaw

4    opinion by the Washington Supreme Court in 2006 was

5    two years after Ray and whether you say it

6    distinguished Ray or whatever, it basically approached

7    it from a totally different context.  It was not that

8    Ray had some magic language in the granting clause.

9    They basically said that you have to distinguish Ray

10   because Ray looked at it under the guise of a

11   presumption of fee rather than a presumption of

12   easement.  And that's specifically what the court

13   said.

14           In footnote 11 in Kershaw, it says, "The Ray

15   court thus found no presumption in favor of an

16   easement and applied the Brown factors to reach its

17   conclusion that a fee interest was transferred.  Here,

18   the deed specifically established the purpose of the

19   grant when it stated the land was to be used as a

20   right-of-way for the railway.  This creates a

21   presumption in favor of an easement, which was not

22   present in Ray."

23           Now the fact of the matter is, is the

24   government wants to rely on the Brown opinion in 1996,

25   which was at a minimum clarified, if not reversed on

1    the issue of a presumption of a fee or easement in the

2    <u>Kershaw</u> opinion and wants to rely on an appellate

3    court decision in 2004 in the <u>Ray</u> opinion that was

4    totally distinguished by the Supreme Court of

5    Washington two years later.  And at the same time,

6    <u>Kershaw</u> distinguished <u>Ray</u> and Judge Horn, whether he

7    wants to talk about it or not, emaciated <u>Ray</u>.  And I

8    went through in our brief all of the reasons why and

9    I'll just recount them very briefly.

10         First of all, Judge Horn said that the <u>Ray</u>

11   opinion, first of all, is non-binding obviously, but

12   it was different for a variety of reasons.  One, it

13   was brought as quiet title action.  None of the

14   plaintiffs were before the court as successors in

15   interest were before the court in <u>Ray</u>.  More

16   significantly, all the decisions in <u>Ray</u> were decided

17   prior to the Supreme Court's decision in <u>Kershaw</u>.

18   Four, the holding or evaluation factor guidance in <u>Ray</u>

19   was based on the presumption of a fee and the <u>Kershaw</u>

20   opinion added a significant analytical approach to the

21   precedent of the State of Washington, that is a

22   presumption of an easement exists that is used to

23   define the purpose of the grant is exactly what it

24   says.

25         There are eight reasons.  And what I said

1    before with respect to Subclass 4E is exactly right.

2    Rather than rely on Ray and Brown, which is no

3    precedent at all, and instead of ignoring Kershaw,

4    they ought to follow the guidance of Kershaw.  And if

5    they follow the guidance of Kershaw and approach these

6    deeds as a presumption of easement rather than a

7    presumption of fee, you reach a totally different

8    result in Ray just like you would reach a totally

9    different conclusion that the government has reached

10   in these cases.

11          Now the other thing is, is that in Subclass

12   4A, for example, the government is referring to the

13   right-of-way strip as the only reference to the right-

14   of-way.  But in Subclass 4A, it is a specific grant of

15   a right-of-way and later refers to the right-of-way

16   strip.

17          Now also he made the statement -- Mr.

18   Trauben made the statement that a statutory warranty

19   deed always conveys a fee.  That's totally false.  And

20   the warranty deeds, the statutory warranty deeds in

21   Subclass Five are warranty deeds.  These deeds in

22   Subclass Four are not generally in the statutory

23   warranty deed form.  And he made the statement that if

24   a deed grants a strip of land, that that automatically

25   conveys a fee.  That is directly opposite of the

1    Supreme Court of Washington's holding in <u>Kershaw</u>.

2           Now he totally emaciated words with respect

3    to the Kittinger deed and only partially quoted it.

4    He made the statement that the reservations granted a

5    fee rather than an easement.  That's directly contrary

6    to law and logic in <u>Reichenbach</u> and <u>Beres</u> that are

7    cited in our briefs.  And his comments about the

8    historical context are actually almost laughable.

9    He's the one that also said that the trail, since it

10   went to Woodinville, was not in Seattle.

11          But then you referred to the over and across

12   language, Your Honor, and I would refer you again to

13   Judge Alexander's dissent in <u>Brown</u> on what does the

14   over and across mean and it specifically means a

15   right-of-passage as was indicated in the <u>Kershaw</u>

16   opinion.  It's indicative of an easement rather than a

17   fee.  Thank you, Your Honor.

18          THE COURT:  Thank you.  Mr. Trauben?

19          MR. TRAUBEN:  Just a few things I want to

20   make clear.  The fact that the Subclass Five deeds are

21   warranty deeds has no bearing on the deed

22   interpretation of the deeds at issue here.  Those are

23   the deeds that the Plaintiffs were willing to agree

24   conveyed a fee.  That doesn't mean that the deeds in

25   Subclass Four don't convey a fee.  Those are the ones

1    they've agreed to.  Obviously we have a dispute.  So

2    there's no evidence or argument as to the

3    interpretation of the Subclass Four deed.

4              Also, in Reichenbach, it had a very

5    interesting restriction there.  There, the reservation

6    or the restriction was that the railroad could not

7    fence in the right-of-way and the court there held

8    that indicated an easement -- only an easement was

9    granted and that was because it showed that the

10   railroad did not have exclusive use of the property.

11   So logically --

12             THE COURT:  That's why we have cow catchers

13   --

14             MR. TRAUBEN:  Yes.

15             THE COURT:  -- Mr. Trauben.

16             MR. TRAUBEN:  Because that was a limitation

17   on the railroad's use of the right-of-way, it only

18   conveyed an easement.  And here what we're talking

19   about is not a restriction on the railroad's use.

20   These reservations are reserving rights to the

21   grantors, that the grantors don't want to convey with

22   the fee.  That's the difference.

23             The language in Kershaw that the Kershaw

24   court found conveyed an easement indicated an

25   easement, the presumption of an easement was in the

1   granting clause.  So take a look at that case.  You'll

2   see where the language was.  The language that created

3   the presumption was in the granting clause.  And

4   they're trying to extend it to any use of the word

5   "right-of-way" in the deed as creating a presumption

6   and that's not what Kershaw holds.

7           With that, Your Honor, I think we make our

8   points in our briefs.  I just want to say that in

9   addition to argument, of course the government is

10  relying on its briefs in this case and I want to thank

11  you.

12          THE COURT:  All right, certainly.  Now we do

13  have the motion to strike, but I don't think we need

14  argument on that.

15          MR. STEWART:  Plaintiffs -- we're willing to

16  submit it on the briefs and the arguments here today.

17          THE COURT:  All right, fine.  Thank you.  If

18  we issue a decision not tomorrow, but at some not

19  terribly distant time in the future, will the parties

20  be ready for a trial on Subclasses Two and Four in

21  Seattle?

22          MR. STEWART:  The Plaintiffs most certainly

23  will, Your Honor.  We have expended a lot of time and

24  resources already in that endeavor and we'll be ready.

25          THE COURT:  All right.  Mr. Trauben?

1        MR. TRAUBEN:  Your Honor, I don't have the

2    resources yet.  I have to still get them.  But I hope

3    to be ready and at this point here in October, I don't

4    anticipate any issues.  But we'll see how discovery

5    goes.

6        THE COURT:  And I'm still going to call it

7    springtime.  At least it's not July in Seattle.  I've

8    bene in Seattle before in July and that's a different

9    situation entirely.  Okay.  With that, we'll call

10    these motions submitted and then proceed to a decision

11    on the motions and do so with a view to carrying

12    forward with the trial in Seattle as scheduled.  Thank

13    you very much.

14        MR. STEWART:  Thank you, Your Honor.

15        MR. TRAUBEN:  Thank you.

16        (Whereupon, at 1:01 p.m., the hearing in the

17    above-entitled matter was concluded.)

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

REPORTER'S CERTIFICATE

DOCKET NO.:  09-103L

CASE TITLE:  Daniel Haggart, et al. v. United States

HEARING DATE:  October 10, 2012

LOCATION:  Washington, D.C.


I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.


Date:  October 10, 2012

_____

Rachel Tucker
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C.  20005-4018