# In the United States Court of Federal Claims

No. 09-103L

(Filed:  December 18, 2012)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| Daniel and Kathy HAGGART, *et al*, For<br>Themselves and As Representatives of a<br>Class of Similarly Situated Persons,<br><br>      Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>      Defendant. | Rails-to-trails case; takings; class action<br>with more than 500 opt-in plaintiffs;<br>interpretation of deeds; ownership<br>issues; liability; measuring damages |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas S. Stewart, Baker Sterchi Cowden & Rice, L.L.C., St. Louis, Missouri, for plaintiffs.  With him on the briefs were Elizabeth G. McCulley, Steven M. Wald, and J. Robert Sears, Baker Sterchi Cowden & Rice, L.L.C., St. Louis, Missouri, and Kansas City, Missouri.

Bruce K. Trauben, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs was Ignacia S. Moreno, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge,

This takings case concerns land previously held as a right-of-way by Burlington Northern and Santa Fe Railway Company ("Burlington Northern") in King County, Washington, and its transformation into a recreational trail under Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)) ("Trails Act").  Plaintiffs comprise a class of approximately 522 named and opt-in owners of property allegedly adjacent to the right-of-way.  The class has been divided into six subclasses based on the nature of the property interests held by plaintiffs. *See Haggart v. United States*, 104 Fed. Cl. 484 (2012).  Plaintiffs in Subclasses Two (112 members) and Four (159 members) have filed separate motions for partial summary judgment.  Plaintiffs in both subclasses allege they

own property that was burdened by an easement for limited railroad purposes that was exceeded and thus destroyed, making the defendant liable for taking plaintiffs' property under the Fifth Amendment[1] by authorizing use of the property as a trail. *See, e.g.*, *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1 (1990) ("*Preseault I*") (holding that the Tucker Act, 28 U.S.C. § 1491(a), provided a remedy for an alleged taking of a property interest in land previously used as a railroad right-of-way that had been transferred to a public entity for use as a public trail). The government has submitted corresponding cross-motions for the two subclasses, contesting liability on a variety of grounds, including whether certain deeds granted an easement or a fee, whether easements are sufficiently broad to encompass trail use in addition to rail use, and whether ownership of certain properties has been shown beyond dispute.

The court concludes that the government is liable to the Subclass Two plaintiffs and several categories of the Subclass Four plaintiffs for the taking of their property by issuing the trail-use authorizations when the rail easements did not encompass that use. Certain ownership issues have been reserved for trial. Further, the court holds that the proper method of calculating damages is the difference between the value of each parcel unencumbered by trail usage and its value so encumbered.

## BACKGROUND

This case involves three strips of land totaling approximately 25.45 miles in length. Fourth Am. Compl. ¶¶ 1-3. The first section runs from milepost 0.0 at Woodinville to milepost 7.3 at Redmond; the second encompasses the span between milepost 5.0 at Kennydale and milepost 10.6 at Wilburton; and the third runs from milepost 11.25 near Wilburton to milepost 23.8 in Woodinville (collectively, "the Corridor"). Fourth Am. Compl. ¶¶ 3-5. The railroad's right-of-way was established during the late 1800s and early 1900s when its predecessors obtained grants of easements or fee simple estates from property owners in the area. *See* Pls.' Mem. in Support of Subclass Two Pls.' Mot. for Partial Summary Judgment on Liability and on the Proper Methodology to Determine the Amount of Just Comp. ("Pls.' Subclass Two Mem.") at 12, ECF No. 89; Pls.' Mem. in Support of Subclass Four Pls.' Mot. for Partial Summary Judgment on Liability ("Pls.' Subclass Four Mem.") at 8, ECF No. 100.

Burlington Northern in due course acquired the right-of-way, and in 2003, it announced its intent to divest itself of the lines at issue. Def.'s Resp. in Opp'n to Subclass Two Pls.' Mot. for Partial Summary Judgment and Cross-Mot. for Partial Summary Judgment ("Def.'s Subclass Two Cross-Mot.") at 9, ECF No. 108. By 2008, only two shippers were using part of the rail line located on the right-of-way at issue.[2] On August 11, 2008, Burlington Northern filed with the Surface Transportation Board ("STB") a petition for exemption to abandon the portion of the line extending from milepost 11.25 to milepost 23.8. Odom Decl., ECF No. 109, Ex. M (Petition for Exemption). Shortly thereafter, on September 5, 2008, Burlington Northern filed notices of

---

[1] The Fifth Amendment specifies that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

[2] None of the corridor is currently being used for rail purposes. Hr'g. Tr. 56:13 (October 10, 2012).

exemption to abandon the remainder of the corridor at issue. *Id.*, Exs. J, N (Notices of Exemption).

On September 18, 2008, King County requested a Notice of Interim Trail Use ("NITU") from the STB and stated its willingness to assume financial responsibility for trail use. Subclass Two Pls.' Proposed Findings of Uncontroverted Fact ("Subclass Two PFF"), ECF No. 90, Ex. B.1 at 1, Ex. B.2 at 2, Ex. B.3 at 2. Acting on that request and Burlington Northern's notices, the STB issued three NITUs — two on October 27, 2008 and one on November 28, 2008. Subclass Two PFF, Exs. B.1, B.2, and B.3. On December 18, 2009, Burlington Northern and King County entered into a Trail Use Agreement that allows for public recreational trail use. Odom Decl., Ex. R (Trail Use Agreement). This agreement also stipulated that the railroad line would be "rail-banked" for potential railroad use in the future. *Id.*[3]

On February 19, 2009, Daniel and Kathy Haggart filed suit in this court, alleging an uncompensated taking of their property contravening the Fifth Amendment. In this complaint, the Haggarts contended that cessation of railroad activities across the burdened property effected an abandonment of the railroad-purposes easement under Washington law, leading to a taking when the NITUs authorizing recreational trail use were issued. Compl. ¶¶ 8-18. In addition to the takings claim, the Haggarts also requested certification of a class consisting of adversely affected residuary landowners. Compl. ¶¶ 19-21. This court certified the class action on September 28, 2009, *see Haggart v. United States*, 89 Fed. Cl. 523 (2009), and on December 23, 2009, the court approved an opt-in plan for providing class notice, *see* Order of December 23, 2009, ECF No. 33. Potential plaintiffs were given until July 1, 2010 to join the class, *see* Order of Jan. 8, 2010, ECF No. 35, and on August 16, 2010, plaintiffs filed a fourth amended complaint listing all persons and entities who opted into the class.[4] After examination of the numerous

---

[3]Rail-banking under the Trails Act preserves railroad-purpose easements which otherwise would terminate by operation of law, thus retaining the easements for potential later reactivation of railroad use. In pertinent part, the Trails Act provides:

> Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 801-836] and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, *in the case of interim use of any established railroad rights-of-way* pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, *if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.*

16 U.S.C. § 1247(d) (emphasis added).

[4]Plaintiffs filed a fifth amended complaint on June 30, 2011 to include a claim that had been omitted from the original filing by mistake. *See* Pls.' Unopposed Mot. to File Fifth Am. Compl., ECF No. 61; Order of July 8, 2011, ECF No. 62.

claims and because more than 500 plaintiffs were involved, on December 9, 2011, the parties filed a joint motion to establish subclasses, ECF No. 74. The court granted this motion and established six subclasses on April 26, 2012. *Haggart*, 104 Fed. Cl. 484.

On June 18, 2012, Subclass Two plaintiffs filed their motion for partial summary judgment on the issues of liability and proper methodology to determine the amount of just compensation. On July 13, 2012, Subclass Four plaintiffs filed their motion for partial summary judgment on the issue of liability. On August 21, 2012, the government responded to the Subclass Two plaintiffs' motion with a cross-motion for partial summary judgment on those same issues, and on September 4, 2012, the government responded to the Subclass Four plaintiffs' motion with a cross-motion for partial summary judgment on the issue of liability. These cross-motions have now been thoroughly briefed and were argued at a hearing held on October 10, 2012.

## STANDARD FOR DECISION

A grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials filed in a case reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." *Id.* at 250.

The party moving for summary judgment bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Consequently, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial[,]'" and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). Because cross-motions for summary judgment are pending before the court, the court must evaluate each motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

## ANALYSIS

## I. LIABILITY

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "[O]nly persons with a valid property interest at the time of the taking are entitled to compensation." *Wyatt v.*

*United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  Real property rights ordinarily are secured by state law; here, the plaintiffs' interests in the rights-of-way at issue are dependent on the law of the State of Washington, the state in which the property is located.  *See Preseault I*, 494 U.S. at 20-21 (O'Connor, J., concurring); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001-04 (1984); *Macy Elevator, Inc. v. United States*, 97 Fed. Cl. 708, 718 (2011).

To find a taking for which liability would arise under the Fifth Amendment in a rails-to-trails case, the court follows a three-part analysis specified by the Federal Circuit in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ("*Preseault II*"):

> (1) who owned the strips of land involved, specifically did the Railroad . . . acquire only easements, or did it obtain fee simple estates;
>
> (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and
>
> (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

100 F.3d at 1533; *see also Geneva Rock Prods., Inc. v. United States*, __ Fed. Cl. __, __, 2012 WL 5866135, at *4 (2012); *Ingram v. United States*, 105 Fed. Cl. 518, 534 (2012); *Longnecker Prop. v. United States*, 105 Fed. Cl. 393, 405 (2012); *Beres v. United States*, 104 Fed. Cl. 408, 423-24 (2012); *Jenkins v. United States*, 102 Fed. Cl. 598, 605 (2011).  To prevail, plaintiffs must demonstrate that the railroad held only an easement (as contrasted to a fee simple estate) on property owned by plaintiffs at the time the NITU was issued, and that either the easement did not encompass public recreational trail use, or that the easement had terminated prior to the alleged taking.

### A. *Subclass Two*

Subclass Two consists of 112 plaintiffs who own 134 parcels of land.  *See* Pls.' Subclass Two Mem. at 15.  In delineating this subclass, the parties agreed and the court concurred that this group consisted of "[o]wners of parcels over which the railroad was granted an easement by a deed referencing the railroad right-of-way or street, but the deed does not expressly state metes and bounds, although metes and bounds may be incorporated by reference to another document or may be in the chain of title."  *Haggart*, 104 Fed. Cl. at 491.

1. *Easements.*

An initial aspect of the *Preseault II* inquiry can be resolved swiftly.  Both parties have stipulated that the predecessor railroad acquired an easement, not a fee interest, in the corridor attendant to the Subclass Two plaintiffs' property.  *See* Joint Status Report (Corrected), ECF No.

68; Pls.' Subclass Two Mem. at 2-3; Def's. Subclass Two Cross-Mot. at 15.  Thus, Burlington Northern acquired an easement while the Subclass Two plaintiffs retained the fee.

      2. *Scope of the easements.*

      If the easement granted to the railroad by plaintiffs' predecessors was limited to railroad purposes and its scope does not include recreational trail use upon issuance of a NITU, then a taking will be established.  *See Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010) ("It is settled law that a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, *if trail use is outside the scope of the original railway easement.*" (emphasis added)); *see also Roeder Co. v. Burlington N. Inc.*, 716 P.2d 855, 859 (Wash. 1986) (en banc) ("Where only an easement for a right of way is concerned, and its use for such purpose ceases, the land is discharged of the burden of the easement and the right to possession reverts to the original landowner or to that landowner's successors in interest.").

      The government contends that recreational trail use falls within the scope of the easement granted in this case for railroad purposes.  Def's. Subclass Two Cross-Mot. at 23.  Plaintiffs, on the other hand, assert that the language of the deeds limits the easement to use for railroad purposes only.  Pls.' Subclass Two Mem. at 18.  In this instance, to interpret the language conveying the easement and to determine the scope of the easement, the court looks to the law of the State of Washington, because that is where the property at issue is located.  Under Washington law, the "interpretation of an easement is a mixed question of law and fact.  What the original parties intended is a question of fact and the legal consequence of that intent is a question of law."  *Sunnyside Valley Irr. Dist. v. Dickie*, 73 P.3d 369, 372 (Wash. 2003) (en banc) (citing *Veach v. Culp*, 599 P.2d 526, 527 (Wash. 1979) (en banc)) (internal citations omitted); *see also Roeder*, 716 P.2d at 859 ("The interpretation of a right of way deed is a mixed question of fact and law.").  In *Sunnyside Valley*, which did not deal with a railroad easement, the court applied standard principles of contract interpretation, stating that:

> The intent of the original parties to an easement is determined from the deed as a whole.  If the plain language is unambiguous, extrinsic evidence will not be considered.  If ambiguity exists, extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions.

73 P.3d at 372 (internal citations omitted).

      When faced with railroad deeds, Washington courts have been more accepting of extrinsic evidence, regularly relying on it to interpret the conveyance language, even when no ambiguity is cited.  *See, e.g.*, *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*, 126 P.3d 16, 25 n.12 (Wash. 2006) ("In addition to the deed language, we may also look to the circumstance surrounding the deed's execution and the subsequent conduct of the parties."); *Harris v. Ski Park Farms, Inc.*, 844 P.2d 1006, 1014 (Wash. 1993) (en banc) (applying the "context rule" when interpreting railroad right-of-way deeds and noting that the rule

"succinctly state[s] . . . that 'extrinsic evidence is admissible as to the entire circumstances under which [a] contract [is] made, as an aid in ascertaining the parties' intent'" (quoting *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990) (en banc))); *see also Brown v. State*, 924 P.2d 908, 912 (Wash. 1996) (en banc) ("In addition to the language of the deed, we will also look at the circumstances surrounding the deed's execution and the subsequent conduct of the parties."). This court, too, has noted that the use of extrinsic evidence in cases involving railroad deeds is both logical and practical, as the original deeds often use unusual or less-than-customary language. *Longnecker Prop.*, 105 Fed. Cl. at 409 ("To look first to the language of the source deeds, but then also to refer to the context of the deeds at their time of execution is reasonable, given their age and the sometimes stilted language used."). Thus, the court will look to the plain language of the original granting deeds, along with extrinsic evidence about the circumstances surrounding their execution, to determine the scope of the easements held by Burlington Northern.

The parties have stipulated that the easements over the Subclass Two plaintiffs' properties stem from "[eight] easement deeds, [two] condemnations, and . . . parcels obtained by adverse possession." Pls.' Subclass Two Mem. at 16; *see also* Joint Status Report (Corrected), ECF No. 68.

(a.) *Easement Deeds.*

All of the source easement deeds at issue in Subclass Two state that they are "for the construction, operation, and maintenance" of the railroad "on, over, across, and through" plaintiffs' land "so long as the [strip of land] shall be used for railroad purposes." Pls.' Subclass Two Mem. at 18; Subclass Two PFF, Exs. 1, 24.A, 266, 287, 336, 390, 495 (providing transcriptions of the source deeds). A transcription of the handwritten Lake Washington Belt Line Company deed, which is the source deed for most of the parcels in Subclass Two, is representative of the deeds and is reprinted below:

Right of Way Deed

This indenture made and entered into this 21st day of July A.D. 1892 by and between The Lake Washington Belt Line Company, a corporation duly incorporated under the laws of the State of Washington party of the first part and the Northern Pacific and Puget Sound Shore Railroad Company, a corporation duly incorporated and existing under the laws of the territory [now State] of Washington party of the second part. Witnesseth: that for and in consideration of the sum of one dollar in lawful money of the United States to said party of the first part in hand paid by said party of the second part the receipt whereof is hereby acknowledged, the said party of the first part has granted and hereby does grant to the said party of the second part its successors and assigns a right of way one hundred (100) feet in width for the construction, operation and maintenance of said railroad company's proposed line of railroad on, over, across and through the following described tracts or parcels of land situated in King County State of Washington follows to wit: . . . [setting out a lengthy property description].

Reserving however to said party of the first part all its littoral and riparian rights as owners of the upland along and upon the shores of Lake Washington *consistent with the use of the right of way hereinbefore granted by the party of the second part for railroad purposes.* And the said party of the first part has granted, bargained and sold and by these presents does grant, bargain, sell and convey to said party of the second part and to its successors and assigns as and for such right of way a strip of land fifty (50) feet in width on each side of the center line of said proposed railroad as heretofore surveyed and now located and staked out and graded and hereafter to be constructed, operated and maintained upon, across, over and through the land hereinbefore described. *To have and to hold the said strip of land to the said party of the second part its successors and assigns so long as the same shall be used for railroad purposes.* This deed is made to correct certain discrepancies in a former deed of the date of the 10th day of August A.D. 1891 conveying the same land as conveyed by this deed. In witness whereof the party of the first part has caused these presents to be signed by its president and attested by its secretary and its corporate seal to be hereunto affixed the day and year first above written.

Subclass Two PFF, Ex. 1 (emphasis added). As noted above, each of the Subclass Two deeds contains similar granting and habendum clauses, and as such, they will be analyzed as a group.

The plain language of the deeds at issue limits the scope of the easements to "railroad purposes," noting that the railroad and its assigns are granted an easement to construct and operate a railroad, but must cede the easement when the land is no longer "used for railroad purposes." Consistent with the plain language of the deeds, Washington courts have stated that deeds containing similar, or even less precise language, conveyed easements that were limited to railroad purposes. *See Swan v. O'Leary*, 225 P.2d 199, 199-201 (Wash. 1950) (en banc) (holding that a grant "for the purpose of a Railroad right-of-way" was an easement that was abandoned when a logging railroad terminated its operations); *Morsbach v. Thurston Cnty.*, 278 P. 686 (Wash. 1929) (holding that a grant of a right-of-way for the construction of a railroad was an easement for railroad purposes); *Hanson Indus., Inc. v. County of Spokane*, 58 P.3d 910, 914 (Wash. App. 2002) ("Washington decisions have consistently interpreted deeds granting a strip of land for a railroad right-of-way as conveying an easement, even in the face of traditional factors signifying a fee."). Thus, the court holds that the source deeds at issue granted an easement for railroad purposes only.

(b.)  *Easements granted through condemnation proceedings.*

Some parcels in Subclass Two are subject to easements granted by condemnation proceedings. *See* Pls.' Subclass Two Mem. at 17. Thirty-eight parcels are subject to an easement over land previously owned by the State of Washington that was condemned "for the purposes of a right of way for the railroad of said petitioner, and for all other of its corporate purposes." Subclass Two PFF, Ex. 46 (transcription of a condemnation proceeding held on February 8, 1904). Two other parcels are subject to what the parties refer to as the Delfel property condemnation, *see* Pls.' Subclass Two Mem. at 17; Def.'s Subclass Two Cross-Mot. at 33, but no court decree relating to that condemnation is part of the record, *see* Def.'s Subclass

Two Cross-Mot. at 25-26.  Although defendant proffers an appropriation statute that it claims authorized the Delfel property condemnation, *id.* at 26, the parties have not stipulated to the language of the condemnation nor to the relevant appropriation statute.  As such, a genuine issue of material fact exists as to the nature of the easement granted by the Delfel property condemnation, and a determination on the government's liability for the alleged taking of the property underlying the Delfel easement is reserved for trial.

The easement granted in the State of Washington condemnation proceeding is more fully documented.  As stated above, the property was condemned "for the purposes of a right of way for the railroad of said petitioner [the Northern Pacific Railway Company], and for all other of its corporate purposes" because the contemplated use was "a public use."  Subclass Two PFF, Ex. 46 (transcription of a condemnation proceeding held on February 8, 1904).  The government argues that this language encompasses all public uses, including rail and trail uses.  Def.'s Subclass Two Cross-Mot. at 33.  Plaintiff argues that use of the appropriated land is limited to the purpose for which it was taken, in this case, a railroad purpose.  *See* Subclass Two Pls.' Resp. to Def.'s Cross-Mot. for Summary Judgment and Reply in Further Support of the Subclass Two Pls.' Mot. for Partial Summary Judgment ("Pls.' Subclass Two Reply") at 7, ECF No. 119.  Both parties cite to *Neitzel v. Spokane Int'l Ry.*, 117 P. 864 (Wash. 1911) in support of their positions. In *Neitzel*, a railroad had earlier acquired an easement for its "corporate purposes" because those purposes were deemed to be a "public use."  *Id.* at 865.  It later allowed a private wholesale grocer to lease part of the land and conduct business on it.  *Id.* at 869.  The court in *Neitzel* noted that the railroad had acquired an easement "only as it needed for its corporate purposes, constituting a public use."  *Id.* at 867.  While the court in other paragraphs referred generally to the purpose of the easement as one of "public use," this was merely shorthand for the aforementioned phrase.  As the plain language of the condemnation suggested, the railroad's easement allowed for common carrier activities — *i.e.*, activities undertaken for a railroad purpose — that served the general public.  The court concluded that "[i]t cannot be seriously argued that a wholesale grocery business conducted by  private corporation is a public use."  *Id.* The language of the condemnation in *Neitzel* is quite similar to that of the State of Washington condemnation at issue here.  In both circumstances, the land was condemned for use as an easement for the railroad and its corporate purposes as a common carrier to serve the public.  As such, it follows that Burlington Northern, as successor to the Northern Pacific Railway Company, acquired an easement for railroad purposes only as a result of the condemnation.

(c.)  *Easements over properties acquired by adverse possession.*

Plaintiffs assert that twelve Subclass Two parcels which conveyed an easement to the railroad were obtained by adverse possession but do not specify by whom.  *See* Pls.' Subclass Two Mem. at 16-17.  The plaintiffs make a one-sentence argument, citing no case law, for why the easements over these parcels have been exceeded, saying, "any easement obtained by prescription (adverse possession) is limited to the same scope of use as the nature of the original use." *Id.* at 21.  The government addresses the question as if the railroad had obtained a prescriptive easement over these parcels.  *See* Def.'s Subclass Two Cross-Mot. at 34-35.  The court cannot discern whether, in reality, plaintiffs are owners of parcels obtained at some point in the chain of title by adverse possession, or whether the railroad obtained a prescriptive easement over parcels that were deeded to plaintiffs.  In either case, the factual record is too undeveloped

for summary judgment to be appropriate, and the court will reserve until trial the issue of the government's liability for the alleged taking of portions of these parcels.[5]

(d.)  *Whether the scope of the easements was exceeded.*

The government contends that recreational trail use — the activity authorized by the Trails Act and the NITUs — is in fact a railroad purpose.  *See* Def.'s Subclass Two Cross-Mot. at 30-36.  Under Washington law, recreational trail use is not a "railroad purpose."  *Lawson v. State*, 730 P.2d 1308, 1312 (Wash. 1986) (en banc) ("[C]learly, a hiking and biking trail is not encompassed within a grant of an easement for railroad purposes only."); *see also King Cnty. v. Squire Inv. Co.*, 801 P.2d 1022, 1025 (Wash. App. 1990) (stating that a change in use from "rails to trails" constitutes abandonment of an easement granted for railroad purposes only); *Longnecker*, 105 Fed. Cl. at 413 (applying Washington law and finding that recreational trail use is not a railroad purpose).  This comports with the Federal Circuit's interpretation of "railroad purposes" to exclude recreational trail use.  *See Toews v. United States*, 376 F.3d 1371, 1376 (Fed. Cir. 2004) ("[I]t appears beyond cavil that use of these easements for a recreational trail — for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway — is not the same use made by a railroad, involving tracks, depots, and the running of trains."); *Preseault II*, 100 F. 3d at 1550 ("The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation.").

The government nonetheless avers that rail-banking and proposed development of a commuter rail line are, in themselves, railroad purposes "facilitated by interim trail use."  *See* Def.'s Subclass Two Cross-Mot. at 27-29.  However, the existence of rail-banking and other potential future rail-related uses do not insulate the government from a takings claim.  Abandonment of the easement is not at issue here; in fact, the court need not determine when, or even whether, the line was abandoned to find that the government has committed a taking.  *See Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 486 (2011) ("We find that trail use is outside the scope of the easement granted . . . irrespective of the existence of railbanking.").  What is important to the court's analysis, rather, is whether the NITU authorized use of an easement *exceeding* one for railroad purposes.  Under the test established in *Preseault II*, step three — which concerns termination of the easement — need only be reached if the easement in question is sufficiently broad to encompass trail use.  *Preseault II*, 100 F.3d at 1552 ("[I]f the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose.").  Because the easements granted by the Subclass

_____

[5]The court acknowledges that under Washington law, a prescriptive "easement . . . extends only to the uses necessary to accomplish the purpose for which the easement was claimed."  *Lee v. Lozier*, 945 P.2d 214, 220 (Wash. App. 1997) (citing *Yakima Valley Canal Co. v. Walker*, 455 P.2d 372, 374 (Wash. 1969)); *see also Lee*, 945 P.2d at 220 ("No use can be justified under a prescriptive easement unless it can fairly be regarded as within the range of the privileges asserted by the adverse user and acquiesced in by the owner of the servient tenement.") (quoting *Restatement of Property* § 477 cmt. b, at 2992 (1944))).

Two source deeds and held by Burlington Northern are not so broad, the court's inquiry need not touch upon the question of pre-NITU abandonment. The NITU mechanism, even as it preserves the continued existence of the easement, points to the government's liability for transforming the purpose of the easement beyond what the original parties to the transaction contemplated.

Next, the government urges that the government is not liable for the taking of plaintiffs' property because it was merely a bystander to a transaction between third parties that provided for trail use. Def.'s Subclass Two Cross-Mot. at 36. Relying on *Navajo Nation v. United States*, 631 F.3d 1268 (Fed. Cir. 2011), it argues that it should not be held liable because the STB "did not authorize, much less require, any parties to enter into an interim trail use agreement." Def.'s Subclass Two Cross-Mot. at 36. Once again, the government's argument is unavailing. Burlington Northern could not convey more than it possessed: a railroad-purposes easement limited by the terms of the agreements which granted it. Without the NITU, neither Burlington Northern nor King County could have transformed the property into a recreational trail; nor could they have acted without STB's authorization to invoke rail-banking and forestall reversion to the plaintiffs. The power to exceed the scope of the easement was held by the federal government, acting through the STB. That power was exercised by the government on October 27, 2008 and November 28, 2008, when it issued the three NITUs. The government may not sidestep responsibility by pointing to the role of King County in creating the physical trail. *See, e.g., Toews*, 376 F.3d at 1381-82 ("[W]hen the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions." (quoting *Preseault II*, 100 F.3d at 1551)); *Sutton v. United States*, __ Fed. Cl. __, __, 2012 WL 5194058, at *3 (2012) ("[The government] is responsible not only for its immediate actions but also for the consequences of its actions in the takings arena."). The agent of the transformation from rail to trail is the federal government, whose authorization enabled the development of the rail corridor for trail use. Consequently, partial summary judgment will be granted holding the federal government liable to those Subclass Two plaintiffs who have established or will establish their ownership of underlying fee interests in the corridor.

> 3. *Ownership of the underlying fees.*

A qualifying plaintiff must have owned pertinent property on the date of the taking. In cases such as this, the date of the taking is identified as "when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting . . . . [T]his occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues a NITU." *Caldwell v. United States*, 391 F.3d 1226, 1233 (Fed. Cir. 2004); *see also Barclay v. United States,* 443 F.3d 1368, 1373 (Fed. Cir. 2006) ("Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU."). For these reasons, the date of the takings here is either October 27, 2008 or November 28, 2008, the two dates when the NITUs were issued and the rail-banking mechanism went into effect, thus circumventing any possibility of the plaintiffs' property rights vesting.

Plaintiffs contend that they have established ownership of the various underlying fee interests because (1) the parties stipulated that the Subclass Two plaintiffs "own land adjacent to parts of the railroad line acquired by the original railroad as an easement" and (2) plaintiffs'

ownership deeds do not use metes and bounds descriptions that identify the "railroad right[]of[]way as the boundary extending up to but not including the railroad's right-of-way." Pls.' Subclass Two Mem. at 5.

The government disputes this characterization, saying it "only agreed that the predecessor railroad acquired an easement in the subject right-of-way in the area where these [p]laintiffs' property is located.  The United States has not stipulated that these [p]laintiffs own the underlying fee in the railroad right-of-way."  Def.'s Subclass Two Cross-Mot. at 15.  In these circumstances, the government argues that all Subclass Two plaintiffs "must come forward with evidence showing that they 'received [their abutting] property from the fee owner of the right-of-way property'" for any of them to be entitled to summary judgment.  *Id.* at 38.  Additionally, it argues that where Subclass Two plaintiffs' deeds refer to other documents that use metes-and-bounds descriptions, or where Subclass Two plaintiffs' property is separated from the railroad right-of-way by a highway, no presumption exists under Washington law that those plaintiffs own to the center line of the railroad right-of-way.  *Id.* at 41-43.  In short, the government contends that the Subclass Two plaintiffs must present chain-of-title evidence showing that they received their property from the original owner of the right-of-way and, in addition, must also present further evidence to demonstrate that they own to the centerline of the railroad right-of-way.

(a.)  *Must the plaintiffs present chain of title evidence?*

A longstanding doctrine of common law says that "the conveyance of land bounded by or along a highway carries title to the center of the highway unless there is something in the deed or surrounding circumstances showing an intent to the contrary."  *Roeder*, 716 P.2d at 861; *see also Macy Elevator*, 97 Fed. Cl. at 719.  Washington adopted this common law doctrine, applying it first to private streets and non-navigable rivers.  *See McConiga v. Riches*, 700 P.2d 331 (Wash. App. 1985); *Knutson v. Reichel*, 518 P.2d 233 (Wash. App. 1973).  The Washington Supreme Court, sitting *en banc*, then held that this "'highway presumption' likewise appl[ies] to railroad rights of way."  *Roeder*, 716 P.2d at 861.  Under Washington law, "[g]enerally then, the conveyance of land which is bounded by a railroad right of way will give the grantee title to the center line of the right of way if the grantor owns so far, unless the grantor has expressly reserved the fee to the right of way, or the grantor's intention to not convey the fee is clear."  *Id.* This presumption applies even when "the deed refers to the grantor's right of way as a boundary without clearly indicating that the side of the right of way is the boundary."  *Id.*  However, the presumption is rebutted when "a deed refers to the right of way as a boundary but also gives a metes and bounds description of the abutting property . . . [because a] metes and bounds description in a deed to property that abuts a right of way is evidence of the grantor's intent to withhold any interest in the abutting right of way."  *Id.* at 862.

In *Roeder*, the court cautioned that for the presumption to apply, a plaintiff landowner must present some evidence of having received his or her property from the owner of the right-of-way.  716 P.2d at 862.  Without this evidence, the presumption would mean that "'that a person acquiring title to an abutting lot thereby acquires a fee in the [right of way], even though his grantor could not have conveyed such fee, [and] would have the effect of taking property from one owner and giving it to another.'"  *Id.* (quoting *Standard Oil Co. v. Milner*, 152 So. 2d

431, 438 (Ala. 1962)).  Thus, the Washington Supreme Court in *Roeder* denied claims by landowners who had neither shown the location of the property nor produced the deeds through which they acquired their property to the court.  *Id.* at 570-71.

The government incorrectly construes this language as a limitation that requires plaintiffs to provide a complete record of chain of title dating back to the original fee owner of the right-of-way property.  Def.'s Subclass Two Cross-Mot. at 38, 41.  Instead, plaintiffs must only present the original deeds granting a right-of-way to the predecessor railroad and the deeds that show plaintiffs owned the property abutting the right of way at the time the NITU was issued.  As long as those deeds do not contain language evincing the grantor's intent to withhold any interest in the abutting right of way, plaintiffs' burden is satisfied and the presumption that plaintiffs hold title to the center line of the right-of-way applies.  Subclass Two plaintiffs who have shown, via deeds that the government does not contest, that they owned their properties at the time the NITU was issued — and whose deeds do not reference a document that contains metes and bounds and whose lands are not separated from the railroad by a highway — are thus granted summary judgment as to their ownership of the land to the center line of the railroad's easement.

(b.) *Deeds that make reference to documents that contain metes and bounds.*

None of the Subclass Two plaintiffs hold deeds that make express use of metes and bounds.  Nevertheless, the government argues that "[s]ome of the Subclass Two [p]laintiffs' deeds refer to, and incorporate by reference, other documents to identify the boundaries of the property conveyed" that do use metes and bounds.  Def.'s Subclass Two Cross-Mot. at 39.  The government contends that where a plaintiff's deed refers to another document that uses metes and bounds, the centerline presumption is rebutted.  *Id.* at 38-40.

As mentioned above, Washington law presumes that a grantee owns title to the center line of a railroad right-of-way, unless "the grantor's intention to not convey the fee is clear." *Roeder*, 716 P.2d at 861.  The grantor's intent is evident, and the presumption rebutted, when "a deed refers to the right of way as a boundary but also gives a metes and bounds description." *Id.* at 862.  Washington law further dictates that "the general rule is that reference to a plat or map in a deed of conveyance makes it a part thereof."  *Cook v. Hensler*, 107 P. 178, 180 (Wash. 1910); *see also Saterlie v. Lineberry*, 962 P.2d 863, 864 (Wash. App. 1998).  *Cook* also states that "if a party purchases a certain numbered block of land according to the official map of the city and his purchase is so described in the deed, a further description of the block by metes and bounds or courses and distances would be subordinate to the description of the block by its number, and would have to give way in case of conflict."  107 P. at 180.  Plaintiffs cite to this language to support their contention that the centerline presumption remains intact as long as the ownership deed itself does not provide a metes-and-bounds description.  Pls.' Subclass Two Reply at 45. Such reliance is misplaced.  The *Cook* court only notes that a lot number used as a descriptor on an official map takes precedence over an additional metes-and-bounds description not included on the official map.  Plaintiffs also argue that *Northlake Marine Works, Inc. v. City of Seattle*, 857 P.2d 283 (Wash. App. 1993) supports their contention that any land referred to by lot number will receive the benefit of the centerline presumption.  *See* Pls.' Subclass Two Mem. at 33-34.  There is no reference in *Northlake* to the precise terms of the deed at issue or whether the

deed incorporated a plat by reference that contained a metes-and-bounds description; rather, the court merely explained that the lots were described by "lot number" and were thus subject to the centerline presumption. *See Northlake*, 857 P.2d at 289. This does not upset the general rule of Washington law that a metes-and-bounds description is incorporated into the deed by reference if a deed simply refers to a plot of land by lot number, and also makes reference to a plat that uses metes and bounds.

Although it claims that multiple Subclass Two deeds are subject to this limitation, the government refers to only two, the Kolesar deed (No. 239) and the Boydston parcel (No. 50.B), by name and in detail. Def.'s Subclass Two Cross-Mot. at 39-40; Def.'s Resp. to Subclass Two Pls.' Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Subclass Two PFF") ¶ 12, ECF No. 111. Because the centerline presumption for these two parcels is potentially subject to rebuttal, the ownership issue of the two tracts is reserved for trial.[6]

> (c.) *Parcels with an intervening road or parcel between the parcel and the railroad right-of-way.*

Subclass Six, which is not at issue in these motions, was designed to encompass the "[o]wners of parcels over which the parties dispute whether the parcel is adjacent to the railroad right-of-way by virtue of an allegedly intervening fee parcel or street." *Haggart*, 104 Fed. Cl. at 491. The government now revisits the delineation of subclasses and argues that eighty-one of the 134 parcels in Subclass Two are not adjacent to the railroad right-of-way because of an intervening road or parcel and should be moved to Subclass Six. *See* Def.'s Resp. to Subclass Two PFF; Hr'g. Tr. 32:18 to 33:13, 34:9-20. Plaintiffs admit that an intervening street was constructed between the open land of eleven Subclass Two parcels and the railroad right-of-way, including one parcel that the government did not identify. *See* Pls.' Subclass Two Reply at 45.[7]

Plaintiffs have provided a 1904 plat to show that six of these parcels — Nos. 105, 186, 212.A, 212.B, 239, and 318 — are next to an intervening street, Lake Washington Boulevard,[8] which was platted *after* the railroad's right-of-way was granted. *See* Pls.' Subclass Two Reply Ex. H (Hillman Garden of Eden plat). The plat shows that the railroad right-of-way was in place next to the street, which was dedicated to the public use at the time of the platting. *Id.* Under Washington law, the plaintiffs who own these six parcels own the entire fee underlying the public road. *Finch v. Matthews*, 443 P.2d 833, 838 (Wash. 1968) ("Since *Burmeister v. Howard*,

---

[6]For any other Subclass Two parcels, to rebut the presumption that plaintiffs have taken to the center line of the railroad right-of-way, the government must identify and provide supporting evidence to show that the deeds refer to the railroad right-of-way as a boundary and incorporate by reference a metes-and-bounds description.

[7]These parcels are Nos. 105, 186, 193.A, 193.B, 212.A, 212.B, 239, 287, 318, 450, and 495. Pls.' Subclass Two Reply at 45, n.21.

[8]The street is referred to as Lake Shore Boulevard on the map, but is now called Lake Washington Boulevard. *See* Pls.' Subclass Two Mem. at 48, n.22.

1 Wash. Terr. 207 (1867), this court has not departed from the rule established in that case, that the fee in a public street or highway remains in the owner of the abutting land, and the public acquires only the right of passage, with powers and privileges necessarily implied in the grant of the easement."). Thus, these plaintiffs also own to the center of the railroad right-of-way, in the absence of any other evidence provided to rebut the centerline presumption. *See Roeder*, 716 P.2d at 861.  Summary judgment as to ownership is therefore granted for Nos. 105, 186, 212.A, 212.B, and 318.[9]

Because evidence is absent on the intervening roads that affect the other parcels, the court consequently concurs with the government's position that there are "factual issues . . . that need to be worked out" with regard to the other parcels. *See* Hr'g. Tr. 33:25 to 34:1.  The ownership issue for the remaining contested parcels is reserved for trial.

(d.) *Other contested parcels.*

Separately, the government posits that plaintiffs have failed to show that they owned eight Subclass Two parcels on the date of the NITU issuance. *See* Def.'s Resp. to Subclass Two PFF.  For four of these parcels,[10] the ownership issue has already been reserved for trial because of a dispute over intervening streets.  Regarding the remaining four, Nos. 377.A, 397, 418.B, and 457, the government argues that plaintiffs did not own those parcels on the dates the NITUs were issued because plaintiffs did not provide deeds or other documentation that prove ownership. *See* Def.'s Resp. to Subclass Two PFF ¶¶ 111, 115, 119, 127.  In addition, the government argues that No. 49.B is submerged shore land not adjacent to the railroad right-of-way. *Id.* ¶ 10. Plaintiffs have not adequately responded.  The ownership issue for these parcels is reserved for trial.

Ownership is not specifically contested by the government for 45 parcels.[11]  The centerline presumption applies to those parcels and summary judgment as to ownership is granted for them.

## B. *Subclass Four*

Subclass Four consists of 159 plaintiffs who own 214 parcels of land.  Pls.' Subclass Four Mem. at 3.  Fifty-three source deeds pertain to this subclass. *Id.*  The plaintiffs in this

---

[9]Although No. 239 is included on the map, the government contests ownership based on the metes-and-bounds issue discussed above, and thus summary judgment regarding ownership is inappropriate regarding this parcel. *See* Def.'s Subclass Two Cross-Mot. at 39.

[10]Nos. 153, 193.B, 279, and 450.

[11]These parcels are Nos. 6, 24.A, 24.B, 46, 50.A, 60, 85, 88, 94, 98, 102, 120, 133, 150, 155, 176.A, 176.B, 192, 219, 220, 241, 256, 261, 266, 268, 273, 295, 312, 321, 336, 338, 341, 351, 353, 358, 379, 382, 390, 412, 419, 440, 441, 488, 504.A, and 520, to the extent the parcels are adjacent to sections of the railroad right-of-way where the parties do not dispute that an easement was granted.

subclass are "[o]wners of parcels over which the parties dispute whether the railroad was granted an easement or a fee by a deed referencing the railroad right-of-way or street, but the deed does not expressly state metes and bounds, although metes and bounds may be incorporated by reference to another document or may be in the chain of title." *Haggart*, 104 Fed. Cl. at 491.

    1.   *Easements or fees.*

The parties contest whether the fifty-three source deeds granted an easement or a fee to Burlington Northern's predecessor railroad. *See* Def.'s Resp. in Opp'n to Subclass Four Pls.' Mot. for Partial Summ. Judgment and Cross-Mot. for Partial Summ. Judgment ("Def.'s Subclass Four Cross-Mot.") at 3, ECF No. 117. The parties have grouped the fifty-three deeds into five categories (A through E) based upon common language in the various deeds. *See* Pls.' Subclass Four Mem. at 24.

    (a).  *Subclass Four, category A.*

Subclass Four, category A, derives from fifteen source deeds that are nearly identical and are titled "Right-of-Way Deed." *See* Pls.' Subclass Four Mem. at 24; Def.'s Subclass Four Cross-Mot., Ex. A (transcriptions of Group A deeds). These deeds cite as consideration "the benefits and advantages to accrue to [me or us] from the location, construction, and operation" of the railroad, and specifically grant a "right of way" to the railroad. Def.'s Subclass Four Cross-Mot., Ex. A.

Construing railroad deeds had been a thorny issue for the Washington Supreme Court throughout the twentieth century. *See Kershaw*, 126 P.3d at 21 ("Throughout the 20th century, railroad deeds posed a recurring problem for courts."); *Swan*, 225 P.2d at 200 ("The authorities are in hopeless conflict."); *see also Brown*, 924 P.2d at 911 ("The decisions are in considerable disarray."). As early as 1950, Washington Supreme Court attempted to provide a bright-line rule to determine whether a deed conveyed an easement or a fee:

> We think when the opinion [in *Morsbach*, 278 P. 686] is critically read and considered with the precise question we have before us in mind, it is clear that we adopted the rule that when the granting clause of a deed declares the purpose of the grant to be a right of way for a railroad the deed passes an easement only, and not a fee with a restricted use, even though the deed is in the usual form to convey a fee title.

*Swan*, 225 P.2d at 201. The court thus found that a quitclaim deed conveying "for the purpose of a Railroad right-of-way . . . a strip of land 50 feet in width" conveyed an easement and not a fee interest. *Id.* at 199. Other cases also placed great emphasis on "right-of-way" language used in the granting clause. *See Roeder*, 716 P.2d at 859-60 (holding that a statutory warranty deed conveyed an easement when it conveyed a parcel of land fifty feet wide "for all railroad and other right-of-way purposes"); *Veach*, 599 P.2d at 527 (holding that a deed conveying "[a] right-of-way one hundred feet wide" conveyed an easement, not a fee simple).

Then, in 1996, the Washington Supreme Court retreated from this relative clarity, saying that where the instrument was a statutory-warranty-form deed, it "must find that the grantors intended to convey fee simple title unless additional language in the deeds clearly and expressly limits or qualifies the interest conveyed." *Brown*, 924 P.2d at 912. The court in *Brown* set out seven factors to determine whether additional language in the deed adapted the statutory form to grant easements instead of fee simples:

> (1) whether the deed conveyed a strip of land, and did not contain additional language relating to the use or purpose to which the land was to be put, or in other ways limiting the estate conveyed; (2) whether the deed conveyed a strip of land and limited its use to a specific purpose; (3) whether the deed conveyed a right of way over a tract of land, rather than a strip thereof; (4) whether the deed granted only the privilege of constructing, operating, or maintaining a railroad over the land; (5) whether the deed contained a clause providing that if the railroad ceased to operate, the land conveyed would revert to the grantor; (6) whether the consideration expressed was substantial or nominal; and (7) whether the conveyance did or did not contain a habendum clause, and many other considerations suggested by the language of the particular deed.

924 P.2d at 912. The court found the deeds at issue in *Brown* conveyed a fee simple to the railroad, differentiating the deeds before it from those in *Roeder*, *Veach*, and *Swan* because the deeds in the previous cases had used "right of way" "in the granting or habendum clauses to qualify or limit the interest granted." *Id.* at 914.

The *Brown* legacy lasted ten years, until the Washington Supreme Court decided *Kershaw* in 2006. *Kershaw* returned to an emphasis on the earlier cases, *Veach*, *Swan*, and *Morsbach*, to hold that "language establishing that a conveyance is for right of way or railroad purposes *presumptively* conveys an easement and thus provides the 'additional language'" to overcome the general rule that fee simple title is conveyed when a statutory warranty deed is used. *Kershaw*, 126 P.3d at 24-25 (emphasis added). The court found that language giving the railroad a right-of-way in the granting clause of the deed created a presumption of an easement. *See id.* at 25. Once that presumption was established, it considered the other language in the deed through the lens of the *Brown* factors and found that additional language granting the railroad the "right to construct, maintain and operate a railway or railways over and across the same" supported the presumption of an easement. *Id.* In short, *Kershaw* instructs other courts to begin their analysis of railroad conveyance deeds by looking first for language in the granting clause that conveys the land for right-of-way or railroad purposes, and further instructs that courts should presume that an easement was granted if this language is present. Then, using the *Brown* factors, courts should examine the remainder of the deed to see if the presumption of an easement is rebutted by other language. *Kershaw* is the most recent decision of the Washington Supreme Court to address whether right-of-way deeds convey an easement or fee, and it must serve as the touchstone of this court's analysis of the deeds related to the Subclass Four categories.

Plaintiffs argue that the Subclass Four, category A source deeds conveyed an easement, not a fee simple, because the deeds use the term "right of way" in the granting clause and cite as

consideration "the benefits and advantages to accrue to [the grantor] from the location, construction[,] and operation" of the railroad, thus illustrating that each grant was made for railroad purposes. Pls.' Subclass Four Mem. at 26. The government contends that the Subclass Four, category A deeds conveyed a fee simple, because their language resembles a deed found to convey fee simple by a Washington state intermediate court and a federal appeals court. *See* Def.'s Subclass Four Cross-Mot. at 13 (citing *Ray v. King Cnty.*, 86 P.3d 183 (Wash. App. 2004); *King Cnty. v. Rasmussen*, 299 F.3d 1077 (9th Cir. 2002)). The government argues that the decision of the Washington intermediate appellate court in *Ray* survived *Kershaw* because of a footnote in which the *Kershaw* court distinguished the deed in *Ray* from the deeds at issue by saying, "[w]hile the *Ray* deed did include the phrase 'right of way' it did so only to the extent that it stated it was conveying a 'right of way' strip. . . . Here, the deed specifically established the *purpose* of the grant when it stated the land was 'to be used by [the Railway] as a right of way for a railway. This creates a presumption in favor of an easement which was not present in *Ray*." *Kershaw*, 126 P.3d at 25 n.11 (emphasis in original) (internal citations omitted).

   *Rasmussen* is a Ninth Circuit decision that is not binding on the Supreme Court of Washington or this court. *See State v. Everybodytalksabout*, 166 P.3d 693, 697 (Wash. 2007) (en banc); *Beres v. United States*, 97 Fed. Cl. 757, 799 (2011). Because *Rasmussen* relies heavily on *Brown* and was decided prior to *Kershaw*, the court does not find it persuasive. And while *Kershaw* did not disapprove of *Ray*, it dealt with the case in a cursory fashion, in dictum placed in a footnote. *See Beres*, 97 Fed. Cl. at 789 ("As the *Kershaw* court did not consider both references to the phrase 'right of way' in the [*Ray*] deed when drawing a distinction between the [*Ray*] deed and the deed under review in *Kershaw* . . . [,] the footnote in *Kershaw* is not persuasive."). In its holding in *Kershaw*, the Washington Supreme Court set out explicit instructions for future analysis: language in the granting clause that conveys the land as a right-of-way or for railroad purposes creates the presumption of an easement, which may be rebutted if a thorough examination of the remainder of the deed language using the *Brown* factors yields overwhelming evidence to the contrary. *See Kershaw*, 126 P.3d at 25 ("While the use of the term 'right of way' in the granting clause is not *solely* determinative of the estate conveyed, it remains highly relevant.") (emphasis in original).

   The granting clauses of the Subclass Four, category A deeds convey the land as a "right of way one hundred (100) feet in width." Def.'s Subclass Four Cross-Mot., Ex. A (transcription of Group A deeds). Furthermore, the clauses reveal that the purpose of the conveyance is for a railroad, stating that the grant is made "[i]n consideration of the benefits and advantages to accrue to me from the location, construction[,] and operation of the . . . Railway." *Id.* The presumption, therefore, is that the Subclass Four, category A deeds conveyed an easement, not a fee simple, to Burlington Northern's predecessor.

   Given this presumption, the *Brown* factors offer modest supporting insight into the parties' intent. Following the lead of *Kershaw*, which labeled the process "Strip of Land v. Right of Way," the first four *Brown* factors are examined together. *Kershaw*, 126 P.3d at 23. The granting clause of the deed conveyed only a "right of way," and the phrase "strip of land" never appears in the Subclass Four, category A deeds. Rather, strip is used only in the second paragraph of the deeds, and appears just after the phrase "right of way," "suggesting that the granting clause uses the dominant phrase 'right of way' to convey an easement." *Beres*, 97 Fed.

Cl. at 787.   This analysis is bolstered by *Kershaw*, where the court found an easement when the deed conveyed a "strip of land seventy[-]five feet wide."  126 P.3d at 18.

The fifth *Brown* factor asks whether the deed contains a reverter clause.  The Subclass Four, category A deeds do not, so this factor is inapplicable.  *See Kershaw*, 126 P.3d at 24 (finding the factor inapplicable when no reverter clause is present).   The sixth *Brown* factor asks whether the consideration expressed was substantial or nominal.  No monetary consideration is given in the Subclass Four, category A deeds; instead, the consideration is the benefit accruing to the grantors from the location, construction, and operation of the railroad.  The value of this consideration is not established in the record; thus, this factor is neutral.  *See Ray*, 86 P.3d at 190; *Kershaw*, 126 P.3d at 24 (noting that *Brown* gives "little weight to this factor when value of easement or fee simple cannot be ascertained from the record"); *Brown*, 924 P.2d at 915.

The seventh factor directs the court to examine whether the deeds contain a habendum clause or any other relevant language.  The Subclass Four, category A deeds contain habendum clause language that reads: "To have and to hold the said premises, with the appurtenances, unto the said party of the second part and to its successors and assigns forever."  Def.'s Subclass Four Cross-Mot., Ex. A (transcription of Group A deeds).  The *Kershaw* court found that a habendum clause reciting "'said right of way, strip of land easements, privileges and appurtenances to it'. . . attempts to convey a fee by encompassing all the potential sticks in the bundle."  126 P.3d at 24.  The *Kershaw* court still found that an easement was conveyed, following a long line of other cases that found easements to be conveyed through deeds that contained habendum clauses that were substantially similar to the Subclass Four, category A clauses.  *See e.g., Veach*, 599 P.2d at 527 ("To have and to hold, all and singular, said premises, together with the appurtenances unto the said party of the second part, and to its assigns forever."); *Swan*, 225 P.2d at 199 ("To Have and to Hold All and singular the said premises together with the appurtenances, unto said party of the second part, and to his heirs and assigns forever." (emphasis omitted)); *Morsbach*, 278 P. at 687 ("To have and to hold the general premises with the privileges and appurtenances thereto belonging to the Northern Pacific Railroad Company, its successors and assigns, to their use and behoof forever.").   Thus, this factor slightly favors the grant of a fee simple, but is not determinative.  Because the presumption that an easement was granted applies to the Subclass Four, category A deeds, and only one factor favors the conveyance of a fee, the court finds that the Subclass Four, category A deeds conveyed an easement to the railroad.

(b.)  *Subclass Four, category B.*

Only one deed, referred to by the parties as the "Kittinger Deed," is related to Subclass Four, category B.  That handwritten deed has been transcribed as follows:

[Deed] 269500
JR Lewis et al
to
Northern Pacific Railway Company

Deed

This indenture made this 24th day of June A.D. 1903 by and between Mary C. Kittinger and George B. Kittinger, her husband of Seattle state of Washington; the Pugent Sound National Bank a body corporate under the laws of the United States doing business at Seattle in the State of Washington and J.R. Lewis of the city of San Jose, State of California, parties of the first part and the Northern Pacific Railway Company a body corporate under the laws of Wisconsin, the party of the second part. Witnesseth that the said parties of the first part are the owners in fee simple of the following premises, situate in the County of King State of Washington, to wit: Lots number One (1), Two (2), and Three (3) of Section Twenty (20) Township Twenty-Four (24) north of range Five (5) East, which said lands lie next to and front upon the eastern shore of [L]ake Washington and have appurtenant thereto certain riparian and littoral rights

And whereas, *the said party of the second part wishes to construct its railroad over and across said lands on the westerly side thereof near to and along the shores of said lake and has made a survey for said line of said road and staked the same out, and wishes to secure for such purposes the right of way over and across said lands* and to secure that end has bargained for and purchased of the parties of the first part, the following described strip, piece and parcel of said lands above named to wit: a strip, piece or parcel of said lands One Hundred (100) feet in width, in, over and across said Lots One (1), Two (2), and Three (3) of said section Twenty (20) township Twenty-Four (24) north of range Five (5) east having for its boundaries two lines parallel with and equidistant from the centerline of the road of said party of the second part as the same is now surveyed over and across the said premises together with such additional widths as may be necessary to catch the slopes cuts and fills of the road bed of said railroad in containing a total area of Ten and 5/10 acres more or less.

Now therefore the said parties of the first part, for and in consideration of the sum of Two Thousand One Hundred and Fifty Dollars to them in hand paid do hereby grant, bargain, sell, and convey unto the said party of the second part *the said strip, piece, and parcel of land One Hundred feet in width as hereinbefore described* and containing Ten and 5/10 acres more or less provided, however, and it is understood and agreed by and between the parties of the first part and the parties of the second part that the said first parties reserve from this grant for themselves _____ heirs, successors and assigns, all littoral and riparian rights appurtenant to the lands herein conveyed, also the right of a highway crossing over and across the said lands granted to and from the lakeshore to the lands lying next easterly the lands herein granted. Provided that in passing and repassing the road of the second party is in no wise obstructed or injured, reserving the right to mine coal, and reserving also the right to build an overhead crossing upon an[d] over said property and tunnels under the same, provided, however, that such overhead crossing and tunnels shall be so located and constructed and operated as not to interfere with the possession or use of the said granted lands, by the said

second party, its successors, or its assigns and that the plans for such overhead crossing shall first be submitted to and approved by the superintendant of the first party before the same shall be built or constructed and no tunnels shall be made or excavated under said granted lands without the plans for the same are first submitted to an[d] approved by the chief engineer of the second party. It being understood that the crossing herein provided for shall have a clearance of at least Twenty-Three feet above the rails of the railroad track of the second party as constructed and from time to time changed.

Witness the hands and seals of the first parties with the president of the said Pugent Sound National Bank and the seal of the said bank this 24th day of June 1903.

Def.'s Subclass Four Cross-Mot., Ex. B ("Kittinger Deed") (emphasis added).

Again, the court looks first to the granting clause to see whether this deed conveys the land as a right-of-way for railroad purposes, to determine whether the presumption of an easement exists. *See Kershaw*, 126 P.3d at 25. The granting clause of the Kittinger deed conveys that the "said strip, piece, and parcel of land . . . as hereinbefore described." Therefore, the court looks to the paragraph preceding the granting clause for the description that is incorporated into the granting clause by reference. This description refers to a "right of way over and across said lands" that the railroad wishes to "secure for such purposes" as the construction of its railroad. Kittinger Deed. This description makes evident that the land is being conveyed as a right-of-way for railroad purposes, and, because it is incorporated into the granting clause, the easement presumption applies.

Turning to the first through fourth *Brown* factors, the court notes that the word strip is only used when describing where the railroad would like to locate its right-of-way for the construction of the railroad "over and across" a larger acreage of land. Kittinger Deed. It is again used after the term "right of way," suggesting that right-of-way is the dominant phrase and the intent of the parties was to convey an easement. *Id*. Thus, these factors support the presumption of an easement.

The fifth *Brown* factor asks whether the deed contains a reverter clause. The Kittinger Deed does not, so this factor is inapplicable. *See Kershaw*, 126 P.3d at 24 (finding the factor inapplicable when no reverter clause is present). The sixth *Brow*n factor asks whether the consideration expressed was substantial or nominal. The Northern Pacific Railway Company paid the Kittinger Deed grantors $2,150 for the right of way. In 1903, this was likely a substantial sum. *Kershaw*, 126 P.3d at 24 (finding $1,000 to be substantial in 1905); *Brown*, 924 P.2d at 915 (finding $1,310 to be substantial between 1906 and 1910). Thus, this factor favors a fee, but is not given much weight because the record lacks detail regarding the actual value of an easement versus fee. See *Kershaw*, 126 P.3d at 24. The seventh factor directs the court to examine whether the deeds contain a habendum clause or any other relevant language. The deed does not contain a habendum clause. Although defendant argues that the absence of such a clause suggests a fee was created, *see* Def.'s Subclass Four Cross-Mot. at 24, the court follows the *Kershaw* court's analysis of the fifth factor and finds factor seven to be inapplicable when the

relevant clause is not present in the deed, s*ee Kershaw*, 126 P.3d at 24 (finding factor five inapplicable when no reverter clause was present in a deed).  Because the presumption that an easement was granted applies to the Subclass Four, category B deed, and only one factor favors the conveyance of a fee, the court finds that the Subclass Four, category B deed conveyed an easement to the railroad.

                (c.)  *Subclass Four, category C.*

       Only one deed, referred to by the parties as the "Fagerberg Deed," is of concern for Subclass Four, category C.  That deed as transcribed from handwritten form reads:

> Deed 263562
> Andrew J. Fagerberg et ux
> to
> Northern Pacific Railway Company
>
> Right of way deed
>
>      The grantors Andrew J. Fagerberg and Minnie Fagerberg, his wife of Houghton, King County state of Washington, in consideration of the Eight Hundred Fifty-One and no/100ths ($851.00) Dollars now paid, convey and warrant unto the Northern Pacific Railway Company a Wisconsin Corporation, the real property situate in King County, State of Washington, described as follows:
>
>      A strip of land one hundred (100) feet in width being 50 feet on each side of the center line of the proposed change of road of the Northern Pacific Railway Company as the same as located surveyed and staked out upon, across, over and through that portion of the northeast quarter (N.E. ¼) of section twenty (20) township twenty-five (25) north range five (5) east of W.M *not included in the present right of way* of the Northern Pacific Railway Company across said premises containing 3.05 acres more or less which *present right of way* is a strip of land 100 feet in width being 50 feet on each side of the center line of the road of said Railway Company as originally located surveyed and partially constructed upon, over, across and through said northeast quarter of section twenty township twenty-five north range five east reserving two private road crossings and said Railway Company is to make a practical wagon road to connect with the northwest corner of the grantors premises west of said strip of land. Witness our hand this 7th day of May A.D 1903.

Def.'s Subclass Four Cross-Mot., Ex. C ("Fagerberg Deed") (emphasis added).  Again, the court looks first to whether the granting clause conveys the land as a right-of-way for railroad purposes.  *See Kershaw*, 126 P.3d at 25.  The granting clause of the Fagerberg deed does not make reference to a conveyance of a right-of-way for railroad purposes, so no presumption of an easement exists.  Nor is the deed in conventional statutory warranty form, so no presumption of a

fee exists.  *See Kershaw*, 126 P.3d at 23.  Thus, finding no presumption, the court looks at the language of the deed using the *Brown* factors to determine the parties' intent.  *See id.*

Turning to the first through fourth *Brown* factors, the deed conveys a strip of land but also refers to the conveyance in the caption of the deed as a right-of-way and as an additional conveyance to the railroad's "present right of way."  Fagerberg Deed.  This additional language indicates that the purpose of the conveyance of the land was to provide an additional right-of-way to the railroad, and evinces intent to convey an easement.  *See Kershaw*, 126 P.3d at 23 (citing *Brown* as "affirming the 'special significance to the words "right of way" in railroad deeds'").  Thus, the first four factors, considered together as one, slightly favor the creation of an easement.  The fifth *Brown* factor asks whether the deed contains a reverter clause.  The Fagerberg Deed does not, so this factor is inapplicable.  *See Kershaw*, 126 P.3d at 24 (finding the factor inapplicable when no reverter clause is present).  The sixth *Brown* factor asks whether the consideration expressed was substantial or nominal.  The Northern Pacific Railway Company paid the Fagerbergs $851 for the right of way.  In 1903, this was likely a substantial sum.  *Kershaw*, 126 P.3d at 24 (finding $1,000 to be substantial in 1905); *Brown*, 924 P.2d at 915 (finding $1,310 to be substantial between 1906 and 1910).  Thus, this factor favors a fee, but is not given much weight because the record lacks detail regarding the actual value of the easement versus fee.  *See Kershaw*, 126 P.3d at 24.  The seventh factor directs the court to examine whether the deeds contain a habendum clause or any other relevant language.  The deed does not contain a habendum clause, so this part of factor seven is inapplicable.

Extrinsic evidence becomes pertinent.  Plaintiffs point to a 1908 deed from one of the 1903 Fagerberg grantors that makes reference to the 1903 conveyance:

> Deed 3623
> Andrew J. Fagerberg et ux
> to
> Northern Pacific Railway Company
>
> The grantors Andrew J. Fagerberg and Minnie Fagerberg, his wife, for and in consideration of the sum of one dollar ($1.00) in hand paid, do hereby waive and forever release the Northern Pacific Railway Company, a Wisconsin corporation, from constructing a certain practical wagon road provided for in a certain deed given by the grantors herein to the said Railway Company, having date of May 7, 1903, and recorded in volume 359 of Deeds page 166 of King county records.  *The said deed conveys a right of way to the said Railway Company* through the Northeast quarter of section 20, Township 25 north Range 5 East W.M. in King County, Washington, dated this 4th day of February of 1908.

Subclass Four Pls.' Proposed Findings of Fact ("Subclass Four PFF"), Ex. 29 (emphasis added), ECF No. 101.  The additional use of the words "right of way to the said Railroad Company" to describe the grant in the 1903 conveyance suggests that an easement was created.  Thus, like factors one through four, factor seven favors the creation of an easement.  Only factor six favors a fee.  The court accordingly concludes that the Subclass Four, category C deed conveyed an easement, not a fee.

       (d.)  *Subclass 4, category D.*

       Four deeds appertain to Subclass Four, category D, each of which are substantially similar except in the amount of consideration given by the railroad, which is listed as $400 in two deeds and $1 in the remaining two deeds.  Def.'s Subclass Four Cross-Mot., Ex. D (transcription of handwritten Group D Deeds).  The text of one deed is reprinted below:

Deed 63539
Andrew Lunn et ux
to
Seattle Lakeshore and Eastern Railway Company

Right of Way Deed

*In consideration of the benefits and advantages accruing* to Andrew Lunn and Alfreda Lunn, his wife, *from the location, construction and operation of the Seattle Lake Shore and Eastern Railway* in the County of King in the State of Washington and in the further consideration of the sum of Four hundred Dollars in Gold Coin of the United States to them in hand paid by the Seattle Lake Shore and Eastern Railway Company a corporation formed and existing under and by virtue of the laws of Washington Territory (now State of Washington) the receipt whereof is hereby acknowledged *they do by these presents give grant bargain sell and convey* unto the said Seattle Lake Shore and Eastern Railway Company its successors and assigns forever *the following described strip of real estate* situate in said County of King and being a part of the (E½) east one half of the Northwest quarter (NW ¼) of the Northeast quarter (NE ¼) and the Southwest quarter (SW ¼) of the Northeast quarter (NE ¼) all of section number twenty-two in Township number twenty-six north Range number five east Willamette Meridian. Said strip of land herein conveyed *being more particular described as follows* to wit: *All that portion of the above described lands that lie within a distance of fifteen feet on each side of the center line of the railway of said company* as the said center line is now located, staked out and established upon and across the first above described lands or lands adjacent thereto containing two acres more or less. Together with all their right title or interest therein or thereto so that *neither they nor any person or persons claiming by through or under them shall have any claim or demand either in law or equity against said Railway Company because of the construction operation or maintenance of its said Railway through said lands* or appertaining to said strip of land through and out of the said first above described lands. And the said Andrew Lunn and Alfreda Lunn, his wife for themselves and for their heirs executors and administrators do by these presents covenant and agree with the said Railway Company that they the said Andrew Lunn and Alfreda Lunn his wife are the owners in fee simple of all the above described lands that the same are free and clear of all encumbrances and that *they and their heirs executors and administrators will and shall forever warrant and defend the title to the said strip of land against all lawful claims whatsoever.* And the said Railway Company, its successors or assigns shall have the right to go

upon the land adjacent to said center line 200 ft. on each side thereof and cut down all trees dangerous to the operation of said Railway. Provided that the said Railway Company shall allow the said Andrew Lunn and wife to put in at the sole expense of the said Andrew Lunn two farm road crossings as already located on the said lands and the said grantors and their assigns shall have the perpetual use of said crossings. In witness whereof the said Andrew Lunn and Alfreda Lunn, his wife have hereunto set their hands and seals this ___ day of ___ A.D. 1890 (blank in original).

Def.'s Subclass Four Cross-Mot., Ex. D ("Group D Deeds") (emphasis added). The first consideration listed in the granting clause of these deeds refers to "the benefits and advantages accruing to [the grantors] from the location, construction and operation of the . . . Railway." *Id.* Because the granting clause sets forth a railroad purpose, the presumption is that the Subclass Four, category D deeds conveyed an easement, not a fee simple.

Turning to the first through fourth *Brown* factors, the court notes that the deed conveys a "strip of real estate," but also refers to the conveyance in the caption of the deed as a right-of-way. Group D Deeds. This language indicates that the purpose of the conveyance of the land was to provide a right-of-way to the railroad, and evinces intent to convey an easement. *See Kershaw*, 126 P.3d at 23 (citing *Brown* as "affirming the 'special significance to the words "right of way" in railroad deeds'"). Thus, the first four factors, considered together as one, slightly favor the creation of an easement.

The fifth *Brown* factor asks whether the deed contains a reverter clause. The Subclass Four, category D deeds do not, so this factor is inapplicable. *See Kershaw*, 126 P.3d at 24 (finding the factor inapplicable when no reverter clause is present). The sixth *Brown* factor asks whether the consideration expressed was substantial or nominal. In all of the deeds, the benefits accruing to the grantors from the location, construction, and operation of the railroad are given as consideration. In two of the deeds, nominal consideration of $1 is also given; in the two other deeds, more substantial consideration exists in the amount of $400. Thus, this factor slightly favors a fee for two of the deeds, but not for the two others. Nonetheless, the factor is not given much weight because the record lacks detail regarding the actual value of the total consideration given. *See Kershaw*, 126 P.3d at 24. The seventh factor directs the court to examine whether the deeds contain a habendum clause or any other relevant language. The deeds do not contain a habendum clause, so this part of factor seven is inapplicable. However, the deeds provide other relevant language, which states that the grantors "shall [not] have any claim or demand either in law or equity against said railway Company because of the construction operation or maintenance of its said Railway through said lands." Group D Deeds. This language suggests that the railroad was given an easement for railroad purposes, and not a fee, because it specifies a release of claims for railroad-related activity only, raising the inference that the grantors could have claims against the railroad for non-railroad uses of the land. Thus, factor seven favors the creation of an easement. Because the presumption of an easement exists, and only one factor favors the creation of a fee, the court finds that the deeds pertinent to Subclass Four, category D grant an easement, not a fee.

(e.) *Subclass Four, category E.*

Subclass Four, category E involves thirty-two deeds which vary in language but are all captioned "Right of Way Deed." *See* Def.'s Subclass Four Cross-Mot., Ex. E (Group E Deeds). Beyond the caption, they do not contain any further mention of a right of way or the purposes of the grant. The granting clauses of the deeds in Subclass Four, category E do not make reference to a conveyance of a right of way for railroad purposes, so no presumption of an easement exists. Moreover, some of the deeds in this category are in statutory warranty form, so a presumption of a fee exists with regard to those. *See Kershaw*, 126 P.3d at 23; *Brown*, 924 P.2d at 912. Other deeds in this category are quitclaim deeds, which do "not create a presumption that a fee simple estate was transferred." *Roeder Co. v. K & E Moving & Storage Co., Inc.*, 4 P.3d 839, 843 (Wash. App. 2000).

For these deeds, turning to the first through fourth *Brown* factors, the court notes that the deeds convey a strip of land, but also refer to the conveyance in the caption of the deeds as a right of way. Thus, the first four factors, considered together as one, slightly favor the creation of an easement. *See Kershaw*, 126 P.3d at 23 (citing *Brown* as "affirming the 'special significance to the words "right of way" in railroad deeds'"). The fifth *Brown* factor asks whether the deed contains a reverter clause. The deeds in this category do not, so this factor is inapplicable. *See Kershaw*, 126 P.3d at 24 (finding the factor inapplicable when no reverter clause is present). The sixth *Brown* factor asks whether the consideration expressed was substantial or nominal. The consideration given by the railroad in the deeds in this category varies in amount, ranging from $25 to $4,295. While the range makes it difficult for the court to determine the weight of the consideration, the court concludes that the existence of the larger amount of monetary compensation favors the creation of a fee. However, because the record lacks detail regarding the actual value of the easement versus fee, the factor should not be relied upon heavily by the court. *See Kershaw*, 126 P.3d at 24. The seventh factor directs the court to examine whether the deeds contain a habendum clause or any other relevant language. None of the deeds contains a habendum clause. Correspondingly, none contains language in the body of the deed that suggests an easement, and not a fee, was granted. Because of the absence of such phrases, the plain language of the deeds appears to grant a fee, so this factor favors the creation of a fee. In short, the court concludes that all of the deeds in Subclass Four, category E convey a fee, and not an easement, regardless of whether or not they originally carried a presumption of a fee. The use of the words "Right of Way Deeds" in the caption is not sufficient, without more, to indicate that an easement, not a fee, was being conveyed. The court grants the government summary judgment with respect to the plaintiffs in Subclass Four, category E.

2. *Scope of the Easements.*

The next question is whether the deeds in the categories A through D granted an easement limited to railroad purposes. As the court performed a similar analysis for deeds in Subclass Two, only a cursory review is necessary. The Subclass Four deeds grant an easement for the "location, construction, and operation" of the railroad, and specifically grant a "right-of-way" to the railroad. Def.'s Subclass Four Cross-Mot., Ex. A (transcriptions of Group A Deeds). The deed pertinent to category B explicitly conveys an easement for railroad purposes by including a description that refers to a "right of way over and across said lands" which the

railroad wishes to "secure for such purposes" as the construction of its railroad.  Kittinger Deed.
The deed relevant to category C refers to the conveyance of the easement as a right of way in the
caption of the deed, and notes that the grant is an additional conveyance to the railroad's "present
right of way."  *Id*., Fagerberg Deed.  The deeds for category D all refer to the easement granted
as a right of way to the railroad.  They contain additional language that appears to limit the grant
to railroad purposes, because they specify a release of claims for railroad-related activity only,
suggesting that the grantors could have claims against the railroad for non-railroad uses of the
land.  *Id*., Group D Deeds.  Consistent with the language of these deeds, which suggests
easements granted for railroad purposes only, Washington courts have stated that deeds
containing similar language conveyed easements that were limited to railroad purposes.  *See
Swan*, 225 P.2d at 199-201 (holding that a grant "for the purpose of a Railroad right-of-way" was
an easement that was abandoned when a logging railroad terminated its operations); *Morsbach*,
278 P. at 690 (holding that a grant of a right-of-way for the construction of a railroad was an
easement for railroad purposes); *Hanson Indus.*, 58 P.3d at 915, 918 (holding that deeds that
"convey strips of land for the purpose of a railroad 'over and across' the grantors' lands"
conveyed an easement that terminated when Burlington Northern abandoned its line).  Thus, the
court holds that the source deeds for Subclass Four, categories A through D granted an easement
for railroad purposes only.

As explained earlier, recreational trail use is not a railroad purpose and thus exceeds the
scope of the Subclass Four easements.  Similarly, neither rail-banking nor the proposed
development of a commuter rail line insulates the government from a takings claim.  As with
Subclass Two, abandonment of the easements is not at issue here, and the court need not
determine when, or even whether, the line was abandoned to find that the government has
committed a taking.  *See Ellamae Phillips Co.*, 99 Fed. Cl. at 486 ("We find that trail use is
outside the scope of the easement granted . . . irrespective of the existence of railbanking.").
What is important to the court's analysis, rather, is whether the NITU authorized use of
easements *exceeding* that for railroad purposes.  Under the test established in *Preseault II*, step
three (concerning termination of the easement), abandonment need only be reached if the
easement in question is sufficiently broad to encompass trail use.  *Preseault II* , 100 F.3d at 1552
("[I]f the terms of the easement when first granted are broad enough under then-existing state
law to encompass trail use, the servient estate holder would not be in a position to complain
about the use of the easement for a permitted purpose.").  Because the easements granted by the
Subclass Four source deeds and held by Burlington Northern are not so broad, the court's inquiry
need not touch upon the question of pre-NITU abandonment at this stage.  The NITU
mechanism, even as it preserves the continued existence of the easement, points to the
government's liability for transforming the purpose of the easement beyond what the original
parties to the transaction contemplated.

3.  O*wnership.*

A qualifying plaintiff must have owned pertinent property on the date of the taking.  As
discussed with respect to Subclass Two, the date of the taking is identified as "when state law
reversionary property interests that would otherwise vest in the adjacent landowners are blocked
from so vesting . . . . [T]his occurs when the railroad and trail operator communicate to the STB
their intention to negotiate a trail use agreement and the agency issues an NITU."  *Caldwell*, 391

F.3d at 1233; *see also Barclay*, 443 F.3d at 1373 ("Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU."). For these reasons, the date of the taking is either October 27, 2008 or November 28, 2008, the two dates when the NITUs were issued and the rail-banking mechanism went into effect, thus circumventing any possibility of the plaintiffs' property rights vesting. Plaintiffs contend that they have established ownership of the underlying fee because (1) the parties stipulated that the Subclass Four plaintiffs owned land adjacent to the railroad right-of-way on the NITU date and (2) plaintiffs' ownership deeds have property descriptions that do not describe their land by reference to metes and bounds that would clearly identify the railroad right of way as the property boundary. Pls.' Subclass Four Mem. at 4-5. With their proposed findings of fact, plaintiffs also attached maps and deeds to show each plaintiff's parcel and ownership of that property. *See generally* Subclass Four PFF.

The government resists the ownership claims of the Subclass Four plaintiffs by arguing that they cannot rely on the centerline presumption to establish ownership and must provide chain of title information. Def.'s Subclass Four Cross-Mot. at 2. In addition, the government takes issue with many of the plaintiffs' proposed findings of fact because of the nature of the supporting documents. *See generally* Def.'s Resp. to Subclass Four Pls.' Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Subclass Four PFF"), ECF No. 118.

For Subclass Four, as with Subclass Two, it is sufficient for a finding of liability that some Subclass Four plaintiffs have established ownership of the underlying land. Summary judgment as to ownership is granted for plaintiffs to whom the centerline presumption applies and whose ownership the government does not otherwise contest in its response to plaintiffs' proposed findings of fact.

## II.  MEASURING DAMAGES

The Fifth Amendment provides for "just compensation" when private property is taken for public use. U.S. Const. amend. V. To determine "just compensation," the court must calculate the difference between what plaintiffs had before the taking by the issuance of the NITU and what they were left with afterward. *See Otay Mesa Prop., L.P. v. United States,* 670 F.3d 1358, 1364 (Fed. Cir. 2012) ("Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after' method.").

The "after" is uncontested: after the NITU issued, qualifying plaintiffs had property burdened by a general easement permitting recreational trail use with the potential for future railway use by way of rail-banking or possible future development of a commuter rail line. Each plaintiff's "after" value may be appraised according to the pertinent parcel size and location. The "before" value is contested. Plaintiffs believe that a proper "before" value can be arrived at by calculating the property's value unencumbered by any rail or trail easements, because the issuance of the NITU blocked the railroad's abandonment and plaintiffs had reversionary rights in their property. Pls.' Subclass Two Mem. at 35. Contrastingly, the government considers the "before" value to be the value of the property still burdened by a railroad easement. Def.'s Subclass Two Cross-Mot. at 21; Hr'g. Tr. 30:11-20. In short, the government argues that

plaintiffs would only be entitled to the diminution in value to their property caused by the elements of the easement which exceed the original railroad-purpose easement.

To support its belief that damages must be calculated using burdened property as the basis, the government points to two cases: *Schneider v. United States*, No. 8:99-CV-315, 2003 WL 25711838 (D. Neb. Aug. 29, 2003) and *Carolina Plating Works, Inc. v. United States*, 102 Fed. Cl. 555 (2011). The court in *Schneider* relied on Nebraska law and Congress' statement in the Trails Act that "such interim [trail] use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes" to determine that no abandonment had occurred. *Schneider*, 2003 WL 25711838, at *4-5 (quoting 16 U.S.C. § 1247(d)). The government's reliance on *Schneider* is misplaced; under *Presault II*, abandonment of the easements is not at issue here, and the court need not determine when, or even whether, the rail line was abandoned to find that the government has committed a taking. *See Presault II*, 100 F.3d at 1533, 1552. Additionally, interpretations of the Nebraska law on abandonment of easements are inapplicable to this case. Furthermore, pronouncements in the Trails Act cannot alter state abandonment law; rather, the STB's action under the Trails Act effects a taking precisely by preventing the operation of those state laws. *See Caldwell*, 391 F.3d at 1229 (noting that a taking occurs when the Trails Act "prevents the operation of state laws that would otherwise come into effect upon abandonment-property laws" and "the original easement granted to the railroad under state property law is not broad enough to encompass a recreational trail"). The measure of damages after that taking has occurred is determined by state property law, not Congress' preventive measures. Nor does *Carolina Plating* support defendant's contention. In that instance, the court did not determine whether the easements at issue were limited to railroad purposes, bypassing consideration of the second element of *Presault II*, and instead turned to the third element of *Presault II*. In that respect, it concluded that whether the railroad had abandoned its easement under South Carolina law was a question of material fact that could not be resolved in a dispositive motion. *See Carolina Plating*, 102 Fed. Cl. at 560-61. That outcome does not dictate that the court, in this instance, should use defendant's proffered formulation of the measure of damages.

Plaintiffs' position is that the "before" state of their property should be one unencumbered by rail or trail easements, because that is what they would have held absent operation of the Trails Act. Pls.' Subclass Two Mem. at 35-36. Plaintiffs base this assertion on a "state law reversionary right to unencumbered land." *Id.* at 35 (internal quotes removed); *see Ybanez v. United States*, 102 Fed. Cl. 82, 87 (2011) ("The determination of what was taken from plaintiffs turns not on the status of the land at the time of the NITU but what interest plaintiffs would have had in the absence of the NITU."); *Rogers v. United States,* 101 Fed. Cl. 287, 293-94 (2011) ("[The] combined blocking of state law abandonment and imposition of a new easement [by the NITU] constitutes the taking. . . . [T]he Trails Act would have blocked an abandonment of the railroad easement and prevented the fee simple, unencumbered by that railroad easement, from reverting to Plaintiffs.") To determine whether reversion would have occurred, the court ordinarily looks to the original grant of the easement through a lens of state law principles. *See Macy Elevator, Inc. v. United States,* 105 Fed. Cl. 195, 200 (2012) (evaluating the "before" condition of plaintiffs' property according to whether the respective easements were granted through determinable deeds, condemnation, or adverse possession, in accord with Indiana law); *Jenkins*, 102 Fed. Cl. at 613-19 (stating that plaintiffs were entitled to recover the value of their

property as if Iowa law reversionary interest rules had taken effect); *Rogers*, 101 Fed. Cl. at 295-96 (holding that the "before" condition of the property was unencumbered by the original easement in accord with Florida contract principles, rather than Florida abandonment common law).

Plaintiffs contend that, pursuant to Washington state law, the easement would have terminated absent the NITU. Pls.' Subclass Two Mem. at 39. Under Washington law, an easement is abandoned when non-use is coupled with the express or implied intent to abandon the easement. *Heg v. Alldredge*, 137 P.3d 9, 13 (Wash. 2006) (en banc); *see also Netherlands Amer. Mortg. Bank v. Eastern Ry. & Lumber Co.*, 252 P. 916, 918 (Wash. 1927). Both factors are present here. A 12.55-mile segment at issue was being used by two shippers at the time the NITU issued, but both agreed to use another facility and have stopped using that segment. Subclass Two PFF, Ex. B.1 at 2 (NITU, November 28, 2008); Hr'g. Tr. 56:6-13. There had been no local freight traffic on the other portions of the line at issue for more than two years before the other petitions for exemption were filed with the STB on September 8, 2008. *See* Subclass Two PFF, Ex A.2 (Petition for Exemption) at 4, Ex. A.3 at 4 (Petition for Exemption) at 4. Further, Burlington Northern evinced its actual intent to abandon the easement quite literally, in the form of its request for an abandonment exemption. If negotiations with King County had fallen through and the parties had failed to reach an agreement satisfying the NITU requirements, the requests for exemption would not have been modified by the STB, but would have taken effect, one on December 28, 2008 and the others on April 25, 2009. Subclass Two PFF, Ex. B.1 (NITU (Nov. 28, 2008), at 7, Ex. B.2 (NITU (Oct. 27, 2008)), at 3, Ex. B.3 (NITU (Oct. 27, 2008)), at 3. The easements would have terminated through abandonment, leaving plaintiffs with unburdened property, but for the Trails Act, the NITU, and the rail-banking provision. The true "before" state of the plaintiffs' property, absent federal intervention through action of the STB, would have been a fee unencumbered by easements. Damages should therefore be calculated using the value of plaintiffs' property in unencumbered condition.

## CONCLUSION

For the reasons stated, the government is liable for a taking of the property of plaintiffs in Subclass Two and those in Subclass Four, categories A through D. The takings occurred on October 27, 2008 and November 28, 2008, upon issuance of the NITUs. Nonetheless, certain claims within those Subclasses and categories are subject to genuine disputes regarding ownership, and those ownership issues are reserved for trial.

Claims falling within Subclass Four Category E do not have viable causes of action, and those claims are dismissed.

Damages shall be determined by measuring the decrease in value of plaintiffs' property due to the burden of the trail easement, using the unencumbered fee as the baseline.[12]

---

[12]The Subclass Two plaintiffs filed a motion to strike two declarations appended to the government's cross-motion for summary judgment. *See* Subclass Two Pls.' Evidentiary Objections to and Mot. to Strike the Decls. of Susan Odom and Craig R. Watson Filed with

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

Def.'s Cross-Mot. for Summary Judgment, ECF No. 114.  The government opposes the motion, noting that it does not relate to a "pleading" as defined by Rule 7 of the Rules of the Court of Federal Claims ("RCFC"), and accordingly, that a motion to strike is procedurally improper under RCFC 12(f).  *See* Def.'s Opp'n to Subclass Two Pls.' Mot. to Strike at 2-3, ECF No. 120 (citing *Riser v. United States*, 97 Fed. Cl. 679, 685 (2011); *Entergy Nuclear Fitzpatrick LLC v. United States*, 93 Fed. Cl. 739, 742 (2010); *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 180 n.15 (2005)).  Both of the contested declarations appear to be based upon personal knowledge as required by RCFC 56(c)(4).  *See Boston Edison*, 64 Fed. Cl. at 181.  The government's opposition is well taken, and the motion to strike is DENIED.