## UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DANIEL AND KATHY HAGGART, *et al*, | ) | |
| For Themselves and As Representatives of a | ) | |
| Class of Similarly Situated Persons, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 09-103 L |
| | ) | |
| vs. | ) | Judge Charles F. Lettow |
| | ) | *Electronically filed on August 19, 2013* |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS UNDER THE UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACT OF 1970

**TABLE OF CONTENTS**

I.     INTRODUCTION AND PROCEDURAL HISTORY ........................................................4

II.    THE LODESTAR METHOD SERVES AS THE ANALYTICAL FRAMEWORK FOR DETERMINING ATTORNEYS' FEES UNDER THE URA ...........................................9

III.   THE LODESTAR ANALYSIS OF HOURS EXPENDED AND THE APPROPRIATE BILLING RATES IN THIS CASE.....................................................................................13

     A.  The Hours Expended as Set Forth in Exhibit A are Reasonable .................................14

     B.  The Billing Rates Utilized for All Timekeepers in this Case are Their Standard Billing Rates, are Extremely Reasonable in the Kansas City Market, and Have Already Been Specifically Approved in Five Other Rails-to-Trails Cases by Different DOJ Attorneys ..........................................................................................................20

     C.  Plaintiffs' Request for Reasonable Costs Incurred is Also Proper Under the URA....25

IV.   CONCLUSION.................................................................................................................28

## TABLE OF AUTHORITIES

*Biery v. United States*, Case No. 07-693L ...................................................................3, 22

*Blum v. Stenson*, 464 U.S. 886 (1984) ..................................................................3, 10

*Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012) .....................................3, 9, 10, 11, 21

*Capreal v. United States*, Case No. 09-186 (Fed. Cl.)………………………………………3, 15, 24

*Carolina Plating Works v. United States*, Case No. 09-152 (Fed. Cl.) ...............................3, 15,24

*Davis County Solid Waste Management and Energy Recovery Special Service District v. United States Environmental Protection Agency*, 169 F.3d 755 (D.C. Cir. 1999) ...............................3, 21

*Gregory v. United States*, 110 Fed. Cl. 400 (Apr. 12, 2013)…………………………………….3, 21

*Hash v. United States*, 2012 WL 1252624 (D. Idaho) ...........................................3, 13, 14, 20, 21

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ......................................................3, 10, 13, 14, 15, 20

*Janssen v. United States*, Case No. 09-559 (Fed. Cl.)………………………………………….3, 15, 24

*Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714 (5th Cir. 1974)...............3, 10, 11, 13, 23

*Moore v. United States*, 63 Fed. Cl. 781 (Fed. Cl. 2005) ........................................3, 13

*Pennsylvania v. Delaware Valley Citizens' Council For Clean Air*, 478 U.S. 546 (1986).......3, 10

*Perdue v. Kenney A. ex rel. Winn*, 130 S. Ct. 1662 (2010)..................................................3, 13, 14

*Preseault v. United States*, 52 Fed. Cl. 667 (Fed. Cl. 2002)...................................3, 13, 14, 20, 21

*Raulerson v. United States*, 99 Fed. Cl. 9 (Fed. Cl. 2011)..................................................3, 15, 24

*Rhutasel v. United States*, 105 Fed. Cl. 220 (Fed. Cl. 2013) ....................................................3, 15

*Richter v. United States*, Case No. 10-176L (Fed. Cl.).......................................................3, 15, 24

*Singleton v. United States*, Case No. 09-456 (Fed. Cl.).......................................................3, 15, 24

*Ybanez v. United States*, Case No. 09-172L (Fed. Cl.).......................................................3, 15, 24

# I.    INTRODUCTION AND PROCEDURAL HISTORY

This is by far the largest Rails-to-Trails case to date by way of size of the class and monetary damages.  This Class originally included over 700 potential Plaintiffs who collectively own over 800 parcels of land in King County, Washington.  Landowners who collectively own over 200 parcels of land did not decide to join the class.  After the enrollment phase of the Class Notice Period, over 580 Plaintiffs opted into the Class.  The parties filed cross-motions for summary judgment and the Court, after extensive briefing and oral argument, granted Plaintiffs' motion for 325 parcels of land and granted the Defendant's summary judgment motion relating to 180 parcels (D.E. 133).

Long before this Court's liability ruling, in order to determine the just compensation for each of the parcels, Class Counsel hired David Matthews, the preeminent MAI appraiser in the United States in Rails-to-Trails cases[1] to appraise representative parcels of land.  Class Counsel preliminarily grouped the parcels into categories and those categories were revised by Mr. Matthews after the parcels were inspected on numerous occasions over the past several years.  Mr. Matthews appraised 1 or more parcels of land from each category.  After this Court's liability ruling, the Defendant hired Bates McKee, a local appraiser in Seattle, to appraise the same representative parcels.  In January, 2013, the parties agreed to enter into settlement negotiations and specifically set a schedule for the final resolution of the case.  *See* JSR dated 1-23-13, D.E. 136.  The parties agreed upon and informed this Court that the deadline for resolution of this entire case by way of settlement was July 31, 2013.  Because July 31, 2013 was an agreed upon deadline, Class Counsel agreed to postpone the original trial date.

---

[1] David Matthews is one of the most experienced and prominent appraisers in the United States but he is the preeminent appraiser in Rails-to-Trails cases.  Out of the total population of 65 Rails-to-Trails cases or so, Mr. Matthews has been retained in 19 of them, many times as a joint appraiser, and in numerous states.

In an attempt to effectuate the settlement, the parties attended mediation on May 29 and 30 before Senior Judge Wiese. The parties reached an agreement for the land values "taken" -- the amount of the settlement was a global settlement in a sum certain (the allocation of the global amount and the specific amount for each Class Member's compensation was left up to Class Counsel based upon their appraiser's appraised values). The parties also reached a tentative agreement on the interest rate for delay damages to be applied to the global amount of the settlement (because the defendant breached the settlement agreement, the issue of the proper interest rate to be applied for delay damages is the subject of an additional motion for partial summary judgment filed simultaneously herewith).

The original trial setting in June was continued in January when the Defendant agreed to a settlement timeline to resolve all issues by July 31. During and immediately following the mediation, in exchange for Defendant's promise once again to reach a final settlement by July 31, 2013, Plaintiffs agreed to continue the second trial setting in November. Because the Defendant did not abide by the agreement to resolve all of the pending issues by July 31, the parties are now at an impasse with respect to statutory attorneys' fees and costs.

Under the terms of the Uniform Relocation Assistance and Real Property Act of 1970, 42 U.S.C. § 4654(c) (2006) ("URA"),[2] the Plaintiffs are entitled to reimbursement of reasonable attorneys' fees and costs. Plaintiffs' attorneys' fees should be based on the lodestar method, which multiplies the attorneys' reasonable hourly rates by their reasonable hours expended on

---

[2] The relevant portion of the URA, 42 U.S.C. § 4654(c), provides in part:

The Court rendering a judgment for a Plaintiff in a proceeding… awarding compensation for the taking of property by a Federal agency… shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the Court… reimburse such Plaintiff for his reasonable costs, disbursements and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

the litigation.  Plaintiffs thus request reimbursement of attorneys' fees in the amount of $2,885,360 and reimbursement of reasonable costs and expenses in the amount of $667,864.[3]

### A. Procedural History Regarding the Proposed Settlement

Because the deadline to settle land values was May 31, 2013, as this Court is aware, the parties attended mediation of this case on May 29 and May 30 before Senior Judge Wiese.  At the conclusion of mediation, the counsel for the Class and for the United States agreed to the Settlement of this case with respect to the fair market value of the Subclasses One, Two, Three and Four for which the Court granted Summary Judgment to Plaintiffs.  (*See* Order dated 12-18-12, D.E. 133).  Further, the parties agreed to an interest rate for delay damages—however, Class Counsel stated that the interest rate was contingent upon resolution of the entire case, including statutory attorneys' fees and costs, by July 31, 2013, the date the parties stated was the deadline for the entire settlement of this case in their JSR dated January 23, 2013.[4]  (D.E. 136).  Following the mediation, Class Counsel provided their statement of attorneys' fees and costs to counsel for the United States in early June.  Despite the parties agreed upon schedule and deadlines and Class Counsel's continual requests for a response to statutory fees and costs, Counsel for the United States egregiously made their first offer, which was a bad faith counter-offer, on the very last day to settle, July 31, 2013.

---

[3] *See* Exhibit A attached hereto, which is Plaintiffs detailed statement of work performed and expenses incurred, and discussion in Section III *infra*.  Plaintiffs have added $50,000 to fees for anticipated work over the next year and $50,000 in expenses to close the class.

[4] Paragraph 14 of the JSR states that "The parties will agree on just compensation values for all representative and nonrepresentative parcels no later than July 31, 2013 or the parties will proceed to trial in November;" paragraph 15 states that "The parties intend to agree on the interest rates and amount of statutory attorneys' fees no later than July 31, 2013, or the parties will proceed to trial in November;" and paragraph 16 states that "If a final settlement is not agreed upon by the parties, including just compensation for land values, interest rates for delay damages and statutory attorneys' fees, subject to approval by the STB and the designated representative of the Attorney General's Office on or before July 31, 2013, the parties ask the Court to proceed to trial in November as stated above." (D.E. 136).

Defense counsel's conduct in not responding during June and July on the issue of fees and costs is even more egregious because, at the conclusion of the mediation, with Judge Wiese present, the issue of fees and costs was discussed. Defense counsel inquired if Class Counsel could provide an estimate of fees and costs, to which Class Counsel stated that statutory attorneys' fees and costs were approximately $3,500,000 and defense counsel said that he had guessed as much and that it should "not be a problem." Based on Defendant's assurance, the parties agreed that the schedule for resolving the case by July 31, 2013 would be adhered to and that the second trial date could be continued.

On the date of the deadline, July 31, 2013, for the first time, Defendant requested some type of supporting documentation of expenses, even though documentation of expenses in previous Rails-to-Trails cases has never been requested or provided. In fact, Class Counsel has settled numerous cases with this and other DOJ counsel without ever having to provide expense documentation. In fact, Class Counsel has specifically settled two previous cases with Mr. Trauben, defense counsel in this case, without ever providing expense documentation. However, in an attempt to preserve the settlement, Class Counsel sent the Defendant copies of all the experts' invoices.[5]

In an obvious delay tactic, over the next week, without any additional conversation about statutory fees, Defendant wanted other "documentation" regarding expenses. Class Counsel stated that copies of further documentation was not required, that Defendant's request was simply a "delay tactic," and that copies would not be compiled—a process that could take weeks or months and would merely generate additional attorneys' fees. Because the standard for fees

---

[5] As depicted in Exhibit A and as described in Exhibit B, Plaintiffs hired David Matthews as their lead appraiser, John Kilpatrick as their review appraiser, and Bob Thorpe and his staff as land use experts who mapped every parcel. Out of the total of $617,864 of total expenses incurred to date, the experts have already been paid a total of $381,000, which is well over half of the entire total.

and costs is "reasonableness," and because the fees and costs are very reasonable for this large and sophisticated Class, particularly when the fees and costs are less than 2% of the entire settlement, Plaintiffs do not believe providing copies of receipts and invoices is warranted. Defendant's request is unjustified, is an undue burden, and is merely an attempt to harass Class Counsel, particularly when the statutory fees issue is the primary issue and the expenses are quite reasonable. These issues have arisen now simply and solely because defense counsel did not timely request approval from his superiors—which has now become the typical modus operandi for this defense counsel. This delay is incredible when you consider that interest is accruing at a rate of at least $16,000 per day. Defendant stated in the most recent JSR that he wants 45 days to conduct discovery and to review expense receipts—that will cost the government over $700,000 in additional interest, which is more than the actual expenses!! (*See* JSR filed on 08-12-2013, D.E. 145). That is ludicrous.

To exacerbate matters further, days before the parties' JSR was due on August 6, 2013, Class Counsel told defense counsel that they planned on informing this Court as to the lack of the Defendant's response, lack of due diligence, and breach of the terms of the settlement agreement. Class Counsel sent defense counsel a copy of their proposed position in the proposed JSR. Defense counsel immediately called Class Counsel and "begged" for an extension. Out of professional courtesy, despite having experienced continual and similar delays from this same counsel, Class Counsel mercifully agreed to an extension until August 12, 2013—only to get burned once again.

Counsel for the United States has refused to negotiate in good faith and has shown an inability to negotiate in good faith in this and other cases when it comes to statutory attorneys' fees and costs. Therefore, and unfortunately, this Court must now determine statutory attorneys'

fees and costs. Since interest is running at over $16,000 **per day**, and since the statutory fees and costs amount to less than 2.5% of the global settlement, it is Class Counsels' hope that the Court can resolve these issues in a more timely manner. Class Counsel will still accept the terms of the fair market value of the land agreed upon at mediation but, if defense counsel would rather go to trial on those values, Class Counsel is happy to do so and will request a third trial setting as soon as possible.

**B. Class Counsel's Statutory Attorneys' Fees and Costs**

In this case, Class Counsel's statutory attorneys' fees are $2,835,360 and costs are $617,864.[6] Class Counsel also requests an additional $50,000 in attorneys' fees and $50,000 in expenses that will be incurred during the Class Closing phase of this case including the Notice of Settlement, numerous and extended meetings in Seattle, Washington with landowners for explanation of the settlement, and a fairness hearing and distribution of payment for a total of $2,885,360 in attorneys' fees and $667,864 in expenses.[7] Class Counsels' statutory attorneys' fees and costs are entirely reasonable since this Class was so large and complicated, extensive work was performed over 4 years, the Defendant fought liability vigorously, and numerous experts were retained and paid.

**II. THE LODESTAR METHOD SERVES AS THE ANALYTICAL FRAMEWORK FOR DETERMINING ATTORNEYS' FEES UNDER THE URA**

In determining reasonable attorneys' fees, the Court must begin with the "lodestar" figure, which is "the number of hours reasonably expended on the litigation multiplied by a

---

[6] *See* Exhibit A and Section III *infra*.

[7] Class Counsel requests an additional $50,000 in fees that will be incurred over the next year. Those fees include time for meetings with class members, preparing and sending Notice of Settlement and answering questions, which will arise after the Notice is sent, and also meetings when the funds are distributed. If $50,000 is divided by an average rate of $350 (somewhere in between attorney high rate of $475.00 and paralegal at $150.00) per hour is less than 150 hours which will occur over the next year. The expenses will be for the travel required, meeting rooms and mailing of the Notice.

reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  It is well-settled in the Federal Circuit that the lodestar method is the preferred means for calculating attorneys' fees under a fee-shifting statute such as the URA.  *See, e.g., Bywaters v. United States*, 670 F.3d 1221, 1228-29 (Fed. Cir. 2012).

At its heart, the lodestar method is a simple calculation wherein the Court determines attorneys' fees by multiplying the attorneys' reasonable number of hours expended on the litigation by the reasonable hourly rate charged.  *Blum v. Stenson*, 464 U.S. 886, 888 (1984).  It is also well-settled that there is a "strong presumption" that the lodestar calculation produces a reasonable attorneys' fee.  *Pennsylvania v. Delaware Valley Citizens' Council For Clean Air*, 478 U.S. 546, 565 (1986).

Not only has the Federal Circuit made it clear that the lodestar method is to be utilized and that a strong presumption exists that it is correct, the Federal Circuit has also specifically stated that the court may only deviate from the lodestar figure in "rare" and "exceptional" cases "supported by both 'specific evidence' on the record and detailed findings by the lower courts." *Bywaters*, 670 F.3d at 1229.  The Court may only deviate from the lodestar figure in rare and exceptional cases and only based on factors other than those already taken into consideration in the lodestar calculation — "adjustments are warranted only where the lodestar figure fails to take into account a relevant consideration." *Id.*

### A.  Plaintiffs' Request for Reasonable Attorneys' Fees are Proper Based on the 12 *Johnson* Factors

There are generally 12 factors for the Court to consider in determining the proper attorneys' fees under the lodestar method.  The 12 factors were first identified and discussed by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc*. 488 F.2d 714 (5th Cir. 1974).  The so-called "*Johnson* factors" are:

(1)     the time and labor required;

(2)     the novelty and difficulty of the questions;

(3)     the skill requisite to properly perform the legal service properly;

(4)     the preclusion of other employment by the attorney due to acceptance of the case;

(5)     the customary fee;

(6)     whether the fee is fixed or contingent;

(7)     time limitations imposed by the client or the circumstances;

(8)     the amount involved and the results obtained;

(9)     the experience, reputation, and ability of the attorneys;

(10)    the "undesirability" of the case;

(11)    the nature and length of the professional relationship with the client; and

(12)    awards in similar cases.

*Johnson*, 488 F.2d at 717-19; *see also Bywaters*, 670 F.3d at 1229.

Class Counsel easily satisfies each and every one of the 12 factors, as more fully set forth below:

(1)     **The time and labor required**—The time and labor required is set forth in Exhibit A and is fully supported by Exhibits B through G;

(2)     **The novelty and difficulty of the questions**—The issue of deed interpretation based on original source conveyances in King County, Washington was based on complex law based on over 100 years of authority from the Washington Supreme Court, presented very novel issues, and the questions presented by those original source conveyances were and are extremely difficult;

(3)     **The skill requisite to properly perform the legal service properly**—There are between 60 and 70 Rails-to-Trails cases pending before the Court of Federal Claims and the attorneys of BSCR are counsel on 45 of them, the attorneys and paralegals of BSCR are one of less than a handful of attorneys in the entire country who could have pursued this litigation to this extent and to this result, and who also had the proven ability and experience to handle a case of this magnitude and to present and advance the legal arguments on behalf of these Washington landowners effectively;

(4)     **The preclusion of other employment by the attorney due to acceptance of the case**—This has been, over a 4 year period of time, an extensive investment of manpower by the attorneys of BSCR, as demonstrated by the fact that they invested over 8,000 hours on a contingent fee basis and, during that over 4 year period of time, precluded employment in other work at their normal hourly rates, rates that could arguably be higher under the Laffey Matrix, which could havce been charged here but weren't;

(5)     **The customary fee**—It is customary for lawyers in Rails-to-Trails cases to invest their own time and expenses on a contingent fee basis and that is exactly what

occurred in this instance and the hourly fee under the lodestar method is the customary fee in cases of this type based on clear precedent from the Federal Court;

(6) **Whether the fee is fixed or contingent**—The fee contract with the landowners was the "greater" of 35 percent of the total award or the statutory fees pursuant to the URA and, as a result, the lodestar calculation under the URA is the only issue for the Court's determination at this point and class counsel, once the settlement is finally approved, will request division of the common fund for the ultimate fee award to class counsel;

(7) **Time limitations imposed by the client or the circumstances**—There were no time limitations imposed by the landowners because they simply wanted to pursue their constitutional rights under the Fifth Amendment, but a significant amount of the time expended on behalf of these landowners was incurred as a direct result of the fact that Plaintiffs were responsible for the entire discovery in the case and because of litigation strategies employed by the government which, to this point, have proven to be unsuccessful on the merits;

(8) **The amount involved and the results obtained**—This factor and the issue of liability and the measure and methodology of damages has already been thoroughly briefed and Class Counsel has been highly successful in the results obtained here – the largest Rails-to-Trails case to date;

(9) **The experience, reputation, and ability of the attorneys**—This issue has also been thoroughly briefed and is supported by Exhibits B through G and it should be noted that class counsel has been successful for landowners across this country – so - far in every case they have filed;

(10) **The "undesirability" of the case**—This is probably dependent on the eye of the beholder but these Washington landowners wanted to pursue their constitutional right for just compensation under the Fifth Amendment and so this was a desirable case under the law, the location of the trail, but was an undesirable case based on the time commitment, monetary commitment and the state law on the subject;

(11) **The nature and length of the professional relationship with the client**—Not particularly relevant under these circumstances other than to say this case is now over 4 years old and the landowners have not received any compensation and the attorneys have not received any compensation under the URA either; however, class counsel has extensive relationships with class members and communication regarding status on a daily basis; and

(12) **Awards in similar cases**—All cases that Plaintiffs are aware of have utilized the lodestar calculation for the determination of statutory attorneys' fees under the URA and all cases that the Plaintiffs are aware of, including the 7 cases cited herein where DOJ has been held liable or has already agreed to settlement based on similar

calculations, support the request that Plaintiffs made herein for their reasonable attorneys' fees and costs.

Exhibit A sets forth the hours expended and the work performed as a basis for the lodestar calculation in this case as well as the reasonable costs incurred herein. Exhibit B, the Affidavit of Thomas S. Stewart, supports the hours expended and describes the nature and quantity of the work performed in further support of the lodestar calculation. Exhibits C through G specifically support the applicable billing rates utilized in the lodestar calculation as being reasonable in the Kansas City market and in fact, Elizabeth McCulley could have easily been billed at a higher rate of $475.00 – the same as other partners. But, in addition to Exhibits A through G, an analysis of all 12 of the *Johnson* factors as discussed above further supports the lodestar calculation in this case.

### III. THE LODESTAR ANALYSIS OF HOURS EXPENDED AND THE APPROPRIATE BILLING RATES IN THIS CASE

Although the lodestar approach necessarily involves the examination of numerous factors and is not perfect and absolute, it has become the "guiding light" and has "achieved dominance in the federal courts" since the *Hensley* decision. *Hash*, 2012 WL 1252624 at *3 (D. Idaho April 13, 2012) (*citing Perdue*, 130 S. Ct. at 1672). In determining a reasonable attorneys' fee, the Court must begin with the lodestar figure, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. The lodestar figure is "[t]he lynchpin to calculation of a fee under the URA." *Moore v. United States*, 63 Fed. Cl. 781, 785 (Fed. Cl. 2005).

The party seeking attorneys' fees under the URA must submit "adequate evidence supporting the amount of hours worked and rates charged to enable the Court to determine the amount of a reasonable fee." *Hensley*, 461 U.S. at 433. The adequate evidence submitted must

-13-

provide "sufficient detail upon which the Court can determine the reasonableness of the hours, fees, and expenses for each individual for whom they seek reimbursement." *Preseault v. United States*, 52 Fed. Cl. 667, 669 (Fed. Cl. 2002).

In order to facilitate the Court's review of the reasonableness of the number of hours expended on this case and the appropriate hourly rate charged, Plaintiffs have attached a detailed statement of all professional services rendered on this matter from March 1, 2009 through July 31, 2013, which is attached hereto as Exhibit A. Exhibit A provides the appropriate detail as required by *Hensley* and *Perdue*, including the date of each service, the initials of each timekeeper, and actual hours expended by tenths, and a detailed description of the actual work performed. Exhibit A also includes a recap at the end of all hours expended by each timekeeper and the appropriate rate to be utilized for that timekeeper. Plaintiffs request, based on the lodestar calculation as completely set forth in Exhibit A, the payment of reasonable attorneys' fees in the amount of $2,885,360[8] and for their reasonable costs incurred and to close the Class in the amount of $667,864.[9] Plaintiffs also offer the Affidavit of Thomas S. Stewart, the Senior Partner in charge of this litigation, in reference to both the total hours expended and the appropriate hourly rate to be applied, which is attached hereto as Exhibit B.

### A. The Hours Expended as Set Forth in Exhibit A are Reasonable

The Court's first obligation in determining a reasonable attorneys' fee under the lodestar approach is to review the reasonableness of the number of hours expended. *See Hash*, 2012 WL 1252624 at *11. Given the fact that this litigation has occurred over a period of over 4 years, involved a very large class action with hundreds of landowners and thousands of documents, and

---

[8] *See* Exhibit A, which totals $2,835.360, and footnote 3 *supra* and an additional $50,000 to close the Class bringing the total fees to $2,885,360.

[9] *See* Exhibit A, which totals $617,864, and footnote 3 *supra* and an additional $50,000 in expenses to close the class for a total of $667,864 in expenses.

addressed numerous issues in a rather uncertain and emerging area of law, the Court must examine the hours expended in a variety of different ways, including the total hours, the hours worked on particular projects and issues, and if the hours were expended by the proper timekeepers at an appropriate level. In determining a reasonable number of hours expended, the Court must exclude hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. In this instance, Plaintiffs have already exercised billing judgment and removed excessive, redundant or otherwise unnecessary hours as set forth in Exhibit B.

This litigation started in March of 2009 and Exhibit A goes through July 31, 2013, a period of over 4 years. During that over 4 year period, Plaintiffs' counsel expended 8,046 hours of time, an average of less than 2,000 hours per year. That is an average of approximately 150 hours per month for attorneys and paralegals combined on a large class action in a highly complex area of law. Hours expended in the range of a little less than 2,000 hours per year, particularly in a case of this size, is exceedingly reasonable. Similar hours in other Rails-to-Trails cases, in much smaller cases, have already been approved by DOJ in several other recent cases that have already settled involving Plaintiffs' counsel, including *Ybanez v. United States*, Case No. 09-172L (Fed. Cl.) (Judge Hodges)*; Richter v. United States*, Case No. 10-176L (Fed. Cl.) (Judge Firestone); *Singleton v. United States*, Case No. 09-456 (Fed. Cl.) (Judge Danich); *Raulerson v. United States*, 99 Fed. Cl. 9 (Fed. Cl. 2011) (Judge Margolis); *Carolina Plating Works v. United States*, Case No. 09-152 (Fed. Cl.) (Judge Allegra); *Janssen v. United States*, Case No. 09-559 (Fed. Cl.) (Judge Merow); *Rhutasel v. United States*, 105 Fed. Cl. 220 (Fed Cl. 2013) (Judge Smith) and *Capreal v. United States*, Case No. 09-186 (Fed. Cl.) (Judge Wheeler).

The work performed in a class action of this magnitude, involving over 500 parcels of land in King County, Washington, has also been extremely reasonable and necessary. Class

Counsel and class members have been in constant contact on a daily basis in order to research each parcel of land and provide updates to these sophisticated landowners. A review of Exhibit A indicates that the work performed generally falls into 6 broad categories, as follows:

1) General pleadings—besides the original Complaint and Amended Complaints, Plaintiffs' lawyers prepared a number of JSRs, initial disclosures, and motions, including sub-classes based on deed language, and all of this work was correctly and properly performed by partners in the firm;

2) Verification of Individual Claims and work with title documents and issues:

   a. The applicable original source conveyance documents for each parcel had to be identified, located, and obtained;

   b. All documents from the STB had to be identified, located and obtained to ascertain all facts concerning the NITU and trail use agreement;

   c. Valuation maps showing the original source conveyances were identified and obtained from the National Archives in Washington, D.C.;

   d. Chain of title-type research had to be conducted on some parcels to gather the proper ownership deeds and documentation at the time the NITU was issued;

   e. The records kept in King County, Washington were researched, obtained and reviewed as well as time spent with several title companies in the area and AXXION mapping company to assist in gathering the proper documentation of ownership and adjacency;

   f. After the original source conveyances and the proper ownership deeds were located and identified, the entire railroad line for over 25 miles was mapped by parcel identification number including reference to the original source conveyance and the proper owner on the date of the NITU;

   g. Property owner spreadsheets were created for all parcels, which included the claimant's name, the parcel number, and address of the parcel, the legal description of the parcel, the identification of the NITU deed, and the identification of the original source conveyance, and then categories and sub-categories of the property owner spreadsheets were created based on original source conveyance, and type of parcel (either residential, agricultural, or commercial); and

   h. Much of this work was administrative in nature and was performed by paralegals;

3) <u>Management of the Class</u>:

    a. Besides the pleadings associated with the certification of the class, notice and enrollment forms were developed, disseminated, received, and recorded;

    b. Numerous meetings were held in Seattle with landowners regarding the nature of the case during the Class Notice Period and, thereafter, numerous meetings were held regarding the status of the case;

    c. Several meetings were scheduled and conducted, including trips to Seattle, Washington, and Washington, D.C. (for obtaining NARA documents, meetings with DOJ on the case status and meetings for settlement purposes, and oral argument) over a 4 year period; and

    d. Several meetings with appraisers, review appraisers, and land use planners were conducted in Seattle, Washington for appraisal site visits for appraisal purposes;

    e. Because the class was so large, involving over 500 parcels over a 25 mile stretch of railroad track in King County, the landowners had questions during every phase of the litigation and status letters were periodically sent out to all class members and phone calls from class members were received almost on a daily basis;

4) <u>All discovery in the case was basically performed by the attorneys and paralegals for the Class</u>:

    a. All supporting documentation for every parcel, including original source conveyances, parcel maps, county assessor's reports, and ownership deeds, consisting of 12 volumes, were assembled and given to defense counsel;[10]

    b. After defense counsel reviewed the supporting documentation for each parcel contained in the 12 volumes of the Claims Book, defense counsel noted objections of one kind or another to the supporting documentation and responses were finalized and additional documentation was gathered;

    c. A detailed Claims Index was developed from the original property owner spreadsheets and from the documentation contained in the Claims Book; and

    d. Stipulation charts were developed, exchanged, and revised on various occasions based on all of the documentation gathered by Plaintiffs during the Claims Book process; and

    e. The property owners were divided into subgroups.

---

[10] The 12 volumes of Claims Book documentation were submitted to the Defendant on August 16, 2010.

5) Legal research and summary judgment briefing:

    a. Washington law was extensively researched on a variety of different issues leading up to the summary judgment briefing;

    b. The legal research was all performed by a senior associate;

    c. Extensive research was also conducted into historical documentation concerning the development of the railroad and that work was generally performed at the paralegal level;

    d. Extensive summary judgment briefing was prepared, on various subclasses, and the defendant filed cross-motions; and

    e. Because the briefing ultimately involved 500 parcels, massive and voluminous statements of uncontroverted facts were prepared and replied to, involving a review of all documentation produced in the 12 volumes of the Claims Book.

6) The entire appraisal process:

    a. Class Counsel hired David Matthews, the preeminent Rails-to-Trails appraiser in the country;

    b. Mr. Matthews has appraised over 10 Rails-to-Trails cases, including *Preseault v. United States*, and has worked for DOJ, worked for Plaintiffs, and worked as a joint appraiser;

    c. Mr. Matthews conducted actual site visits and selected "representative" parcels to be appraised;

    d. After the representative parcels were appraised, Plaintiffs and Mr. Matthews developed a damages calculation spreadsheet for extrapolation of the square foot values from the representative parcels to all of the other remaining parcels;

    e. The Defendant hired Bates McKee to appraise the representative parcels; and

    f. The parties attended mediation and negotiated a settlement of land values based on the damages calculation spreadsheet that Plaintiffs prepared.

Not only are the total hours reasonable over a 4-year period and based on the total volume of work performed, but the breakdown of hours by timekeeper illustrates that the work was performed at the appropriate level without duplication. As shown on the recap page of

-18-

Exhibit A, the over 8,000 hours expended by BSCR timekeepers can easily be divided into 4 categories of timekeepers:

1.     <u>Senior Litigator</u> – Thomas S. Stewart ("TSS") is the Senior Partner[11] working on this case (at $475 per hour), he worked 1,240.50 hours over 4 years, and he performed tasks normally assigned to a senior litigator, such as reviewing pleadings, working on summary judgment motions, and doing the oral argument;[12]

2.     <u>Partner</u> – Elizabeth G. McCulley ("EGM") is the Junior Partner assigned to this case and she worked 1,928.30 hours[13] (at $375 per hour) over 4 years, and she was responsible for the supervision of the research performed by the Senior Associate, the gathering of documentation performed by paralegals, all of the discovery in the case, and reported to Thomas S. Stewart;[14]

3.     <u>Associates</u> – Laura Bettenhausen ("LXB") is the Senior Associate primarily working on this case, she worked a total of 1,139.80 hours over 4 years, and she was responsible for all of the legal research under Washington law that led to all of the summary judgment briefing and also reviewed the paralegal work with respect to the massive statement for uncontroverted facts and the search for railroad charters;[15] and

---

[11] *See* Exhibit B.

[12] Two other senior litigators, Brent W. Baldwin ("BWB") and Steven M. Wald ("SMW"), worked on this case before Thomas S. Stewart took over the responsibility. *See* Exhibit A.

[13] It should be noted that at the time the attorneys' fee bill was re-submitted to Defendant's counsel because the parties were unable to resolve the attorneys' fees and cost, the fees were provided to Mr. Trauben to include July time and EGM's July time of approximately 30 hours had not yet been posted to the account by the accounting department——the additional 30 hours amounts to over $11,000 that Class Counsel has not included in the amount that they are seeking reimbursement on.

[14] One other Partner, J. Robert Sears ("JRS"), worked on this case before Elizabeth G. McCulley took over responsibility.

[15] Other associates, Anne Baggott ("AEB"), Jodi Butler ("JLB"), and Kristi Pfotenhauer ("KMP") worked on the case before leaving the firm, at which time Laura Bettenhausen took over responsibility with the periodic assistance of Ambika Behal ("AB").

4.  <u>Senior Paralegal</u> – Grant Houske ("GEH") is the Senior Paralegal assigned to this file and he worked 1,069 hours, and he handled all of the administrative tasks, all of the document gathering and reporting, including original source conveyances and ownership deeds, and the entire discovery process and Claims Book process, worked extensively with title companies, and worked on the statement of uncontroverted facts.[16]

Plaintiffs have already exercised billing judgment and removed all "excessive, redundant, or otherwise unnecessary time entries." *Hensley*, 461 U.S. at 434. Each timekeeper, at their appropriate level and billing rate, had a specific role to play and worked together as a cohesive unit. Although some excessive hours have been removed with respect to attorney research, the Court must realize "that a fair amount of duplication is inherent in complex litigation involving several attorneys – even within one law firm." *See Hash*, 2012 WL 1252624 at *13. Not only did this case involve a large class action that lasted 4 years, but Plaintiffs took this representation with no assurance that they would prevail and no assurance that they would recover attorneys' fees and therefore had no reason or justification to overbill, such that this Court should "not lightly second-guess Plaintiffs' determination of what costs are reasonable." *Preseault*, 52 Fed. Cl. at 680.

**B. The Billing Rates Utilized for All Timekeepers in this Case are Their Standard Billing Rates, are Extremely Reasonable in the Kansas City Market, and Have Already Been Specifically Approved in Seven Other Rails-to-Trails Cases by Different DOJ Attorneys**

Exhibit B specifically addresses the standard billing rates for the various timekeepers in this case:

1.  Thomas S. Stewart, Senior Litigator, at $475 per hour;

---

[16] Other paralegals worked on this case over the 4 years as required and as shown in Exhibit A. Wendy Haberl ("WHL") was the paralegal in St. Louis before she left the firm and before Grant Houske took over responsibility for all of the paralegal duties. The total paralegal hours, as shown in Exhibit A, are 2,382.20 hours, which is 30% of the total hours.

2. Elizabeth G. McCulley, Junior Partner, at $375 per hour;

3. Laura Bettenhausen, Senior Associate, at $275 per hour; and

4. Grant Houske, Senior Paralegal, at $150 per hour.

But, even though Exhibit B establishes the standard billing rates for all timekeepers in this case, "something more than an attorney's own Affidavit is required to establish the prevailing market rate for attorney's fees." *Hash*, 2012 WL 1252624 at *3 (*citing Preseault*, 52 Fed. Cl. at 678). Thus, in addition to Exhibit B, Plaintiffs have produced Exhibits C through G, additional Affidavits concerning the prevailing market rate for attorneys' fees, that separately and collectively establish that the rates utilized by BSCR as set forth in Exhibit A are actually average or below average for the Kansas City market rate for timekeepers with similar experience. Perhaps even more important than that, however, is the fact that these exact rates, as set forth in Exhibit A, have already been approved by other DOJ lawyers in in at least 5 other Rails-to-Trails cases within the last 6 months alone. Judge Charles Wheeler held that these exact rates are "reasonable" for Class Counsel. *See Gregory v. United States*, 110 Fed. Cl. 400 (Apr. 12, 2013).[17]

First, Plaintiffs note that they have rather summarily chosen Kansas City as the proper forum for the determination of the prevailing market rate. Based on the *Bywaters* opinion, it is at least arguable, if not probable, that Washington, D.C. is actually the appropriate forum. At a minimum, Plaintiffs could argue that the Laffey Matrix establishes the appropriate rate if Washington, D.C. was the chosen forum and, obviously, the rates in Washington, D.C. under the Laffey Matrix would be substantially higher than those proposed herein. At a minimum, if Plaintiffs did advance the argument that Washington, D.C. was the proper forum, Defendant

---

[17] Exhibits C through G, attached hereto, are Affidavits from 5 experienced commercial litigators in Kansas City. The Affidavits were originally filed in support of a fee request in the *Gregory* case, but apply equally in this case. Judge Wheeler, in *Gregory*, approved the exact same rates as requested herein.

would then have to establish that the *Davis County*[18] exceptions to the forum rule applied, that the vast majority of the work was actually performed in Kansas City <u>and</u> that there was a "substantial" difference in the prevailing market rate.

Second, Exhibit B contains a detailed description of the experience for each primary timekeeper in the 4 billing categories. The billing rates of $475 an hour for Thomas S. Stewart, $375 per hour for Elizabeth G. McCulley, $275 per hour for Laura Bettenhausen, and $150 per hour for Grant Houske were established, and utilized, based on the experience of each timekeeper within the Kansas City market. Those rates are extremely reasonable and appropriate in the Kansas City market, not only as set forth in Exhibit A as supported by Exhibit B, but also based on the following supporting Affidavits:

      1.    **Affidavit of Robert Thompson** (Exhibit C) – Robert Thompson is a practicing attorney in Kansas City, Missouri, is a partner in the Bryan Cave law firm, has practiced law in Kansas City for 24 years, is an experienced commercial litigator, is very familiar with billing rates in Kansas City and St. Louis since he has served as the Managing Partner of Bryan Cave's Kansas City office and currently serves on the Executive Committee for the entire firm, and his affidavit establishes that the rates for senior litigators at Bryan Cave range from $475 per hour to $625 per hour (as compared to Thomas S. Stewart's rate of $475 per hour), that billing rates for junior partners range from $400 per hour to $450 per hour (as compared to Elizabeth G. McCulley's rate at $375 per hour), that billing rates for senior associates generally range from $330 per hour to $400 per hour (as compared to Laura Bettenhausen's rate at $275 per hour), and

---

[18] The Federal Circuit has adopted and applied an exception to the forum rule recognized by the D.C. Circuit Court of Appeals in *Davis County Solid Waste Management and Energy Recovery Special Service District v. United States Environmental Protection Agency*, 169 F.3d 755, 158 (D.C. Cir. 1999). *See also Biery v. United States*, Case No. 07-693L, Opinion by Judge Firestone, D.E. 173, attached hereto as Exhibit H.

that billing rates for senior legal assistants range from $150 per hour to $185 per hour (compared to Grant Houske's rate at $150 per hour);

2.    **Affidavit of Charles Christian Kirley** (Exhibit D) – Chris Kirley is an experienced commercial litigator at Husch Blackwell in their Kansas City, Missouri office, who has practiced law in Kansas City for 35 years, who has also served on the firm's Executive Committee and is very familiar with hourly billing rates in Kansas City and St. Louis, and whose personal billing rate is between $520 per hour and $570 per hour, and who states that the billing rates for Thomas S. Stewart at $475 per hour as a senior litigator and $375 per hour for Elizabeth G. McCulley as a junior partner, "are comparable to the rates charged by Husch Blackwell for similarly situated litigation attorneys";

3.    **Affidavit of Mark E. Johnson** (Exhibit E) – Mark Johnson is a practicing attorney in Kansas City, Missouri with the Stinson Morrison Hecker law firm, has practiced law in Kansas City for 36 years and is an experienced commercial litigator, is very familiar and knowledgeable concerning hourly billing rates at Stinson Morrison Hecker and also in the Kansas City and St. Louis markets because he has served and is serving on the firm's Executive Committee, and he states that the billing rates for Thomas S. Stewart at $475 per hour as a senior litigator, $375 per hour for Elizabeth G. McCulley as a junior partner, Laura Bettenhausen at $275 as a senior associate, and Grant Houske at $150 per hour as a senior paralegal "are reasonable for legal work that is based on complex federal practice and are appropriate in the Kansas City and St. Louis markets" and that "these rates are within Stinson Morrison Hecker's rates for similar work in the Kansas City and St. Louis markets";

4.    **Affidavit of Jack L. Campbell** (Exhibit F) – Jack Campbell has practiced law in Kansas City for 42 years, is a Partner in the Polsinelli Shughart law firm, is very familiar with

hourly billing rates for attorneys and paralegals in the Kansas City and St. Louis markets, and states that the hourly billing rates "for Thomas S. Stewart at $475 per hour as a senior litigator, and Elizabeth G. McCulley at $375 per hour as a junior partner, are extremely reasonable for legal work that is based on complex federal practice and are appropriate in the Kansas City and St. Louis markets" and that "these rates are within Polsinelli Shughart's rates for similar work in the Kansas City and St. Louis markets"; and

5.    **Affidavit of Diana Jordison** (Exhibit G) – Diana Jordison is an experienced lawyer in Kansas City at the Horn Aylward & Bandy LLC law firm who has practiced law for 27 years, has practiced in both large and small law firms, who has personal knowledge concerning billable hour rates for complex commercial litigation in Kansas City, and who states that "the hourly rates utilized by [BSCR]… are extremely reasonable for legal work that is based on complex federal practice and are appropriate in the Kansas City market."

Third, it is hard to know precisely what the Defendant's objection is, if any, to the billing rates utilized herein or the expenses.  Why?  Because the Defendant has never expressed any objection to these billing rates or expenses.

Plaintiffs do not believe that Defendant has any objection to the billing rates addressed herein.  In fact, on at least 7 other occasions within the last year, other lawyers from DOJ have approved these exact rates:

1.    *Ybanez v. United States*, Case No. 09-172L (Fed. Cl.) (Judge Hodges);

2.    *Richter v. United States*; Case No. 10-176L (Fed. Cl.) (Judge Firestone);

3.    *Singleton v. United States*; Case No. 09-456 (Fed. Cl.) (Judge Damich);

4.    *Raulerson v. United States;* 99 Fed. Cl. 9 (Fed. Cl. 2011) (Judge Margolis);

5.    *Carolina Plating v. United States*, 09-152 (Fed. Cl.) (Judge Allegra);

6. *Janssen v. United States*, Case No. 09-559 (Fed. Cl.) (Judge Merow); and

7. *Capreal v. United States*, Case No. 09-186 (Fed. Cl.) (Judge Wheeler).

Plaintiffs do not know if Defendant has any legitimate or viable objection to the rates offered herein but, even if they do at this late date, they should be estopped from raising any objection now based on the fact that they would not and did not raise any objection up to now and because they have specifically approved these exact rates on at least 7 other occasions.

### C. Plaintiffs' Request for Reasonable Costs Incurred is Also Proper Under the URA

The costs incurred in this case of $617,864 are reasonable for over four years of work on a class of this size. The total expenses of $617,864 can be broken down as follows:

#### 1. Legal Research and Motion Practice

The internet legal research performed in this case over 4 years is very reasonable, particularly considering the complexity of legal issues involved in this case and amounts to $18,150.63. Deed research, document compilation and analysis, mapping over 500 parcels as well as NARA original railroad maps and motion practice was very time consuming and required very detailed work. Class Counsel filed this lawsuit, moved for Class certification—which Defendant originally opposed, and this Court certified the Class. Class Counsel identified and grouped the Class Members into subclasses. Additionally, Class Counsel conducted extensive legal research and filed motions for summary judgment for several subclasses. Defendant opposed Plaintiffs summary judgment motions and the Court ultimately ruled.

#### 2. Case Document Research, Management and Mapping

Class Counsel had to identify all of the property owners who owned property adjacent to the former rail corridor in October or November, 2008. Class Counsel then had to review their ownership deeds and assessor parcel reports. Counsel made four trips to Washington, DC to

search the National Archives to obtain all three of the segments of the former railroad right-of-way. Class Counsel then had to map each parcel number and identify each owner on parcel maps. Class Counsel had to map each source deed for each segment of the rail corridor (which Axxion mapping company also did as requested by DOJ and then stipulated to by Class Counsel). Class Counsel prepared detailed spreadsheets with pertinent information for each Class Member and compiled 12 volumes of Claims Books containing documents for every parcel verifying ownership, location and original source deeds.

### 3. Travel—Meetings Landowners, with DOJ and Oral Argument

In addition to the 4 trips to D.C. to research the National Archives, BSCR traveled to Seattle or Washington, D.C. on approximately 30 separate occasions for many different purposes over 4 years:

> (1) **Over 20 Meetings with Class Members**: BSCR held numerous meetings with plaintiffs and putative class members totaling over 500 persons/entities in Seattle, Washington during the short Notice Period of three months. BSCR had several attorneys meeting with and available for Class Members and putative Class Members and meetings were reasonably necessary to meet with every class member and to manage this large Class containing somewhat individual claims (based on each Class Member's parcel of land). Further, managing a class of this size is difficult and, over the over 4 year period, BSCR made numerous trips to Seattle, Washington to keep the class apprised of the status of the litigation and answer all questions from class members;

> (2) **Experts**—Additionally, BSCR has had approximately 10 meetings in Seattle with experts in preparation for site visits and appraisals (BSCR usually combined a trip to meet with experts with the trip to meet with landowners); and

> (3) **Washington, D.C.**—BSCR also traveled to Washington, D.C. on approximately 8 occasions. Class Counsel traveled to Washington D.C. for the oral argument on the cross-motions for summary judgment, as well as three specific meetings for settlement purposes over the course of several years. BSCR met with DOJ in D.C. on several occasions in attempts to settle this case and traveled to D.C. two additional times for oral argument and mediation.

Seattle and Washington D.C. are expensive venues as far as travel expenses go. All travel expenses include airfare, hotels, meals, car rentals, gas and meeting room rentals. All in all, BSCR made approximately 30 trips to either Seattle or Washington, D.C., involving different BSCR attorneys and paralegals have taken place, and all of the travel expenses equal $139,465.45.

### 4. Trial Preparation, Including Expert Witnesses

Class counsel researched expert witnesses and prepared for trial—and obtained a trial setting. Class Counsel's land planning expert measured the dimensions of each parcel including the larger parcel, former right-of-way area and remainder parcel. Class Counsel and their appraisal experts conducted numerous site visits of each parcel, interviewed Class Members and Class Counsel's expert grouped parcels into over 20 subgroups and prepared appraisals for representative parcels. Representative parcels were then extrapolated to non-representative parcels. Other experts were hired and the total **fees for experts were $381,279.64**, well over half of the total expenses. *See* Exhibit A. The expenses incurred were necessary due to Defendant's Opposition to Summary Judgment, motion practice and trial setting on damages. Class Counsel continued to prepare for trial and also prepared for mediation simultaneously.

### 5. Future Expenses

Class Counsel's costs to date are extremely reasonable. Further, because Class Counsel will have to make several additional trips to Seattle over the next 12 months for status meetings, to obtain settlement consent and to close the Class, Class Counsel requests an additional $50,000 for postage, airfare, hotels, car rentals, meeting venue rental and meals for a total cost amount to $667,864.07.

## IV.    CONCLUSION

The lodestar method of determining reasonable attorneys' fees under the URA should be utilized in this instance.  Under the lodestar method, the hours expended by Plaintiffs' counsel in this case are reasonable and the billing rates applied to those hours at every level are fair and reasonable as well.  As a result, Plaintiffs respectfully move that their motion for attorneys' fees and costs under the URA be granted and that they be awarded fees of $2,885,360 and costs of $667,864.

Respectfully submitted,

Date:  August 19, 2013                    BAKER STERCHI COWDEN & RICE, L.L.C.

By   */s/ Thomas S. Stewart*
          Thomas S. Stewart
          Elizabeth G. McCulley
          2400 Pershing Road, Suite 500
          Kansas City, MO 64108
          (816) 471-2121
          (816) 472-0288 (facsimile)
          stewart@bscr-law.com
          mcculley@bscr-law.com

          -and-

          Steven M. Wald
          J. Robert Sears
          1010 Market Street, Suite 950
          St. Louis, MO 63102-1708
          (314) 231-2925
          (314) 231-4857 (facsimile)
          wald@bscr-law.com
          sears@bscr-law.com
          **ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing was filed with the Clerk of the Court via ECF on this 19th day of August, 2013, with a copy of the same being served via electronic mail (ECF) by the Clerk of the Court on this same day, to:

BRUCE K. TRAUBEN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
E-mail: bruce.trauben@usdoj.gov
**ATTORNEY FOR DEFENDANT**

*/s/ Thomas S. Stewart*

ATTORNEY FOR PLAINTIFFS
