**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| DANIEL HAGGART AND KATHY HAGGART, et al., For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) ) ) | No.  09-103 L |
| | ) | |
| Plaintiffs, | ) | Judge Charles F. Lettow |
| | ) | |
| vs. | ) | *Electronically filed February 13, 2014* |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MOTION FOR COURT APPROVAL OF FEES
AND PROPOSED DIVISION OF THE COMMON FUND**

## TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................1

II. THE PROCEDURAL HISTORY OF HOW THE CLASS WAS FORMED AND HOW EACH CLASS MEMBERS' RIGHT TO COMPENSATION WAS ESTABLISHED...........................................................................................................1

III. THE TERMS OF THE SETTLEMENT..........................................................................4

    A. How the Value of $110,000,000 in the Aggregate Was Determined as the Value for Each Class Member's Property .........................................................5

    B. How Pre-Judgment Interest or "Delay Damages" in the Amount of $27,962,218.69 was Determined .....................................................................8

    C. How Payment of the Statutory Attorneys' Fees and Expenses in the Amount of $2,580,000 was Determined ...........................................................9

IV. WHAT COMPRISES THE COMMON FUND FOR DETERMINING THE PROPER PERCENTAGE FOR CLASS COUNSELS' ATTORNEYS' FEES...............................11

V. AN AWARD OF 30% OF THE COMMON FUND INCLUDING STATUTORY ATTORNEYS' FEES IS THE APPROPRIATE MEASURE OF CLASS COUNSELS' ATTORNEYS' FEES IN THIS CASE..........................................................................15

    A. The Supreme Court has Held That the Common Fund Upon Which an Attorney Fee is Calculated Should Include the Full Amount Obtained for the Benefit of the Class ....................................................................................16

    B. Approximately 33% of the Common Fund is a Typical Percentage for an Attorneys' Fee Award in Common Fund Cases .............................................20

    C. This Court has Already Approved Attorneys' Fees of 34% of the Common Fund (Including the URA Attorneys' Fee Amount) and 40% of the Common Fund (Not Include the URA Attorneys' Fee Amount) in Other Trails Act Taking Cases................................................................................21

    D. An Award of 30% of the Common Fund Including Statutory Attorneys' Fees is Entirely Reasonable Since All of the Class Members Have Already Consented to It ................................................................................................23

VI. CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

*Preseault v. United States*, 494 U.S. 1 (1990) ...................................................................2

*Glosemeyer v. United States*, 45 Fed. Cl. 771 (Fed. Cl. 2000) ........................................2

*Moore v. United States*, 63 Fed. Cl. 781 (Fed. Cl. 2005) ...........................11-15, 21-22

*Raulerson v. United States*, 108 Fed. Cl. 675 (Fed. Cl. 2013)...................................11-15, 21- 22

*Voth Oil Co., Inc. v. United States*, 108 Fed. Cl. 98 (Fed. Cl. 2012).......................... 11, 13-15, 22

*Bishop v. United States*, 2013 WL 450991, No. 10-594L
   (Fed. Cl. August 19, 2013).................................................................... 11, 14-15, 22

*Janssen v. United States*, Case No. 09-559, Order dated 10/17/2013
   (D.E. 64) (Judge Merow) ........................................................................................11

*Quimby v. United States*, 107 Fed. Cl. 126 (Fed. Cl. 2012) ....................................13, 25

*Boeing v. Van Gemert*, 444 U.S. 472 (1980) .......................................................... 16-18

*Trustees v. Greenough*, 105 U.S. 527 (1882) ...................................................................16

*Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885) ..................................16

*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970) ......................................................16

*Sprague v. Ticonic National Bank,* 307 U.S. 161 (1939) ................................................16

*Hall v. Cole*, 412 U.S. 1 (1973) ......................................................................................16

*Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975) ............... 16-17

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970). ....................................................16

*Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993)..................................17

*Camden I Condominium Assoc., Inc. v Dunkle,* 946 F.2d 768 (11th Cir. 1991) ....................17, 20

*Wiles v. Southwestern Bell Telephone Co.*, 2011 WL 2416291 (June 9, 2011) ...........................20

*In re Texas Prison Litigation,* 191 F.R.D. 164 (W.D. Mo. 1999) ...................................20

*Johnston v. Commercial Mortgage Corp.,* 83 F.3d 241 (8th Cir.1996) .........................20

*In re IPO Securities*, 2009 WL 3397238 (S.D. N.Y. 2009)................................................................20

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3rd Cir. 2000) ................................................20

*In re Merry-Go-Round Ent., Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) .........................................21

*In re Informix Corp. Sec. Litigation*, ND 97-1289 (N.D. Cal. 1999) ...........................................21

*In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) .........................................................21

*Kurzweil v. Phillip Morris Co.*, 1999 WL 1076105 (S.D. NY 1999)...........................................21

*In re Commercial Explosives Antitrust Litigation*, MDL No. 1039 (D. Utah Dec. 29, 1998).......21

*In re National Health Laboratories Sec. Litigation*, Nos. 92-149 & 93-1694 (D.D. Cal. Aug. 15, 1995 (Brooks, M.J.) ...........................................................................................................21

*In re Meldridge Inc. Sec. Litigation*, No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and Apr. 15, 1996) (Frye, J.) ...........................................................................................................21

## I.      INTRODUCTION

This Court issued its liability ruling on December 18, 2012 and concluded that the government was liable for 254 Class Members who collectively own 316 parcels of land. After an extensive appraisal process and two different mediations before Judge Wiese, the parties have now agreed to the Settlement of this case. The Settlement is a resolution that Class Counsel believes to be fair and appropriate for all of the individual property owners who comprise the Class. In addition, this Settlement has been approved by the Surface Transportation Board and by various levels of the Department of Justice. Class Counsel now requests that this Court approve an award of 30% of the Common Fund[1] as Class Counsels' attorneys' fees in this case as part of this Court's final approval of this Settlement upon completion of the fairness hearing. Class Counsel contacted counsel for the United States regarding this motion. The Defendant stated that "The United States takes no position regarding Class Counsel's request for the award of a contingency fee, so long as it does not affect the obligations of the United States." Class Counsel does not understand the Defendant's statement, but regardless, Class Counsel's fee motion does not or cannot affect the obligations of the United States.

## II.     THE PROCEDURAL HISTORY OF HOW THE CLASS WAS FORMED AND HOW EACH CLASS MEMBERS' RIGHT TO COMPENSATION WAS ESTABLISHED

The United States took a portion of property owned by Class Members in King County, Washington who held fee title to the land over which the abandoned BNSF Railroad once ran. An easement for a public recreational trail with the potential reactivation of a railroad was imposed upon Class Members' property in October and November of 2008. This public access

---

[1]  The Common Fund is defined as including land values, interest for delay damages, and statutory attorneys' fees. *See* discussion in Sections IV and V *infra*.

1

easement was created by operation of the federal National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act").  Because the railroad only held an easement for railroad purposes and the Class Members own the underlying fee in the right-of-way, the Fifth Amendment of the United States Constitution requires that the United States pay these landowners for the taking of their reversionary interest in their property.  *Preseault v. United States*, 494 U.S. 1 (1990); *Glosemeyer v. United States*, 45 Fed. Cl. 771 (Fed. Cl. 2000).

The named Plaintiffs, Daniel and Kathy Haggart, retained Thomas Stewart and Elizabeth McCulley and their law firm, Baker Sterchi Cowden & Rice, LLC ("BSCR") to be their legal counsel representing them in their claim seeking compensation for the taking of their property. Plaintiffs' counsel agreed to undertake this representation according to terms of a contingent fee agreement providing that counsel would receive 35% of the total recovery received for the property owners.[2]  Prior to Class Certification, numerous other Plaintiffs joined the case by signing contingency fee agreements and Plaintiffs' Complaint was thereafter amended to reflect additional Plaintiffs prior to Class Certification.  In fact, each and every landowner was provided Class Counsel's contingency fee agreement and was advised in writing that Class Counsel's requested fee would be 35% of the Common Fund.  Even those landowners who did not sign a contingency agreement and later opted into the Class were well aware that Class Counsel would pursue a fee of 35% of each landowner's award, including land values, interest for delay damages, and statutory attorneys' fees.

The Court approved this case as a Class Action and Class Counsel then held numerous meetings with Class Members and potential Class Members during the Notice of Class Action

---

[2]  All Class Members who signed contingency fee agreements before the case was certified as a Class agreed to a 35% contingent fee of the Common Fund, which was defined to include land values, interest for delay damages, and statutory attorneys' fees.

phase of this case.[3]   Class Counsels' representation of the Class during the initial claim validation process involved extensive research into historical land title records concerning the establishment of the original railroad easement in the early 1900's and subsequent transfers of title to the property owners, specifically property owners owning their land in October and November, 2008.   Class Counsel also mapped the entire railroad right-of-way identifying all property owners along the right-of-way (subsequently mapped by Axxion at the request of the parties).   Class Counsel obtained documents concerning the Railroad's easement, and presented Claims Books containing all documents to Counsel for the United States for review.   This also required that Class Counsel review numerous legal instruments affecting the twenty-five mile long abandoned railroad corridor and each individual property owners' interest in the land adjacent to and underlying the Railroad's right-of-way.   In addition to establishing each Class Member's legal title to the property, Class Counsel was also required to establish the physical dimensions of each of the 316 parcels of land.

Determining each Class Member's title, and defining the nature of the interest relative to other competing interests in the corridor, involved extensive legal and factual research.   For each Class Member and each parcel, Class Counsel assembled the relevant historical and title research establishing that the Class Members held fee title to the property on the date of taking.   Class Counsel also gathered plat maps for each parcel and reviewed GIS documentation that defined the nature and physical dimensions of each parcel.   This involved obtaining surveys, plat maps, GIS research, and tax assessment records for each separate parcel as well as other documents from property owners and public records.   This information was assembled into a "Claims Book"

---

[3]   Class Counsel explained the attorneys' fees that would be sought by Class Counsel and all Class Members have been aware from the beginning of this case that Class Counsel would be seeking an attorneys' fee award of 35% of the total gross damage award (disclosed as including the URA fee) for each Class Member.

that was provided to the United States.  This process of determining and defining each Class Member's title to the property and property dimensions along this corridor was a difficult, costly, and time-consuming process.  The work was largely done by Class Counsel's firm and was then reviewed by various King County Departments, King County appraisers, the appraisers hired by the United States and Class Counsel, and counsel for the United States, as well as Axxion, a professional mapping company.  Class Counsel also hired a land planning company to help determine the dimensions of each parcel.  Work done by Class Counsel saved the United States literally hundreds of thousands of dollars.

The United States challenged liability and the parties divided the Class into Subclasses. The parties conducted extensive briefing on liability and this Court ordered the Defendant liable for 254 Class Members who collectively own 316 separate parcels of property.  The parties prepared for a trial on damages and Class Counsel hired expert appraisers to value the land.  The parties entered into settlement negotiations and ultimately attended a two-day mediation in May, 2013.  The parties also mediated statutory attorneys' fees and costs in September of 2013, thereby reaching the Settlement in this case, which has now been fully and finally approved by the parties.

## III.    THE TERMS OF THE SETTLEMENT

The parties have now agreed, by way of compromise and settlement, that the United States will pay the total sum of $140,541,218.69.  This total amount of $140,541,218.69 consists of $110,000,000 in principal for the value of the land taken, $27,961,218.69 in interest for delay damages, and $2,580,000 for statutory attorneys' fees and costs pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c).

The $2,580,000 for statutory attorneys' fees and costs has been allocated between statutory attorneys' fees of $1,920,000 and reimbursement for reasonable costs and expenses of $660,000.

A.     **How the Value of $110,000,000 in the Aggregate Was Determined as the Value for Each Class Member's Property**

Once Summary Judgment was granted, each Class Member's title to their respective property was established and the parties each hired appraisers to establish the value of specific representative parcels of property on the date of taking.  Class Counsel hired David Matthews, MAI Appraiser.  Mr. Matthews is the preeminent appraiser in Rails-to-Trails cases and has extensive knowledge regarding land valuation.  Class Counsel also hired John Kilpatrick, MAI Appraiser, as a review appraiser.  Mr. Kilpatrick analyzed the government's appraisals, as well as Mr. Matthews' appraisals.  Mr. Kilpatrick supported Mr. Matthews' valuations.

Class Counsel provided Mr. Matthews with the "Claims Book" and other detailed title and property information for each of the 316 individual parcels.  Together, Class Counsel instructed Mr. Matthews as to the Court's determination of the methodology when determining the value of each Class Member's property interest taken by operation of the Trails Act.  Upon his selection, Mr. Matthews began the valuation of the property and Class Counsel continued to prepare for trial.  In mass appraisal situations, in Rails-to-Trails cases, the appraiser typically appraises representative parcels and extrapolates values to the other non-appraised parcels, and that is what Mr. Matthews did in this case.  Mr. Matthews and Class Counsel jointly initially evaluated each of the properties and developed a list of valuation groups and sub-groups.  The valuation groups were based upon the character and use of the property and included, for example, residential, industrial, commercial, and agricultural categories.  Within each of these groups certain sub-groups were developed.  The sub-groups were developed for properties that shared common valuation characteristics.  For example, a residential subdivision with a number of similar adjoining or nearby homes of similar size would be a sub-group of the residential

group.  Commercial properties were similarly grouped based on size and location and were then similarly placed into sub-groups.

Within each sub-group, Mr. Matthews identified "representative parcels."  A representative parcel was one that the appraisers considered a good proxy for the other properties in the valuation sub-group because it shared a common use, zoning, similar location, and other significant features with the other properties in the sub-group.  The appraisers also identified a number of "unique parcels" that did not share common valuation features with any other property.  Mr. Matthews then provided this list of property groupings, sub-groupings and designated "representative" and "unique" parcels to Class Counsel.  Class Counsel made numerous visits to the properties and had numerous discussions with property owners about their property.

There were 21 appraisals conducted.  Each of these "representative" and "unique" properties was fully appraised by Mr. Matthews and an appraisal report was prepared.  The appraisal methodology employed by Mr. Matthews (and the appraisal reports that he prepared) were consistent with those standards established in the "Uniform Appraisal Standards for Federal Land Acquisition" manual developed by the Interagency Land Acquisition Conference,[4] (the "Yellow Book") and the Uniform Standard of Professional Appraisal Practice (USPAP).

Specifically, Mr. Matthews was asked to determine the value of each representative parcel before and after the imposition of an easement.[5]  This "before and after" standard was ordered by this Court as the measure of compensation due each property owner as of the date of

---

[4]  The Interagency Land Acquisition Conference which developed and revised the Yellow Book was chaired by the former Assistant United States Attorney General Lois Schiffer.

[5]  Mr. Matthews was retained to appraise the subject property before and after imposition of the easement defined as follows:  "In the 'before' condition, Plaintiffs' properties will be evaluated as unencumbered, i.e., without any railroad easement.  In the 'after' condition, Plaintiffs' properties will be evaluated subject to the present encumbrance—an easement for recreational trail use subject to the possible reactivation of a railroad."

taking.  Mr. Matthews determined this value for each appraised "unique" and "representative" parcel and provided a lengthy appraisal report documenting the basis for the valuation of each "representative" and "unique" property.  Class Members whose property was appraised were involved in the appraisal process.

Mr. Matthews and Class Counsel then prepared a schedule with the value of the property taken for each of the 316 properties.  The value of the property interest taken by the government in each "unique property" was the amount determined by the appraisal of that specific property. The value of the property interest taken by the government in each "representative property" was the amount determined by the appraisal of that specific property.  The value of the property interest taken in each property that was not directly appraised was determined by Mr. Matthews' value per square foot of the representative properties in a sub-group that were appraised, and were then extrapolated to each parcel in the sub-group based on the individual square footage of each individual parcel.

Throughout the appraisal process, over a nine month period, Class Counsel conducted an extensive independent review of appraisals and proposed property valuations.  This independent review included multiple visits by Class Counsel to the properties, extensive meetings with property owners in each category, detailed review of the appraisal reports, and independent research using King County Assessor records and comparable property sales and tax records available through numerous discussions with appraisers and real estate brokers.

The government hired their own appraiser, Bates McKee, to conduct site visits and to appraise all of the properties as well.  Once the appraisals on both sides were complete, and after Class Counsels' extensive evaluation of the government's appraisals, the parties prepared for and attended a two-day mediation before Judge Wiese in Washington, D.C. on March 30 and 31,

2013.  The Parties resolved the issues of valuing the land and ultimately reached an agreement on a compromise settlement at $110,000,000.  The Settlement includes the compensation due each property owner for land values based on the value established by this valuation and mediation process.  The complete schedule of each property owner's specific compensation amount for land values is specified on a schedule retained by the parties.[6]

### B. How Pre-judgment Interest or "Delay Damages" in the Amount of $27,961,218.69 was Determined

As part of the Settlement, the parties agreed that the property owner's interest in their land was taken in October and November, 2008.  It is now February, 2014 and payment of compensation has not yet been made.  The parties agreed, following mediation, upon the appropriate amount of money to compensate the Plaintiffs for the United States' delay in providing them their Constitutionally-mandated compensation.  The parties agreed to a compromise rate of interest between the 52-week T-bill rate and the Moody's index of corporate bond rates compounded annually.  The Settlement provides for a total pre-judgment interest/delay damages amount of $27,961,218.69.

The total of $27,961,218.69 was determined using the rate established by the parties with accrued interest from the date of taking through May 31, 2014.  The pre-judgment interest/delay damages were calculated through May 31, 2014 because that was the date by which counsel for the parties anticipated final payment of the Settlement amount would be made by the U.S. Treasury to the Class Counsel's trust account for distribution to each individual Class Member.

---

[6]  In all Rails-to-Trails cases resolved thus far between Class Counsel and the government, which is more than 10 cases, the valuation schedule has never been made publically available.  Both the individual Class Members, by and through Class Counsel, and DOJ believe the settlement amounts are private.  All Class Members have already received detailed individual disclosures of their individual settlements and, at this point, even before the Fairness Hearing, 95% of all Class Members have consented in writing to their individual settlement amounts with no objections of any kind, and with no requests to speak, appear, or address the Court at the Fairness Hearing.

The Settlement Agreement between the parties provides for a "refund" of interest not yet accrued to the government if payment is actually made prior to May 31, 2014 and continued interest beyond May 31, 2014 if payment is not made by that date.

    **C.**    **How Payment of the Statutory Attorneys' Fees and Expenses in the Amount of $2,580,000 was Determined**

Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice testified before the U.S. House Judiciary Committee, Subcommittee on Commercial and Administrative Law on June 20, 2002 in a hearing on litigation and its effect on the Rails-to-Trails program.  In his testimony, Assistant Attorney General Sansonetti noted the significant effort that is involved in resolving Trails Act takings claims.[7]  Assistant Attorney General Sansonetti noted that, "These cases require a deed-by-deed liability analysis and a parcel-by-parcel valuation analysis.  Therefore, while a Class Action of 1,000 individuals may technically constitute just one case, they in reality must be defended as if

---

[7]  Assistant Attorney General Sansonetti testified,

> "[The] Supreme Court has repeatedly recognized that takings analysis is highly fact-specific and ad hoc…In our experience, this is equally true of the analysis in the rails-to-trails context, i.e., liability in rails-to-rails cases turns on the specific language of each individual deed conveyance, while damages analysis will depend on the specific physical characteristics of each individual property interest…Each of these results in significant expenditures of time and resources, and complicates our ability to resolve cases and ensure that truly deserving landowners receive just compensation in as expeditious manner as possible…The defense of the rails-to-trails cases poses special challenges for the Environment Division. Although the total potential monetary exposure from these cases is only about one percent of the total potential monetary exposure of the entire takings litigation docket presently being handled by the Environment and Natural Resources Division, three of the nine attorneys assigned to our "Takings Team" devote the majority of their time to these cases, along with two others who devote a considerable portion of their time as well.  These cases require a deed-by-deed liability analysis and a parcel-by-parcel valuation analysis. Therefore, while a class action of 1,000 individuals may technically constitute just one case, they in reality must be defended as if they were 1,000 separate cases…These cases also impose disproportionate expert witness costs.  In order to determine just compensation for these cases, we must retain land appraisers who must separately analyze each parcel of land and provide an opinion of value for the property interest taken.  The costs of these appraisals, can, and frequently do, exceed the value of the land being appraised.  Thus, we increasingly are being called upon to spend more to defend these cases than we might pay out in just compensation.  Nor could this money be saved by settling the cases, as we would still need some sound justification for any Settlement amount.  As our existing cases progress toward the damages phase, we expect this problem to continue.  Therefore, we must make careful use of our resources to avoid exhausting our division's expert witness budget."

they were 1,000 separate cases." Counsel for the Class agrees. Representing the interests of the 254 property owners in this case was both time-consuming and expensive.

Class counsel has already spent more than 8,500 hours working on behalf of the Class Members over the course of over 4 years. In addition, Class Counsel has already incurred approximately $635,000 in out-of-pocket expenses on behalf of the Class and will incur additional expenses related to travel expenses, meetings with Class Members and finalizing the Settlement and distributing individual Settlement awards to Class Members, of which Class Counsel will not seek additional reimbursement. To date, Class Counsel has been paid nothing for their work on this case. The Class Members' property was originally taken in 2008. During the more than five years since the property was taken, Class Counsel has continually met with and advised and kept Class Members apprised of the status of this case. Numerous Class Members have called Class Counsel—some frequently—asking when this case will be resolved and what can be done to achieve a final resolution.

Absent a Settlement of the government's liability under the URA for paying the statutory attorneys' fees, this issue would have to have been resolved by litigation before this Court. The time required to litigate the attorneys' fees together with the additional expense of litigating attorneys' fees (in both additional interest and yet more attorneys' fees) would increase the ultimate expense to the federal government without substantially increasing any benefit to the property owners. Further, having to litigate the government's URA attorneys' fees liability would further delay final resolution of this case and likely delay ultimate payment of compensation to the property owners well into early 2015.

With this understanding in mind, after the initial impasse on fees and costs and after Class Counsel briefed the issues, Class Counsel and counsel for the United States entered into

11

settlement discussions concerning the United States' liability to pay attorneys' fees and expenses under the URA.  By reason of these settlement discussions, and after a second mediation before Judge Wiese, Class Counsel and counsel for the United States settled the United States' URA liability for $2,580,000.  The total settlement amount of $2,580,000 has been allocated with $1,920,000 toward the Class Members' attorneys' fees and $660,000 toward the expenses advanced on behalf of the Class by Class Counsel.  Class Counsel agreed to this Settlement on the condition that the Justice Department would diligently pursue final approval of this Settlement so that the Class Members would receive their compensation in May of 2014 and not experience further delay in receiving compensation for the taking of their property.

## IV.  WHAT COMPRISES THE COMMON FUND FOR DETERMINING THE PROPER PERCENTAGE FOR CLASS COUNSELS' ATTORNEYS' FEES

A disagreement apparently currently exists between several judges on the Court of Federal Claims as to whether statutory attorneys' fees should be included as part of the Common Fund before a reasonable percentage is applied against the Common Fund to determine Class Counsel's ultimate attorneys' fees.  For example, Judge Bruggink in *Moore v. United States*, 63 Fed. Cl. 781 (Fed. Cl. 2005) and Judge Margolis in *Raulerson v. United States*, 108 Fed. Cl. 675 (Fed. Cl. 2013) included statutory attorneys' fees along with land values and interest as part of the Common Fund.  Judge Firestone, however, in *Voth Oil Co., Inc. v. United States*, 108 Fed. Cl. 98 (Fed. Cl. 2012) and *Bishop v. United States*, 2013 WL 450991, No. 10-594L (Fed. Cl. August 19, 2013) concluded that the amount of statutory attorneys' fees should not be included in the Common Fund for purposes of calculating a percentage of reasonable attorneys' fees pursuant to the URA.  *See also Janssen v. United States*, Case No. 09-559, Order dated 10/17/2013 (D.E. 64) (Judge Merow).

In this case, although Class Counsel is probably entitled to 35% of the Common Fund, even 33% of the Common Fund amounts to $45,527,199.23 even if statutory attorneys' fees are not included in the Common Fund.[8]   Here, Class Counsel is merely requesting 30% of the Common Fund with statutory attorneys' fees included, which is 5% less than of the contingency fee agreements and consistent with all of the consents from all of the landowners already received, which amounts to $41,964,363.23.   With statutory attorneys' fees included, the Common Fund is $139,881,218.69, and 30% of $139,881,218.69 is $41,964,363.23.

This Court has discretion when awarding an attorneys' fee percentage from the Common Fund.  *Moore*, 63 Fed. Cl. at 787 (stating "[W]e do not view ourselves as bound by any one methodology.  The decision to award attorneys' fees in common-fund cases is committed to the sound discretion of the Court.")  In *Moore*, Judge Bruggink held that an award of 34% of the Common Fund, which included statutory attorneys' fees, is typical, fair and reasonable: "<u>34% of the total award including statutory fees is consistent with the standard percentage-of-the-fund approach.</u>"  *Id.* at 786 (emphasis added).

Similarly, earlier this year, Judge Margolis awarded 33% of the Common Fund to Class Counsel and included the statutory attorneys' fees in the calculation as part of the Common Fund.  *Raulerson*, 108 Fed. Cl. 675.  Judge Margolis specifically found that 33% of the Common Fund, including land value, interest for delay damages, and statutory attorneys' fees, was fair and reasonable.  In *Raulerson*, Judge Margolis cited *Moore* and noted that Class Counsel in *Moore* actually requested that the Court award 40% of the Common Fund, which included damages, interest and the URA award.  Judge Margolis noted that Judge Bruggink in *Moore*, "finding that

---

[8]   The Common Fund would include land values of $110,000,000 and interest for delay damages of $27,961,218.69, for a total of $137,961,218.69, even if statutory attorneys' fees are not included in the Common Fund, and 33% of $137,961,218.69 is $45,527,199.23.

40% was a relatively high rate to apply to a Common Fund including statutory fees, instead awarded fees amounting to 34% of the Common Fund, in addition to the expenses—thus adopting the very approach that Class Counsel advocates here, except with a 34% fee in *Moore*." *Raulerson*, 108 Fed. Cl. at 679.  *See also Quimby v. United States*, 107 Fed. Cl. 126 (Fed. Cl. 2012).  In *Raulerson*, Class Counsel requested a fee of 33% of the Common Fund, consisting of the fair market value of land, interest for delay damages, and statutory attorneys' fees, and Judge Margolis agreed and awarded attorneys' fees of 33% of the Common Fund, including statutory attorneys' fees.

Judge Firestone has apparently reached a different conclusion.  In *Voth Oil*, quoting *Moore*, Judge Firestone stated that "Applying the [contingency] percentage to fees collected under the [URA] is at odds with the purpose [of the statute]."  *Voth*, 108 Fed. Cl. at 105. Although Judge Bruggink in *Moore* did state that although "applying the percentage to fees collected under the statute is at odds with that purpose" of the URA, he <u>ultimately</u> <u>did</u> award Class Counsel 34% of the Common Fund which <u>did</u> actually include the fair market value of the land, interest for delay damages, <u>and</u> statutory attorneys' fees.  *See Moore*, 63 Fed. Cl. at 789 (holding "in light of the above, we conclude that a fee award of $1.6 million is a reasonable recovery for Class Counsel… [T]his is essentially 34% of the total award <u>including statutory fees</u> and is consistent with the standard percentage of the fund approach.").  In *Moore*, Class Counsel had requested 40% of the Common Fund and Judge Bruggink merely reduced the percentage requested to 34% and included statutory attorneys' fees in the computation.  Additionally, Judge Bruggink held that "application of the Common Fund doctrine to class action settlements does not compromise the purposes underlying fee-shifting statutes."  *Moore*, 63 Fed. Cl. at 788. Judge Firestone held that the 40% fee request of the Common Fund was well within the

reasonable range for contingent fees in class actions and awarded 40% of the Common Fund defined as land value and interest only.  *Voth Oil*, 108 Fed. Cl. 98.

Judge Firestone again, apparently relying on her decision in *Voth Oil*, reached the same conclusion in *Bishop*.  Judge Firestone excluded the amount of statutory fees in the percentage awarded to Class Counsel for attorneys' fees.  It appears that Judge Firestone in *Voth Oil* misread and misapplied Judge Bruggink's conclusion in *Moore* as excluding the statutory attorneys' fees in the Common Fund prior to the percentage award.  In fact, Judge Margolis, subsequent to Judge Firestone's opinion in *Voth Oil*, noted that Class Counsel in *Moore* requested that the Court award expenses and 40% of the Common Fund, which was reduced to 34% of the Common Fund which included land damages, interest for delay damages, and the URA award.  *Raulerson*, 108 Fed. Cl. at 679.  The end result is that the holdings in *Voth Oil* and *Bishop* basically come to the same conclusion as *Moore* and *Raulerson* since, by reducing the requested amount from 40% to 33%, awarding 33% of the land values and interest with statutory fees included was basically the same as 40% of the land value and interest without statutory fees included.

Although Class Counsel is probably entitled to a division of the Common Fund at 33% of the Common Fund, including statutory attorneys' fees, under the rationale of *Moore* and *Raulerson*, Class Counsel is merely requesting a division of 30% of the Common Fund including statutory attorneys' fees in this case.  If the Common Fund does not include statutory attorneys' fees, under the terms of the Settlement, the Common Fund would amount to $137,961,218.69.  An award of 33% of the Common Fund excluding statutory attorneys' fees would then amount to $45,527,199.23.  That would be the result under the *Voth Oil* and *Bishop* test.  If, however, the Common Fund also includes statutory attorneys' fees in this case, the Common Fund would

amount to $139,881,218.69.  Class Counsel's request in this case is 30% of the Common Fund including statutory attorneys' fees, rather than 33% or 34% as was approved in *Moore* and *Raulerson*, which amounts to $41,964,363.23.  This request of 30% of the Common Fund including statutory attorneys' fees is extremely reasonable under the rationale and holdings of *Moore* and *Raulerson*, is substantially less than the $45,527,199.23 that would result under *Voth Oil* and *Bishop*, and all of the Class Members have been fully apprised and have already consented to a division of the Common Fund that awards 30% to Class Counsel.

**V.    AN AWARD OF 30% OF THE COMMON FUND INCLUDING STATUTORY ATTORNEYS' FEES IS THE APPROPRIATE MEASURE OF CLASS COUNSELS' ATTORNEYS' FEES IN THIS CASE**

Class Counsel requests an award of 30% of the Common Fund including statutory attorneys' fees in this case.  An award of 30% of the Common Fund including statutory attorneys' fees amounts to $41,964,363.23.  Class Counsels' request of 30% of the Common Fund in this case is based on (1) precedent from the Supreme Court which states that an attorneys' fee should be calculated to include the full fund obtained for the benefit of the Class; (2) 33% of the Common Fund is a typical percentage for an attorneys' fee award in Common Fund cases; (3) this Court has already approved attorneys' fees of 34% of the Common Fund (including the URA attorneys' fees amount) and 40% of the Common Fund (not including the URA attorneys' fees amount) in other Trails Act taking cases; and (4) all of the Class Members have already consented to an award of 30% of the Common Fund including statutory attorneys' fees.

**A.      The Supreme Court has Held That the Common Fund Upon Which an Attorney Fee is Calculated Should Include the Full Amount Obtained for the Benefit of the Class**

The United States Supreme Court has affirmed the use of a percentage of the Common Fund approach as the method to determine the attorneys' fee for work on behalf of a Class in a situation such as this case.  In *Boeing v. Van Gemert*, 444 U.S. 472 (1980), Justice Powell wrote:

> Since the decisions in *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1885), <u>this Court has recognized consistently that a litigant or a lawyer who recovers a Common Fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.</u>  *See Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970); *Sprague v. Ticonic National Bank,* 307 U.S. 161 (1939); *cf. Hall v. Cole*, 412 U.S. 1 (1973).  The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough*, supra 105 U.S. at 532-537, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorneys' fees, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257-258 (1975).  The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.  *See, e.g.*, *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 392 (1970).

*Boeing*, 444 U.S. at 478 [9] (emphasis added).

---

[9]   *See also* Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 14:6 (4th ed.).  The Common Fund doctrine allows a court to distribute attorney's fees from the Common Fund that is created for the satisfaction of Class Members' claims when a class action reaches Settlement or judgment.  The doctrine is grounded in the principles of *quantum meruit* and unjust enrichment, in two senses.  First, the doctrine prevents unjust enrichment of absent members of the class at the expense of the attorneys.  It is meant to compensate the attorneys in proportion to the benefit they have obtained for the entire class (the fund), not just the representative members with whom they have contracted. Second, the doctrine prevents the unjust enrichment of absent Class Members at the expense of the class representatives.  In the absence of the doctrine, only the present members, who hired the attorneys, would have to pay attorney's fees, while all the members, both absent and present, would enjoy the benefits of the Settlement or judgment.  The members who did not hire the attorneys would be unjustly enriched at the expense of those who did.

Before any potential for a fee from a Common Fund arises, there must be the creation of such a Common Fund by efforts of plaintiffs' counsel.  Technically, plaintiffs have been successful when creating such a fund.  As long as plaintiffs can demonstrate that it was their efforts that resulted in conferring this benefit on the class, they are entitled to a fee from that fund under equitable court powers, regardless of their posture as prevailing parties in whole or in part in the formal litigation or Settlement thereof.

4 *Newberg on Class Actions* § 14:6 (4th ed.) (citations omitted).

In *Boeing*, the Supreme Court held that Class Counsel should have their fee determined by reference to the entire award because the measure of the benefit to the Class was the entirety of the award obtained by Class Counsel as a benefit to the members of the Class.  "Since the benefits of the class recovery have been 'traced with some accuracy' and the costs of recovery have been 'shifted with some exactitude to those benefiting," the full award was the appropriate measure for determining Class Counsel's fees.  *Boeing*, 444 U.S. at 480-481 (*citing Alyeska Pipelíne Service Co. v. Wilderness Society,* 421 U.S. at 265, n. 39).  That is precisely what has occurred in this case.

Federal courts of appeal, particularly the D.C. Circuit and the Eleventh Circuit, have shown a distinct preference for the Common Fund doctrine when determining attorneys' fees for Class Counsel.  For example, *in Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993), the D.C. Circuit stated that "we conclude that percentage-of-the-fund is the proper method for calculating fees in a Common Fund case."  Similarly, in *Camden I Condominium Assoc., Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991), the Eleventh Circuit stated that "We believe that the percentage of the fund approach is the better reasoned in a Common Fund case."

The Settlement in this case involves a Common Fund of $139,881,218.69 (including $1,920,000 of statutory attorneys' fees) or $137,961,218.69 (not including statutory attorneys' fees) (the reimbursed portion of $660,000 in expenses are not included in the Common Fund) that the Government has agreed to pay for the benefit of the participating Class Members.  This Court has discretion when defining and determining the make-up of the Common Fund. Plaintiffs contend that the fund upon which the percentage fee should be determined is the entire Settlement amount.  The entire Settlement is the measure of the Class Members' entire monetary benefit, not just the land value principal and pre-judgment interest that they receive, but also the

amount of the statutory attorneys' fees under the URA paid by the United States to defray a portion of the Class Members' attorneys' fees.  Class Counsels' success in obtaining funds from the government in the way of statutory attorneys' fees under the URA has the effect of increasing the percentage of the land value principal and pre-judgment interest that each Class Member will actually receive.

The Settlement in this case was reached in light of a potential fee-shifting statute, specifically the URA.  The Settlement included the United States paying a portion of the Class Members' attorneys' fees under the URA.  The fact that, in this case, a portion of the Common Fund was achieved because of a fee-shifting statute is not inconsistent with using the percentage-of-the-Common Fund method to establish the fee for Class Counsel.

The United States' payment toward the Class Members' attorneys' fees offsets their obligation and is part of the Class benefit upon which the attorneys' fee calculation should be based, which is why Class Counsel reduced the requested percentage from 33% to 30% if the Common Fund included attorneys' fees under the URA.  As directed by the Supreme Court in *Boeing*, the Common Fund includes all monetary benefits obtained on behalf of the Class.  There is no dispute that Class Counsel's efforts in obtaining statutory attorneys' fees under the URA for the benefit of Class Members from the United States benefited the entire Class.  For every dollar Class Counsel obtained from the United States in statutory attorneys' fees, the Class benefits proportionally.  Simply put, Class Counsel are asking for a fee equal to 30% of the benefit conferred on the Class Members including their efforts to recover statutory attorneys' fees.  This result is consistent with the Supreme Court's analysis in *Boeing*.

Calculating attorneys' fees based upon the percentage-of-common-fund approach proposed by Class Counsel achieves a fair and just result.  This method provides compensation

to Class Counsel for their efforts to maximize the total recovery.  At the same time, each Class

Member's proportional attorneys' fee obligation is reduced and their net award increased.[10]  If

the URA attorneys' fee portion of the Settlement is not included in the Common Fund upon

which the attorneys' fee is calculated, there would be no incentive for Class Counsel to devote

any resources for recovering attorneys' fees from the United States, which benefit the Class.

Further, including the United States' statutory attorneys' fee amount in the Common

Fund does not raise any concern that Class Counsel would draw out the litigation in order to

drive up the statutory attorneys' fees because, as is true in all contingent fee cases, the longer a

case remains pending and the more work required by counsel, the less profitable the

representation.  Including the recovery of statutory attorneys' fees in the Common Fund more

fully aligns Class Counsel's financial interest with the Class Members' financial interest.  As

previously noted, when Class Members are credited the amount of statutory attorneys' fees paid

by the federal government, Class Members are paying attorneys' fees representing less than 30%

of the land value principal and pre-judgment interest.

---

[10] *See for example*, Martha Pacold, ATTORNEYS' FEES IN CLASS ACTIONS GOVERNED BY FEE-SHIFTING STATUTES, 68 Univ.Chic. L.R. 1007 (2001).  In that law review article, the author considered the incentives created in determining an award of attorneys' fees using percentage-of-the Common Fund approach in the context of cases with fee-shifting statutes.  She concluded that, "the purposes of statutory fee shifting and the Common Fund doctrine support the idea that fee-shifting provisions should not preempt additional equitable awards.  Fee-shifting provisions exist to ensure that attorneys are compensated with at least the lodestar amount, eliminating the bias against taking the cases of poor plaintiffs. *These provisions [fee-shifting statutes] should be taken as setting a minimum fee.  Under the Common Fund doctrine the attorney is additionally entitled to a reward proportionate to the benefit obtained for the class.  As a matter of equity, there is no reason why the attorney's fees should be limited to the statutory lodestar minimum if the benefit conferred on the plaintiffs exceeds that minimum.*  Overall, establishing a presumption of fee availability under both the statute and the Common Fund doctrine is probably a better way to equalize Settlement and judgment fee potential, and to remove extra incentives to avoid judgment, than is the allowance of risk multipliers.  Finally, presuming a full percentage fee in hybrid cases, regardless of whether they are settled or tried, would remove any incentive attorneys may have to discriminate against hybrid cases.  *Id.* at 1033 (emphasis supplied).

**B.      Approximately 33% of the Common Fund is a Typical Percentage for an Attorneys' Fee Award in Common Fund Cases**

Thirty percent of the Common Fund is less than the typical percentage paid Class Counsel in cases such as this.  According to the leading treatise, *Newberg on Class Actions*:

> "An attorney whose work creates a Common Fund is 'entitled to a reasonable fee . . . taken from the fund…Usually 50 per cent of the fund is the upper limit on a reasonable fee award from a Common Fund, in order to assure that fees do not consume a disproportionate part of the recovery obtained for the class, though somewhat larger percentages are not unprecedented…<u>Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around 33% of the recovery</u>."

Alba Conte and Herbert B. Newberg, 4 *Newberg on Class Actions* § 14:6 (4th ed.) (citations omitted) (emphasis added).[11]

The payment of attorneys' fees from a percentage of the Common Fund is typical in Class Actions, including Trails Act takings cases.  For instance, in "Common Fund" cases where attorneys' fees and class members' benefits are distributed from one fund, the Eighth Circuit has held that a percentage of the benefit method is preferable.  *See Wiles v. Southwestern Bell Telephone Co.*, 2011 WL 2416291 (June 9, 2011) (citing *In re Texas Prison Litigation,* 191 F.R.D. 164, 176 (W.D. Mo. 1999), *citing Johnston v. Commercial Mortgage Corp.,* 83 F.3d 241, 245 (8th Cir.1996); *accord Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991)).  In addition, the court awarded 33% of the Common Fund—$170 million dollars in attorneys' fees—in a $538 million dollar common fund case in *In re IPO Securities*, 2009 WL 3397238 (S.D. N.Y. 2009).

---

[11] A Third Circuit case is also instructive.  In *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3rd Cir. 2000), Class Counsel was successful in obtaining a $9.5 Million Settlement for the benefit of the class in a RICO claim. "In accordance with their agreement with their clients (the class representatives), and the terms of the class action notice to which no Class Member objected, Class Counsel applied for attorneys' fees, amounting to 33% of the Settlement amount, and approximately $300,000 in costs." *Id.* at 191.  The district court only allowed fees of l8% of the total Settlement amount.  The Class Counsel appealed and the Third Circuit reversed and remanded stating that the district court had not justified its reduction in the fee award from the 33% sought by the Class Counsel.  As a result, *Gunter* illustrates the fact that a 33% fee is typical in cases such as this.

Further, large multimillion dollar Common Fund cases and the attorneys' fees awarded support Class Counsel's request in this case. For instance 30% or <u>more</u> has been awarded in cases such as the following: *In re Merry-Go-Round Ent., Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000) (awarding $71 million−40% of $185 million common fund); *In re Informix Corp. Sec. Litigation*, ND 97-1289 (N.D. Cal. 1999) (awarding $40 million−**<u>30%</u>** of $137 million common fund); *In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (awarding $46 million−**<u>36%</u>** of $127 million common fund); *Kurzweil v. Phillip Morris Co.*, 1999 WL 1076105 (S.D. NY 1999) (awarding $37 million−**<u>30%</u>** of $124 million common fund); *In re Commercial Explosives Antitrust Litigation*, MDL No. 1039 (D. Utah Dec. 29, 1998) (Sam. J.) (awarding $23 million−**<u>30%</u>** of $77 million common fund); *In re National Health Laboratories Sec. Litigation*, Nos. 92-149 & 93-1694 (D.D. Cal. Aug. 15, 1995 (Brooks, M.J.) (awarding $19 million−**<u>30%</u>** of $64 million common fund); and *In re Meldridge Inc. Sec. Litigation*, No. 87-1426 (D. Or. Mar. 19, 1992, Nov. 1, 1993, and Apr. 15, 1996) (Frye, J.) (awarding $20 million−**<u>37.1%</u>** of $54 million common fund). Class Counsel's requested award is warranted in this case based on Class Counsel's success in this case and avoidance of litigation delays of payment. Class Counsel could frankly have requested more, but chose not to do so.

**C.     This Court has Already Approved Attorneys' Fees of 34% of the Common Fund (Including the URA Attorneys' Fee Amount) and 40% of the Common Fund (Not Including the URA Attorneys' Fee Amount) in Other Trails Act Taking Cases**

Just last year, in 2012, this Court considered the appropriate attorneys' fees in a similar South Carolina Trails Act Class. In *Raulerson*, Senior Judge Margolis awarded 33% of the common fund to Class Counsel. *Raulerson*, 108 Fed. Cl. 675. Additionally, in 2005, this Court considered what attorney fee was appropriate in a similar Missouri Trails Act Class. In *Moore*,

Judge Bruggink noted that "<u>34% of the total award including statutory fees and is consistent with the standard percentage-of-the-fund approach</u>."  63 Fed. Cl. at 786 (emphasis added).

The Settlement in this case specifies that Class Counsel receive attorneys' fees which are 30% of the total award, including statutory fees, which is 3% or 4% percent of the Common Fund less than that approved by this Court in *Moore* and *Raulerson*.  Like Judge Bruggink found in *Moore* and Judge Margolis found in *Raulerson*, Class Counsel believes that this is an attorneys' fee "consistent with the standard percentage-of-the-fund approach" and is fair and appropriate for the significant work performed (and successes achieved) on behalf of the Class Members by Class Counsel.

Specifically, the Settlement provides for Class Counsel to be paid attorneys' fees equal to 30% of the Common Fund.  The Common Fund upon which this 30% is calculated includes the land value, interest for delay damages, and the amount paid by the government in payment of its URA statutory attorney fee liability.   The Common Fund is $139,881,218.69,[12] and 30% of this Common Fund is $41,964,365.40.

Specifically, in *Moore*, Judge Bruggick analyzed awards both ways, including and excluding statutory attorneys' fees.  He analyzed 34% of the Common Fund and 40% of the Common Fund (excluding statutory attorneys' fees) determining the similar outcomes and ultimately awarded 34% of the Common Fund that included statutory attorneys' fees.  Judge Firestone, in *Voth Oil* and *Bishop*, discussed *Moore* and the analysis of the award of the Common Fund, (how it was reasonable and fair) which excluded statutory attorneys' fees, and awarded 40% of the Common Fund as fair and reasonable (considering Class Counsel's receipt of the statutory attorneys' fees under the URL).

---

[12] The Common Fund amount of $139,881,218.69 does not include the reimbursement of expenses in the amount of $660,000.

**D.    An Award of 30% of the Common Fund Including Statutory Attorneys' Fees is Entirely Reasonable Since All of the Class Members Have Already Consented to It**

The BSCR law firm agreed to represent the Class on a contingency fee basis in which BSCR would receive a fee equal to 35% of the total award (Common Fund) received by the Class.  BSCR took the risk and, obviously, if BSCR did not receive a successful recovery, BSCR would not be paid.  As a result, Class Members had no obligation to pay any attorneys' fees incurred in bringing this action on their behalf.

The 35% contingency fee was specified in the contingency fee agreement with all the pre-Class Certification Plaintiffs.  It was also provided and presented to each and every Class Member in writing who opted into the Class through the Enrollment process.  However, instead of requesting this Court's approval of 35% of the Common Fund, Class Counsel is instead requesting a reduced 30% of the Common Fund, depending on how this Court defines the Common Fund.  Class Counsel believes this is a fair result and is standard in Class Actions for payment of attorneys' fees.

Class Counsel has continually advised each Class Member throughout the course of the litigation, and as developments occurred, of the tentative terms of the then proposed, now final Settlement, including the 30% of the Common Fund that Class Counsel is seeking.  No Class Member has ever objected to payment of 30% of their total gross damage award.  In fact, as appraisals were completed over the last 10 months, Class Counsel has repeatedly provided individual disclosure statements to each Class Member which indicated their tentative specific land value, their interest, their projected amount of statutory attorneys' fees at 30% of the total gross award, and their likely individual net award.

Once the parties reached this provisional Settlement[13] in May, Class Counsel sent each Class Member a detailed letter explaining the provisional Settlement terms and provided an individual disclosure statement—which again specifically disclosed 30% of the total Common Fund awarded to Class Counsel if it was ultimately approved by the Court.  Again, in September of 2013, Class Counsel again sent each Class Member a draft Notice of Settlement, which included their individual disclosure of their land value, pre-judgment interest, and their share of statutory attorneys' fees.  The disclosure once again included a deduction for the 30% of the Common Fund as Class Counsel's attorneys' fees, and each Class Member was provided a "Consent to Settlement" form to sign.

After the September mailing, consent forms started pouring in to Class Counsel.  The vast majority of Class Members voiced their appreciation and gratitude for the settlement.  Class Counsel also travelled to Seattle on two occasions in October and early December and met with Class Members to discuss the settlement, answer questions, and to collect Class Members' consent forms.  Again, then, in November, 2013, Class Counsel sent yet another letter explaining the settlement, with individual disclosures to Class Members who had not yet consented or responded.  To date, Class Counsel has already received 95% of the Class Members' written consents.  Class Counsel has never received, after multiple communications, <u>any</u> objections of any kind to the specific award for attorneys' fees.

The facts that all Class Members have been aware of Class Counsel's contingency fee amount of 35%, have been informed in writing that Class Counsel is requesting 30% of each Class Member's <u>gross</u> damage award on numerous occasions, and have either expressly

---

[13] Counsel for the United States and Class Counsel reached a preliminary Settlement following the mediation in May.  However, since the Settlement agreement was subject to approval from upper levels within the Department of Justice, the Settlement was "provisional" subject to final approval.

consented or have not objected to payment of this attorneys' fee, are considered highly presumptive of the reasonableness of the 30% award of attorneys' fees out of the total Common Fund. *See Quimby*, 107 Fed. Cl. 126. There is no question that all Class Members have repeatedly received notice of the amount of Class Counsels' attorneys' fees. The fact that, after repeatedly receiving notice, almost all Class Members have consented in writing to it, demonstrates that Class Counsels' request is reasonable.

## VI.    CONCLUSION

Class Counsel has worked diligently on this case for over four years. Class Counsel has constantly and consistently kept all Class Members apprised of the status of this litigation. All Class Members, aware of Class Counsels' fee agreement, chose to hire Class Counsel to represent them and have consented to Class Counsels' attorney fee award. A fee request of 30% of the Common Fund (including URA fees) is extremely reasonable and consistent with all Common Fund case law. Based on the foregoing, Class Counsel requests that this Court award 30% of the Common Fund, defined as including land values, interest for delay damages, and URA fees.

Respectfully submitted,

Date:  February 13, 2014               BAKER STERCHI COWDEN & RICE, L.L.C.

By    */s/ Thomas S. Stewart*
      Thomas S. Stewart
      Elizabeth G. McCulley
      2400 Pershing Road, Suite 500
      Kansas City, MO 64108
      (816) 471-2121
      (816) 472-0288 (facsimile)
      stewart@bscr-law.com
      mcculley@bscr-law.com

      -and-

26

Steven M. Wald
J. Robert Sears
1010 Market Street, Suite 950
St. Louis, MO 63102-1708
(314) 231-2925
(314) 231-4857 (facsimile)
wald@bscr-law.com
sears@bscr-law.com
**ATTORNEYS FOR PLAINTIFFS**


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing was filed with the Clerk of the Court via ECF on this 13th day of February, 2014, with a copy of the same being served via electronic mail (ECF) by the Clerk of the Court on this same day, to:

BRUCE K. TRAUBEN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
E-mail: bruce.trauben@usdoj.gov
**ATTORNEY FOR DEFENDANT**

*/s/ Thomas S. Stewart*
ATTORNEY FOR PLAINTIFFS

4845-0528-5909, v. 1

27