```
1              UNITED STATES COURT OF FEDERAL CLAIMS

2

3   DANIEL HAGGART, et al.,          )

4            Plaintiffs,             )

5                vs.                 ) Case No. 09-103L

6   THE UNITED STATES OF AMERICA,    )

7            Defendant.              )

8

9

10

11

12                          Courtroom 7

13          Howard T. Markey National Courts Building

14                  717 Madison Place, N.W.

15                    Washington, D.C.

16                  Friday, March 28, 2014

17                      2:30 p.m.

18                  Class Fairness Hearing

19

20

21   BEFORE:   THE HONORABLE CHARLES F. LETTOW

22

23

24

25   Reported by:  Sara J. Vance, CERT
```

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFFS:

 3              THOMAS S. STEWART, ESQUIRE

 4              ELIZABETH GEPFORD MCCULLEY, ESQUIRE

 5              Baker Sterchi Cowden & Rice, LLC

 6              2400 Pershing Road

 7              Suite 500

 8              Kansas City, Missouri  6108-2533

 9              (816)448-9368

10              stewart@bscr-law.com

11

12   ON BEHALF OF THE DEFENDANT:

13              BRUCE TRAUBEN, ESQUIRE

14              U.S. Department of Justice - Civil Division

15              Post Office Box 26

16              Ben Franklin Station

17              Washington, DC  20044

18              (202)305-0267

19              bruce.trauben@usdoj.gov

20

21   ATTENDING CLAIMANTS:

22              Susan Long (by telephone)

23              Denise and Gordon Woodley

24              Michael Young (by telephone)

25
```

```
 1                    P R O C E E D I N G S
 2                    -   -   -   -   -
 3              (Proceedings called to order at 2:30 p.m.)
 4              THE COURT:  Good afternoon.
 5              ALL:  Good afternoon, Your Honor.
 6              THE COURT:  The case before the Court this afternoon
 7    is Haggart vs. United States, Number 09-103L.
 8              For the record, Ms. McCulley, are you the person
 9    carrying the leading role for the Plaintiffs today or not?  Or
10    is your colleague?
11              MS. MCCULLEY:  No, Mr. Stewart is, Your Honor.
12              THE COURT:  All right, Mr. Stewart, you're ready.
13              MR. STEWART:  Yes.  All right, thank you, Your Honor.
14    Do you want to enter appearances first?
15              THE COURT:  Yes, if you would, please.
16              MR. STEWART:  Yes.  I'm Tom Stewart, Your Honor,
17    Class Counsel; my partner, Elizabeth McCulley.
18              THE COURT:  Thank you.
19              And, Mr. Trauben.
20              MR. TRAUBEN:  Yes.
21              THE COURT:  Yes.
22              MR. TRAUBEN:  Good afternoon, Your Honor.  Bruce
23    Trauben for the United States.
24              THE COURT:  All right.  Now, I propose that we
25    address first the fairness hearing to examine the propriety and
```

1    suitability of the settlement.  And then, after we're done with

2    that, we ought to take any issues that arise respecting the

3    attorneys' fee question.  Is that satisfactory, Mr. Trauben?

4              MR. TRAUBEN:  Yes, Your Honor.

5              THE COURT:  Mr. Stewart?

6              MR. STEWART:  Yes, Your Honor.

7              THE COURT:  All right.  We do have the task of adding

8    several people by telephone.  I wonder if Mr. and Mrs. Woodley

9    are here.  Are you here, Mr. Woodley?

10             MR. WOODLEY:  Thank you, Your Honor.  Gordon Woodley.

11             THE COURT:  All right.  And Mrs. Woodley.

12             MR. WOODLEY:  And Denise Woodley.

13             MRS. WOODLEY:  I'm Denise Woodley.

14             THE COURT:  Now, we're going to have a small issue

15   about speaking in the microphones.  I'm not sure, for example

16   the court reporter could hear Mr. and Mrs. Woodley.

17             THE REPORTER:  I can if they project and stand.  If

18   they're going to participate more --

19             THE COURT:  They are, but when they do, I'm going to

20   ask that they come forward to the podium.  Just a moment.

21             Now, what I propose to do -- you may sit, please --

22   is to make the calls to Mrs. or Ms. Long and Mr. and Mrs.

23   Young.  May I do that?  Does everyone agree that's appropriate

24   at this point?

25             MR. STEWART:  Yes, Your Honor.

```
 1              MR. TRAUBEN:  Yes, Your Honor.
 2              THE COURT:  I'd like to be able to ensure that they
 3     participate fully in the fairness hearing.
 4              (Pause for telephone connections.)
 5              THE COURT:  Ms. Long?
 6              MS. LONG:  Yes.
 7              THE COURT:  Are you on the line and can you hear
 8     appropriately?
 9              MS. LONG:  I can hear you.
10              THE COURT:  All right.  Thank you.
11              Mr. and Mrs. Young, are you on the line?
12              Mr. and Mrs. Young?  We might have to try this again.
13     Just a moment, Ms. Long.
14              MR. YOUNG:  Your Honor, this is Mike Young.  I
15     apologize.  I am here.
16              THE COURT:  All right.  Is your wife with you, Mr.
17     Young?
18              MR. YOUNG:  No, she isn't.  She's gone to get one of
19     our daughters.  I apologize.
20              THE COURT:  All right.  Now, are you going to
21     participate yourself?
22              MR. YOUNG:  Yes, sir.
23              THE COURT:  All right.  Would you mind -- I want to
24     make sure, Ms. Long, that you also can hear, now that we have
25     Mr. Young on the line.  Can you?
```

```
 1              MS. LONG:  Yes, I can.  Thank you.
 2              THE COURT:  Let me explain what's happening.  We are
 3     in a courtroom at the National Courts Building in Washington,
 4     and we have Mr. Stewart and Ms. McCulley as representative of
 5     the Haggart Class of Plaintiffs; and then we have Mr. Trauben
 6     as representative of the Government.  We also have Mr. and Mrs.
 7     Woodley present in the courtroom.  We are just about to begin
 8     the fairness hearing.
 9              What I propose is that Mr. Stewart, on behalf of
10     Plaintiffs, open the fairness hearing; then Mr. Trauben then
11     respond; and then we hear from you.  May we do that?
12              MS. LONG:  Yes.
13              MR. YOUNG:  Of course, Your Honor.
14              THE COURT:  Thank you.
15              Mr. Stewart?
16              MR. STEWART:  Right, Your Honor.
17              May it please the Court, Your Honor?
18              THE COURT:  Indeed.
19              MR. STEWART:  Obviously, Your Honor, under Rule
20     23(e), the parties jointly request that the Court approve the
21     proposed settlement today.  Under Rule 23(e), the claims,
22     issues or defenses of a certified class may be settled,
23     voluntarily dismissed, or compromised only with the Court's
24     approval.
25              The legal standard under Rule 23(e) is that the
```

1    settlement must be fair, reasonable, and adequate.  There are a

2    number of cases cited in our joint proposal, Your Honor, and I

3    won't bore you with those at this point, but they all cite to

4    that very basic legal standard under Rule 23(e).  Under this

5    legal standard, as set forth in Rule 23(e) and as interpreted

6    by the courts on numerous occasions, a joint settlement

7    proposal enjoys a presumption of fairness afforded by the

8    Court's preliminary fairness determination.

9           And pursuant to all of the case law, the Court should

10   consider a number of factors, including, number one, the

11   relative strengths of Plaintiffs' case compared to the proposed

12   settlement; number two, the recommendation of the counsel for

13   the class regarding the proposed settlement, taking into the

14   account the adequacy of Class Counsel's representation of the

15   class; number three, the reaction of the class members to the

16   proposed settlement; number four, the fairness of the

17   settlement to the entire class; and, five, the fairness of the

18   provision for attorneys' fees.

19          And, so, with that legal background, Your Honor, I'd

20   like to take just a moment to talk about the background and

21   procedural posture of this case as to how we got to this point.

22   Plaintiffs in this lawsuit sought just compensation from the

23   United States based on allegations that the STB's issuance of

24   three NITUs, notice of interim trail uses, pursuant to the

25   National Trail System Act, commonly referred to as the Trails

1   Act, relating to three different segments of an abandoned

2   corridor in King County, Washington, interfered with the

3   property rights under Washington law and constituted a taking

4   of private property requiring just compensation.

5          The Plaintiffs in this case all allege that they were

6   the fee-simple owners of land adjacent to and underlying this

7   25.5-mile right of way.  Plaintiffs originally asserted that

8   they brought this action for themselves and as representatives

9   of the class of similarly situated persons and filed their

10  motion to certify the class on May 21st, 2009, which was Docket

11  Entry Number 11.

12         On September 3, 2009, the parties jointly moved the

13  Court to certify the case as an opt-in class, pursuant to Rule

14  23, which was Docket Entry Number 25.  The Court granted class

15  certification on September 28, 2009, which was Docket Entry 26.

16  And following an extensive notice and open enrollment period,

17  Plaintiffs filed a fourth amended complaint on August 16, 2010,

18  with lists of all class members who had enrolled under the

19  plan, that was presented to the Court and approved by the

20  Court, which was Docket Entry Number 43.

21         The parties then filed a joint motion to establish

22  six subclasses on December 9, 2011, which was Docket Entry

23  Number 74, and the Court granted the parties' joint request in

24  a joint motion on April 26th, 2012, which was Docket Entry

25  Number 81.  After extensive discovery and documentation

1    relating to the class members' claims, the parties filed cross

2    motions for summary judgment relating to Subclasses 2 and 4,

3    and the Court rendered its ruling on December 18, 2012,

4    granting in part and denying in part the parties' cross

5    motions, which was Docket Entry Number 133.

6              And then after a significant appraisal process, a

7    significant period of negotiation, and two separate mediations

8    before Judge Wiese, there remains 253 landowners subject to the

9    mutually-agreed-upon settlement today.

10             On February 11th, 2014, the parties submitted a joint

11   status report to advise the Court that a provision of

12   settlement agreement reached by the parties had also been

13   approved by the appropriate representatives from the Attorney

14   General's Office, which was Docket Entry Number 160.  The joint

15   motion for approval of the settlement and of notice to the

16   class members was filed on February 12, 2014, which was Docket

17   Entry 161.

18             And the Court's order of preliminary approval and

19   setting the date of the fairness hearing for today was

20   originally entered on February 25, 2014, which was Docket Entry

21   Number 164.  And then the parties asked the Court to revise it

22   slightly, and the Court issued a second order preliminarily

23   approving the settlement on February 27, 2014, which was Docket

24   Entry Number 168.

25             The settlement, Your Honor, and the terms of the

Daniel Haggart, et al., v. USA                                    3/28/2014

1    settlement are that the United States will make a cash payment
2    in an amount not to exceed $140,541,218.69 to resolve all the
3    Plaintiffs' claims.  Specifically, the United States has agreed
4    by way of compromise and settlement to pay to Plaintiffs the
5    sum of $110 million, representing the aggregate fair market
6    value of the property interest allegedly taken as of the date
7    of the three NITUs involved in this case.
8              In addition to the value of the land taken, the
9    United States has also agreed, by way of compromise and
10   settlement, to pay to Plaintiffs the sum of $27,961,218.69 in
11   interest for delayed damages through May 31, 2014.  And,
12   finally, the United States has always agreed, by way of
13   compromise and settlement, to pay to Plaintiffs the sum of
14   $2,580,000, representing Plaintiffs' statutory attorneys' fees
15   and costs in this action, which has been allocated between
16   statutory attorneys' fees of $1,920,000 and costs and expenses
17   of $660,000.
18             In exchange, Plaintiffs have agreed that this
19   settlement constitutes a full, complete, and final resolution
20   of any and all of Plaintiffs' claims against the United States
21   and stipulate to a voluntary dismissal of this action with
22   prejudice.
23             Now, we're asking the Court for approval today, and
24   the process has been well documented at this point.  Pursuant
25   to the Court's order, preliminarily approving the settlement,

1    both on February 25 and February 27 of 2014, the Court approved

2    a notice that was mailed on Monday, March 3, 2014.  The notice,

3    which was prepared by the parties and approved by the Court,

4    contained all of the material terms of the settlement,

5    including land values, interest, statutory fees and costs, and

6    the percentage and amount of attorneys' fees pursuant to

7    Plaintiffs' motion for Court approval of fees and proposed

8    division of the common fund, which was filed on February 13,

9    2014, which was Docket Entry Number 163.

10           The notice also contained an individual disclosure

11   statement for each of the 253 Plaintiffs, which is actually the

12   third time each Plaintiff had received such information, which

13   included their individual share of principal for land values,

14   their allocated share of delay damages on a pro rata basis,

15   their individual share of statutory attorneys' fees on a pro

16   rata basis, their individual deduction for total attorneys'

17   fees at 30 percent on a pro rata basis, and their ultimate net

18   amount.

19           The Court, in the notice, set March 28th, today, as

20   the date for the fairness hearing and set March 18 as the

21   deadline for any class member to comment on the proposed

22   settlement, object to the proposed settlement, or to notify the

23   Court of their intention to address the Court or to participate

24   in the fairness hearing.

25           As of the deadline established by the Court, which

1    was March 18, 2014, 250 of the 253 class members had

2    affirmatively consented to the settlement.  Class Counsel did

3    ultimately receive three comments or objections from class

4    members:  One from Susan Long, who's on the phone today; one

5    from Michael Young, who's on the phone today; and one from

6    Gordon Woodley and his wife.

7            Those objections and their comments -- well, first of

8    all, the first two, Sue Long and Gordon Woodley, were prepared

9    and filed with the Court on Friday, last Friday, which was

10   March 21, which is Docket Entry Number 174; and the other two

11   that were received from Michael Young and from Denise Woodley

12   were filed with the Court this Wednesday, March 26th, when they

13   were received by Class Counsel.

14           And I guess at this point, Your Honor, do you want me

15   to discuss those comments or objections or just continue

16   forward, because I can discuss them briefly or however you want

17   to do it.

18           THE COURT:  If you would summarize your view of what

19   those comments provide --

20           MR. STEWART:  Okay.

21           THE COURT:  -- that might be a suitable introduction.

22           MR. STEWART:  I will, Your Honor, because first with

23   respect to Sue Long, she originally consented to the settlement

24   amount.  And in her comment form that was filed with the Court,

25   she specifically says she doesn't object to her personal

1    settlement amount.  Her objection is, quote, "with respect to

2    attorneys' fees and how shared," end quote, which it's our

3    position that that's not an issue at the fairness hearing

4    today.  And she really has no standing in that particular issue

5    today at all.  And, so, it's unclear to us as to whether her

6    comment is actually an objection or not.

7              THE COURT:  We'll find out.

8              MR. STEWART:  We'll find out.  With respect to

9    Michael and Julia Young, it's Class Counsel's position that

10   they didn't really object either.  They merely say that they

11   don't want less than what has already been disclosed to them in

12   their comment form.  And, in fact, they actually approve but

13   specifically state in their comment form their approval is,

14   quote, "conditioned on receiving a net cash award equal to or

15   greater than the amount already specified," end quote, in the

16   individual disclosure statement.

17             And I think both what the DOJ and Class Counsel want

18   to point out is that they may have to accept less as a matter

19   of law, although we hope it's quite slight, if the Government

20   actually pays before May 31, because as the Court is aware and

21   I'm sure Department of Justice is aware, interest is running at

22   $16,000 a day, and there's actually an incentive for the

23   Government to pay that early as a credit at $16,000 a day,

24   which if it's paid before May 31, they will receive a pro rata

25   deduction from the amount that's actually specified in their

1    individual disclosure.

2              THE COURT:  I'm sure Mr. Young understands that.

3              MR. STEWART:  Okay.  On the issue of attorneys' fees,

4    Your Honor, their comment form states that, quote, "they

5    decline to approve/endorse Class Counsel's proposed handling of

6    attorneys' fees, which should be left to the sound discretion

7    of the Court," end quote, which I think everybody here agrees

8    with, and that's what was exactly done in this instance by

9    submitting to the Court and seeking the Court's preliminary

10   approval of that.

11             With respect to Mr. Woodley and his wife, Denise,

12   it's the Class Counsel's position that nothing about the

13   purported fee sharing agreement is appropriate at this fairness

14   hearing.  There is no motion before the Court.  There is

15   nothing pending filed by Class Counsel pertaining to it.  Mr.

16   Woodley has attempted to file pleadings previously, which have

17   been stricken by the Court on two different occasions.

18             And, in fact, in this Court's order of March 6, 2014,

19   which was Docket Entry Number 173, where the Court struck Mr.

20   Woodley's attempted pleadings in this case, the Court

21   specifically stated that, quote, "Mr. Woodley and his wife are

22   class members and claimants in this Rails to Trails takings

23   action and as such they have the right to file comments with

24   and through Class Counsel on the proposed settlement of the

25   class action and to participate in the fairness hearing

1    regarding potential acceptance by the Court of the settlement

2    terms," end quote, those settlement terms that I just went

3    through.  And that is what Mr. Woodley should be limited to

4    when he speaks and addresses the Court today.

5              In our opinion, Your Honor, he has no standing to

6    discuss anything here today other than his own personal claim.

7              With respect to his personal claim, and we want to

8    assure the Court that Mr. Woodley and his wife were treated

9    just the same as every other class member in this case, and

10   their settlement amount involved an arm's length transaction

11   where two different appraisers, actually of national

12   reputation, looked at their property.  We had a two-day

13   mediation on that topic before Judge Wiese, who also approved

14   it, and DOJ and Class Counsel agreed and approved it, as well.

15             In fact, not only is Mr. Woodley and his wife the

16   only Kittinger claimant who has objected on the issue of value

17   of their personal claim, but Mr. Woodley is, in essence, the

18   only class member, in our opinion, out of all 253, who has

19   offered any form of an objection to the issue of land values on

20   a personal level.  And that fact should be highly persuasive to

21   this Court on the issue of overall fairness to the entire

22   class.

23             With respect to his personal claim, it is true that

24   some members of the Kittinger class of Plaintiffs received more

25   money.  It is also true that some members of the Kittinger

1    class of Plaintiffs received less money.  All of it is based on

2    an elaborate appraisal process where two national appraisers

3    looked at this based on the size and shape and location and

4    other characteristics of this property, which is contained

5    within the Yellow Book that form the basis for this entire

6    appraisal process.

7              And there were other issues associated with the

8    physical dimensions and characteristics of these properties.

9    And they were also subject to negotiation with respect to

10   Roeder issues, Roeder being a case in Washington that involved

11   metes and bounds description on the property and things of that

12   nature, which we negotiated at great length with Mr. Trauben on

13   that particular prospect.

14             And based on the appraisal standards in the Yellow

15   Book, which were the particular facts surrounding Mr. Woodley

16   and his wife's claim, were explained to him personally, were

17   explained to his wife personally, and we just think everything

18   is particularly fair, not only with respect to Mr. Woodley, but

19   with respect to the entire class as a whole.

20             So, the parties ask the Court today to approve this

21   settlement as it pertains to all 253 class members as fair,

22   reasonable, and adequate under Rule 23(e) and issue an order to

23   that effect.  The parties' request for approval is based on

24   several different factors, considered under Rule 23(e) and

25   elaborated on in great length in the case law, including,

1    number one, every aspect of the joint proposed settlement was

2    negotiated at arm's length with the Department of Justice; two,

3    it was the recommendation of Class Counsel that the Court

4    approve the settlement for the entire class, and I believe Mr.

5    Trauben will say it's his recommendation, as well, Your Honor;

6    three, the reaction of class members has been overwhelmingly

7    positive.

8              There have either been 250 or 252 class members who

9    have affirmatively consented to their own settlement amount and

10   only one objection was received, frankly objecting on a

11   nonissue before this Court.  The settlement is fair across the

12   board for all class members because it is based on the amount

13   of land actually taken from each individual class member and is

14   specifically based on the value of their own individual

15   specific parcel of land.

16             In short, all the requirements of Rule 23(e) have

17   been clearly established, and the settlement is fair and

18   reasonable under Rule 23(e).  Thank you, Your Honor.

19             THE COURT:  Thank you, Mr. Stewart.

20             Mr. Trauben?

21             Well, I should just say, I know this case has been

22   hard work for counsel on both sides, and the Court, I know from

23   our own experience with the issues in the case, as well.  And

24   it's commendable that we've reached at least this point.

25             Mr. Trauben?

1          MR. TRAUBEN:  Thank you, Your Honor.  I am not going

2     to repeat the -- everything said by Mr. Stewart.  He did a very

3     good job, and this is one of the few occasions where the two of

4     us agree on practically everything.  That does not happen too

5     often.

6          Although Mr. Stewart did say a few things that did

7     raise some -- not concern, but that I did flag.  One that Mr.

8     Stewart referred to, the land actually taken, and, in fact, as

9     a result of this settlement, the United States does not assent

10    to liability.  It, in fact, if this case were litigated to

11    judgment, most likely the counsel for the United States would

12    be recommending an appeal.  But because this is -- and this is

13    one of the points that I rise to make, and that is that this is

14    a settlement; it is not a stipulation or consent to judgment.

15    No judgment should be entered against the United States in this

16    case.  This was an arm's length -- as Mr. Stewart said, this is

17    an arm's length negotiation of a settlement between the

18    parties.

19          Also, I would like to put on the record that this

20    settlement has no value as precedent in any pending or future

21    litigation involving any other Rails to Trails class action or

22    any action that may be filed in the future relating to this

23    same right-of-way that's at issue in this case.

24          Finally, one of the points I want to make, also, is

25    that the Plaintiffs have been made aware, through the notice

1    given to them that was approved by this Court, that the United

2    States will submit tax identification information to the United

3    States Department of Treasury so that it may determine whether

4    the United States is entitled to any offset under the Debt

5    Collection Improvement Act, 31 U.S.C. Section 3325(d).  And, in

6    fact, the majority of the tax identification information has

7    been collected and already submitted to Treasury.

8            THE COURT:  May we talk about that a minute?  But

9    I'll come to that when you're finished.

10           MR. TRAUBEN:  Okay.  I just want to make another

11   point, is that if there are any objections to the land values

12   that Plaintiffs are to receive, that -- and I was not aware

13   that there were any -- I thought that the majority of the

14   comments I've seen related to attorneys' fees and the

15   distribution of attorneys' fees and not to land values.  If

16   that's incorrect, I would like to point out that Plaintiffs did

17   have a choice to not opt in into this class action.  In fact,

18   several -- two Plaintiffs filed a separate action, and also

19   once in this case as a class member they could have moved to

20   opt out, and that was not done.

21           So, the -- I think we will address, then, settlement

22   or the issue of attorneys' fees subsequently.

23           THE COURT:  Yes.

24           MR. TRAUBEN:  So, I may have a comment.

25           THE COURT:  May we talk about tax identification

1    numbers?

2              MR. TRAUBEN:  Yes, Your Honor.

3              THE COURT:  Now, I understand the desire of the

4    Government to have the IRS be blessed with these numbers so

5    that if there is any amount owed the United States that can be

6    offset.  But in addition, it's my understanding, and you can

7    correct me if I'm wrong, that the interest component of this

8    would be taxable apart from any capital item that might be

9    reflected in the base amount.  Is that correct?

10             MR. TRAUBEN:  That's a subject I have no comment on,

11   Your Honor.

12             THE COURT:  Okay.

13             MR. TRAUBEN:  I cannot address it.

14             THE COURT:  All right.

15             MR. TRAUBEN:  In fact, actually, we are not

16   submitting this information to the Internal Revenue Service but

17   rather to the Department of Treasury.

18             THE COURT:  Treasury.  So, the Treasury itself, which

19   deals with the offsets, can handle that.

20             MR. TRAUBEN:  Exactly.

21             THE COURT:  All right.  Now, I have the statute in

22   hand that deals with the offset.  So, let me ask you, Mr.

23   Trauben, briefly a question.  You mentioned a majority.  May I

24   ask what's going to happen -- and, Mr. Stewart, you might

25   answer this as well -- what's going to happen with the total

1    amount if all the tax identification numbers have not been

2    received?

3            MR. STEWART:  I don't know if Mr. Trauben is better

4    prepared to answer that or I am, Your Honor, but I'll give it a

5    shot.  I think we're well, well beyond just the majority.  We

6    are actually, I think, less than 10 lacking now.  So, we have

7    approximately 245 of the 253.  In the past, when this issue has

8    come up, we've provided all of them that we can provide, which

9    is what we are striving to do here.

10           This is the first time, to my recollection, that the

11   actual identification of the Debt Collection Act and inclusion

12   of that in the notice, has actually been part of the notice

13   that was disseminated to class members.  But we have

14   historically attempted to voluntarily provide that information

15   anyway.

16           In every case that I'm aware of in probably 15 other

17   settlements before this Court, I'm not aware of any situation

18   -- well, except for the one Bruce -- Mr. Trauben just referred

19   to with respect to the follow-up lawsuit here, where there were

20   just two landowners -- I'm not aware of any situation where 100

21   percent of the landowners actually supplied their Social

22   Security number.

23           Some of them are just suspicious and won't do it,

24   although we're batting well over 90 or 95 percent on that.  And

25   in every case up to this point, the Government or Treasury has

Daniel Haggart, et al., v. USA                3/28/2014

1  gone ahead and made payment, even if they did not supply their

2  Social Security number.

3              THE COURT:  That was my question, whether supplying

4  all of the numbers, whether they be tax identification numbers

5  or Social Security numbers, was a precondition to payment of

6  the settlement amount.

7              MR. STEWART:  Up to this point, Your Honor, it has

8  not been enforced by the United States Treasury.

9              THE COURT:  All right.

10             Mr. Trauben?

11             MR. TRAUBEN:  Just briefly, Your Honor.  In the past,

12  we have been able to argue the point with Treasury that an

13  exception should apply.  Since then, and I'm not sure of the

14  date, it was in January, the Department of Treasury amended its

15  policy and now no exceptions may apply.  This is unchartered

16  territory.  We have not had a settlement where we have not

17  submitted all of the tax identification information to Treasury

18  under the new policy.  So, we shall see how it will be handled.

19             In the past, Mr. Stewart is correct.  If we were

20  lacking a few, payment still was made.  And, you know, we

21  identified an exception for those few whose tax information we

22  were not able to provide.

23             THE COURT:  All right.  Let's just stop a minute,

24  because I'm a little concerned on this point.  My understanding

25  is that the total settlement amount will be paid through you,

1    Mr. -- your firm, Mr. Stewart, and it will be held in trust.

2    Is that right?

3              MR. STEWART:  Yes, Your Honor.

4              THE COURT:  And then paid out to the individuals.

5              MR. STEWART:  Yes, Your Honor.

6              THE COURT:  Would that make a difference to your

7    point, Mr. Trauben?

8              MR. TRAUBEN:  That payment is to Mr. Stewart's firm?

9              THE COURT:  That's right.  He could presumably hold

10   the amount for the people who don't provide tax identification

11   numbers unless and until they do provide them, and that could

12   be handled that way.  Would that assuage the Treasury

13   Department?

14             THE COURT:  Your Honor, I have not presented this

15   proposal to them.  If it is in the form of an order, I could

16   present that order to the Department of the Treasury and argue

17   the case that they need to comply with the Court's order.

18             THE COURT:  Well, if people don't provide the tax

19   identification numbers, they might not get their money.  If you

20   have one holdout, I would hate to see the entire class be

21   deprived of their money.

22             MR. STEWART:  We would voluntarily -- volunteer, Your

23   Honor, if that's part of the Court's concern, that if they

24   haven't provided that Social Security number to Treasury, and

25   if Treasury wants to insist on it, we're happy to hold that

1  money in trust until they do.

2          THE COURT:  Well, that might not satisfy the

3  Treasury's new position.  That's what I'm concerned about.

4          MR. TRAUBEN:  It is a concern, but it's one that we

5  have not had to deal with yet.

6          THE COURT:  Well, we probably might in this

7  particular case.  You have a listing, obviously, Mr. Stewart,

8  of those people who have not provided tax identification

9  numbers?

10          MR. STEWART:  We do, Your Honor.

11          THE COURT:  Okay.  Now, I commend you for dealing

12  with this in partially unchartered territory.  As far as

13  counsel are concerned, are we ready to hear from those who wish

14  to participate telephonically or in person?

15          MR. STEWART:  Yes, Your Honor.

16          MR. TRAUBEN:  Yes.

17          THE COURT:  All right.  Ms. Young, are you still on

18  the line?

19          MR. STEWART:  Do you mean Ms. Long, Your Honor?

20          THE COURT:  Oh, did I -- I'm sorry.  It's Mr. Young

21  and Ms. Long.  Thank you very much.

22          Ms. Long, are you on the line?

23          MS. LONG:  Yes, I am.

24          THE COURT:  All right, good.  And you've heard

25  everything that's happened so far?

1         MS. LONG:  Yes, I have.

2         THE COURT:  All right.  And you have a comment about

3    the settlement.  This is your chance to make it, please.

4         MS. LONG:  My comment is with respect to attorneys'

5    fees and how they are shared, and I filed a written comment.

6    Is that part of the record, or should I read it?

7         THE COURT:  No, it's part of the record, but you may

8    certainly elaborate on it.

9         MS. LONG:  Well, it is my understanding based upon

10   the written and oral statements that I received from Elizabeth

11   McCulley and Thomas Stewart, that they do not intend to abide

12   by the fee-sharing agreement they signed with Gordon Woodley

13   with respect to the Kittinger Plaintiffs.  They have also made

14   a number of derogatory statements to Kittinger Plaintiffs via

15   email communications I received and to myself personally by

16   phone concerning Gordon Woodley that I believe are unwarranted.

17        And, so, I felt compelled because they indicated that

18   they weren't going to abide by the fee-sharing agreement

19   because Mr. Woodley had not brought any clients to the case.

20   So, I felt that I needed to make clear that I would not have

21   joined the class action lawsuit were it not for Gordon

22   Woodley's legal counsel and efforts.  And I believe that I am

23   not alone in this.

24        I also wish to state that I have no personal

25   relationship with Gordon Woodley, and my contacts with him have

1    revolved almost exclusively around the Haggart litigation and

2    issues related to this litigation.  I just felt compelled

3    because it seemed to me that -- that the statements that

4    Elizabeth and Thomas made were very derogatory and were

5    designed to claim that Mr. Woodley was acting only in his own

6    self-interest in the matter and that moreover that any

7    complaint would be -- at this hearing would likely, therefore,

8    put in jeopardy the financial settlement, when it was my

9    understanding he was simply trying to make sure that everybody

10   had the facts on which to judge whether or not the amounts of

11   monies provided in the settlement for their property where

12   there wasn't any factual error in their calculations.

13           As a statistician -- I'm a professor of managerial

14   statistics --

15           THE COURT:  I'm sorry, you'll have to say that a

16   little more loudly.

17           MS. LONG:  Oh, I'm a professor of managerial

18   statistics, and therefore I understand how easy it is in

19   calculations to have errors crop in.  And, so, I thought it was

20   a valid reason that he was bringing forth.

21           THE COURT:  All right.  Let me ask a quick question:

22   You obviously have property affected and directly affected and

23   you have property that with respect to which you would receive

24   a payment.  Are you satisfied with the payment amount and the

25   settlement generally insofar as that payment amount is

Daniel Haggart, et al., v. USA                    3/28/2014

1   concerned?

2           MS. LONG:  I am, yes.

3           THE COURT:  All right.  Are you satisfied with the

4   process by which that payment amount was resolved via

5   settlement?

6           MS. LONG:  I would have thought procedurally it would

7   have been better for people to have received in writing a bit

8   more detail about it, but, you know, I think that's water over

9   the dam.

10          THE COURT:  All right.  Where are you a professor of

11  management statistics, I take it?

12          MS. LONG:  At Syracuse University in New York.

13          THE COURT:  All right.  Thank you.

14          Mr. Trauben, do you have any questions?

15          MR. TRAUBEN:  No, Your Honor.

16          THE COURT:  Mr. Stewart?

17          MR. STEWART:  No, Your Honor.

18          THE COURT:  All right.  Anything further, Ms. Long?

19          MS. LONG:  No.

20          THE COURT:  All right.  Thank you.  And if you want

21  to say something again, I'll give you one more chance.

22          Now, Mr. Young, you told me earlier that your wife

23  was not going to be on the line, and I did hear you and pay

24  attention to that.  Now we can hear from you, though.

25          MR. YOUNG:  Thank you, Your Honor.  We really

1    appreciate and respect the rulings you've made in this case,

2    and we also appreciate the work of both our Class Counsel and

3    the Department of Justice attorney that they've invested,

4    because I think without all of them we wouldn't have this

5    proposed settlement.  And the result, as we understand it, is

6    the amounts that the Government has agreed as a settlement to

7    put as damages and as attorneys' fees into the process.

8             I do have three objections.  I think they can be

9    stated quickly, but that doesn't mean we don't think they have

10   some significance.

11            I think it may be clearer if you'd indulge me of

12   visualizing a couple of buckets.  And you can picture them

13   sitting on Class Counsel's table or wherever, but one large

14   bucket and a smaller bucket.  The large bucket I'd put a big

15   "D" or dog on it.  D stands for damages.  The Government has

16   agreed as a settlement to pay this to the property owners.  It

17   compensates for taking -- for what we believe was a taking of

18   part of our property.  And you could put a number on it, I

19   suppose it would be -- I guess it's $110 million that the

20   counsel have described, plus interest.  And it's to be shared

21   among the hundreds of Plaintiffs or property owners.

22            The small bucket you could put an "A" on it.  "A"

23   would stand for attorneys' fees.  And as I hear it, the

24   Government has agreed to pay the lawyers who have represented

25   us property owners an amount that the statute says compensates

1    them fairly for their effective and successful efforts on our

2    behalf.  And I think the number on that is -- a round is $2

3    million.  So, that's --

4              THE COURT:  I suspect, and we can ask counsel, I

5    suspect that's a settlement of an amount under the Uniform

6    Relocation Act, but we'll find out.  I see nods from counsel,

7    but we'll explore that in a minute.

8              MR. YOUNG:  Okay.  Well, Your Honor, that leads to

9    our three objections.  We have no objection to the amounts that

10   Class Counsel and Mr. Trauben on behalf of the Government have

11   agreed should be the total amount in bucket "D" for damages or

12   bucket "A" for attorneys' fees.

13             Our objections have to do with related but different

14   points.  One is it sounds to me like from the papers we

15   received that Class Counsel proposes to put a third bucket on

16   their counsel table, and it's a pretty good-sized bucket.  It's

17   -- I would mark it "B" as bonus attorneys' fees or something.

18   And it sounds like the number there is about $40 million.  And

19   it's -- I'd say it's empty at the moment, but Class Counsel

20   want you, Your Honor, to take about a third of the damages that

21   are supposedly going to the property owners, take them out of

22   bucket "D" and move them over -- "D" as in dog -- and move them

23   over to bucket "B" as in bravo or boy as additional attorneys'

24   fees.

25             That new bucket would be roughly 20 times the

1  attorneys' fees that apparently are authorized by statute.  And

2  we do object to this part of Class Counsel's proposal.  We're

3  grateful to them, appreciate their work, but we believe that

4  the attorneys' fees prescribed by statute in bucket "A"

5  compensate them well and fairly for their good work.  But

6  that's the first of three points.

7          Second or next-to-the-last point and second objection

8  concerns Class Counsel's duties to us property owners, to their

9  clients.  And I'm a, I'll say, recovering lawyer myself.  I

10  recently retired after doing this for some time, and my

11  impression, at least from my own perspective, is that as a

12  lawyer I owe fiduciary duties to my clients of accountability

13  and full disclosure.  And if Class Counsel had fulfilled those

14  duties, all of us, 200-and-some-odd people as property owners

15  could have made informed decisions about the question you asked

16  Ms. Long, and that is is she satisfied with the amount that's

17  proposed to award her individually.

18          And -- but we -- Mr. Stewart has said, well, there

19  were no objections, everybody consented overwhelmingly -- or

20  almost everybody -- overwhelmingly positive except for a few

21  disgruntled holdouts.  But these -- they've collected -- they,

22  Class Counsel -- have collected hundreds, a whole pile, of

23  uninformed consent because Class Counsel told all of us that

24  the process couldn't go forward unless we signed them and we

25  wouldn't have an opportunity until this hearing to be heard

1    from.

2            And, so, that's why I qualified my consent, and I

3    don't think it's an academic objection.  I don't know that my

4    number is wrong, the dollar amount is wrong, but I don't know

5    if it's right either.  And I have a strong sense that the

6    Woodleys' number is not correct, that it's understated.

7            And, so, just the second objection, I would just ask

8    Your Honor to remind Class Counsel of their duties to their

9    clients of accountability and full disclosure and order them to

10   fulfill it.  If we -- Ms. Long was more diplomatic than I'm

11   being, and she said, well, it would be helpful if they've given

12   us a little more information.  Well, they -- we specifically

13   asked them for the documentation that shows how they came up

14   with the numbers, and they declined -- declined to do it.  I

15   just feel like that isn't the way lawyers should behave.

16           My third and last point and last objection is that I

17   object to the Class Counsel's plan that I don't believe is part

18   of the joint settlement agreement, their plan to retain 100

19   percent of the attorneys' fees that you, Your Honor, decide to

20   approve in this case.  And I think I'm probably -- again, I may

21   be more blunt than Ms. Long, but I probably am in sync with her

22   on this.

23           Class Counsel entered a contract, a written contract,

24   with a Washington State lawyer, Mr. Woodley, recognizing the

25   role he was playing.  That contract recited that he had

1    recruited some of us, and we're just among the ones that he did

2    recruit, and the contract committed to share a specified

3    portion of any attorneys' fees in this case with Mr. Woodley.

4           And like Ms. Long, we understand that Class Counsel

5    are now reneging on their contract, refusing to implement it,

6    and we understand that from emails that both Class Counsel and

7    Mr. Woodley have sent us.  That just doesn't seem fair or

8    honorable, and I think Mr. Stewart early on objected to whether

9    we would have standing, but we as property owners are

10   beneficiaries of the contract.  We're -- both Mr. Woodley and

11   the Class Counsel have been working hard on our behalf.  We're

12   beneficiaries, and we object and ask you to rule that whatever

13   attorneys' fees you award be shared as specified in their -- in

14   their written contract.

15          And I understand, Your Honor, at the end of a case

16   it's natural for the lawyers and maybe even the Judge to start

17   kind of smelling the barn, just want to get the darn thing over

18   with, but -- and we want it to be over with, too, but we just

19   ask you to have the staying power and the commitment to do the

20   whole job.

21          And Mr. Stewart pointed out in, I think his fifth

22   numbered point when he started talking, was that it's part of

23   the deal to approve the fairness of attorneys' fees.  And

24   they've become a huge part of this.  It's maybe an 800-pound

25   gorilla, but it's $40 million.  And if you were to ignore that

1    so that issues involving the attorneys' fees have to be cited

2    in separate litigation, it just doesn't seem like you really

3    will have finished your job here.

4              Thank you, Your Honor.

5              THE COURT:  All right.  Thank you.  I will give you

6    another chance if you have anything further to say, Mr. Young.

7              Now I would like to hear from Mr. and Mrs. Woodley.

8    Would you come forward, please, to the podium.

9              MR. WOODLEY:  Yes, thank you, Your Honor.

10             THE COURT:  I'm going to ask you to do that simply

11   because it would be prudent to ensure that the reporter can

12   take down what you have to say.  Which of you would care to

13   speak first?

14             MR. WOODLEY:  Ladies first?  Age before beauty?

15             THE COURT:  Well, that's up to the two of you.

16             MRS. WOODLEY:  I have prepared something to read

17   because I am not a public speaker, and it's easier for me to do

18   it this way.  I have found Class Counsel to be very

19   intimidating.  They make me nervous, and so that's one of the

20   reasons I'm nervous.

21             THE COURT:  You aren't that nervous appearing in

22   court, so you're doing fine.

23             MRS. WOODLEY:  Well, you know what, you will notice

24   the people that are willing to appear, that have the nerve, are

25   attorneys, that people in general, it's not that they don't

1   care and it's not that they don't have objections, it's that

2   they have fear.

3           My name is Denise Woodley.  I live next to the

4   abandoned railroad in the Kittinger D parcel of Bellevue,

5   Washington.  I was formerly employed, self-employed, as a

6   deposition reporter for 12 years, and I've had the privilege of

7   working with clients such as Washington State Governor Jay

8   Insley, as well as three Washington State Supreme Court

9   Justices, when they were practices attorneys.  I'm very

10  familiar with attorney behavior --

11          THE COURT:  I would just interject that one of my law

12  school classmates was a Chief Justice of the Washington Supreme

13  Court.  That was some time ago.  But in any event, go ahead.

14          MRS. WOODLEY:  I've had great clients.  I'm very

15  familiar with attorney behavior, often at its worst when there

16  are not judges present.  I have experienced Class Counsel Tom

17  Stewart and Elizabeth McCulley to be dishonest in their

18  dealings with my husband and I as they have repeatedly tried to

19  hide the ball.  Some of the emails they have sent to my husband

20  are very rude and unprofessional.  They have not sent me all

21  email correspondence that other neighbors receive.  And they

22  didn't even have our address correct for several years, even

23  though we repeatedly corrected them.

24          I'm aware -- personally aware of several errors they

25  have made thus far, including nearly excluding one claimant,

1    James Johnson, entirely, due to their oversight, that was

2    brought to their attention by my husband, Gordon Woodley.

3              I am personally aware of a couple of claimants who

4    were given wrong settlement amounts on their paperwork with

5    math that did not add up.  When confronted with this, Ms.

6    McCulley replied, "We don't make mistakes."  Our own math on

7    our own thing has just now changed to be 5,000 lower.  I have

8    no, you know, idea why that just changed, no explanation from

9    counsel.

10             We have repeatedly requested all documentation

11   pertaining to our three building lots along the railroad, which

12   are combined to create one tax parcel with King County.

13   Without seeing appraisal information and spreadsheets, there's

14   no way that I can make an informed consent regarding my

15   settlement because I have not yet been informed.  My

16   understanding is that there could be different items that

17   create discounts or offsets for certain properties.

18             I understand that these properties are not all the

19   same.  Their uniqueness creates a recovery that's different for

20   the taking.  I would like to see in writing from the

21   professionals and experts the appraisals and all the offsets

22   that the Baker Sterchi Firm believes apply to my property.  I

23   believe I'm entitled to this information so that I can check

24   for a tax receipt.

25             They have told me that there was offset language in

Daniel Haggart, et al., v. USA                    3/28/2014

1    the legal description of our property, the use of the term
2    "metes and bounds."  That language is only used on one of our
3    three lots due to its width being slightly shorter on the
4    original plat.  There is no metes and bounds language on the
5    two larger lots, just the small portion -- partial lot.
6            The majority of our property falls in the category of
7    clear lot description and not metes and bounds.  Yet I
8    understand they've taken a deduction from ours for that
9    language.  When I attempted to explain this to counsel, they
10   brushed me off.  I recently learned that they are also applying
11   an offset to our property based on a rock ledge.  We have no
12   rock ledge.
13           They must have our property confused with a different
14   one.  There is large, two-to-three-inch pieces of rocks that
15   are all along the railroad, but that's all along the entire
16   railroad.  It's not something unique to our property.
17           THE COURT:  Are you talking about the ballast?
18           MRS. WOODLEY:  Probably, is that the rocks they put
19   on railroads?
20           THE COURT:  Yes.
21           MRS. WOODLEY:  Okay.  When I requested this
22   information in person in Kirkland, Washington, Mr. Stewart
23   wrote up some numbers on a legal pad using a calculator as to
24   how our recovery was discounted.  He talked some circles and he
25   kept changing the numbers to get it to match the settlement

1    amount on the proposed compensation form.  He then promptly put

2    his legal pad in the briefcase, and not giving me the

3    calculations he created.

4            Certainly, these attorneys aren't the ones to decide

5    all on their own which parcels receive what.  If so, this is

6    wrong.  I need to see the underlying information provided by

7    the experts, not just the figures from the attorneys who feel

8    they are incapable of error.

9            I would urge the Court to have the U.S. Treasury pay

10   the claimants directly and without delay.  I wouldn't trust --

11   ask counsel to hold my purse, let alone figure out the just

12   compensation for the taking of our property or to fairly

13   distribute large sums of money in a timely fashion without

14   delay tactics.  And especially not for them to keep track of

15   parcel numbers and hold back people's money if they don't get

16   the numbers they brought, because I wouldn't trust they would

17   get the people's numbers correct.

18           I have legitimate concerns regarding their integrity

19   based on their dealings with both my husband and I.  The mere

20   fact that they filed a request attempting to prevent me from

21   speaking for a couple of minutes of time today, in addition to

22   my husband speaking today, illustrates their continuing attempt

23   to control the claim in a way which stifles dissent.

24           I am sure that Class Counsel say we're the only

25   people with objections.  Many of the claimants are in dire

1    financial situations, elderly people with pensions, single

2    moms, who would like to see their settlement sooner rather than

3    later.  Counsel are very intimidating and present only those

4    facts that benefit their own interest.  If they had clients'

5    best interests at heart, they would not be asking for 30

6    percent of our recovery on top of their full compensation of

7    over $2.5 million in attorneys' fees and expenses.

8              I would even venture to say that people signed the

9    settlement paperwork under duress, as even their 70 percent

10   share is a lot of money, and they were put in a position of not

11   wanting to jeopardize it by upsetting the Class Counsel.

12             I doubt that any of my neighbors realize that Class

13   Counsel are already receiving their full hourly fees and 100

14   percent of their expenses on top of asking for a 30 percent cut

15   of claimants' compensation, as this was never adequately

16   explained.  It was presented to us originally as a 35 percent

17   customary contingency fee.  We didn't realize it was over and

18   above full attorneys' fees being awarded.

19             I believe that if the claimants realize that Class

20   Counsel have already been awarded 100 percent of their hourly

21   fees and 100 percent of their expenses, and if claimants were

22   asked if they would like to keep all of their settlement for

23   the taking of their property and not give 30 percent to Class

24   Counsel who have already been paid for their work, the

25   claimants would say yes, and I'd be happy to take the time to

1   go around and ask them.  They would like to keep their entire

2   settlement monies, I'm certain.

3          The reason people agreed to it is everyone realizes

4   that attorneys are not taking this case for free but they

5   should -- but should they really make an extra $40 million when

6   property owners are not made whole or compensated for their

7   property?  Who lost the land?  The Baker Sterchi Firm has

8   clearly lost sight of their clients' best interests.

9          I would urge the Court to have the agreed-upon

10  settlement amounts expeditiously paid to the claimants directly

11  without delay.  This will prevent the Baker Sterchi Firm from

12  claiming the Woodleys are holding up their funds.  And believe

13  me, any spin they can put on it they will, as they have

14  demonstrated this animosity in the past.  This is not sour

15  grapes on my part.  I just want to ensure that all claimants

16  are compensated fairly.

17         As for our individual compensation amount, we ask

18  that the Court direct the Government to place that into the

19  registry of the Court while we obtain the previously requested

20  documentation required for us to be able to give informed

21  consent.

22         I took time off work and traveled here today.  And I

23  trust that you will make the correct decision for us.  Thank

24  you for your time.

25         THE COURT:  Thank you.

1          Mr. Woodley?

2          MR. WOODLEY:  Thank you, Your Honor.  Appreciate

3    that.  The purpose of the Uniform Relocation Act is providing

4    just compensation so that they, the landowners, are kept whole

5    and are economically placed in the same position they would

6    have been had they not had their land taken from them.  And

7    that's fundamental.  That is a statement made on the Senate

8    floor, on Senate Bill 1 on October 27th, 1969 by John Sherman

9    Cooper, Senator of Kentucky, who was on that -- a sponsor of

10   that bill.

11         The main sponsor was Edmund Muskie, and Senator

12   Muskie, also when he introduced the bill for final passage, he

13   went and actually went through 12 provisions that must be

14   followed in the taking of a property for federal purposes.

15   Now, he said as to the highlighted portion right there, and

16   highlight that, "First.  Transactions must be carried out in a

17   manner that will assure that the person whose property is taken

18   is no worse off economically than before the property was

19   taken.

20         In this case, somebody's property is worth $100,000,

21   and it's taken, and they get back $70,000 net, they are now

22   $30,000 worse off than if the property had not been taken.

23         Senator Mundt also talked about the purpose of the

24   bill.  The URA had "One basic purpose and that is to make these

25   people so displaced economically whole."

1          Our Constitution provides that when property is taken

2   for a public purpose that the owner will receive just

3   compensation.  And just compensation in this case is making and

4   keeping the landowner whole, 100 percent of the just

5   compensation.  The just compensation in this case is the amount

6   of the value of the land or property rights taken plus the

7   delay damages, interest on that taking, from the date of the

8   taking.

9          The Court has asked not to address attorneys' fees,

10  the $40 million, right now.  Is that what I understand?  You

11  want me to just follow on --

12          THE COURT:  Or I'd like to take that as a secondary

13  item, because it really arguably -- well, I've already said

14  that.  It doesn't bear directly; it does bear indirectly on the

15  class settlement.

16          MR. WOODLEY:  Well, from my standpoint, it seems to

17  bear on the division of a person's 100 percent just

18  compensation, which is part of the fairness and reasonableness

19  of the settlement.  If the Court were to divide that up and

20  give them less than just compensation to provide additional or

21  windfall, bonus, however you want to call it attorneys' fees,

22  enhanced attorneys' fees to the Missouri firm, then that would

23  deplete and deprive these landowners of at least 30 percent of

24  their -- Mr. Young, as he had it, their --

25          THE COURT:  Well, let's just put it this way, the

1    Court, as a result of the class action rule at Rule 23, does

2    control attorneys' fees as part of the proceedings on the

3    class.  So, that in a sense is definitely of the fair and

4    adequate determination that the Court has to make.

5              MR. WOODLEY:  Right.  The motion that Class Counsel

6    brought, I think it's Docket Entry 163, was noticeably lacking,

7    Your Honor, for two things.

8              THE COURT:  It's actually 162, I think.

9              MR. WOODLEY:  There was a revised.

10             THE COURT:  Oh, you're right.  You're right.  You're

11   right.

12             MR. WOODLEY:  Okay.  And I'm not sure exactly -- I

13   didn't go back to compare what the differences were, but much

14   of this motion has been taken from earlier class actions and

15   been cut and paste for that.  So, what I'd like to say on that,

16   Your Honor, is that Rule 23(h) on attorneys' fees is

17   permissive, number one, but, more importantly, noting in that

18   brief, there's two things that weren't in that brief that

19   should have been in that memo to the Court.

20             One was a thorough citation to the Bywaters vs.

21   United States case, 670 F.3d, and that particular -- by not

22   including Bywaters vs. United States, that, to me, as a

23   practicing attorney and where I come from, that would be

24   considered severe lack of candor to the Court if there is a

25   binding precedent from the Circuit in which the court sits

1    that's on point as to what you look to for attorneys' fees and

2    the court has -- says you look in this case to the URA

3    attorneys' fees for the lodestar, and under the Relocation Act,

4    42 U.S.C. 4654(c), under that statute they are to get all

5    reasonable attorneys' fees and expenses reasonably incurred in

6    the litigation.

7           The essence of that is to try to fully compensate

8    Class Counsel for their efforts.  And I think Mr. Young

9    commented that it seemed to him, and it does seem to us, as

10   well, that they have been amply compensated for their efforts,

11   even given the fact that they're lodestar that they presented

12   to the Government and the Government had an objection at one

13   point to it, the lodestar was for excessive hours at

14   contemporary rates, not using historical rates going back to

15   2009, but using contemporary rates, which is, where we come

16   from and I think also in the Supreme Court under Hensley vs.

17   Eckerhart that you're supposed to use historical rates.  They

18   didn't do that.  So, it inflated that.

19          But be that as it may, we're not here to rehash the

20   lodestar because the Government has accepted and agreed to

21   that.  All we're doing is if the Court accepts that, that

22   should be the end of the attorney fee issue on whether or not

23   Class Counsel is entitled to more.

24          In the -- there's two things that are part and parcel

25   of the URA and the Bywaters vs. US citation.  And to please the

1   Court I'd like to just put up to the Court the Bywaters case of
2   this Circuit, which is the authority in the Circuit.  And as
3   the Court says, the question of whether or not we're going to
4   apply our law or the law of a regional circuit, the Court says
5   we apply our law and that the district -- they approve a
6   district court settlement there that would give the claimants
7   100 percent of their claim value.  They did not allow any
8   enhanced fees at all.
9           And in that case, the Court said the court's --
10  District Court's award of attorneys' fees in this case were
11  quite clearly based upon mandatory fee-shifting provisions of
12  the URA.  And then they compared the class' action 23 and said
13  that is not mandatory, that's a permissive.  And they said
14  under the URA the Court shall determine an award of reasonable
15  attorneys' fees.  Then they concluded, therefore, "The award of
16  fees thus depends on the construction of the URA and not the
17  construction of Rule 23."
18          That's this Circuit's decision.  That's the first
19  time that appellate authority has ruled directly on the URA in
20  this Circuit.  And that's the authority I hope that we're all
21  going to uphold and respect, because only a fair reading of
22  that case in its entirety -- a person would come away thinking
23  I get -- if you are counsel, I get URA attorneys' fees.  I
24  don't get an opportunity to ask for enhanced attorneys' fees
25  after counsel has already litigated the amount of URA

1    attorneys' fees.  You don't get a second bite at the apple to

2    come up and try to get enhanced fees.

3              Now, so, the fact that -- the fact that Bywaters is

4    nowhere to be found in Class Counsel's briefing to the Court on

5    this attorney fee issue that they raise is very disturbing to

6    me as a professional, but it's really disturbing to me because

7    that reflects what Class Counsel has done with the entire class

8    of keeping them in the dark as to facts or law or circumstances

9    that do not favor their self-interest.

10             For example, Class Counsel claims that they've got

11   lots of consents.  They do have lots of consents, but they're

12   uninformed consent, or substantially uninformed consent,

13   because Class Counsel did not inform them of decisions, facts,

14   and law that the class would need to know before they can make

15   an informed consent on their proposal for enhanced attorneys'

16   fees.

17             So, what did they not tell the class?  The Class

18   Counsel never informed the class that the URA was actually

19   designed to have the Government pay all reasonable attorneys'

20   fees and expenses so that they, the claimants, could keep 100

21   percent of their compensation claim.  That was never told to

22   the class.

23             Class Counsel never informed them that class

24   claimants in the Supreme Court decision of Blum vs. Stenson

25   stated a reasonable attorneys' fees is one that's adequate to

1    attract competent counsel, and I'm sure that that lodestar in

2    the URA of $1.92 million is a -- would be considered a

3    reasonable attorneys' fees, that's adequate to attract counsel.

4    But the Court then went on to say a reasonable attorneys' fees

5    does not produce windfalls to attorneys.

6              And in this particular case, there's no other way to

7    describe Class Counsel's request for attorneys' fees of $40

8    million on top of the lodestar as anything other than a

9    windfall.  He's asking for attorneys' fees that, as Mr. Young

10   said, more than 20 times the reasonable amount of attorneys'

11   fees that the parties have already agreed to.  He's asking --

12   he's asking that all of his time, including the excessive time

13   and time that was devoted to unsuccessful claims, which was

14   never deducted out of his lodestar, as they should have been,

15   he's asking for that time, for paralegals, associates, and

16   partners, at an astounding $5,215 per hour.  That's what it

17   comes to.

18             Another way of looking at it is his request for $40

19   million in attorneys' fees is roughly 88 years of work for an

20   attorney at his -- his current hourly rate of $475.

21   Unbelievable.  I mean, I'll take it he has nerve, but he

22   doesn't respect the law.  And he certainly doesn't respect the

23   rights of the claimants in this case to get the full 100

24   percent just compensation that the law intends, that Senator

25   Cooper, Senator Muskie, Senator Mundt and all the senators that

1    passed it unanimously in 1969 would have them get 100 percent.

2            Class Counsel on the third point never informed the

3    class claimants of the Supreme Court decision in Pennsylvania

4    vs. Delaware Valley Citizens, which clearly stated that with

5    fee-shifting statutes, these statutes were not designed as a

6    form of economic relief to improve the financial lot of

7    attorneys.  Well, this is what his Docket Entry 163 is.  It's

8    solely to feather the Missouri firm's nest.

9            As to point number four, Class Counsel never informed

10   class claimants of the Supreme Court holding in Burlington vs.

11   Dague.  I don't know if I have Dague pronounced correctly.  But

12   there in Dague, any enhancement, whether it be a 25 percent

13   enhancement, that's the issue in that case, or a 2000 percent

14   enhancement, which counsel is asking for in this case, any

15   enhancement is simply not permitted.  The Court said, "We hold

16   that enhancement for contingency is not permitted under the

17   fee-shifting statutes at issue.  We reverse the court of

18   Appeals judgment insofar as it affirmed 25 percent enhancement

19   of the lodestar."

20           Counsel never -- on the fifth point -- never informed

21   class claimants that his attempted enhancement or contingency

22   is simply not permitted under the fee-shifting statutes.  That

23   would have been the honest thing to do.  That would have been

24   the fair thing to do.  That's something that the claimants have

25   a right to expect as Washington citizens under Washington law

1    with the Rules of Professional Conduct that control dealing

2    with citizens in the State of Washington.

3              Under the Rules of Professional Conduct in

4    Washington, under Rule 1.4, the -- and that's 1.4(a) -- "the

5    lawyer shall give the client any material relevant information,

6    any decision, so that there can, in fact, be informed consent."

7    And informed consent is defined under that rule as -- and

8    that's Rule 1.0, Subsection E, "Informed consent denotes the

9    agreement by a person to a proposed course of conduct after the

10   lawyer has communicated adequate information and explanation"

11   as to a particular proposed course of conduct.

12             In this case, the proposed course of conduct to have

13   them simply agree that it's okay to take 30 percent of their

14   fund without telling them that it's not okay under federal law,

15   it's not okay in the Federal Circuit under Bywaters vs. United

16   States, it's not under the Supreme Court authority.  It's

17   certainly not okay under the actual URA, which is designed to

18   provide for full payment of attorneys' fees so that the

19   claimants can keep 100 percent of their fund.

20             Six, the counsel never informed class claimants about

21   Bywaters itself.  Bywaters came out in 2012.  The cite is 670

22   F.3d 121.  They never informed class claimants of point seven

23   that the Court's award of fees depends on the construction of

24   the URA, not the construction of C.R. 23.  That's at 1227.

25             Point eight, Class Counsel never informed class

1    claimants that they had no obligation to let Class Counsel take

2    any deduction.  He should have told them, we don't -- I, as

3    Class Counsel, he should have said to them, don't have any

4    right to take any deduction from your just compensation.  You

5    are supposed to get 100 percent of your compensation without

6    deduction.  He never told them that.

7              Had he told them that, please rest assured, that

8    everybody, even the senior citizens, even the people on fixed

9    incomes, would have said, then we want our 100 percent, if

10   that's what the law says.  We don't want you going ahead and

11   taking an additional $40 million out of our combined fund

12   resources, out of bank account, so to speak.  We get our full

13   percent of our -- 100 percent of our bank account that the

14   Government can pay.

15             The ninth point, Class Counsel never informed class

16   claimants that the $2,580,000 URA fees and expenses to be paid

17   by the Government ensured that they would get to keep 100

18   percent of their just compensation, just as the Senators

19   Cooper, Muskie, and Mundt assured everybody on the floor of the

20   Senate, that was the central purpose of the URA back in 1969.

21   And that hasn't been amended and changed to delete that, and

22   there's nothing in the URA that says they can come back in

23   addition to URA and ask a court for additional fees.  That

24   wasn't the design.  The design was for the claimant to get 100

25   percent.

1          All of these people have been basically sold a bill
2    of goods by Class Counsel, who would not be in candor with
3    them, and he would not share the law with them.  He wanted to
4    get a windfall amount of attorneys' fees, all at their expense.
5    And when he does that, he violates another rule of professional
6    conduct in the State of Washington, because if the claimants
7    are entitled to 100 percent of their just compensation,
8    whatever that value plus interest is, then by him coming in and
9    wanting to take and grab and carve out a share of that, when
10   he's not entitled to it by law, that amounts to asking the
11   client for a gift.  It's a gift in Washington.  And it is
12   unethical for a client to be asked for a gift by an attorney in
13   the State of Washington.  That's Rule of Professional of
14   Conduct 1.8(b).
15         Now, the rule does say -- it does qualify it.  It
16   says it has to be a substantial gift.  But I think under the
17   circumstances here I don't think anybody's going to think that
18   hundreds of thousands of dollars from every -- from many, many,
19   many, 100 or 200, claimants, from each of them, would be
20   considered not asking a substantial gift of these claimants by
21   this counsel who has no right to ask.
22         When you don't get informed consent, as he did not,
23   when you violate the Rules of Professional Conduct in asking,
24   which he has, when you have in terms of hiding the ball on
25   these folks and not telling them the truth so they can make an

1    informed consent, you have put it -- Class Counsel has put his

2    and her own self-interest ahead of their clients.  They have

3    breached their fiduciary duties.  They have committed gross

4    misconduct to even ask for $40 million of attorneys' fees or

5    any amount of attorneys' fees.  If it's $1, they don't have a

6    right to ask for the $1.  Whether or not that's a substantial

7    gift, it's probably not.  But $40 million is a substantial

8    gift, and they asked for 40 million.

9          Now, to make sure that I was on solid ground to be

10   making representations to you, based on Washington ethical

11   rules, I asked independent counsel to review Class Counsel's

12   submission and to review the Uniform Relocation Act, to review

13   Bywaters vs. United States, and this Class Counsel -- I mean,

14   independent counsel, who does do class action litigations, is a

15   Stanford graduate, been practicing for over 37 years.  He

16   served on the Board of Governors of the Washington State Bar

17   Association.  He served as the Chair of the Attorney

18   Disciplinary Section of the Washington State Bar Association.

19         It is his opinion that what Class Counsel from

20   Missouri had done is that they have abdicated their

21   responsibility, breached their fiduciary duties, claimed

22   outrageous attorneys' fees for which they had no right to claim

23   under the RPC 1.4 or asking as a gift under 1.8, both sections

24   violate the RPCs.  The class -- the independent counsel, Mr.

25   Peter Scott Ehrlichman, has asked me to ask the Court to refer

1    this entire matter of seeking bonus windfall attorneys' fees

2    that are not part of the lodestar process, that are asked for

3    after the lodestar process has already been terminated, asking

4    the Court to refer Class Counsel to any disciplinary bar

5    association or body, governing body, that governs attorney

6    misconduct in this district or in this circuit.

7            I asked independent counsel to advise as to whether

8    or not there is any other avenue other than the URA for fee

9    entitlement, and he says that "It's my understanding that the

10   purpose of the URA is to make the eligible claimant whole and

11   to ensure that each claimant receives 100 percent of claimant's

12   Fifth Amendment taking claim.  Any other outcome would defeat

13   the purpose of the Act," the URA, "depriving the claimants of

14   full, just compensation is not fair, not equitable, not legal,

15   and not just."

16           He goes on to say in Paragraph 7 that Class Counsel's

17   attempt to obtain excessive, exorbitant fee from his clients'

18   just compensation under an inapplicable equitable common fund

19   theory and that equitable theory for recovery of attorneys'

20   fees is unavailable to him where there is a mandatory award of

21   fees under the URA.

22           If there is to be an enhanced enhancement under the

23   Supreme Court authority, he would -- and under the Bywaters vs.

24   United States, he would have to show this is a rare and

25   exceptional case, that the contingency was not consumed already

1    in his lodestar, and convince a court of that, and put on

2    specific evidence of that.  And in this case, he has not done

3    that.  In this case, he has also not produced a single expert

4    witness that will verify his request of $40 million attorneys'

5    fees as being a reasonable, proper, ethical, legal request to

6    be made of this Court.

7            And, frankly, the claimants in this case should not

8    be put to a position of having to even comment on that case.

9    He shouldn't have even brought the motion, much less having to

10   defend and discuss this.

11           So, Your Honor, when -- when there -- and I'm

12   pointing right to here -- when there is no information provided

13   by Class Counsel on the forms that they sent out that tells

14   them any of the law as to their entitlement to keep 100 percent

15   of their just compensation, without deduction by Class Counsel,

16   and when they never informed Class Counsel [sic] that the URA

17   attorneys' fees were designed to fully compensate his firm and

18   that the Government would pay all the URA fees actually

19   incurred on their behalf, so that they would have no liability

20   for fees and expenses, in keeping with the congressional

21   mandate that claimants are to be kept whole and fully

22   compensated, and when the class -- he failed to say that the

23   class had no liability to pay any attorneys' fees or expenses,

24   that should have been up front with these folks, at least as of

25   2012 when Bywaters vs. United States came down.

1           Now, this isn't a case where Mr. Stewart and his firm
2      are unaware of a case that's recently come down and they get
3      surprised by it.  This is a case they know about it and have
4      deliberately decided not to raise it in this hearing.  And
5      that's something that where I come from on the West Coast, if
6      there's -- if there's authority that's against your position
7      and it seems to be pretty much on point, the only ethical thing
8      you can do, you raise it to the Court, you tell the Court why
9      it is you think it may not apply, or can distinguish it based
10     on facts, and ask the court to either create a new law and
11     avoid that, but you certainly don't do what Class Counsel did,
12     which was to ignore it in hopes that the Court would ignore it
13     and in hopes that nobody would say anything and in hopes that
14     this whole $40 million railroad going through succeeds and
15     nobody complains.

16          Now, Class Counsel may tell you in rebuttal that he's
17     had other courts give him windfall attorneys' fees or bonus
18     attorneys' fees on top of his lodestar.  And he'd be right.
19     Last year, I believe, a judge of this Court gave him $10
20     million in windfall attorneys' fees that he had no right to ask
21     for, he had no right to claim, that was against the rules of
22     the URA, it was against the rules of Bywaters vs. United
23     States.

24          He did the same thing he's doing in this case, which
25     he didn't inform his claimants; the claimants didn't complain;

1    he said, hey, look, they didn't complain; and the Court said,

2    yep, they didn't complain, so they must be in favor of you

3    getting $10 million.  And the Court gave it to him.  That is a

4    huge mistake, and it's a mistake that we hope this Court will

5    not make.

6            Now, Mr. Stewart in his submissions has told the

7    Court that he has a whole list of URA fee basis coming through

8    this Court system, with different judges, maybe some with you.

9    But I think there's at least a dozen cases.  Because of the --

10   because of the strong likelihood that he will ask and try this

11   procedure of asking for attorneys' fees he's not entitled to

12   recover again in those cases, this Court should send a clear

13   signal to Class Counsel that it's not in accordance with the

14   rule of the Circuit.

15           As to our -- there's one more thing I want to say

16   about the group, and then I want to go to our own and be very

17   brief about that.

18           There are several things we're asking the Court to do

19   that we think -- we think it's fair in this fairness hearing.

20   We're asking as to you, Your Honor, as being the protector and

21   the ultimate guardian of these claimants' Fifth Amendment

22   taking rights and compensation, that you award -- make sure

23   that they get awarded 100 percent of their just compensation

24   without any deduction.

25           We think the Court should approve the $1,920,000 URA

1    mandatory lodestar attorneys' fees that were fully litigated as

2    full compensation for all reasonable attorneys' fees.

3    Consistent with Bywaters vs. United States, we ask that the

4    Court should direct payment of those fees, however, directly

5    into the registry of the Court to be held pending further

6    hearing and resolution of any competing claims to those fees,

7    which he has raised this issue and brought it to a head and it

8    needs to be resolved.  And this Court is asked to put those

9    fees in the registry of the Court so that they can be resolved

10   and whatever happens it gets distributed out of the registry

11   for his lodestar attorneys' fees.

12           The Court should deny the Class Counsel's motion to

13   divide and deprive class claimants of the full value of their

14   just compensation.  The class is entitled to receive 100

15   percent of their just compensation for the property rights

16   taken with accrued interest from the day of the taking.

17           The Court should rule that that's -- that they're

18   entitled to do that.  Because if the Court rules that way, that

19   they're entitled to 100 percent, that will be in keeping with

20   the URA and the congressional intent of the URA.  It will be in

21   keeping with Bywaters vs. The United States, and it will

22   prevent this issue from ever coming up to any other judge in

23   your Court.

24           The Court should deny Class Counsel's motion to take

25   the $40 million from the class just compensation because it is

1    substantially tantamount to soliciting a substantial gift from

2    clients that violates rules of professional conduct 1.88, as

3    well as asking for an excessive fee from a client, which is

4    also a violation of Washington law that protects -- is designed

5    to protect clients against avaricious attorneys.

6          The Court should deny Class Counsel's motion to have

7    all the class compensation monies paid into the firm's bank

8    account.  When I was sitting back in the bar, I know I couldn't

9    speak, but I get to speak now, that's really not a good idea

10   for a whole lot of reasons.  One, there's a lot of people that

11   just don't trust these folks.  Number two, I know if my money

12   was in his bank account he might hold it for an awfully long

13   time, because as we'll get into our individual claim, asking

14   for just reasonable documentation to even see what went on in

15   our claim, he wouldn't give us that.  So, why would he not then

16   hang onto the money a lot longer?

17         There's no reason why the Department of Treasury

18   cannot pay every class claimant's eligible claim directly to

19   the claimant once the claimant has complied with the provision

20   of providing the Treasury with a Social Security number.  So,

21   frankly, 95, 98 percent could be paid directly right now from

22   the Treasury, without ever going through Missouri counsel's

23   trust account.

24         Frankly, I would ask the Court one last thing, and I

25   know I've gone on long, but we do not want the lodestar

1    attorneys' fees to be added into our valuation of our claim so

2    that counsel can claim, oh, we've given a common fund and then

3    on a -- tried -- and an inapplicable common fund theory try to

4    take it away.  We want the attorneys' fees to go to counsel

5    eventually, through the registry of the Court, but not to be

6    paid to claimants for the very purpose of them taking away 30

7    percent of everything, because they just want -- these people

8    just want to be paid their 100 percent that they're entitled to

9    be paid.

10           They don't want to be part of lawsuits about who got

11   -- who got what and how come we're -- he's getting 30 percent.

12   They just want some peace and quiet and to be in the position

13   that they should have been in without ever taking their

14   property, that is, economically whole.  And they -- if counsel

15   gets away with this like he got away with it last year, to take

16   ill-advised, unethical attorneys' fees from its clients, then

17   the claimants don't get their just compensation.

18           As to our personal compensation claim, Your Honor,

19   Class Counsel has an obligation under Washington law, RPC

20   1.4(b), to say -- to promptly comply with all reasonable

21   requests for information.  I'm going to put up the rule because

22   I'm sure the Court maybe hasn't seen the rule before, and maybe

23   Class Counsel, who is doing a lot of work in the State of

24   Washington, hasn't seen the rule before either.  But it's

25   there, and it's there for the protection of the clients.  It's

1   there, also, so that they can make informed consent.

2            RPC 1.4, Communication, mandates that, (b), Part (b),

3   a lawyer shall explain to the extent reasonably necessary to

4   permit the -- and then it goes on to the next page -- the

5   client to make informed decisions regarding representation.  It

6   also goes on to say under 1.4(a)(4), there we are, that he

7   shall promptly comply with reasonable requests for information.

8            The written request was provided to him on October

9   23rd, asking for the underlying appraisal, the spreadsheets,

10  and the calculations that would show how it was they got to the

11  number they got to.  And I understand in this case that it was

12  Class Counsel that made the decisions based on appraisal

13  information and factors.  They did the math, but how they got

14  to those numbers, that's what they have told the Court in

15  earlier submittals.  And I haven't heard anything different

16  that somehow there is an appraiser that's doing all of this

17  from start to finish.  The appraiser gives the parameters;

18  counsel does the math.

19           So, when we asked for that, that's a reasonable

20  request.  Washington law mandates that you provide that.  Class

21  Counsel refused to provide it.  We asked again in December.

22  Basically, we're asking him for transparency; we're asking him

23  for -- to give people the opportunity to see what the documents

24  are.  "Tom, on several occasions, the most recent being on

25  October 23rd, 2013, we requested that you provide each of our

1    mutual clients with the representative appraisal used as a

2    starting point to calculate each owner's preliminary

3    compensation disclosure statement, together with the

4    spreadsheets used to arrive at that calculation.  My clients

5    tell me that they have not yet received these materials.  So

6    I'm making one last request that you voluntarily make the

7    requested disclosures before the end of December," well in

8    advance of a fairness hearing.

9            "Our clients are entitled to this basic information.

10   Voluntary compliance will facilitate our clients' informed

11   consent to the proposed settlement and will obviate the need to

12   expend time and money seeking judicial assistance" -- as we're

13   doing now -- "in this matter.  We look forward to your

14   cooperation."  Tom refused to submit those.

15           Then Tom, on May 7th, I again communicated with Mr.

16   Stewart and I asked him again to please, if we're going to

17   meet, bring -- bring with you to the meeting the appraisals,

18   the spreadsheets, and the calculations.  And letting him know

19   that I was authorized by Star Evans, next-door neighbor,

20   Michael and Julia Young, who lives next-door to them, and my

21   wife and I, the three of us are -- have authorized me to ask

22   that.  And I said to him, it's okay if you couldn't do -- if

23   you couldn't do everybody, now you can do at least three, get

24   it done, please.  No.  And basically he said he didn't care

25   whether we had the information or not.

1          Well, again, it's not his claim.  He's Class Counsel.

2    He might not care.  He may not want to do what is required

3    under Washington law to be done, but he has an obligation to do

4    it.  It's our claim.  We cant' give informed consent until we

5    see the documents.  And, so, the numbers might be fine; or they

6    might be really off.  But we won't know, and we can't give

7    informed consent until that happens.

8          So, what I'm asking the Court on that is do not hold

9    up a single person's payment where they have consented based on

10   our needing information.  I would ask that the Court say

11   whatever amount the Government and Class Counsel had agreed

12   upon that we were supposed to be paid, put that into the

13   registry of the Court, as well as his lodestar fees.  Put our

14   monies into the registry of the Court, so we don't get them

15   until we sort this out.  But we need to sort it out with basic

16   information, the appraisal information that was the starting

17   point, the spreadsheets, and the calculations.  And if we do

18   that, then we can come back and say, yeah, it looks great, or

19   no, we've got a problem.  But until that happens, we can't do

20   it, and we certainly don't want to hold up anybody's 100

21   percent of their just compensation.

22         And, so, Your Honor, I thank you for your time, and

23   that concludes my remarks.  I would ask the Court permission to

24   file my written statements and supporting declarations.

25         THE COURT:  The Court will defer on that request, Mr.

1    Woodley.  What I propose we do is take a 10-minute recess now

2    and reconvene at 4:31 or 2 and hear briefly from Mr. Stewart

3    and Mr. Trauben and then proceed.

4         Thank you.  We're in a short recess.

5         (A short recess was taken.)

6         THE COURT:  Please be seated.  Mr. Stewart?  A

7    commentary, please.

8         MR. STEWART:  Thank you, Your Honor.  I will try to be

9    very brief.  First of all, I guess we were all patient with Mr.

10   Woodley's presentation.  I believe 99 percent plus of it was

11   probably objectionable and inappropriate for a fairness

12   hearing.  So, I hope the Court takes my lack of objecting not

13   to believe that I agree with any of it.

14        I guess vilifying me is okay, but in essence, the

15   primary comment to make is that Mr. Woodley does -- simply does

16   not understand the law on this subject at all.  And, in

17   essence, he even went further and I guess questions Mr. Trauben

18   and the DOJ's knowledge or implementation of the law in terms

19   of what to do in a common fund contingent fee setting, but I

20   guess more importantly he's called into question your ability,

21   Your Honor, to rule on the law and interpret the law.

22        And he's even gone beyond that to, in essence, question

23   the integrity and the ability of every judge on this Court to

24   interpret the law and rule on the law, because what he failed

25   to mention was in all of -- probably 15 cases over the course

1    of the last few years, almost every judge on this Court has

2    ruled that lawyers are not restricted to the statutory fee

3    amount, whether it's a URA or any other amount in a common fund

4    case, and I could go through the list with Judge Wheeler, Judge

5    Firestone, Judge Margolis, particularly he mentioned with

6    respect to the Raulerson case, Judge Bruggink, Judge Horn,

7    Judge Merow, all of them, on and on, have had this exact issue

8    in front of them, and have ruled correctly with respect to what

9    the law is with respect to the division of the common fund in a

10   contingent fee case.

11          The basic premise of his argument is that the URA

12   attorneys' fees fully compensates Class Counsel, because it is

13   ostensibly a fee-shifting statute, and the URA was designed to

14   fund or to compensate Class Counsel or attorneys when a

15   fee-shifting statute is involved.

16          And what is fascinating to me is his announcement that

17   Bywaters should have been informed or all the class members

18   should have been informed of Bywaters.  The reality is, is that

19   Bywaters actually stands for nothing and has no precedential

20   value on this particular issue at all with respect to the

21   division of a common fund.  Bywaters was a Little Tucker Act

22   case that did not involve a contingent fee at all and did not

23   involve a common fund at all.

24          And, so, this is not a question of the enhancement of

25   Class Counsel's fees under the URA, or under the lodestar at

1    all, and, frankly, 80 or 90 percent of what Mr. Woodley said is

2    of no relevance whatsoever to the Court with respect to the

3    issues that the Court confronts at this fairness hearing.

4         One of the comments he made, and this is when he made

5    the same comment, is that it would be a disaster to pay the

6    money into our trust account, because somehow we would delay

7    the payment to the class members.  The reality is that every

8    one of the settlements in front of all of these judges I just

9    mentioned, we have made that payment immediately.  We have no

10   incentive to hold onto it in any way, shape or form, and, in

11   fact, in this instance, and in every settlement agreement I

12   think we've done with Mr. Trauben and the DOJ now, we have had

13   obligation actually to dismiss the lawsuit and inform the Court

14   that all of the payments have been made within 14 days of that

15   payment, and to actually voluntarily dismiss the case at that

16   time.

17        There were some questions or some statements about that

18   we did the math and that we failed to provide them

19   spreadsheets.  I think it demonstrates a total lack of

20   knowledge about how the appraisal process worked in this case,

21   how the settlement process worked in this case.  And, in fact,

22   I specifically showed the spreadsheet of the numbers to Ms.

23   Woodley at the Woodmark Hotel in Seattle and went through them.

24   I apologize profusely if she thought I was intimidating in any

25   fashion, but that's not my point and that was not my point in

1   talking with her.

2          And, in fact, we provided the exact numbers on that

3   spreadsheet to Mr. Woodley in writing that he failed to show

4   the Court.

5          He wants more transparency, or he requested more

6   transparency, but we specifically responded to his individual

7   inquiry, and when he purportedly represented other Kittinger

8   claimants and said that they wanted additional information as

9   well, and he made that statement today, and actually mentioned

10  a couple of the people, he failed to realize that we provided

11  them information when they requested it, and all of the

12  Kittinger claimants, including Star Evans and others that he

13  mentioned today, had already consented to the 30 percent and

14  were well aware that for months, if not years, and we told him

15  specifically that if any class member comes and talks to you

16  with an individual request for information, let us know and we

17  will be happy to meet with them in person and go over that

18  information.  He never provided any name to us of anyone who

19  has requested the information or who had not already consented

20  to the settlement.

21         And, what's really interesting, in addition, and I don't

22  know -- I guess the best way to respond to most of Mr.

23  Woodley's comments is to just direct the Court's attention to

24  Class Counsel's memorandum in support of the unopposed motion

25  to strike documents, which is DE number 171, which actually

1   goes through in some detail our position and statement with

2   respect to what's transpired with Mr. Woodley over the course

3   of the last several years.

4        One of the comments -- and today, what's even more

5   interesting, is before the Court struck Mr. Woodley's

6   pleadings, I'm not sure if the Court read them or not, but the

7   reality is, is that many or most of the statements that Mr.

8   Woodley made today are directly inconsistent with the

9   statements he previously attempted to make to the Court in

10  pleadings.

11       Mr. Woodley specifically stated that the Court should

12  give approval to the settlement terms in the pleadings before

13  the Court that were struck by the Court, and he specifically

14  endorsed the method, amount and calculation of attorneys' fees

15  requested by Class Counsel, and specifically endorsed the 30

16  percent figure utilized by Class Counsel to determine fees, and

17  endorsed the inclusion of statutory fees in the common fund as

18  part of those pleadings that he filed with the Court.

19       And this, frankly, demonstrates what we've been up

20  against as Class Counsel in dealing with Mr. Woodley, and all

21  of this stuff for months, if not years.

22       I don't believe -- I have never, Your Honor, in any way,

23  shape or form attempted to mislead the Court, misinterpret the

24  law or do anything illegal, and I have not done that in this

25  case, and the fact remains that this is a fair and reasonable

1    settlement for all of the class members, including Mr. Woodley,

2    and the fact that 250 or 252 of the 253 class members

3    considered to strongly endorse it is the best evidence of that.

4         Mr. Woodley stood up here and told the Court that there

5    were a whole bunch of other people that feel like they were

6    misled, without producing any one of them, with the possible

7    exception of Ms. Long, or Mr. Young, but the reality is, is

8    that there were 50 or 100 class members, almost every one of

9    the Kittinger class members who Mr. Woodley purportedly

10   represented, who wanted to speak at this fairness hearing in

11   opposition to everything Mr. Woodley said, and I told him that

12   that would be unnecessary.

13        We did enclose a number of emails with respect to our

14   document 171 that was filed on March 5, from a lot of those

15   class members, which is maybe the best evidence of exactly what

16   they really think about Mr. Woodley's position in his statement

17   today.

18        With that, Your Honor, I renew my request that this

19   settlement be approved, it was an arm's length transaction with

20   the Federal Government, there were appraisers that worked hard

21   on this for two years, followed every note, and we did not do

22   the math on this, they did, and Mr. Trauben can ascertain that

23   in a mediation in front of Judge Wiese, that's exactly what

24   transpired, and we prepared the spreadsheet and we actually

25   showed it to Mr. Woodley.

Daniel Haggart, et al., v. USA                          3/28/2014

1          Nothing further, Your Honor.

2          THE COURT:  Thank you.  Mr. Trauben?

3          MR. TRAUBEN:  Yes, Your Honor, I'll be brief.  The

4    matter regarding the contingency figure requested by counsel is

5    a matter between them and their client.  Now, so long as it

6    does not affect the obligations of the United States -- we

7    believe it should not affect the obligations of the United

8    States in this case.  The United States' obligations were under

9    the URA, which is a matter of the settlement before the Court,

10   and that should not be affected by any other fee request.

11         The other point that I wanted to touch on briefly is the

12   process that we reached in this and how we went about it.  And

13   we visited every piece of property at issue in this case.

14         THE COURT:  Did the property owners know that?

15         MR. TRAUBEN:  I don't know if all the property owners

16   knew we were out there looking at their property or not, but we

17   visited all of their property.  The Plaintiffs and their

18   appraiser visited all of the property.

19         THE COURT:  And you and your appraiser?

20         MR. TRAUBEN:  Yes, I did, with my appraiser.  Our

21   appraisers hired by the United States looked at the individual

22   lay of the land of every piece of property and put that into

23   consideration, and when we went into the mediation, we had

24   specific points about the different properties and the issues

25   that involved with them and we didn't discuss necessarily every

1    individual property, but there were common factors among groups

2    of property that we discussed.  And a lot of that was addressed

3    in the mediation.

4          So, it was an arduous process that involved many, many

5    hours, and that states to me that this is a fair, reasonable,

6    adequate settlement.

7          THE COURT:  Before you leave the podium, I ask again if

8    you have any further thoughts on what we should do about tax

9    identification numbers.

10          MR. TRAUBEN:  Well, I trust that counsel for Plaintiffs

11    will be able to provide the few remaining that have not yet

12    been provided.

13          THE COURT:  I hope so, too.  That would solve a lot of

14    problems.  All right, now, Ms. Long?

15          MS. LONG:  Yes?

16          THE COURT:  Are you still with us?

17          MS. LONG:  Yes, I am.

18          THE COURT:  Do you have anything further in light of

19    what has transpired?

20          MS. LONG:  Well, I learned I was somewhat uninformed.  I

21    did want to state that I did request, personally, in a

22    conversation with Elizabeth, a more factual basis for how the

23    figures were calculated in my case.  And all the specific --

24    you know, she was unwilling to provide anything in writing,

25    things I asked for she said, well, you know, it's confidential,

1    it's confidential.  And she told me -- said some things

2    generally, but not really adequate if -- to make an informed

3    judgment, and I just decided, you know, I didn't want to hold

4    things up for everyone else.

5         THE COURT:  Were you aware that counsel for the class

6    and counsel for the Government and their respective appraisers

7    visited your property to look at it?

8         MS. LONG:  No.  And Elizabeth didn't convey that, she

9    made it sound like things were more general.  But, you know,

10   that's why things in writing are helpful.  I also wasn't aware

11   that in terms of this URA award that that actually was -- if

12   I'm understanding correctly, was for the -- actually, you know,

13   their hours and costs that that covered that, because it's very

14   hard for an individual to judge, well, what is reasonable for

15   attorneys' fees, you know, how much time did they put in and

16   their costs and all of that.  So -- but I certainly was not

17   aware, and was not provided with any basis to judge those

18   things.

19        THE COURT:  All right.  Do you have anything in

20   addition?

21        MS. LONG:  No.

22        THE COURT:  Okay.

23        MS. LONG:  Thank you very much.

24        THE COURT:  No, thank you.  Mr. Young?

25        MR. YOUNG:  Yes, Your Honor.

Daniel Haggart, et al., v. USA                                    3/28/2014

```
1          THE COURT:  Have you been patient and listened?
2          MR. YOUNG:  I have been grateful for the opportunity to
3    listen, Your Honor, thank you.
4          THE COURT:  Do you have anything?  Go ahead?
5          MR. YOUNG:  I just, one point, obviously you don't need
6    me to help you figure out what's the right legal standard or
7    what the cases require in terms of percentage fee in addition
8    to the statutory fee, you'll decide whatever is right there.
9    If it is appropriate to have a fee added onto the statutory
10   fee, I hope it's obvious, but I should say it anyway, we would
11   really appreciate your taking a hard look at the number that's
12   been thrown out there, the $40 million, like as Mr. Woodley
13   said, none of us have been provided -- none of us property
14   owners have been provided any information whatsoever to support
15   either the statutory attorneys' fee or the bonus, I don't know
16   what the right statutory term is, but an additional fee under I
17   think you're citing some kind of a civil rule or something.
18         Second, Mr. Trauben's comment, I respect very much that
19   his point that the attorneys and appraisers went through an
20   arduous, time-consuming process, and all I can say is, many of
21   us do that, only to learn that we were human and we made a
22   mistake.  And, so, we appreciate all the effort that was put
23   into coming up with individual property values, but I don't
24   think it -- I don't think it means that the people who are the
25   claimants shouldn't be able to have and consider how the
```

Daniel Haggart, et al., v. USA                          3/28/2014

1   calculations were made.

2          And that brings me to the last observation on what I've

3   heard.  Mr. Stewart has said several times that either he or

4   Ms. McCulley showed somebody something, or explained somebody

5   something, and I want to support Ms. Long's comment, hearing

6   something or being shown it on the run, in my case, I made a

7   request of the -- of the Baker firm for the same kind of

8   underlying documentation and calculations that it sounds like

9   Ms. Long probably did, and what I got instead was not a written

10  response or email response to my request, but a terse "call me"

11  and a cell phone number, which I did, and I was taken on

12  horseback through some information that was apparently being

13  read from documents, but I asked for the documents and was told

14  no.

15         And even for, you know, even an experienced appraiser

16  would want to see the paper if they're being asked to give a

17  second opinion or if they're being asked to confirm or accept

18  or approve somebody else's appraisal.  Somebody like us who are

19  laypeople with respect to property appraisals, you know, we

20  can't just listen to something for two minutes and feel like we

21  could absorb and understand and know whether something is right

22  or at least is acceptable to us.  And that's what happened

23  here.

24         And when I heard Mr. Woodley speak and then Mr. Stewart

25  speak, I think they're both -- I think they're both telling the

1    truth, as I would expect, but it's like ships passing in the

2    night.  Mr. Woodley's pointing out that we weren't adequately

3    informed, and that our requests weren't even -- were declined

4    or refused, whatever is the right word, and Mr. Stewart said,

5    well, gosh, all these people approved.  Well, an uninformed

6    consent isn't --

7              THE COURT:  Mr. Young?  Hello?

8              LAW CLERK:  I think we lost him.

9              THE COURT:  Ms. Long?

10             MS. LONG:  Yes, I'm here.

11             THE COURT:  What happened to Mr. Young?

12             MS. LONG:  I don't know.

13             THE COURT:  I don't know either.  I was about to ask

14   Mr. Young whether or not he was aware that counsel and the

15   appraisers had visited his property.  Well, all right, Mr.

16   Woodley, Ms. Woodley, do you have something in a minute or so

17   that you would care to address?

18             MRS. WOODLEY:  Well, one of the things --

19             THE COURT:  Nope, Ms. Woodley, I'm sorry to make you do

20   this, you get a little exercise anyway.

21             MRS. WOODLEY:  I'm scared of coming up there.

22             THE COURT:  No, you're not.

23             MRS. WOODLEY:  Yes, I am.

24             MR. WOODLEY:  Yes, she is, trust me.

25             THE COURT:  You're used to it.

1          MRS. WOODLEY:  One of the issues that brought unfairness
2     to my attention that Mr. Stewart tried to explain to me, with
3     all his calculations, was my question to him, okay, well, we
4     have like 142 feet of railroad area that's been taken, and
5     another neighbor has 50 feet.  So, she's getting $600,000 and
6     we're getting $400,000.  So, at the beginning he said, oh,
7     people are being compensated for the amount of property that
8     was taken.  Well, that's not true.
9          And then Mr. Young's property, which is almost identical
10    to ours, he has three lots, one just slightly smaller --
11          THE COURT:  Do you have a house on your property?
12          MRS. WOODLEY:  Yeah.
13          THE COURT:  So, you have a three-lot property with one
14    house?
15          MRS. WOODLEY:  Correct.  And so does Mr. Young.
16          THE COURT:  Okay.
17          MRS. WOODLEY:  And our properties have the same
18    steepness.
19          THE COURT:  What lateral footage do you have?  Just out
20    of curiosity.
21          MRS. WOODLEY:  The top?
22          THE COURT:  You must have a road.  That's all right.
23          MRS. WOODLEY:  The road is on our property.
24          THE COURT:  All right.
25          MRS. WOODLEY:  So it's an easement that goes through the

1   property.

2           THE COURT:  I'm just trying to picture all this.  Go

3   ahead.

4           MR. WOODLEY:  Show him the map.

5           THE COURT:  No, that's okay.

6           MRS. WOODLEY:  There is an easement that goes through

7   the property that is the road, so people actually own the road

8   to and then the railroad comes up.

9           MR. WOODLEY:  But his question was what the latitude is,

10  do you know?

11          MRS. WOODLEY:  No.

12          MR. WOODLEY:  I can answer that.

13          THE COURT:  All right.  Go ahead, Ms. Woodley.

14          MRS. WOODLEY:  So, when you look at two properties that

15  are almost identical, and then the Youngs' amount, they're

16  supposed to receive about $800,000, I'm guessing, in general,

17  $800,000, and ours is $400,000, and they're almost identical.

18  I mean, same slope, same everything would apply, we're only a

19  few doors away.  So, that's when I went, well, wait a minute,

20  this isn't fair.  And if it is fair, I'm not going to quibble

21  about it, even though it's an awful lot of money, because I do

22  just want things to be fair.  That's why Gordon and I came

23  today.

24          THE COURT:  All right.  Thank you.  Mr. Woodley?

25          MR. WOODLEY:  Okay.  The property we're talking about,

1    we've got 140 lineal feet.

2              THE COURT:  That's what I wanted to know.

3              MR. WOODLEY:  Yes.  The Youngs have 135.  Square

4    footages, we're within 1,500 square feet of land, equivalent.

5    Slope, same slope characteristics, no rock ledges on either one

6    of our properties.  Metes and bounds, both of us have one -- we

7    have -- he has three lots as well.  Both of us have a metes and

8    bounds on a little strip of a partial lot, actual partial lot,

9    because that's how you do it when you don't have a full lot.

10   You can't describe something as being lot 21 if you only have a

11   portion of it.  It's lot 21 and then it's metes and bounds, but

12   we have lots 40, 41 and part of 20.  And the part of 20 has a

13   little metes and bounds.  One house away, there's a 50-foot lot

14   between us, with a house on it, that's Star Evans.

15             THE COURT:  A 50-foot lot with a house?

16             MR. WOODLEY:  A 50-foot wide lot -- well, no, in this

17   whole thing, lots were -- lots were divvied up in 50s, that's

18   why we've got three of them, almost three of them.

19             THE COURT:  Right.

20             MR. WOODLEY:  Yeah, okay.  So, 50 feet away from the end

21   of our property, is the beginning of Mike Young's property, all

22   right, and his two-plus lots, almost three lots.

23             So, same deed class, class -- subclass 3, same slope,

24   same characteristics, same everything.  And Mike and I have

25   talked about it and we've shared and he said, Gordon, get me --

1    get my materials, get your materials, let's look over them

2    together and see why it is that Class Counsel is putting you

3    about $400 to $500,000 less than what we're getting.  Because I

4    said -- I mean, it's a dramatic difference.

5           And there is obvious hard feelings between Class Counsel

6    and how we've been treated, but -- and I hope that didn't

7    figure into the equation, I don't know.  We would just like to

8    see it.  The actual documentation.  The starting point.  The

9    appraisal starting point, the spreadsheets, the calculations.

10   We've never seen them.  They've talked about it, briefly, but

11   we've never seen it.

12          And, frankly, trust is a little hard to come by these

13   days, based on some of the things that have been said and if

14   you look at the things that have been said about me, I'm the

15   worst person to ever live on Lakehurst Lane, apparently,

16   because I complain -- I dissent, and I'm a possible objecter,

17   their attitude through this whole thing has been squelched

18   dissent, don't have anybody object, get everybody to consent,

19   and they slam through 30 percent.

20          And, I almost got sucked down that rabbit hole, because

21   I do contingency work.  Thirty percent seems real to me.  But

22   then one of the neighbors, I'm not going to say who it was,

23   said, why are they getting 30 percent -- why would they ask for

24   30 percent when the government is supposed to pay all their

25   attorneys' fees on the low side?  And a light bulb went off on

1    me and I went, holy -- I better go look at the lodestar

2    history.  What is the purpose of the lodestar?  Lodestar was to

3    give them 100 percent.  They weren't supposed to have any

4    deductions taken.  They weren't supposed to have any common

5    fund theory taken away from them.

6         So, that's why I had the -- ethically, I went to ethical

7    counsel, I said, what do I do here.  I said this, what do I do

8    now?  They said, you've got to go tell them exactly.

9         THE COURT:  What I would like you to do, before you

10   leave the podium.

11        MR. WOODLEY:  Yes.

12        THE COURT:  Is describe to me the topographical

13   condition of your property from kind of vertical.

14        MR. WOODLEY:  Site up?

15        THE COURT:  That's exactly right.

16        MR. WOODLEY:  That's exactly right, okay, sure.

17        THE COURT:  Starting from the road or, you know, I take

18   it, is the road a boundary?

19        MR. WOODLEY:  No, actually, the road is on the property

20   and the appraiser had taken the roads off to get actual

21   liveable space.

22        THE COURT:  Right, okay.  But it's your property, okay.

23        MR. WOODLEY:  Yes.  So, road --

24        MRS. WOODLEY:  I took some photos of the slope.

25        THE COURT:  I'm sorry, I didn't hear you.

1          MRS. WOODLEY:  I took some photos of the slopes of the

2     three properties that we've been discussing.

3          THE COURT:  Well, let's just do it in court here.

4          MR. WOODLEY:  All right.

5          THE COURT:  You can help your husband, it's allowed.

6          MR. WOODLEY:  That's nice, thank you.  Okay, maybe I

7     shouldn't have, on behalf of the Court.

8          THE COURT:  Well, just put it on the screen.

9          MR. WOODLEY:  So everybody can see it, okay.  All right,

10    basically -- go ahead.  What?

11         MRS. WOODLEY:  The road doesn't seem right.

12         MR. WOODLEY:  Oh, yeah, it does, but if you want to take

13    a side cut, there is property that goes down on the other side.

14    So, railroad is up here, that's the easement that was

15    abandoned.  There is a slope here.  There is no rock ledge ever

16    there, so I don't know what -- where that came from.

17         THE COURT:  What is the degree of the slope, please?

18    You show it as about a 30-degree slope, maybe 30 to 40-degree

19    slope.

20         MR. WOODLEY:  I think that's about right.

21         MRS. WOODLEY:  I should mention --

22         MR. WOODLEY:  We walk down from the railroad down.

23         MRS. WOODLEY:  I garden it.

24         THE COURT:  I'm sorry?

25         MRS. WOODLEY:  I stand on it and garden.  I mean --

1          MR. WOODLEY:  She gardens in it and trims trees in it

2     and stuff like that.

3          THE COURT:  All right.

4          MR. WOODLEY:  Well, I think that's probably close within

5     ten degrees either -- a total of ten-degree variance.  Then the

6     road.  Then the house.  And then down here, right about that

7     level, our house is a little subterranean on the base, but that

8     level, both head, and then lake Washington is to the left of

9     this, and when this property was actually deeded to the

10    railroad in 1903, the Chief Justice of the Territorial Supreme

11    Court, Joseph Lewis, made sure that all these owners got to

12    keep all of the rights to this property, other than surface

13    rights to the railroad.  They got mining rights, water rights,

14    all the water rights.  I mean, and he really did a nice job of

15    protecting us.  And that was -- that was one of the briefings

16    that counsel had asked me to do in this case, I did, I gave him

17    the materials and he kind of chopped a little bit of it and

18    gave it to you.

19         THE COURT:  Have you got that written on something that

20    you can just write Woodley 1 and give it to --

21         MR. WOODLEY:  Absolutely.

22         THE COURT:  All right, fine.  All right, thank you.  And

23    why don't you hand it to Mr. Stewart, I'm going to ask him to

24    comment on it in a minute.  Okay.  Anything further?

25         MR. WOODLEY:  Thank you, Your Honor.  Appreciate it.

Daniel Haggart, et al., v. USA                                    3/28/2014

1          THE COURT:  Thank you.

2          MRS. WOODLEY:  And no, we were not aware that anybody

3    ever stepped on -- trespassed on our property to take

4    information about appraising.

5          THE COURT:  Well --

6          MR. WOODLEY:  Not aware that --

7          THE COURT:  I don't know if it was a trespass.

8          MR. WOODLEY:  It's not a trespass, but not aware that it

9    was in planning or happening.

10         THE COURT:  Okay.

11         MR. WOODLEY:  The only thing I've seen is that the

12   people's -- the few people whose houses were actually

13   appraised, they were advised that they were going to be

14   actually appraised.  But --

15         THE COURT:  Okay.

16         MR. WOODLEY:  But people that -- no one on my lane has

17   said that they had any knowledge about anybody being on --

18   looking at their property.

19         THE COURT:  Okay, thank you.

20         MR. WOODLEY:  All right.

21         THE COURT:  Mr. Stewart, Ms. McCulley, one of you, could

22   you take Woodley 1 and make your comments, please.

23         MR. STEWART:  I don't have any comments, Your Honor.

24         THE COURT:  You don't?

25         MR. STEWART:  The slope is a lot greater than that.

1          THE COURT:  Let's hand it --

2          MR. STEWART:  I don't know if it's rock or not, it might

3   be something else.  The appraisers were out there on numerous

4   occasions.  I've been on Mr. Woodley's property at least ten

5   times.  They had pictures of it.  They took aerials of it for

6   purposes of the appraisals.  They're talking about Class

7   Counsel's mathematical calculations, it's not Class Counsel's

8   mathematical calculations, it's the appraiser's mathematical

9   calculations.

10         THE COURT:  Right.

11         MR. STEWART:  And even though their properties may look

12  similar, they're not, based on their size, even though they

13  alleged that they are, because there are significant

14  differences in this value based on size of these lakefront

15  properties.

16         THE COURT:  All right, thank you.  Mr. Trauben, do you

17  have any comment?

18         MR. TRAUBEN:  No, Your Honor, except that -- well, the

19  only comment that I have, and of moment here is that these

20  waterfront -- these lakefront properties, the -- our appraiser,

21  the United States appraiser determined that the most critical

22  factor in valuing the lakefront properties was the amount of

23  frontage along the lake.  So, if their frontage along the lake

24  varies, then it was our view that that was the greatest factor,

25  rather than the depth of the property.  That the value of the

Daniel Haggart, et al., v. USA                                    3/28/2014

1    land, the further away you went from the lake, was not as

2    great.  In other words, the land in the back was not as

3    valuable as the land in the front.  So, you have to know --

4         THE COURT:  And you agree that there is a bulkhead on

5    the front between the property and the lake, I take it?

6         MR. TRAUBEN:  I don't recall specific property.

7         THE COURT:  Well, I'll take Mr. Woodley's word for it.

8         MR. TRAUBEN:  Should I hand this to the Court?

9         THE COURT:  Why don't you hand it to the clerk,

10   obviously if you want it, you may have a copy of it.

11        Okay.  With that, are we finished?  Anything further,

12   Mr. Trauben?

13        MR. TRAUBEN:  No, Your Honor.

14        THE COURT:  Anything further, Mr. Stewart?

15        MR. STEWART:  No, Your Honor.

16        THE COURT:  All right.  Mr. Woodley?

17        MR. WOODLEY:  Your Honor, did Mr. Young get to finish

18   his statement or not?

19        THE COURT:  I don't think -- Mr. Young?

20        MR. YOUNG:  Yes, Your Honor?

21        THE COURT:  Oh, you're back?

22        MR. YOUNG:  I didn't leave, I'm just so old that I

23   fumbled my cell phone, I apologize, Your Honor.

24        THE COURT:  All right, did you have anything further you

25   wanted to say?

1        MR. YOUNG:  No, I don't know at what point I stopped
2   being audible to you, but I do want Mr. Trauben to know, if I
3   got cut off before that, that I'm not being critical of his or
4   Class Counsel's or the appraiser's efforts, I know it was a lot
5   of work, it's just that even when we humans try to do something
6   perfectly, we still can make mistakes, and that's what we were
7   hoping to check on, if we had been allowed to see the
8   documentation behind these numbers.  And, you know, Mr.
9   Woodley's made that point, it's we just couldn't make an
10  informed consent without having -- being given the
11  documentation, and that didn't happen.
12       THE COURT:  Well, thank you, Mr. Young.  With that, may
13  the Court declare the fairness hearing closed?
14       MR. STEWART:  Yes, Your Honor.  I mean, I think
15  historically, I don't know -- are you going to plan to take
16  this under advisement, Your Honor?
17       THE COURT:  Yes.
18       MR. STEWART:  And I think it's critical for both the
19  government and Plaintiffs, with respect to the $16,000 a day,
20  that we, and maybe you've already moved on this with the
21  treasurer, I know with all the Social Security numbers, et
22  cetera, but the timeliness is somewhat critical, Your Honor,
23  thank you.
24       THE COURT:  Well, it is, but I understand that.  Mr.
25  Trauben, do you have any commentary?

1          MR. TRAUBEN:  No, Your Honor.  Nothing further.

2          THE COURT:  All right, one of the reasons we scheduled

3    the hearing when we did is to move the matter along, obviously,

4    from everybody's standpoint.

5          MR. TRAUBEN:  Thank you.

6          THE COURT:  And obviously that's why I also raised the

7    point about the Social Security numbers and whether that would

8    put a hitch in the process.

9          Now, the one question I would raise, and it's really a

10   request I would make, is that after you consult with each

11   other, you believe that there is something about this -- I

12   guess I should say tax identification number issue, that the

13   Court ought to know before ruling on the fairness hearing,

14   would you please file a notice and tell the Court about it?

15         MR. TRAUBEN:  Yes, I certainly will, Your Honor.

16         THE COURT:  Okay, thank you.  Now, the fairness hearing

17   is concluded.  Do you have any commentary on the briefing

18   respecting the motion that you have filed on division of the

19   common fund?  Do you want to do that, or do you want to rest on

20   your papers?  The Court understands your papers.

21         MR. STEWART:  Yeah, we'll rest on our papers, Your

22   Honor.

23         THE COURT:  Mr. Trauben?

24         MR. TRAUBEN:  That's fine, Your Honor.

25         THE COURT:  All right.  Ms. Long?

Daniel Haggart, et al., v. USA                                    3/28/2014

1        MS. LONG:  Yes?

2        THE COURT:  Mr. Young?  Mr. Young?

3        MR. YOUNG:  Your Honor, I apologize, I don't understand,

4   is this question going to attorneys' fees or is it not?

5        THE COURT:  Well, I think I just addressed attorneys'

6   fees by taking a submission on the papers, Mr. Young.

7        MR. YOUNG:  Okay.  But some of us -- some of us are only

8   being represented by Mr. Woodley and by the Baker firm, and we

9   haven't personally filed any papers.  So, will you be in a

10  position to take into consideration the oral comments that

11  we've made?  Because I don't have anything else to say besides

12  what I've already said.

13       THE COURT:  Well, that's fine.  That's why, Mr. Young,

14  you had every right to an opportunity to speak, and you did.

15       MR. YOUNG:  Thank you, Your Honor.  You've heard me out,

16  I appreciate it very much.

17       THE COURT:  Well, I hope so.  That was part of the

18  exercise.  All right.  With that, the case is submitted, and I

19  must say, this is the largest, or it's not the largest

20  collective action the Court has had, I had one with 20,750

21  individual members, but this is the largest class action the

22  Court has had as such, and, so, the Court will take this under

23  advisement and we'll do our best to come out with something

24  reasonably promptly, but hopefully we'll address all the issues

25  that have been raised.  Yes, Mr. Woodley?

Daniel Haggart, et al., v. USA                          3/28/2014

1          MR. WOODLEY:  Your Honor, you had reserved ruling on my
2    request to provide you with materials.
3          THE COURT:  No, that's why I've thought about that and
4    that's why I gave you hopefully every opportunity to speak.
5          MR. WOODLEY:  Okay.  Mr. Young's got a declaration that
6    he would like the Court to consider.
7          THE COURT:  In addition to his comment?
8          MR. WOODLEY:  Yes.
9          THE COURT:  Why doesn't he submit that through Mr.
10   Stewart and Ms. McCulley and we'll take that as a late
11   commentary.
12         MR. WOODLEY:  Okay.  And I would like the Court to
13   accept the declaration of independent ethics counsel, could
14   that be submitted through Mr. Stewart as well?
15         MR. STEWART:  I totally object to that, Your Honor.
16         THE COURT:  I'm sorry?
17         MR. STEWART:  I object to that, Your Honor, it's total
18   hearsay, and I have not seen it before today, I haven't even
19   seen it as of today.
20         THE COURT:  All right, and I think the Court can deal
21   with that, or that whole constellation of issues, Mr. Woodley.
22         MR. WOODLEY:  So, my written objections, Your Honor,
23   even for the record?
24         THE COURT:  Well, you've made a written objection that
25   has been forwarded by counsel.


For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1       MR. WOODLEY:  Oh, no, that was -- no, the substance of
2   the objection was -- it was never requested in the form that
3   you have to write all your objections in advance of the
4   hearing.
5       THE COURT:  That's why you were also given an
6   opportunity to speak and to make a full presentation to the
7   Court, Mr. Woodley.  I even gave you -- you know, I even gave
8   you, I think, an opportunity to provide something in writing in
9   the sense of actually drawing the topographic -- the rough
10   topographical sketch of your property.  I hope I did.
11       MR. WOODLEY:  With the Court's permission, I will give
12   the declaration of Mike Young to counsel to file --
13       THE COURT:  Well, now Mr. Young can submit that to
14   counsel himself.
15       MR. WOODLEY:  I have his signed declaration.
16       THE COURT:  Fine, you can work with counsel to have it
17   provided here as supplemental notice to the Court.  That's
18   perfectly fine.
19       MR. WOODLEY:  All right.  Thank you, Your Honor.
20       THE COURT:  I would just comment that my classmate was
21   Barbara Durham, she was noted for wearing hats, I don't know if
22   you're aware of that, but anyway.
23       MR. WOODLEY:  She was pretty stylish.
24       THE COURT:  Well, we'll leave that aside.  In any event,
25   thank you very much, and the matter will be submitted.

1            COUNSEL:  Thank you, Your Honor.

2            (Whereupon, at 5:13 p.m., the hearing was adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 CERTIFICATION OF TRANSCRIBER

 2

 3          I, Sara J. Vance, CERT, court-approved transcriber,

 4    certify that the foregoing is a correct transcript from the

 5    official electronic sound recording of the proceedings in the

 6    above-titled matter.

 7

 8

 9

10    DATED:   3/31/14            /S/ Sara J. Vance

11                               Sara J. Vance, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```