# In the United States Court of Federal Claims

No. 09-103L

(Filed:  May 21, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| **Daniel and Kathy HAGGART, *et al*, For Themselves and As Representatives of a Class of Similarly Situated Persons,** ) )  )  )  ) | Rails-to-trails case; takings; class action with more than 500 opt-in plaintiffs; settlement; fairness of settlement; common-fund approach to award of attorneys' fees to class counsel |

|  |  |
|---|---|
| **Plaintiffs,** ) |  |
| ) |  |
| **v.** ) |  |
| ) |  |
| **UNITED STATES,** ) |  |
| ) |  |
| **Defendant.** ) |  |
| ) |  |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas S. Stewart, Baker Sterchi Cowden & Rice, L.L.C., Kansas City, Missouri, for plaintiffs.  With him on the briefs were Elizabeth G. McCulley, Steven M. Wald, and J. Robert Sears, Baker Sterchi Cowden & Rice, L.L.C., St. Louis, Missouri, and Kansas City, Missouri.

Bruce K. Trauben, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs was Robert G. Dreher, Acting Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge,

This rails-to-trails class action is before the court on the parties' Joint Motion for Approval of Settlement and plaintiffs' Motion for Court Approval of Fees and Proposed Division of the Common Fund.  Plaintiffs are more than 500 landowners who allege a taking of their land by the federal government when the Surface Transportation Board issued Notices of Interim Trail Use ("NITUs") relating to three segments of railroad rights of way in King County, Washington.  *See Haggart v. United* States, 89 Fed. Cl. 523, 528 (2009) ("*Haggart I*").  The rights of way were previously held by the Burlington Northern and Santa Fe Railway ("Burlington Northern").  *Id*.  Rather than abandon the rights of way, Burlington Northern

requested and received NITUs from the Surface Transportation Board, transferring its interest in the rights of way to King County, Washington for recreational use as trails.  *See id.* at 529.

Plaintiffs promptly filed this suit as representatives of a class of landowners, alleging an uncompensated taking of their private property without compensation in contravention of the Fifth Amendment.  After the court certified the class, the parties jointly moved to divide the class into six subclasses, which the court approved.  *See Haggart v. United States*, 104 Fed. Cl. 484, 491-92 (2012) ("*Haggart II*").  The parties then filed cross-motions for partial summary judgment relating to Subclasses Two and Four.  *Haggart v. United States*, 108 Fed. Cl. 70, 74-75 (2012) ("*Haggart III*").  The court granted in part and denied in part the parties' cross-motions, assigning liability to the government in some instances but not others, and also recognizing the existence of genuine disputes of material fact relating to further class members.  *See id.* at 98.  As a result of the court's decision, the parties entered into settlement negotiations regarding 253 landowners whose claims remained viable.  *See* Joint Mot. for Approval of Settlement ("Joint Mot.") at 3, ECF No. 161.  A settlement agreement was reached and gained full approval of the authorized representative of the United States Attorney General.  *Id.* at 3-4.  The court then preliminarily approved the parties' settlement plan and allowed notice of the proposed settlement to be provided to the class.  Order of Feb. 25, 2014, ECF No. 164.  After the class was given an opportunity to comment on the settlement, the court held a hearing on the fairness of the settlement agreement on March 28, 2014 in Washington, D.C.  A married couple who are class members participated in person in Washington, D.C., and two class members participated via telephonic means.  Hr'g Tr. 2:21-24 (Mar. 28, 2014).[1]

## BACKGROUND

### A. The Takings Claim

At issue in this case are three strips of land, totaling approximately 25.45 miles in length.  *Haggart III*, 108 Fed. Cl. at 75.[2]  The strips consist of a railroad right of way initially established during the late 1800s and early 1900s and eventually acquired by Burlington Northern.  *Id.*  In 2003, Burlington Northern announced its intent to divest itself of the railroad lines at issue.  *Id.*  Five years later, in 2008, Burlington Northern filed with the Surface Transportation Board a petition for exemption to abandon the rail corridor.  After these petitions were filed, King County, Washington requested a NITU from the Surface Transportation Board, agreeing to assume financial responsibility for trail use.  *Id.*  At the end of 2009, Burlington Northern and King County entered into a Trail Use Agreement, which allowed for public recreational trail use and stipulated that the railroad line would be "rail-banked" for potential railroad use in the future.  *Id.* at 75-76.  The NITUs was granted, and the plaintiffs filed their suit, alleging that under Washington law, the "cessation of railroad activities across the burdened property effected

---

[1]Further citations to the transcript of the Fairness hearing will omit reference to the date.

[2]"The first section runs from milepost 0.0 at Woodinville to milepost 7.3 at Redmond; the second encompasses the span between milepost 5.0 at Kennydale and milepost 10.6 at Wilburton; and the third runs from milepost 11.25 near Wilburton to milepost 23.8 in Woodinville . . . ."  *Haggart III*, 108 Fed. Cl. at 75.

an abandonment of the railroad-purposes easement . . . , leading to a taking when the NITUs authorizing recreational trail use were issued." *Haggart III*, 108 Fed. Cl. at 76.

## B. The Settlement Agreement[3]

In preparation for trial, both parties retained appraisers to independently examine the subject properties to determine the fair market value of the property interests alleged to have been taken. Joint Mot. at 4. Given the large number of individual properties, class counsel for the plaintiffs worked with their appraiser to establish valuation groups and sub-groups based upon the character and use of the properties, *see* Pls.' Mot. for Court Approval of Fees and Proposed Division of the Common Fund ("Pls.' Mot. for Fees") at 6, ECF No. 163, ultimately dividing the properties into 22 groups. Joint Mot. at 4. Within each group, representative parcels were selected to serve as a proxy for the other properties in the group based on common use, zoning, similar location, and other features shared with properties in the group. *See* Pls.' Mot. for Fees at 7. Certain parcels were designated as "unique" because they did not share enough common valuation features with any other property. *Id.* Plaintiffs' expert then appraised each of the representative and unique parcels. *Id.* For properties designated as "unique," the fair market value was directly determined by an appraisal for that specific property. *Id.* at 8. Similarly, for a parcel selected as a representative parcel, the parcel's fair market value was determined by the specific appraisal conducted respecting that property. *Id.* "The value of the property interest [allegedly] taken in each property that was not directly appraised was determined by [the appraiser's] value per square foot of the representative properties in a sub-group that were appraised, and were then extrapolated to each parcel in the sub-group based on the individual square footage of each individual parcel." *Id.*

The government retained its own appraiser to conduct site visits and appraise all properties as well.[4] After two days of mediation with Senior Judge John P. Wiese, the parties

---

[3]At the fairness hearing, the government emphasized that it was choosing to settle the case, but it was not conceding liability. Hr'g Tr. 18:6-10; *see also* Hr'g Tr. 18:19-23 ("Also, I would like to put on the record that this settlement has no value as precedent in any pending or future litigation involving any other [r]ails[-]to[-][t]rails class action or any action that may be filed in the future relating to this same right-of-way that's at issue in this case.").

[4]During the fairness hearing, the court inquired into the appraisal process:

Mr. Trauben [government's counsel]: "[W]e visited every piece of property at issue in this case.

The Court: Did the property owners know that?

Mr. Trauben: I don't know if all the property owners knew we were out there looking at their property or not, but we visited all of their propert[ies]. The [p]laintiffs and their appraiser visited all of the propert[ies].

The Court: And you and your appraiser?

agreed to valuations of the representative parcels "that took into consideration the strengths and weaknesses of each side's appraisal." Joint Mot. at 4.[5]  The agreed-upon fair market values of the representative parcels were then used to value the parcels within each of the 22 groups. *Id.* These agreed-upon values led to an overall compensation amount of $110,000,000.00, plus interest through May 31, 2014 of $27,961,218.69. *Id.*[6]

The parties additionally agreed to the reimbursement of reasonable attorneys' fees and costs. Joint Mot. at 5.  In a takings case, the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("Uniform Relocation Act"), 42 U.S.C. § 4654(c), authorizes the reimbursement of reasonable attorneys' fees and costs to a prevailing plaintiff.[7]  In this instance,

---

Mr. Trauben: Yes, I did, with my appraiser.  Our appraisers hired by the United States looked at the individual lay of the land of every piece of property and put that into consideration, and when we went in to the mediation, we had specific points about the different properties and the issues that [were] involved with them and we didn't discuss necessarily every individual property, but there were common factors among groups of property that we discussed.  And a lot of that was addressed in the mediation.  So, it was an arduous process that involved many, many hours, and that states to me that this is a fair, reasonable, adequate settlement.

Hr'g Tr. 68:13 to 69:6.

[5]Class counsel represents that the "complete schedule of each property owner's specific compensation amount for land values is specified on a schedule retained by the parties." Pl.'s Mot. for Fees at 9.  Further, class counsel attests that in the more than 10 rails-to-trails cases it has resolved with the government, the "valuation schedule has never been made publically available.  Both the individual [c]lass [m]embers, by and through [c]lass [c]ounsel, and D[epartment of ]J[ustice] believe the settlement amounts are private." *Id.* at 9 n.6.

[6]The parties calculated interest through May 31, 2014, the estimated date of payment of settlement.  Joint Mot. at 4.  The parties agree, however, that interest may be recalculated based upon the Department of Treasury's date of actual payment, using the same method of interest computation employed for the stated estimated interest amount and an annual interest rate of 4.2%.  Joint Compromise Settlement Agreement Between Plaintiffs and the United States ¶ 7, ECF No. 161-2.  Moreover, if the government pays more in interest than has accrued as of the date of actual payment, the plaintiffs have agreed to refund the amount over-paid. *Id.*

[7]42 U.S.C. § 4654 states in pertinent part:

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a [f]ederal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse

class counsel and the government agreed to reimbursement of statutory attorneys' fees of $1,920,000.00 and statutory costs and expenses of $660,000.00.  Joint Mot. Ex. A (Notice of Proposed Final Settlement of Class Action Against the United States) at 1, ECF No. 161-1.

The parties have agreed that upon approval by this court of the settlement agreement, the government will submit the approved settlement to the Judgment Fund Branch of the U.S. Department of the Treasury for payment.  Joint Mot. at 5.  After the Department of the Treasury reviews and approves the settlement, the settlement funds will be transmitted electronically to class counsel for distribution to the named plaintiffs and class members who are to receive compensation.  *Id.*[8]

The settlement agreement identifies the claimants whose claims were dismissed following the court's decision on the parties' cross-motions for summary judgment.  Those class members' claims will be dismissed with prejudice and without compensation.  Joint Mot. at 3 n.1.

### C. The Contingent Fee Agreement

In addition to the joint motion for approval of the settlement agreement, which provides for the payment of the principal, interest, and statutory attorneys' fees and costs, plaintiffs' class counsel has moved for approval of a contingency fee arrangement and the related proposed division of the common fund.  Pls.' Mot. for Fees at 1.  Class counsel requests an award of 30% of the common fund, defined as the principal, interest, and statutory attorneys' fees.  *Id.* at 1 & n.1, 3.  Thus delineated, the common fund would amount to $139,881,218.69 ($110,000,000.00 (principal) + $27,961,218.69 (interest) + $1,920,000.00 (statutory attorneys' fees)), 30% of which amounts to $41,964,365.61.  The government has not taken a formal position on class counsel's motion, but it has commented that "there is no binding precedent on what funds should comprise the '[c]ommon [f]und,'" Def.'s Resp. to Pls.' Mot. for Court Approval of Fees and

---

such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c).

[8]Currently, "[t]he Department of the Treasury requires each [c]lass member receiving a portion of the total settlement to provide their Social Security Number or Federal Tax Identification Number prior to processing payment, so that the Department of the Treasury may fulfill its statutory obligations under the Debt Collection Improvement Act of 1996 (31 U.S.C. § 3325(d))."  Joint Mot. Ex. A, at 2.  At the fairness hearing, the court and the parties discussed the potential impact on distribution of settlement funds by the Department of Treasury if class counsel failed to receive the social security numbers or tax identification numbers for all class members.  *See* Hr'g Tr. 20:24 to 21:9, 85:6-15.  Fortunately, class counsel has received all of the necessary information from class members and no delay should occur in distribution of settlement funds for that reason.  *See* Notice of Supplemental Compliance, ECF No. 185 (notifying the court that SSN/TIN information has been received from all class members).

Proposed Division of the Common Fund at 3, ECF No. 165, citing precedents that at least suggest that statutory attorneys' fees should be excluded from the common fund and then subtracted from the amount class members agreed to pay class counsel, *id.* at 3-4 (discussing *Boeing v. Van Gemert*, 444 U.S. 472 (1980), and *Janssen v. United States*, No. 09-559, slip op. at 2 (Fed. Cl. Oct. 17, 2013), among other decisions).

Class counsel states that that all class members who signed a contingency fee agreement before the case was certified as a class agreed to a 35% contingent fee of the common fund, which was defined to include the land values, interest for delay damages, and statutory attorneys' fees. Pls.' Mot. for Fees at 2 n.2. Class counsel further represents that even those class members who did not sign a contingency fee agreement were provided with a copy of it and were "well aware that [c]lass [c]ounsel would pursue a fee of 35% of each landowner's award, including land values, interest for delay damages, and statutory attorneys' fees." *Id.* at 2. Class counsel has reduced its request to 30% of the common fund, which it argues is both consistent with prior rails-to-trails class actions and reasonable. *Id.* at 26. Class counsel notes that "[the] process of determining and defining each [c]lass [m]ember's title to the property and property dimensions along th[e abandoned railroad] corridor was a difficult, costly, and time-consuming process." *Id.* at 4.

### D. Notice of Settlement to Class Members, Objections to the Settlement, and the Fairness Hearing

The court preliminarily approved the proposed settlement agreement, allowing class counsel to provide notice of the proposed settlement agreement to the class. Order of Feb. 25, 2014, ECF No. 164; *see also* Order of Feb. 27, 2014, ECF No. 168. The notice advised each class member of the proposed settlement terms, including that particular class member's settlement amount and proposed share of attorneys' fees, as well as of their right to participate in the fairness hearing. Joint Mot. Ex A, at 3.

Of the 253 prevailing class members, class counsel received two objections to the settlement and requests to participate in the fairness hearing and one additional request to participate in the fairness hearing. Notice of Compliance at 1, ECF No. 174; Supplemental Notice of Compliance, ECF No. 175. Three class members participated in the fairness hearing: Mr. and Mrs. Gordon Woodley, Susan Long (by telephone), and D. Michael Young (by telephone), on behalf of himself and his wife, Julia H. Young. Hr'g Tr. 2:21-24. Mr. and Mrs. Woodley expressed dissatisfaction with the amount of contingent attorneys' fees being sought by class counsel, contending that the statutory fees are not only sufficient but the only legal source of attorneys' fees. *See, e.g.*, Hr'g Tr. 47:20-23. They also expressed frustration at being denied the details as to how individual claimants' properties were valued and, in turn, assigned a compensation amount. *See, e.g.*, Hr'g Tr. 35:10-24. Ms. Long commented on the division of attorneys' fees between class counsel and Mr. Woodley, stating that she believes class counsel signed a valid fee-sharing agreement with Mr. Woodley that should be honored. Hr'g Tr. 25:9 to 26:12. Ms. Long also stated that she was satisfied with her settlement amount. Hr'g Tr. 26:21 to

27:2.[9]  Mr. Young expressed his dissatisfaction with the contingent fee reflected in the settlement agreement, arguing that statutory attorneys' fees are sufficient to compensate class counsel.  Hr'g Tr. 30:1-5.  Mr. Young also expressed dissatisfaction with the amount of information shared by class counsel with class members regarding valuation of properties and individual settlement amounts. Hr'g Tr. 30:7 to 31:15 ("[W]e specifically asked them for the documentation that shows how they came up with the numbers, and they declined . . . to do it.").  Lastly, Mr. Young, agreeing with Ms. Long, expressed his belief that Mr. Woodley entered into a fee sharing agreement with class counsel, and they should respect that agreement.  Hr'g Tr. at 31:16 to 32:14.

## ANALYSIS

At issue are the parties' joint motion for approval of the settlement agreement and class counsel's separate motion for approval of the contingency fee agreement and the related division of the common fund.

### A. The Parties' Joint Motion for Approval of the Settlement Agreement

Under Rule 23(e) of the Rules of the Court of Federal Claims ("RCFC"), a certified class action "may be settled, voluntarily dismissed, or compromised only with the court's approval." RCFC 23(e) further specifies the procedures that appertain to a proposed settlement, voluntary dismissal, or compromise:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
(4) [Not used.]
(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

RCFC 23(e)(1)-(5).[10]  Previously, the court directed that notice be mailed to all class members and it held a fairness hearing, in accord with RCFC 23(e)(1) and (2), respectively.  What remains

---

[9]Ms. Long's written objection related solely to attorneys' fees, not her individual settlement amount or the settlement as a whole.  *See* Notice of Compliance Ex. A, at 3, ECF No. 174-1.  No issue regarding a fee-sharing agreement between class counsel and Mr. Woodley is before the court.  The court accordingly expresses no opinion on the existence or validity of a fee-sharing agreement between class counsel and Mr. Woodley.

[10]Rule 23 of the Fed. R. Civ. P. is substantially similar to RCFC 23, and decisions by federal courts applying Fed. R. Civ. P. 23 are persuasive in this court.  *See Haggart I*, 89 Fed. Cl. at 529 (citing *Barnes v. United States*, 68 Fed. Cl. 492, 494 n.1 (2005)).  With respect to court approval of a proposed class settlement under RCFC 23(e), however, one relevant difference

is the court's determination whether the settlement agreement is "fair, reasonable, and adequate." RCFC 23(e)(2).

In deciding whether to approve a proposed class settlement, the fundamental question is whether the terms of the settlement reasonably reflect the likely rewards of litigation. *Christensen v. United States,* 65 Fed. Cl. 625, 629 (2005) (citing *Weinberger v. Kedrick,* 698 F.2d 61, 73-74 (2d Cir. 1982) (in turn citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968))). "'[T]o supplement the thus necessarily limited examination of the settlement's substantive terms, attention also has been paid to the negotiating process by which the settlement was reached . . . .'" *Id.* (alterations in original) (quoting *Weinberger,* 698 F.2d at 73-74). Thus, the court must examine both the procedural and substantive fairness of the settlement. Procedural fairness rests on whether the settlement resulted from arms-length negotiations and whether class counsel effectively represented the class by possessing adequate experience and ability and by engaging in sufficient discovery. *Id.* (internal citation omitted). Substantive fairness is a case-by-case inquiry, and, although there is no definitive list of factors a court must apply, many courts have considered some combination of the following:

(1) The relative strengths of plaintiffs' case in comparison to the proposed settlement, which necessarily take into account:

 (a) The complexity, expense, and likely duration of the litigation;
 (b) The stage of the proceedings and the amount of discovery completed;
 (c) The risk of establishing liability;
 (d) The risk of establishing damages;
 (e) The risk of maintaining the class action through trial;
 (f) The ability of the defendants to withstand a greater judgment;[11]
 (g) The reasonableness of the settlement fund in light of the best possible recovery;
 (h) The reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; and

_____

exists. RCFC 23(e) makes no reference to settlements involving opt-out classes, whereas Fed. R. Civ. P. 23(e)(4) allows a court to "refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so." Fed. R. Civ. P. 23(e)(4). The Rules Committee Notes to RCFC 23 clarify that "unlike the [Fed. R. Civ. P.], the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States . . . ." RCFC 23 Rules Committee Note (2002 Revision); *see also Dauphin Islands Property Owners Ass'n v. United States,* 90 Fed. Cl. 95, 102 (2009). Thus the court may not require that the settlement terms afford class members a chance to opt out of the settlement at this stage of the proceedings.

[11]This factor carries little weight in a case such as this one where the defendant is the federal government. The government can theoretically "always withstand greater judgment because of Congress's unlimited ability to tax." *Berkley v. United States,* 59 Fed. Cl. 675, 713 (2004) (internal citations omitted).

(i)  The recommendation of class counsel, taking into account the adequacy of class counsel's representation of the class.

(2)  The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms.

(3)  The fairness of the settlement to the entire class.

*See Dauphin Island*, 90 Fed. Cl. at 102-03 (citing cases) (considering also fairness of attorneys' fees); *see also Raulerson v. United States*, 108 Fed. Cl. 675, 677 (2013) (same); *Voth Oil Co. v. United States*, 108 Fed. Cl. 98, 103 (2012) (same).  Courts analyze these factors in light of "'the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources.'"  *Christensen*, 65 Fed. Cl. at 629 (quoting *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993)).  Because class counsel has submitted a separate motion for approval of a contingency fee, the court will consider only the parties' agreement on attorneys' fees under the Uniform Relocation Act in conjunction with its consideration of the substantive fairness of the settlement agreement.

There is no evidence that the negotiating process was procedurally unfair.  Both parties represent that negotiations were at arms-length.  Joint Mot. at 6.  Plaintiffs retained their own appraiser to determine the fair market value of the properties, as did the government.  *Id.* at 4.  A compromise between diverging appraisal amounts was achieved through mediation under the purview of Senior Judge Wiese.  *Id.*  Class counsel has extensive experience litigating rails-to-trails cases in this court, and the court is confident that class counsel possessed the requisite experience to be effective counsel leading up to and throughout negotiations.  This finding is supported by class counsel's significant success on summary judgment, which required extensive discovery and legal research.  After winning partial summary judgment, class counsel engaged in further substantial and detailed discovery for purposes of determining appraisal values.  *See* Pls.' Mot. for Fees at 6-9.

The court is similarly persuaded that the settlement agreement is substantively fair.  First, perhaps the most important consideration for the court is whether the terms of the settlement agreement reasonably reflect the strengths of the plaintiffs' case in comparison to the proposed settlement.  *Christensen,* 65 Fed. Cl. at 629 & n.6.  This is a relatively large settlement, which accurately reflects the parties' positions following the court's decision on their cross-motions for partial summary judgment regarding liability and the proper methodology to determine the amount of just compensation.  *See Haggart III*, 108 Fed. Cl. at 74-75, 96-98.  Those motions were submitted on behalf of and regarding two large subclasses, each of which had a number of discrete categories of claimants dependent upon differing sources and types of title.  *See id.* at 77-96.  For each of the categories within the two subclasses, the court had to determine whether the railroads had acquired easements or fee simple estates under Washington state law, entailing a deed-by-deed inquiry.  The court held that most categories of deeds showed that the railroad merely held an easement as opposed to a fee.  *See id.* at 82, 89-94.[12]  The court further held that

---

[12]The government was granted summary judgment as to liability for one category of deeds, *Haggart III*, 108 Fed. Cl. at 94, and for other categories, issues of material fact remained and neither of the parties' motions for summary judgment were granted, *see, e.g., id.* at 81

for those deeds showing that only an easement was given to the railroad, the government was liable for a taking to any property holder who had established or would establish ownership of the underlying fee interests in the corridor. *Id.* at 82, 96. In certain instances, issues of ownership of the underlying fee interests were preserved for trial. *See*, *e.g.*, *id.* at 86 ("The ownership issue for these parcels is reserved for trial.").

Thus, after the court rendered its decision on the cross-motions for summary judgment, the plaintiffs were in a strong position, but issues nonetheless remained. The government's liability for a large number of plaintiffs, though not all, had been established. At the same time, numerous factual issues of ownership and some legal issues of liability remained open. Trial would have been lengthy and complex. Plaintiffs would have been required to prove ownership of each class member over the affected parcels, and both parties would have had to present experts to testify as to competing fair market values for the parcels at issue. In these types of large, complex cases, settlement is particularly favored.

In resolving the appropriate methodology for determining damages, the court held that just compensation was the difference between what the plaintiffs had before the taking by the issuance of the NITU, a fee unencumbered by any easements, and what they were left with after the issuance of the NITU. *Haggart III*, 108 Fed. Cl. at 96. Class counsel informed their appraiser of the court's methodology for determining just compensation, and this methodology was used by the parties in their negotiations to reach fair market values of the interests allegedly taken. Pls.' Mot. for Fees at 7-9. This factor strongly weighs in favor of finding the settlement agreement to be fair. Joint Mot. at 6; *see also Janssen v. United States*, No. 09-55L, 2013 WL 6039422, at *1 (Fed. Cl. Nov. 14, 2013); *Voth Oil Co.*, 108 Fed. Cl. at 103 (approving a settlement where plaintiffs had a strong case and were going to receive 100% of negotiated fair market values of each class member's property interests plus interest). Class counsel stated in their notice to class members that they believed that "even if the case were to proceed to litigation and the United States were to be found liable for a taking, it [would be] unlikely that [p]laintiffs would be able to establish entitlement to just compensation in an amount greater than provided for in this settlement." Joint Mot. Ex A, at 2.

Overall, while the prospect of a wholly adverse result may have been low for plaintiffs after the court's decision on the cross-motions for partial summary judgment, the expense, burden, and risk attendant to trial would have been significant. The large overall settlement amount, divided and allocated to each class member's individual property, adequately and fairly reflects the strength of the class members' case.

Second, the court must consider the fairness of the parties' settlement agreement on the statutory attorneys' fees and expenses. The parties agreed to fees and expenses in the amount of $2,580,000, comprised of $1,920,000 in fees and $660,000 in expenses. Pls.' Mot. for Fees at 12. The court's inquiry goes only so far as determining whether the award is a reasonable approximation of the amount due under the statute. *Raulerson*, 108 Fed. Cl. at 678-79 (citing *Moore v. United States*, 63 Fed. Cl. 781, 785 & n.6 (2005)). "Where the actual award

_____

(denying summary judgment for plaintiffs whose deeds contained easements acquired through adverse possession).

is distinctively higher than the amount that would have been due under the U[niform ] R[elocation ]A[ct], this suggests that it might have unduly influenced the other parts of the settlement; however, where the actual award is lower, it is generally reasonable." *Id.* at 679 (internal citations omitted).  Calculation of a fee under the Uniform Relocation Act relies on determining a "lodestar" figure, which is derived by multiplying the hours reasonably expended in pursuit of a successful claim by each attorney's reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983).  "'[I]n general, forum rates should be used to calculate attorneys' fee awards under . . . fee-shifting statutes.'"  *Bywaters v. United States*, 670 F.3d 1221, 1233 (Fed. Cir. 2012) (quoting *Avera v. Secretary of Health & Human Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008)).  An exception applies, however, where the "bulk of the work is done outside of the [forum] in a legal market where the prevailing attorneys' rates are substantially lower."  *Id.* (alteration in original) (internal citations and quotations omitted).

Class counsel represents that they have spent more than 8,500 hours on the case and incurred $635,000 in expenses, which does not include expenses related to obtaining approval of and distributing the settlement.  Pls.' Mot. for Fees at 11.  Class counsel has not been paid for any of its work on this case thus far.  *Id.*  After an initial impasse regarding statutory fees and expenses, the parties mediated a settlement, again before Senior Judge Wiese.  *Id.* at 11-12.  The parties have not supplied the court with any specific information regarding the rates usually charged by class counsel or by other attorneys in their market.  Here, dividing $1,920,000 by 8,500 hours yields approximately $226 per hour.  Undoubtedly, various lawyers and paralegals worked on this case with their own hourly rates, but $226, as an average hourly rate, is not unreasonably high, and in fact, could be considered low.  Because the award is likely lower than what the attorneys might otherwise have received under the statute, it is presumptively reasonable.  Moreover, the resolution of the figure through an adversarial mediation process further militates in favor of finding the agreement on fees and expenses to be reasonable.

Third, class members received notice of the settlement, and their reaction has been favorable, with very limited exceptions.  In response to the court's approved notice, 250 of the 253 class members affirmatively consented to the settlement agreement.  Hr'g Tr. 11:25 to 12:2.  Regarding the class members who did not consent and who participated in the fairness hearing, Mr. Young and Mr. and Mrs. Woodley objected to the substantive terms of the settlement, in addition to attorneys' fees and division of the common fund.  Hr'g Tr. 30:1 to 32:14 (comments of Mr. Young); Hr'g Tr. 35:10-24, 38:8-18 (comments of Mrs. Woodley); Hr'g Tr. 43:19-23, 59:19-24 (comments of Mr. Woodley).  They objected on the grounds that without having received the underlying data and appraisal justifying their individual settlement amounts, they were unable to give informed consent to the settlement.  *Id.*  A third class member, Ms. Long objected only to the division of attorneys' fees, not the substantive terms of the settlement.  Hr'g Tr. 25:4-6.  The rest of the class members, an overwhelming majority, consented to the settlement without qualification.  Hr'g Tr. 11:25 to 12:2.  Class members had received information as early as September 2013 regarding the likely terms of the settlement, and many consented to them at that time.  Pls.' Mot. for Fees at 25.  In March 2014, class members were provided formal notice of the settlement terms and their specific settlement amount (including proposed deductions for attorneys' fees), and they were advised of their right to participate in the

fairness hearing.  *See* Joint Mot. Ex. A & B.  In sum, the notice of the proposed settlement given to class members was adequate and the vast majority of class members consented to the settlement agreement.

Insofar as access by class members to appraisal data arose as a specific issue at the fairness hearing in commentary by the Woodleys and Mr. Young, class counsel responded by stating that he and his colleagues had explained the underlying methodology and data to Mr. and Mrs. Woodley, Mr. Young, and any others that inquired.  *See* Hr'g Tr. 64:21-23, 65:2-4 ("And, in fact, we provided the exact numbers on that spreadsheet to Mr. Woodley in writing that he failed to show the court."); *see also* Hr'g Tr. 72:2-14.  Mrs. Woodley advised the court that she had met with class counsel who had endeavored to explain the basis for the appraisal of their property, *see* Hr'g Tr. 35:25 to 37:3, 74:1-18, but the explanation was not satisfactory to her, particularly because she believed their property was undervalued, Hr'g Tr. 75:14-23.  The court will not hold the settlement agreement to be unfair, unreasonable, or inadequate for this reason.  The parties, with the assistance of experts and a senior judge of this court, agreed on fair market values for the parcels at issue.  Aside from the Woodleys, no other class members have come forward expressing a specific concern that their parcels have been undervalued.

Lastly, although two class members objected to the settlement, citing their inability to determine the fairness of their individual settlement amounts, the court is confident that the settlement is fair to the entire class.  "A settlement meets this factor if its relief is uniformly available, yet simultaneously tailored to distinct groups within the class."  *Raulerson*, 108 Fed. Cl. at 678 (internal citations and quotation marks omitted).  While the appraisers did not directly appraise each property, a sufficient number of representative properties were directly appraised, such that like properties were grouped together and treated comparably.  The few "unique" properties that did not share enough characteristics with any other properties were directly appraised.  This system was logical and fair.  In a class action this large, it would have been impractical to directly appraise every parcel at issue.  The fair market values of representative parcels were negotiated at arms-length before a neutral mediator after both parties retained experienced appraisers to conduct independent appraisals.

In sum, the court finds the settlement terms to be fair, reasonable, and adequate.

**B.  Class Counsel's Motion for Approval of Attorneys' Fees and Division of the Common Fund**

RCFC 23(h) permits the court to award "reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Two features of class counsel's motion for attorneys' fees require approval from this court: (1) class counsel's request to define the common fund to include the principal of the settlement amount, interest, and statutory attorneys' fees (not costs and expenses), and (2) class counsel's request for an award of 30% of the resulting common fund.  *See* Pls.' Mot. For Fees at 1 & n.1.[13]

---

[13]There is no dispute that this settlement creates a common fund under longstanding precedents.  The current explication of the doctrine dates back to the decision by the Supreme

First, judges in this court have been divided on the proper composition of the common fund.  Some have defined the common fund to include the principal, interest, and statutory fees, which allows class counsel to take a percentage of these three items combined.  *See, e.g.*, *Raulerson*, 108 Fed. Cl. at 679 n.3, 681; *Moore*, 63 Fed. Cl. at 789.  Others have defined the common fund to include only the principal amount and interest, and permitted class counsel to take a percentage of the two items.  *See, e.g.*, *Voth Oil*, 108 Fed. Cl. at 105; *Janssen v. United States*, No. 09-559, slip op. at 4 (Fed. Cl. Oct. 17, 2013).  In *Janssen*, the court recognized the split in precedent and proceeded "under what it f[ound] to be the most convincing logic."  *Jannsen v. United States*, No. 09-559, slip op. at 2.  "'Landowners [prevailing in a takings suit] are entitled under the statute[, *i.e.*, the Uniform Relocation Act] to reimbursement for a reasonable attorney fee on the theory that making the landowner suffer that expense would leave him or her with only partial compensation.'"  *Id.* at 2 (quoting *Moore*, 63 Fed. Cl. at 788).[14]  To truly shift the fee, the court reasoned, the amount that the government pays under the Uniform Relocation Act should be subtracted from the total amount payable by the class members from the common fund.  *Id.*

In determining the composition of a common fund, some courts have considered whether a contingency fee agreement explicitly states that statutory attorneys' fees will be included.  *See, e.g.*, *Raulerson*, 108 Fed. Cl. at 679 n.3 (including statutory fees in the common fund and noting that *Voth Oil* was distinguishable because the fee agreement in that case provided for a "dollar-for-dollar credit" for any fees recovered).  Notably, in *Albunio v. City of New York*, __ N.E. 3d __, 2014 WL 1315667 (N.Y. Apr. 3, 2014), the New York Court of Appeals held that any inclusion of the court-awarded fees in the amount on which the contingent fee would be based must be premised upon an express provision to that effect in the contingent fee or other retention agreement; otherwise, the basis for computing the contingent fee would exclude the attorney's fees separately awarded.  *Albunio* was a case brought by two individuals under the New York City Human Rights Law and thus was neither a class action nor did it involve a common fund.

---

Court in *Trustees v. Greenough*, 105 U.S. 527 (1882), where the court permitted a bondholder who successfully sued "to rescue th[e] fund from waste and destruction arising from the neglect and misconduct of the trustees," to collect from the fund itself costs and attorneys' fees he personally expended in bringing the suit by which the trust fund was "saved" and "secured." *Id.* at 532.  The doctrine instructs that "'[where] one party has created or preserved a fund for the benefit of others, the others should contribute to the active party's costs.  The payment comes from the fund itself as a prior charge before the beneficiaries receive it.  The classic example is a class action but it is not necessary for the beneficiaries to be parties to the proceeding at all.'" *Knight v. United States*, 982 F.2d 1573, 1579-80 (Fed. Cir. 1993) (quoting *City of Klawock v. Gustafson*, 585 F.2d 428, 431 (9th Cir. 1978)).  The doctrine does not impose any additional liability on the losing defendant, as contrasted to statutory attorneys' fees.  In essence, "common fund claims . . . effectuate a simple equitable notion — that those who have benefitted from the litigation should share in its costs." *Applegate v. United States*, 52 Fed. Cl. 751, 761 (2002) (citing *Knight*, 982 F.2d at 1580), *aff'd*, 70 Fed. Appx. 582 (Fed. Cir. 2003).

[14]Despite this commentary in *Jannsen* quoting *Moore*, the court in *Moore* defined the common fund to include statutory fees, but lowered the contingent fee percentage from the requested 40% to 34%.  *Moore*, 63 Fed. Cl. at 789.

Nonetheless, the decision gathers a number of state and federal precedents and is instructive regarding the interpretation of contingency fee agreements. *See Albunio*, __ N.E. 3d at __, 2014 WL 1315667, at *__.

In this case, class counsel urges the court to put great weight on the contingency fee agreement that was at least presented to all class members and stated that all statutory fees would be subject to the contingent fee. *See* Pls.' Mot. for Fees at 2 & n.2.  The existence of the contingency fee agreement is manifestly relevant, but the court is tasked with determining the reasonableness of the agreement, and reasonableness cannot solely depend on the agreement written by class counsel.  The court acts as a fiduciary for the class in these circumstances and must independently assess the reasonableness of class counsel's request for fees.  *See Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) ("To fully discharge its duty to review and approve class action settlements, a district court must assess the reasonableness of the attorneys' fees."); *see also Copeland v. Marshall*, 641 F.2d 880, 905 n.57 (D.C. Cir. 1980) ("In 'common fund' cases, the losing party no longer continues to have an interest in the fund; the contest becomes one between the successful plaintiffs and their attorneys over division of the bounty." (citing *Van Gemert*, 444 U.S. 472).  As the Advisory Committee stated in connection with the adoption of Fed. R. Civ. P. 23(h) in 2003:

> Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility.  In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid.  Even in the absence of objections, the court bears this responsibility.

Fed. R. Civ. P. 23 advisory committee's note, 2003 amendments, Subdivision (h).

Inclusion of statutory fees in the common fund for purposes of calculating the contingent fee is arguably unreasonable because the purpose of the statutory fees is to directly, not proportionally, relieve the burden on plaintiffs to pay their lawyers out of the compensation received.  In this instance, the statutory fees are nominal compared to the requested contingent fee, but in other cases, the amounts are much more equal and the burden plaintiffs can be spared is larger.  Even so, here the contingent fee percentage should be applied to the principal and interest, not also to the amount of statutory fees.  Awarding class counsel fees on fees is problematic notwithstanding the fact that the contingency fee agreement signed by the initial class plaintiffs and made available to all class members during the opt-in period might have provided for that result.  In reaching its decision in this regard, the court takes account of the fee percentage requested by class counsel and the overall amount of attorneys' fees sought out of the common fund.  *See Moore*, 63 Fed. Cl. at 789 (considering both percentage and total amount in determining attorneys' fees).

Second, the court must address the reasonableness of class counsel's request for 30% of the common fund.  Contingent fees are valid even in cases where the defendant is statutorily

obligated to pay attorneys' fees. *Venegas v. Mitchell*, 495 U.S. 82, 90 (1990). In *Venegas*, the Supreme Court stated, "In sum, § 1988[, a fee-shifting statute,] controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer. What a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney's' fee that a defendant must pay pursuant to a court order. Section 1988 itself does not interfere with the enforceability of a contingent-fee contract." *Id.*[15] That said, despite class counsel's assertion that all class members have been aware of the existence of the contingency fee agreement for years, the contingent fee agreement in this case does not in and of itself settle the question of what is a reasonable fee. *See Moore*, 63 Fed. Cl. at 787 ("We do not agree that the fee arrangement with named plaintiffs creates a presumption of reasonableness."). The court must still determine the reasonableness of the requested fee award.

In common fund class actions, the percentage-of-recovery method is widely used to assess the reasonableness of fees. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class."). Class counsel urges the court to approve a fee of 30% of the common fund, a

---

[15]Mr. Woodley vigorously contested the validity and application to this settlement of a contingent fee agreement based on a common fund, arguing that the purpose of the Uniform Relocation Act was to give class members 100% of the just compensation owed to them. Hr'g Tr. 43:7-23. In support of this argument he pointed to *Bywaters*, 670 F.3d 1221. Hr'g Tr. 43:24 to 45:2. Mr. Woodley's reliance on *Bywaters* is misplaced. *Bywaters*, which makes no mention of *Venegas*, addresses the proper calculation of the lodestar figure. *See* 670 F.3d at 1228-31. The trial court had calculated the lodestar by determining the reasonable number of hours spent and applying a reasonable hourly rate. *Id.* at 1225-26. The trial court then reduced the calculated figure by 50% due to the relatively modest "amount involved and results obtained," finding that attorneys' fees amounting to 66.5% of the results obtained was unreasonable. *Id.* at 1226. The Federal Circuit reversed and held that "the amount involved and the results obtained" are factors that should be considered in calculating the lodestar in the first instance (*i.e.*, the number of hours reasonably expended) as opposed to an across-the-board reduction after calculating the lodestar. *Id.* at 1230. Moreover, adjustments of the lodestar should only be done in rare and exceptional circumstances, a threshold that case did not surmount. *Id.* (citing *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010)).

Mr. Woodley interprets the court's statement in *Bywaters* that "[t]he award of fees thus depends on construction of the U[niform ]R[elocation ]A[ct ] and not Rule 23," 670 F.3d at 1227, to mean that the Uniform Relocation Act is the *only* means of seeking attorneys' fees in a rails-to-trails case, and a court may not grant fees under RCFC 23(h). Hr'g Tr. 44:9-17. The immediately preceding sentence, however, explains why the Uniform Relocation Act governed in *Bywaters* and RCFC 23 was irrelevant to the case. It states, "The district court's award of attorneys' fees in this case was quite clearly based upon the mandatory fee-shifting provision of the U[niform ]R[elocation ]A[ct ]." *Id.* at 1227. In *Bywaters*, class counsel *chose* not to pursue a percentage of the common fund, but instead exclusively to pursue attorneys' fees under the Uniform Relocation Act. *See* Stipulation and Settlement Agreement, *Bywaters v. United States*, No. 6:99-cv-451, ¶ 21(b) (E.D. Tex. Jul. 31, 2009), ECF No. 158. It does not follow that class counsel in other cases would be barred from seeking fees under Fed. R. Civ. P. 23(h) or RCFC 23(h).

voluntary reduction from 35% specified in the contingency fee agreement.  Pls.' Mot. for Fees at 26.  In determining the appropriate percentage of recovery, this court has applied the following factors:

> (1)  The quality of counsel;
> (2)  The complexity and duration of litigation;
> (3)  The risk of non-recovery;
> (4)  The fee that likely would have been negotiated between private parties in similar cases;
> (5)  Any class member's objections to the settlement terms or fees requested by class counsel;
> (6)  The percentage applied in other class actions; and
> (7)  The size of the award.

*Raulerson*, 108 Fed. Cl. at 679-80; *Bishop v. United States*, No. 10-594L, 2013 WL 4505991, at *4 (Fed. Cl. Aug. 19, 2013); *see also Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 330 & nn.62-63 (3d Cir. 2011) (en banc) (reciting, with approval, a similar list of factors applicable in the Third Circuit).[16]

A review of how other courts have applied these, or similar, factors specifically to large settlements in cases is instructive.  Research has not identified another rails-to-trails action in this court that even approaches the magnitude of this settlement, and consequently the court turns to a consideration of the percentages awarded in class actions in this settlement range in other jurisdictions.  Two months ago, the District Court for the Eastern District of Pennsylvania

---

[16]The Third Circuit factors are:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; [] (7) the awards in similar cases[;] . . . (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations[;] (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained[;] and (10) any innovative terms of settlement.

667 F.3d at 330 nn.62-63 (quoting *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), and *In re Diet* Drugs, 582 F.3d 524, 541 (3d Cir. 2009) (in turn citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Action*, 148 F.3d 283, 338-40 (3d Cir. 1998))).

awarded plaintiffs' counsel 17.8% of a $103.9 million settlement in a multi-district litigation products liability case. *In re Certainteed Fiber Cement Siding Litig.*, __ F.R.D. __, __, 2014 WL 1096030, at *1, *25 (E.D. Pa. Mar. 20, 2014). In that instance, counsel spent over 12,656 hours pursuing the claims. *Id.*, at *25. Six months ago, the District Court for the District of Columbia awarded class counsel its requested 22% of a $153 million settlement. *In re Fannie Mae Sec. Litigation*, __ F. Supp. 2d __, __, 2013 WL 6383000, at * 1 (D.D.C. Dec. 6, 2013), *appeal dismissed*, No. 14-7007, 2014 WL 1378762 (D.C. Cir. Apr. 3, 2014). In approving the requested percentage, which was only "slightly above the mean for settlements of comparable size," the court emphasized the length (10 years), volume of work (over 300,000 hours), complexity, and hotly contested nature of the case. *Id.*, at *12 (internal citations & quotation marks omitted). The district court also recognized that "[b]oth nationally and in [the D.C. Circuit], a majority of common fund class action fee awards fall between twenty and thirty percent." *Id.*, at *11 (internal citations and quotation marks omitted). The court commented that it had access to a study of 2006-2007 cases reporting that "in settlements involving common funds of $100 million to $250 million, the mean award was 17.9% and the median was 16.9%." *Id.*, at *12. This percentage range for common funds of similar magnitude is supported by an empirical study of attorneys' fees awarded in common fund class actions between 1993 and 2008 conducted by Theodore Eisenberg & Geoffrey P. Miller. *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (June 2010).[17] Professors Eisenberg and Miller found that across 689 cases, the average (mean) attorney fee award was 23% of the common fund. *Id.* at 251, 258-59 (Table 3). In like vein, the Ninth and the Eleventh Circuits have both expressed a belief that 25% is an appropriate benchmark that can be adjusted depending on individual case factors. *Id.* at 259 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993), and *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991)). More specifically, Professors Eisenberg and Miller found that for recoveries between $69.6 million and $175.5 million, the average fee award was 19.4% and the median fee award was 19.9%. *Id.* at 265 (Table 7).

The Third Circuit, in an opinion published in 2001, undertook a review of fee awards in class actions resulting in large settlements. *See In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722, 737 n.22 (3d Cir. 2001) ("*Cendant PRIDES*"). The chart listing fee awards contained a number of representative settlements in the $100 million to $150 million range, including: $100 million (12% granted in fees); $111 million (30% granted in fees); $116 million (27.5% granted in fees); $123.8 million (30% granted in fees); $150 million (13% granted in fees); $141 million (15% granted in fees). *Id.* This range of percentages confirms that the reasonableness of a fee award is case-dependent, but also indicates generally that as settlement amounts increase in magnitude, the percentage of fees awarded should decrease. *See id.* at 736 (citing *Court Awarded Attorney Fees, Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 256 (1985)). The Third Circuit had previously explained that "[t]he basis for this inverse relationship is the belief that '[i]n many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.'" *Prudential Ins. Co.*, 148 F.3d at 339 (latter two revisions in original) (quoting *In re First Fidelity*

---

[17]Professor Eisenberg is the Henry Allen Mark Professor of Law & Adjunct Professor of Statistical Sciences at Cornell Law School, and Professor Miller is the Stuyvesant P. Comfort Professor of Law at New York University Law School.

*Bancorporation Sec. Litig.*, 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)). In *Cendant PRIDES*, lead counsel spent 5,600 hours on the case and reached a settlement with the defendants within two months of filing. 243 F.3d at 735. The Third Circuit held that the trial court abused its discretion in determining that lead counsel was entitled to the "high award" of 5.7% ($19,329,463) of a $341,500,000 settlement. *Id*. at 738. The court of appeals emphasized that the case was simple in terms of proof, it settled early, there was a minimal amount of motions practice, and relatively little time was spent on the case compared to other class actions. *Id.* at 735-36. While recognizing that the percentage was in line with prior cases, the court held that when analyzed through the lens of the appropriate factors, it was "clear that . . . the higher fees awarded in the other cases were far more justified than the high award in this case." *Id*. at 738.

The Second Circuit has placed particular emphasis on the importance of a case-by-case analysis. It has recognized that an attorney fee of 25% of a common fund, regardless of the size of the common fund, has often been applied, but it is "nonetheless disturbed by the essential notion of a benchmark." *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 51 (2d Cir. 2000). "Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions." *Id.* at 52. The court agreed that attorneys' fees in class actions should resemble market rates as closely as possible but also reminded that class members are often not fully informed or capable of engaging in collective arms-length negotiations to bargain for reasonable fees. *Id.* In *Goldberger*, the court upheld the trial court's award of 4% of a $54 million settlement, as opposed to counsel's requested 25%, in part because the risk of non-recovery in securities class actions is nominal – almost all cases settle. *Id*. at 52-53.

A further refinement has been applied if the fund is large. "[Some] courts have used a sliding scale, allowing recovery of a given percentage of a certain amount of the fund, and decreasing percentages of subsequent amounts." Federal Judicial Center, *Awarding Attorneys' Fees and Managing Fee Litigation* 77 (2d ed. 2005). For example, in *First Fidelity*, the court awarded the attorneys 30% of the first $10 million of recovery, 20% of the next $10 million, and 10% of all monies over $20 million. *See* 750 F. Supp. at 163.

With this background in mind, the court turns to an application of the factors pertinent to this case. As previously stated, the court has no doubts regarding the quality of counsel in this case. Counsel conducted in-depth factual and legal research regarding the basis for the claims as well as for the motions for summary judgment and the appraisal process that facilitated settlement. Relatedly, the complexity and duration of this litigation is notable. Counsel had to classify the numerous deeds (over 500) into subclasses and then categories within subclasses in light of an understanding of Washington state law regarding whether the railroad had been granted an easement or a fee simple via the deeds at issue. When class counsel took the case, the risk of not prevailing was significant, because recovery depended wholly on the legal interpretation of the deeds at issue. After partial summary judgment was entered, the relative risk for roughly half of the class members had diminished significantly. In sum, the class members' claims were not free of difficulty, but class counsel nonetheless obtained a very

successful result for many class members.  Not surprisingly, virtually all prevailing class members accepted class counsel's requested fee award without demur.[18]

The remaining factors — the fee that likely would have been negotiated between private parties in similar cases, the percentage applied in other class actions, and the size of the award – are of particular importance in a settlement this large.  As a starting consideration, the court finds that 30% of this settlement is within the range allowed in other such cases.  Additionally, this was a very numerous class action for a rails-to-trails case, and the court recognizes that the number of class members in a rails-to-trails case more directly correlates to the amount of work class counsel must perform as compared to other class actions.  Even so, there have been other rails-to-trails cases with numerous class members that have resulted in much lower dollar awards of attorneys' fees.  *See, e.g., Raulerson*, 108 Fed. Cl. at 677 (awarding $10,986,166.48 in attorneys' fees for a 260-member class); *Moore*, 63 Fed. Cl. at 783, 787 (awarding $1,568,122.07 in attorneys' fees for a class action involving 288 claims); *Bishop*, 2013 WL 4505991, at *1, *4 (awarding $523,786.56 for a 68-member class).  This circumstance suggests that the court could lower the percentage of the common funds awarded and still not discourage attorneys from representing class members in rails-to-trails taking actions.  It also bears out the Third Circuit's concern that larger class settlements do not necessarily reflect proportionally greater work by class counsel.  In this instance, the higher settlement is due in part to the unusually high fair market value of the land at issue as compared to that in other cases.

Based upon its review of precedents and empirical studies, the court is persuaded to take an approach that applies different percentages of recovery to different ranges of the settlement.  The court will award class counsel 30% of the first $50 million, 25% of the next $50 million, and 20% of all monies over $100 million.  This scaled methodology recognizes the complexity of the case and the hard work by class counsel, but prevents a windfall resulting from the unusually high value of the land at issue.  Correlatively, the "lodestar cross-check," *see In re Fannie Mae Sec. Litig.*, __ F. Supp. 2d at __ & n.20, 2013 WL 6383000, at *13 & n.20, also confirms the reasonableness of a scaled approach to an award of fees from the large common fund.  Taking the statutory fee settlement under the Uniform Relocation Act as a reference point, which bears some relationship to the lodestar amount, an award of 30% of the common fund would greatly exceed the statutory fee, indicating that some reduction in the percentage fee award is desirable.

## C. Synopsis

The court finds that the common fund consists of $137,961,218.69 ($110,000,000 in principal + $27,961,218.69 in interest), if the settlement amount is paid by the Judgment Fund on May 31, 2014.  From that common fund, class counsel is awarded attorneys' fees totaling

---

[18]As summarized above, only a few members raised objections regarding attorneys' fees, contending either that the statutory attorneys' fees were sufficient or that the percentage of fees awarded from the common fund should be reduced.  *See, e.g.*, Hr'g Tr. 71:10-12 (Mr. Young: "[W]e would appreciate your taking a hard look at the number that's been thrown out there, the $40 million . . . .").  To disallow a contingent fee in this case would be contrary to precedent, *see, e.g., Venegas*, 495 U.S. at 90, but the reasonableness of the percentage requested is quite another matter.

$35,092,243.74.[19]  In effect, because class counsel will retain the agreed statutory fee, class members will receive a dollar-for-dollar credit for the statutory fee paid by the government in the amount of $1,920,000, reducing the amount of attorneys' fees to be paid out of the common fund to $33,172,243.74.[20]

## CONCLUSION

For the reasons stated, the parties' Joint Motion for the Approval of Settlement is GRANTED, and plaintiffs' Motion for Court Approval of Fees and Proposed Division of the Common Fund is GRANTED IN PART.  The clerk is directed to enter judgment in the total amount of $140,541,218.69, consisting of $137,961,218.69 in principal and interest for prevailing class members and $2,580,000 for attorneys' fees and litigation costs awarded pursuant to the Uniform Relocation Act, assuming that these amounts are paid by the Judgment Fund on May 31, 2014.  The judgment is payable to class counsel for distribution to the class according to the terms of this opinion and order and the settlement agreement.  Class counsel shall retain $660,000.00 in litigation costs and expenses and $1,920,000.00 in statutorily awarded attorneys' fees.  The resulting common fund of $137,961,218.69 consists of the principal and interest and does not include statutorily awarded costs or attorneys' fees.  Class counsel is entitled to, and shall retain, $33,172,243.74 of the common fund as a contingent fee.

If payment by the government is made before May 31, 2014, the total interest paid shall be reduced using the same method of interest computation as that employed for the previously stated interest amount at an annual interest rate of 4.2%.  If payment is made after May 31, 2014, the total interest paid shall be increased using the same method and interest rate.  The contingent fee to which class counsel is entitled shall be adjusted accordingly.

The claims of those class members respecting which the government has previously been granted summary judgment on liability are dismissed, as are those whose claims are not listed for an award in the settlement agreement.

The clerk will enter judgment in accord with this disposition.

Costs have already been encompassed in the settlement agreement.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[19](0.3 x $50,000,000) + (0.25 x $50,000,000) + (0.2 x ($137,961,218.69 - $100,000,000)) = $35,092,243.74.

[20]This total amounts to approximately 24% of the common fund.