# In the United States Court of Federal Claims

No. 09-103L

(Filed: May 4, 2017)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **Daniel and Kathy HAGGART, et al., For Themselves and As Representatives of a Class of Similarly Situated Persons,**  ) ) ) ) | Rails-to-trails class action; settlement; appeal of approval of settlement agreement; remand; application of the mandate rule to remanded case; enforceability of settlement agreement as binding contract |
| **Plaintiffs,**  ) ) | |
| v.  ) ) | |
| **UNITED STATES,**  ) ) | |
| **Defendant.**  ) ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas S. Stewart, Stewart Wald & McCulley LLC, Kansas City, Missouri, for plaintiffs Daniel Haggart and Kathy Haggart, et al. With him on the briefs were Elizabeth G. McCulley, Stewart Wald & McCulley LLC, Kansas City, Missouri, Steven M. Wald and Michael J. Smith, Stewart Wald & McCulley LLC, St. Louis, Missouri, and J. Robert Sears, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri.

David C. Frederick, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, D.C., for plaintiffs Gordon A. Woodley and Denise L. Woodley. With him on the briefs were Joanna T. Zhang, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, D.C., and Gordon A. Woodley, Woodley Law, Kirkland, Washington.

Lucinda J. Bach, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Jeffrey H. Wood, Acting Assistant Attorney General, Environment & Natural Resources Division, and Tyler L. Burgess and Sarah Izfar, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

This rails-to-trails class action concerns land previously held as a right-of-way by Burlington Northern and Santa Fe Railway Company ("Burlington Northern") in King County,

Washington, and converted into a recreational trail under Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)) ("Trails Act").  Plaintiffs have alleged that this conversion resulted in a taking of their land without just compensation in contravention of the Fifth Amendment.  Plaintiffs' takings claim has been the subject of four reported decisions from this court and another from the court of appeals.  *See Haggart v. United States*, 89 Fed. Cl. 523 (2009) ("*Haggart I*"); *Haggart v. United States*, 104 Fed. Cl. 484 (2012) ("*Haggart II*"); *Haggart v. United States*, 108 Fed. Cl. 70 (2012) ("*Haggart III*"); *Haggart v. United States*, 116 Fed. Cl. 131 (2014) ("*Haggart IV*"), *vacated and remanded sub nom. Haggart v. Woodley*, 809 F.3d 1336 (Fed. Cir. 2016) ("*Haggart V*").  After certifying a relatively large class, *see Haggart I*, 89 Fed. Cl. 523, and splitting the 522 class members into six subclasses, *see Haggart II*, 104 Fed. Cl. 484, in 2012, the court considered cross-motions for partial summary judgment and found the government liable to certain class members within Subclass Two and Categories A through D of Subclass Four, and granted the government summary judgment as to class claimants in Subclass Four, Category E.  *See generally Haggart III*, 108 Fed. Cl. 70.  The court otherwise denied summary judgment, reserving for trial ownership issues for particular parcels within Subclasses Two and Four and not addressing liability for Subclasses One, Three, Five, or Six.  *Id*.  No valuation issues were addressed on summary judgment.  *Id*.

The parties thereafter reached a settlement after an extensive mediation before Senior Judge John Weise, and the court subsequently approved the parties' settlement agreement and an award of attorneys' fees under a common fund.  *Haggart IV*, 116 Fed. Cl. at 149.  "Of the 253 prevailing class members, class counsel received two objections to the settlement and requests to participate in the fairness hearing and one additional request to participate in the fairness hearing."  *Id*. at 138.  The two objectors challenged the contingent attorneys' fees being sought by class counsel and contended that they were "denied the details as to how individual claimants' properties were valued and, in turn, assigned a compensation amount."  *Id*.  In the ensuing fairness hearing, the court addressed the disclosures made by class counsel to individual class claimants, particularly those made to the objectors, and concluded that the disclosures were sufficient even though they were made on an oral basis.  *Id*. at 142-43.  Given the large number of properties at issue, the parties' appraisers had classified the parcels into unique properties, each of which was individually appraised, and 22 sets of properties that shared common characteristics.  *Id*. at 136.  The latter properties were not all individually appraised, but rather at least one representative property in a grouping was appraised and the other properties in the pertinent grouping were valued from the assessment of the representative property.  *Id*.  The objectors' properties were valued based on an appraisal of a representative property.  In acting to approve the settlement, the court also dismissed the "claims of those class members respecting which the government ha[d] previously been granted summary judgment on liability," as well as the claims of class members who were not included among the compensation awards in the settlement agreement.  *Id*. at 149.

Mr. and Mrs. Woodley, who were objecting class claimants, appealed "the settlement approval and award of attorney fees."  *Haggart V*, 809 F.3d at 1343.  The government supported the Woodleys on their appeal, changing its positions from those it had taken in the fairness hearing, but it did not file an appeal and did not expand or supplement the grounds raised by the Woodleys in their appeal.  *See id*.  The Federal Circuit reversed the court's approval of the

settlement agreement and the award of attorneys' fees under the common fund doctrine, and remanded the case for further proceedings. *Id.* at 1359. In overturning the settlement, the court of appeals ruled that "[f]ull disclosure of the precise methodology employed in arriving at the value of non-representative properties is especially important in this context because of the various inputs used in calculating the fair market value of unappraised properties and the significant discrepancy in the allocation of the final property values." *Id*. at 1349.

Following the remand from the court of appeals, the court initially sought to ensure that all information pertinent to the appraisal process was made available to class members in written form. As counsel for the objecting Woodleys stated at a hearing held after the remand:

> The Woodleys have not received – the electronic website [posted by class counsel] does not provide access to the kinds of spreadsheets that I'm talking about here. Our reading of the Federal Circuit's order is that it required enough information so that a class member, including the Woodleys, could go on and essentially re-engineer the way the valuations were done. The information on the [class] website, as it is being done, does not allow that to happen.

Hr'g Tr. 9:11-19 (Aug. 15, 2016). At that point, counsel for the government advised that the settlement amount for the class, $110 million plus interest, remained in effect but a reallocation of that amount among class members was possible:

> The Court: You want to reopen settlement negotiations?
>
> [Counsel]: . . . I wouldn't call it reopening settlement negotiations. I think we have a settlement number. I think that class counsel needs to provide the information that will enable the individual class members to determine whether the split of that money is fair, and we need to go from there.

Hr'g Tr. 17:20 to 18:5 (Aug. 15, 2016).

Counsel for the class and for the government had previously advised that there were 22 representative valuation categories and that the appraisers for the class and for the government had appraised representative parcels within each category. *Haggart V*, 809 F.3d at 1342 n.5; *Haggart IV*, 116 Fed. Cl. at 136. Post-remand, class counsel indicated that the appraisals had been made available physically to any class member who wanted them, but the appraisals had not been posted electronically. Hr'g Tr. 38:8-10, 13-25 (Aug. 15, 2016). A summary spreadsheet that showed the appraisals side-by-side had also been made available. *Id*. The discourse between the court and the several counsel then focused on the availability of two other spreadsheets that had been used in the mediation process. *See* Hr'g Tr. 42:14-22 (Aug. 15, 2016). Counsel for the Woodleys wanted all three spreadsheets to aid in developing a reallocation of the overall settlement amount of $110 million plus interest among the 253 class participants. Hr'g Tr. 43:19 to 44:21 (Aug. 15, 2016). At that juncture, the court advised counsel for the Woodleys that "[y]ou will have all the discovery you possibly will want," Hr'g

3

Tr. 51:23-24 (Aug. 15, 2016), and specifically that counsel for the Woodleys would get access to the spreadsheets that provided the formulas for the entire array of parcels, Hr'g Tr. 52:17-19 (Aug. 15, 2016).

Although the requisite materials were provided, *see* Class Counsel's Notices of Compliance (Aug. 15, 2016, Aug. 17, 2016, and Sept. 14, 2016), ECF Nos. 218, 219, and 223, no reallocation of the settlement amount was developed and no new settlement was reached. Instead, because of decisions rendered in indirectly related litigation in the United States District Court for the Western District of Washington, *Kaseburg v. Port of Seattle*, No. C14-0784 JCC (W.D. Wash.),[1] the government changed position again and sought to litigate the property interests of the class members who would have benefitted from the earlier class settlement, *see* Hr'g Tr. 7:22 to 9:24 (Dec. 19, 2016). To address the new issues, the government requested that the court establish a briefing schedule for dispositive motions:

> [Counsel]: [W]hat the [g]overnment wishes to do is file two dispositive motions. I mean, these are very, very important issues that raise fundamental questions about this [c]ourt's subject matter jurisdiction and all of the class members' entitlement to compensation here, and the [g]overnment has a fiduciary obligation to the United States taxpayers to raise those issues and to raise them in a thorough and thoughtful manner.
>
> And so we have requested that a briefing schedule, which I'm –
>
> The Court: Well, you haven't requested [a briefing schedule] up to now, so your use of the past perfect tense is inappropriate. If you want to request one, I would like to hear it.
>
> [Counsel]: Okay, Your Honor. I would like to request a briefing schedule.

Hr'g Tr. 10:25 to 11:15 (Dec. 19, 2016). Notwithstanding the nature and extent of the prior proceedings in the case and the length of time it had been pending, the court acceded to the government's request and set a schedule for filing and briefing the motions by the government that are now pending before the court. *See* Scheduling Order of Dec. 19, 2016, ECF No. 235.

The government requests that the court reconsider determinations made by the court in *Haggart III*, its previous decision on liability regarding Subclasses Two and Four. The government also filed three motions for summary judgment that address varying members among the subclasses. The motions relate to (1) class members with parcels that are adjacent to portions of the railroad right-of-way owned by the railroad in fee simple, (2) class members who were plaintiffs in *Kaseburg* before the District Court for the Western District of Washington

---

[1] *See Kaseburg v. Port of Seattle*, No. C14-0784 JCC, 2015 WL 6449305 (W.D. Wash. Oct. 23, 2015) ("*Kaseburg I*"); *Kaseburg v. Port of Seattle*, No. C14-0784 JCC, 2016 WL 4440959 (W.D. Wash. Aug. 23, 2016) ("*Kaseburg II*"), *appeal filed*, No. 16-35768 (9th Cir. Sept. 23, 2016).

relating to the same railroad corridor, and (3) class members with deeds or plats that allegedly exclude the railroad corridor. Additionally, counsel for the Woodleys filed a motion for partial summary judgment on liability with respect to the Woodleys, who are members of Subclass Three, and the government filed a corresponding cross-motion for summary judgment for Subclasses One and Three.[2]

In diametric opposition to these motions, class counsel has submitted a motion to enforce the settlement agreement signed by class counsel and the government in 2014.

For the reasons stated, the government's motion for reconsideration is denied, the government's three motions for summary judgment stretching across subclasses are denied, the Woodleys' and plaintiffs' motions for partial summary judgment on liability for Subclasses One and Three are denied as moot, and the government's cross-motion for partial summary judgment respecting Subclasses One and Three is denied. The class plaintiffs' motion for enforcement of the settlement agreement is granted.

## BACKGROUND

### A. *The Takings Claim*

Eight years ago, on February 19, 2009, Daniel and Kathy Haggart filed suit in this court on behalf of themselves and as representatives of a proposed class of similarly situated persons. *See generally* Compl. Plaintiffs allege that a taking occurred when the Surface Transportation Board ("STB") issued Notices of Interim Trail Use ("NITUs") pursuant to the Trails Act regarding three railroad rights-of-way in King County, Washington. *See Haggart III*, 108 Fed. Cl. at 75-76. The three segments, totaling approximately 25.45 miles, constitute the railroad corridor at issue in this case. *Id.* at 75. The railroad's right-of-way was first established in the late 1800s and early 1900s and was later acquired by Burlington Northern. *Id.* In 2008, Burlington Northern filed with the STB a "petition for exemption to abandon" the railroad corridor. *Id.* Shortly thereafter, King County requested a NITU from the STB and represented that it would take financial responsibility for the trail use. *Id.* The STB then issued two NITUs on October 27, 2008 and a third on November 28, 2008 for the railroad corridor at issue, and plaintiffs subsequently filed suit, alleging a taking by the federal government without just compensation in contravention of the Fifth Amendment. *Id.* at 75-76. In 2009, King County and Burlington Northern reached a Trail Use Agreement to allow public recreational trail use,

---

[2]The class plaintiffs also filed motions for partial summary judgment on Subclasses One and Three and for reconsideration of the court's earlier decision dismissing the claims of Subclass Four, Category E, *see* Pls.' Mot. For Partial Summary Judgment on Liability for Subclasses I & III, ECF No. 231; Pls.' Mot for Recons. Regarding the Subclass Four, Category E Deeds, ECF No. 241, but class counsel subsequently withdrew the motion for reconsideration, *see* Hr'g Tr. 32:1-2 (Mar. 31, 2017); Notice of Pls.' Withdrawal, ECF No. 269. The motion by plaintiffs regarding Subclasses One and Three essentially duplicates a motion filed by the Woodleys, and both will be treated *in pari materia*.

"stipulat[ing] that the railroad line would be 'rail-banked' for potential railroad use in the future." *Id.*[3]

### B. Pre-Settlement Grants of Partial Summary Judgment on Liability

The court certified the class on September 28, 2009, *Haggart I*, 89 Fed. Cl. at 537, and subsequently approved the parties' motion to divide the large class into six subclasses based upon the nature of the property interests involved, *see Haggart II*, 104 Fed. Cl. at 487-88, 492. Plaintiffs in Subclasses Two and Four then moved for partial summary judgment on liability and the government filed a cross-motion with respect to the same two subclasses. *Haggart III*, 108 Fed. Cl. at 74-75. The court determined that the government was liable for a taking of the property held by plaintiffs in Subclass Two and Categories A through D of Subclass Four, but not Category E of Subclass Four. *Id.* at 98. For Subclass Two, the parties "stipulated that the predecessor railroad acquired an easement, not a fee interest, in the corridor attendant to the Subclass Two plaintiffs' property," and the court accordingly held that "the source deeds at issue granted an easement for railroad purposes only." *Id.* at 78-80.[4] The court also concluded that the scope of the easements was exceeded by the recreational trail use. *Id.* at 81-82.

Even so, the court was not able to determine liability for all easements at issue in Subclass Two. First, the court reserved for trial "the nature of the easement granted by the Delfel property condemnation" and the government's liability for parcels obtained by adverse possession. *Haggart III*, 108 Fed. Cl. at 80-81. Second, the court reserved for trial other parcels that were subject to material issues of disputed fact regarding application of the "centerline" presumption. *Id*. at 83-86. Although none of the deeds in Subclass Two made "express use of metes and bounds," the government asserted that two deeds referred to other documents that did use metes and bounds. *See id*. at 84-85. The court held that "[b]ecause the centerline presumption for these two parcels is potentially subject to rebuttal, the ownership issue of the two tracts is reserved for trial." *Id.* at 85. Third, the government noted that particular parcels were not adjacent to the railroad corridor due to an intervening road or parcel. *Id*. The court nonetheless granted summary judgment in favor of plaintiffs for some of these parcels after determining that "these plaintiffs also own to the center of the railroad right-of-way," but found evidence lacking for the remainder of the plaintiffs in that grouping and accordingly stated that "[t]he ownership issue for the remaining contested parcels is reserved for trial." *Id*. Finally, the court reserved for trial ownership issues related to particular plaintiffs because the government had challenged whether such plaintiffs owned their parcels on the date the pertinent NITU was issued. *Id.* at 85-86.

---

[3]As the court previously explained, "[r]ail-banking under the Trails Act preserves railroad-purpose easements which otherwise would terminate by operation of law, thus retaining the easements for potential later reactivation of railroad use." *Haggart III*, 108 Fed. Cl. at 76 n.3.

[4]The Lake Washington Belt Line Company deed was "the source deed for most of the parcels in Subclass Two." *Haggart III*, 108 Fed. Cl. at 79.

In addressing ownership and the centerline presumption set forth in *Roeder Co. v. Burlington N. Inc.*, 716 P.2d 855 (Wash. 1986) (en banc), the court rejected the government's contention that plaintiffs be required "to provide a complete record of chain of title dating back to the original fee owner of the right-of-way property," instead stating that "plaintiffs must only present the original deeds granting a right-of-way to the predecessor railroad and the deeds that show plaintiffs owned the property abutting the right of way at the time the NITU was issued." *Haggart III*, 108 Fed. Cl. at 83-84. The court accordingly held:

> Subclass Two plaintiffs who have shown . . . that they owned their properties at the time the NITU was issued—and whose deeds do not reference a document that contains metes and bounds and whose lands are not separated from the railroad by a highway—are thus granted summary judgment as to their ownership of the land to the center line of the railroad's easement.

*Id.* at 84.

For Subclass Four, the court first addressed "whether the fifty-three source deeds [involved] granted an easement or a fee to Burlington Northern's predecessor railroad." *Haggart III*, 108 Fed. Cl. at 86. The deeds were separated into five categories. *Id.* The court determined that the deeds in Categories A through D, including the "Kittinger Deed," conveyed an easement to the railroad. *Id.* at 86-94. Similar to Subclass Two, the court also concluded that the recreational trail use exceeded the scope of the easements and thus granted summary judgment "for plaintiffs to whom the centerline presumption applies and whose ownership the government does not otherwise contest." *Id.* at 94-96. The deeds in Category E, however, were captioned "Right of Way Deed" and made no "further mention of a right of way or the purposes of the grant." *Id.* at 94. The court granted summary judgment in favor of the government for Category E, holding that "[t]he use of the words 'Right of Way Deeds' in the caption is not sufficient, without more, to indicate that an easement, not a fee, was being conveyed." *Id.*[5]

### C. The Settlement Agreement

After the court rendered its decision on the motions for partial summary judgment, the parties undertook settlement discussions with the aid of Senior Judge John Wiese as the mediator. Those proceedings extended over a period of ten and one-half months and ultimately produced a settlement. *See* Joint Mot. for Approval of S[e]ttlement and of Notice to Class Members and Request to Set Date for Public Hearing, ECF No. 161. The settlement was comprehensive and categorical, addressing the claims of all class claimants, some of whom were to receive agreed compensation and others of whom were not:

> 2. This Joint Compromise Settlement Agreement encompasses all existing claims, disputed issues and/or demands for money damages or other relief (inclusive of all interest, attorneys['] fees, and other litigation expenses that

---

[5]In anticipation of multiple trials on damages, the court provided that "[d]amages shall be determined by measuring the decrease in value of plaintiffs' property due to the burden of the trail easement, using the unencumbered fee as the baseline." *Haggart III*, 108 Fed. Cl. at 98.

7

> have been or could be incurred), that were asserted or could have been asserted in this action, or in any other judicial proceeding, against the United States or any department, agency, or officer thereof, by [p]laintiffs relating to the parcels of land for which compensation was sought in the [c]omplaint as amended.
>
> 3. The [p]laintiffs identified in Attachment A (the "Dismissed Plaintiffs") are or were owners of certain parcels of property situated in King County, Washington, whose claims have been or will be dismissed without compensation.
>
> 4. The [p]laintiffs identified in Attachment B (the "Settling Plaintiffs") are or were owners of certain parcels of property situated in King County, Washington, who will receive compensation in settlement of their claims.
>
> 5. The United States hereby agrees, by way of compromise and settlement, to pay to the Settling Plaintiffs the total sum of $140,541[,]218.69. This amount consists of $110,000,000.00 in principal, and $27,961,218.69 in interest. The United States further agrees to pay statutory attorneys' fees and costs of $2,580,000.00 pursuant to the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c). The amount to be paid for each individual claim of the Settling Plaintiffs is specified in Attachment B.
>
> 6. In consideration of the settlement amount set forth in paragraph 5, the [p]laintiffs agree to dismiss this case with prejudice within 14 days of receipt of payment from the United States pursuant to Court of Federal Claims Rule 41(a)(1)(A)(ii).

Joint Compromise Settlement Agreement between Plaintiffs and the United States ("Settlement Agreement" or "Agreement") at 2-3, ECF No. 161-2. The Agreement also made provision for interest to be paid if the settlement was not effectuated by the estimated payment date of May 31, 2014:

> 7. The calculated interest stated in paragraph 5 is based upon an estimated date of payment of May 31, 2014. The parties agree that interest may be recalculated based upon the U.S. Department of the Treasury's estimated date of actual payment, using the same method of interest computation employed for the estimated interest amount stated in paragraph 5, and an annual interest rate of 4.2%. If, however, the United States pays more in interest than has accrued as of the date of actual payment, the Settling Plaintiffs agree to refund to the United States Treasury the amount over-paid.

*Id.* at 3. The Agreement set out no limitations, conditions precedent, or caveats to its effectiveness or enforceability. The Settlement Agreement as signed on June 18, 2014 is set out in the record at ECF No. 272-2.

*D. Approval of the Settlement Agreement and the Ensuing Disposition by the Federal Circuit on Appeal*

The court issued notice to class members of the settlement in accord with Rule 23(e) of the Rules of the Court of Federal Claims ("RCFC") and provided class members with an opportunity to submit comments and objections to the Agreement, both in written form and at a fairness hearing. *Haggart IV*, 116 Fed. Cl. at 138. As noted previously, two objectors to the Agreement stated their opposition. *Id.* The objectors believed their properties were undervalued and contended that they had not been provided sufficient information in written form to be able to reconstruct the values assigned to their properties from the pertinent appraisals of a representative parcel, or, on a comparative basis, to parcels in other representative groupings. *See id.* at 142. The objectors had received an oral explanation of the methodology and of data regarding their representative grouping, but had not received documentary materials that would have enabled them independently to derive the value assigned to all 253 parcels that were to receive compensation. *Id.* After the fairness hearing, the court concluded that the methodology for the valuations was reasonable and logical in the circumstances, and had achieved fair results. *Id.* at 142-43.

On appeal by the Woodleys, the Federal Circuit disagreed. Noting the "significant discrepancy in the allocation of the final property values," which "ranged from $444.45 to more than $2.4 million," the court of appeals considered that "[f]ull disclosure of the precise methodology employed . . . [wa]s especially important." *Haggart V*, 809 F.3d at 1349. The court recognized that the limited "objections from a class of 253 members militate[d] in favor of approval of the settlement agreement," but gave greater weight to the ability of the several objectors to "verify . . . their individual settlement awards." *Id*. at 1350. The court of appeals accordingly reversed the approval of the settlement agreement and "remand[ed] for further consideration consistent with the foregoing." *Id*. at 1359.

**STANDARD FOR DECISION**

Pursuant to RCFC 56(a), a grant of summary judgment is warranted when the pleadings, affidavits, and evidentiary materials in the case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). A genuine dispute exists when an issue "may reasonably be resolved in favor of either party," *id.* at 250, and a fact is material when it "might affect the outcome of the suit under the governing law," *id.* at 248. The moving party has the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court therefore must draw all factual inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Summary judgment will be appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id*. at 587.

**ANALYSIS**

### A. *The Mandate Rule and the Law of the Case Doctrine*

*1. Delineation of the rule and the doctrine.*

The mandate rule provides that "[o]nly the issues actually decided—those within the scope of the judgment appealed from, minus those explicitly reserved or remanded by the court—are foreclosed from further consideration." *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999) (citing *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 170 (1939)). Under the rule, "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived." *Id.*; *see also Retractable Techs., Inc. v. Becton Dickinson & Co.*, 757 F.3d 1366, 1371 (Fed. Cir. 2014) (applying the mandate rule and holding that "[a] $5 million award was within the scope of the judgment, was incorporated into the mandate without argument, and was precluded from further consideration by the district court"); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) ("[T]he mandate rule precludes reconsideration of any issue within the scope of the judgment appealed from—not merely those issues actually raised."); *Doe v. United States*, 463 F.3d 1314, 1327 (Fed. Cir. 2006) ("[T]he mandate rule 'forecloses litigation of issues decided by the district court but foregone on appeal or otherwise waived.'") (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993)).[6] This principle is recognized in all the other circuits as well, though not always by the same name.[7]

---

[6] The government incorrectly asserts that "[t]he mandate rule *only* precludes a lower court from deviating from the appellate court's mandate." United States' Reply Mem. in Support of Mot. for Summary Judgment as to Class Members Who Are Pls. in *Kaseburg v. Port of Seattle* ("Def.'s Reply in Support of Mot. Regarding *Kaseburg*") at 8, ECF No. 267 (emphasis added). Notably, although "a mandate is controlling as to matters within its compass" and on remand "a lower court is free as to other issues," *Engel Indus.*, 166 F.3d at 1382 (quoting *Sprague*, 307 U.S. at 168), issues addressed by the court's prior judgment, but not appealed, are encompassed within the mandate rule, *see, e.g., id.* at 1383; *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1348 & n.1 (Fed. Cir. 2001).

[7] *See, e.g., United States v. Philip Morris USA Inc.*, 801 F.3d 250, 257-58 (D.C. Cir. 2015) (referring to waiver); *United States v. Wallace*, 573 F.3d 82, 88 (1st Cir. 2009) (referring to the mandate rule); *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (referring to the mandate rule); *Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3d Cir. 1987) (referring to estoppel); *South Atl. Ltd. P'ship of Tenn., LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004) (referring to the mandate rule); *General Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (referring to mandate rule); *United States v. O'Dell*, 320 F.3d 674, 679 (6th Cir. 2003) (same); *United States v. Adams*, 746 F.3d 734, 744 (7th Cir. 2014) (referring to the mandate rule and law of the case); *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456-57 (8th Cir. 1990) (referring to the law of the case); *In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (referring to waiver); *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 321 F.3d 950, 992-93 (10th Cir. 2003) (referring to the law of the case); *Silverberg v. Paine, Webber, Jackson & Curtis, Inc.*, 724 F.2d 1456, 1457 (11th Cir. 1983) (referring to the law of the case).

The law of the case doctrine "is a corollary to the mandate rule." *Tronzo*, 236 F.3d at 1348 n.1 (citing *United States v. Pollard*, 56 F.3d 776, 779 (7th Cir 1995)).  Under this doctrine, "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation."  *Suel v. Sec'y of Health & Human Servs.*, 192 F.3d 981, 985 (Fed. Cir. 1999) (citing *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed. Cir. 1985)).  The doctrine "encourages both finality and efficiency in the judicial process by preventing relitigation of already-settled issues."  *Banks v. United States*, 741 F.3d 1268, 1276 (Fed. Cir. 2014) (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)).  It also "protect[s] the settled expectations of the parties and promote[s] orderly development of the case."  *Suel*, 192 F.3d at 984 (citations omitted).  Additionally, the Federal Circuit has "emphasized the importance of applying [the] law of the case doctrine in protracted litigation."  *Id.* at 985 (citing *Hughes Aircraft Co. v. United States*, 86 F.3d 1566, 1577 (Fed. Cir. 1996), *vacated on other grounds*, *United States v. Hughes Aircraft Co.*, 520 U.S. 1183 (1997)).

Nonetheless, the mandate rule and law of the case are "prudential doctrines that direct a court's discretion, but do not necessarily limit a court's power."  *Tronzo*, 236 F.3d at 1349 (citing cases).  For a court to reevaluate an issue otherwise foreclosed by either or both of these doctrines, however, the circumstances "must be exceptional."  *Id*.  Exceptional circumstances include a substantial change in evidence, a change in controlling legal authority, or a showing that the prior decision was "clearly" incorrect and would result in a "manifest injustice."  *See Banks*, 741 F.3d at 1276 (citing *Gindes v. United States*, 740 F.2d 947, 950 (Fed. Cir. 1984)); *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1336 (Fed. Cir. 2004) (citing *Intergraph Corp. v. Intel Corp.*, 253 F.3d 695, 698 (Fed. Cir. 2001) (in turn citing *Smith Int'l Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576 (Fed. Cir. 1985))).  The party arguing in favor of such a circumstance has a "heavy burden."  *Branning v. United States*, 784 F.2d 361, 363 (Fed. Cir. 1986) (citing *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)).

   2.   *Application of the mandate rule and law of the case in these proceedings.*

To determine how the mandate rule and law of the case apply here, the court begins by examining the scope of its prior final judgment.  *See Tronzo*, 236 F.3d at 1348 & n.1 (considering whether an issue, which was not appealed, fell within the scope of the prior judgment because such a finding would "foreclose[ the issue] from further review on remand" pursuant to the mandate rule); *Exxon Corp. v. United States*, 931 F.2d 874, 877 (Fed. Cir. 1991) ("Orderly and efficient case administration suggests that questions once decided not be subject to continued argument [pursuant to the law of the case doctrine], but the court has the power to reconsider its decisions until a judgment is entered.") (quoting *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1550 (Fed. Cir. 1988), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992)).  In entering final judgment in 2014, the court approved the parties' Settlement Agreement and awarded attorneys' fees.  *Haggart IV*, 116 Fed. Cl. at 149.  Significantly, the court also held that "[t]he claims of those class members respecting which the government has previously been granted summary judgment on liability are dismissed, as are those whose claims are not listed for an award in the settlement agreement."  *Id.*  This statement indicated that the court's judgment encompassed the court's liability determinations for Subclasses Two and Four and the dismissal of claims excluded from the Agreement.  Moreover, the settlement encompassed agreed compensation for

11

those parcel owners who had been granted partial summary judgment on liability as well as those whose claims had been reserved for trial. *See* Hr'g Tr. 30:21 to 31:7 (Mar. 31, 2017). Further, the court's liability determinations and dismissal of particular claims were not appealed. The Woodleys appealed the court's approval of the Settlement Agreement, specifically challenging the failure of class counsel to provide in documentary form all of the appraisal information underpinning their proposed award and the awards of the hundreds of other class members, and the court's award of attorneys' fees under a common fund. *Haggart V*, 809 F.3d at 1342-43. The government neither appealed nor raised any additional issues on appeal. *See id.* at 1343. The Federal Circuit's reversal and remand did not extend beyond the scope of the Woodleys' appeal. *See generally id.*

The government contends that the mandate rule and law of the case do not apply because the court's liability decision for Subclasses Two and Four was an interlocutory decision that the court can now revisit. *See* The United States' Reply Mem. in Support of Mot. for Recons. of Certain Rulings on the Parties' Cross-Mots. for Summary Judgment ("Def.'s Reply in Support of Mot. for Recons.") at 1-3, ECF No. 264; Hr'g Tr. 14:14 to 15:5 (Mar. 31, 2017). The government is mistaken. Although the court's liability decision was interlocutory when issued in 2012, it became embedded in and encompassed by the final judgment entered in 2014. This conclusion is not altered by the fact that the judgment resulted from the court's approval of a settlement agreement that followed the liability determination. *See Ford-Clifton v. Department of Veterans Affairs*, 661 F.3d 655, 660 (Fed. Cir. 2011) ("It is widely agreed that an earlier dismissal based on a settlement agreement constitutes a final judgment on the merits in a *res judicata* analysis.") (citing cases).[8] Additionally, the government's actions in other proceedings demonstrate that the government could have preserved the opportunity to appeal summary judgment issues after the Settlement Agreement was executed. For example, in another rails-to-trails case, *Caquelin v. United States*, 121 Fed. Cl. 658 (2015), *appeal filed*, No. 16-1663 (Fed. Cir. Mar. 8, 2016), the court granted plaintiffs' motion for partial summary judgment and held that a taking had occurred. The parties thereafter reached a settlement agreement, and the government subsequently appealed the court's liability determinations. *See* Corrected Opening Br. and Federal Circuit Rule 35(a) Request for En Banc Review of Appellant United States at 1-3, 15-16, *Caquelin v. United States*, No. 16-1663 (Fed. Cir. Aug. 9, 2016); *see also* Notice at 1 n.1, *Memmer v. United States*, No. 14-135L, ECF No. 56 (Fed. Cl. Dec. 9, 2016) ("The proposed settlement . . . preserve[s] the United States' right to appeal from the Court's [previous] liability ruling.").

Therefore, the court's liability decisions for Subclasses Two and Four, both for and against the government, as well as its dismissal of claims excluded from the Settlement Agreement, are subject to the mandate rule. *See, e.g.*, *Doe*, 463 F.3d at 1327 ("The Doe plaintiffs should have raised the issue of the distinction between their holiday pay claim and their

---

[8]The court of appeals in *Ford-Clifton* applied *res judicata*, rather than the law of the case doctrine, because the appealed decision came from the Merit Systems Protection Board and the court "look[s] with disfavor on the use of the law of the case doctrine by administrative agencies when a final order dismissing a case was earlier made on the basis of a settlement agreement." *Ford-Clifton*, 661 F.3d at 660 (footnote omitted).

overtime pay claim before [liability was reversed on appeal], however. Because they did not, the issue was waived."). The specific decisions made by the court in determining liability for Subclasses Two and Four are the law of the case. *See Suel*, 192 F.3d at 984-85. Accordingly, in addressing the government's requests to revisit issues already decided, the court ordinarily would have to determine whether exceptional circumstances exist that would warrant departure from these two doctrines. That exercise may be of limited utility in this case, however, because the court must first consider the enforceability of the Settlement Agreement previously reached by the parties and the effect of that Agreement on further proceedings.

### B. Enforceability of the Settlement Agreement as a Binding Contract

*1. Applicable law.*

A settlement agreement is a contract that is governed by contract principles. *Slattery v. Department of Justice*, 590 F.3d 1345, 1349 (Fed. Cir. 2010) (citing *Kasarsky v. Merit Sys. Prot. Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002); *Conant v. Office of Pers. Mgmt.*, 255 F.3d 1371, 1376 (Fed. Cir. 2001)). In the context of a class action, "[t]he fact that a settlement agreement is governed by Rule 23 does not diminish its enforceability as a contract." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 596 (3d Cir. 2010).[9] The court's review and approval of a class action settlement agreement calling for an award of damages does not affect the legality or binding nature of that agreement. *Id.* at 593 (citing *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008); *Collins v. Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)). Instead, the court primarily acts as a fiduciary for the absent class members and protects their interests. *Id.* (citations omitted). "[T]his fiduciary protection does not extend to defendants in a class action, who are in a position to protect their own interests during negotiations." *Id.* at 594 (citing *Ibarra v. Texas Emp't Comm'n*, 823 F.2d 873, 878 (5th Cir. 1987)); *see also Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1095 (6th Cir. 2016) (Boggs, J.) ("Rule 23(e) is designed to protect absent class members and other non-parties to the litigation, not the defendants who misread the law and agreed to an unfavorable settlement offer.").

Consequently, a change in law will not affect the binding nature of a settlement agreement. For example, in a recent appeal to the Sixth Circuit, the parties had agreed to a class action settlement agreement providing for damages, but appellants argued that the district court erred in approving the agreement because the Kentucky Court of Appeals, in a subsequent and separate case, had determined that the Kentucky statute relied upon by plaintiffs did not support a class action claim. *Whitlock*, 843 F.3d at 1088, 1093. The Sixth Circuit rejected appellants' contention, holding that "Rule 23(e) does not bar a district court from enforcing a class-action settlement agreement after a post-settlement change in substantive law." *Id.* at 1094. Similarly, the Third Circuit held that a class action settlement agreement was not mooted or rendered

---

[9]RCFC 23 is in material part similar to Rule 23 of the Federal Rules of Civil Procedure, and federal decisions applying Fed. R. Civ. P. 23 are persuasive in this court. *See Haggart I*, 89 Fed. Cl. at 529 (citing *Barnes v. United States*, 68 Fed. Cl. 492, 494 n.1 (2005)). The most notable difference between the two rules is that this court's rule "contemplates only opt-in class certifications, not opt-out classes." RCFC 23 Rules Committee Notes (2002 Revision); *see also Haggart IV*, 116 Fed. Cl. at 139 n.10.

invalid by subsequent legislation, even though that legislation eliminated plaintiffs' cause of action. *Ehrheart*, 609 F.3d at 595-97; *see also In re Syncor ERISA Litig.*, 516 F.3d at 1100-02 (holding that the district court improperly entered summary judgment for defendants after the parties reached a settlement agreement, noting that "[d]efendants knew they had dispositive motions pending and chose the certainty of settlement rather than the gamble of a ruling on their motions"); *Anita Founds., Inc. v. ILGWU Nat. Ret. Fund*, 902 F.2d 185, 189 (2d Cir. 1990) ("[A] change in the law does not render an agreement void.") (citing cases).

Unlike consent decrees, which provide equitable remedies rather than damages and thus are susceptible to modification if circumstances change, settlement agreements are intended to "conclude litigable disputes" and are characterized by "[f]inality, not modifiability." *Whitlock*, 843 F.3d at 1094; *see also Ehrheart*, 609 F.3d at 596 ("It is essential that the parties to class action settlements have complete assurance that a settlement agreement is binding once it is reached.") (citing *In re Syncor ERISA Litig.*, 516 F.3d at 1100 (in turn citing *Collins*, 679 F.2d at 172))).

2. *Pertinent settlement terms.*

Following the court's approval of the Settlement Agreement in May 2014, *see generally Haggart IV*, 116 Fed. Cl. 131, the parties executed a Joint Settlement Agreement on June 18, 2014, *see* Joint Compromise Settlement Agreement Between Pls. and the United States ("Settlement Agreement"), ECF No. 272-2. The terms were identical to those set forth in the Agreement filed by the parties in February 2014, ECF No. 161-2, as quoted *supra*. The Settlement Agreement comprehensively encompasses all existing claims without any limitations or exceptions. *See* Settlement Agreement ¶ 2. The total amount of compensation and interest is stated with specificity, and an attachment to the Agreement provides the amounts allocated to each plaintiff. *Id.* ¶¶ 4-5, Attach. B. The Agreement recites that it was binding on both the plaintiffs and the government, *id.* ¶ 10, and that it was being executed by the parties' authorized legal representatives, *id.* at 4.

On appeal, the Federal Circuit characterized its review of the approval of the Settlement Agreement as "rooted in the Woodleys' request for additional information concerning the methodology class counsel employed in calculating the fair market value of unappraised properties." *Haggart V*, 809 F.3d at 1348. As the court of appeals stated:

> The precise issue before us is whether the Claims Court abused its discretion by finding class counsel's act of explaining, as opposed to physically providing objecting class members with a copy of the final spreadsheet detailing the precise methodology used to calculate the allocation of their property values, satisfied the requirement that the settlement agreement be "fair, reasonable and adequate."

*Id.* (quoting RCFC 23(e)(2)). The Federal Circuit found that the documentary disclosure provided to the Woodleys was inadequate because it did not include information such as the "variables and other inputs from which the fair market value was derived," *id.* at 1350, and thus it did not allow the Woodleys to reconstruct the valuation of their property and compare it to reconstituted values assigned to other properties, *id.* at 1349.

Significantly, the Federal Circuit did not consider or address the terms of the Settlement Agreement itself. The amount of the settlement, interest rate, plaintiffs entitled to compensation, and plaintiffs subject to dismissal were not disturbed on appeal. On remand, the specific allocation of the agreed compensation to individual plaintiffs may need to be altered, but the total amount and all other terms in the agreement remain intact.[10] Until very recently, the government concurred. *See* Corrected Resp. Br. for the United States Supporting Appellants' Req. to Vacate the Judgment of the Court of Federal Claims that Approved the Settlement and Awarded Additional Attorneys' Fees at 28, *Haggart v. Woodley*, No. 14-5106 (Fed. Cir. Dec. 19, 2014) ("While the United States continues to believe that the total principal amount of $110 million is fair to the class as a whole, the approval of the settlement without requiring proper disclosure constituted an abuse of discretion and this case should be remanded to the CFC for proper disclosure to all class members."); Hr'g Tr. 18:1-5 (Aug. 15, 2016) ("I think we have a settlement number . . . [but] class counsel needs to provide the information that will enable the individual class members to determine whether the split of that money is fair.").[11]

In short, the Settlement Agreement was and remains a binding and enforceable contract. The government cannot avoid its "independent contractual obligations," *Ehrheart*, 609 F.3d at 596, even if it now has had a change of heart and wishes to back out of the Settlement Agreement, *see Whitlock*, 843 F.3d at 1095 ("[I]t would be perverse to the aims of Rule 23(e) to employ it in such a way as to rescue a litigating party from a bargain poorly struck.").

3. *The* Kaseburg *decision.*

Although the government initially agreed that the terms of the Settlement Agreement remained intact, excepting only the specific apportionment to individual claimants, the government's position changed after a district court addressed a claim related to a portion of the same railroad corridor in King County that is at issue here. *See Kaseburg II*, 2016 WL 4440959, at *1. In that case, 78 plaintiffs, all members of this class action, filed suit in Washington state court, requesting "an order quieting title in the [c]orridor against a number of parties, including

---

[10]A new allocation of the total compensation amount will be necessary in all events to account for the removal of common-fund attorneys' fees from the awards. *See Haggart V*, 809 F.3d at 1351-59.

Given that class counsel made all documents related to the appraisal process and damages calculations available to all members of the class months ago, *see supra*, at 3-4, class counsel now contends that the allocation can be tested by issuing a new notice of the Settlement Agreement to class members, Pls.' Mot. to Enforce the Settlement Agreement at 8, ECF No. 272.

[11]The government asserts that even if the Settlement Agreement was enforceable, the parties abandoned that Agreement following the Federal Circuit's remand. The United States' Resp. to Pls.' Mot. to Enforce the Settlement Agreement at 11-13, ECF No. 274. Such an argument is manifestly inconsistent with the government's previous positions before the court of appeals and this court, as noted above, as well as class counsel's position regarding the Agreement.

15

King County." *See id.* Plaintiffs filed suit in an effort to restrict King County from using "the railroad's right-of-way for purposes beyond a hiking and biking trail, including the scope exceeding transfers of the subsurface and aerial rights under and above the hiking and biking trail easement, and the imminent use by Puget Sound Regional Transit Authority and Puget Sound Energy, Inc. for public transportation and energy transmission ventures." Pls.' Resp. to the United States' Mot. for Summary Judgment as to Class Members Who Were Pls. in *Kaseburg v. Port of Seattle* ("Pls.' Opp'n to Def.'s Mot. Regarding *Kaseburg*") at 4, ECF No. 254; *see also* First Am. Compl., *Kaseburg v. Port of Seattle*, No. 14-2-03714-5 (Super. Ct. Snohomish Cty. May 16, 2014) at ¶¶ 109-14 (detailing transactions by the Port of Seattle after the Port was granted a quit claim deed by Burlington Northern upon issuance of the NITU). King County "counterclaimed to quiet title against [p]laintiffs." *Kaseburg II*, 2016 WL 4440959, at *1.[12] The case was removed to federal district court. *See* United States' Mot. for Summary Judgment as to Class Members Who Were Pls. in *Kaseburg v. Port of Seattle* ("Def.'s Mot. Regarding *Kaseburg*") at 1, ECF No. 243. The district court issued decisions on summary judgment in favor of the defendants, ultimately dismissing plaintiffs' claims and quieting title to King County. *See Kaseburg II*, 2016 WL 4440959, at *11-12 (summarizing the district court's conclusions).

The *Kaseburg* decision is not binding on this court and cannot and does not affect the enforceability of the Settlement Agreement.

Wholly apart from the binding contractual effect of the Settlement Agreement, the district court's determinations would be problematic for this case because they came years after this court's final judgment and indeed after the Federal Circuit's decision triggering the mandate rule and law of the case. Among other things as well, (1) significant doubt exists whether the district court had subject matter jurisdiction under 28 U.S.C. § 1441, the removal statute, over the plaintiffs' claim, a quiet title action arising wholly out of state law and filed originally in state court; (2) in concluding that the Kittinger Deed conveyed a fee simple to the railroad, the district court seemingly did not consider whether that deed's reference to the right-of-way was incorporated into the granting clause, *see Kaseburg II*, 2016 WL 4440959, at *2-3;[13] (3)

---

[12]The Port of Seattle issued a quit claim deed to King County in February 2013. *See* First Am. Compl., *Kaseburg v. Port of Seattle*, No. 14-2-03714-5 (Super. Ct. Snohomish Cty. May 16, 2014) at ¶ 113.

[13]This court acknowledged the Kittinger Deed's bargain-and-sale form, as the parties had agreed at every stage of the litigation, but found that the deed conveyed an easement because the deed's reference to the right-of-way had been incorporated into the granting clause, and the factors set forth in *Brown v. State*, 924 P.2d 908 (Wash. 1996) (en banc) supported such a finding. *See Haggart III*, 108 Fed. Cl. at 89-91. The government makes two arguments to support a different result respecting the Kittinger Deed. First, it relies on a 1917 map that "references the Kittinger Deed as a bargain and sale deed." The United States' Mot. for Recons. of Certain Rulings on the Parties' Cross[-]Mots. for Summary Judgment at 8, ECF No. 244. The 1917 map makes a point that the court has already accepted, and indeed, the court considered and rejected a nearly identical "bargain and sale" argument presented by the government in its briefing for Subclasses Two and Four. *See* The United States' Resp. in Opp'n to Subclass Four

regarding properties acquired through a 1904 condemnation, the district court did not appear to take account of the fact that the State of Washington granted that land in 1906 to the Hillman Investment Company, which then divided and sold the lots adjacent to the railroad corridor;[14] (4) regarding the scope of the easements, the district court applied the incidental uses doctrine to conclude that the scope of the easements included trail use, *Kaseburg I*, 2015 WL 6449305, at *7-9, but that application contravenes established precedent in the State of Washington;[15] and (5) in addressing the centerline presumption set forth in *Roeder*, 716 P.2d 855, the district court required plaintiffs to produce full chains of title, *see Kaseburg I*, 2015 WL 6449305, at *11, but complete chains of title are not essential to invocation of the centerline presumption under *Roeder* at the summary judgment stage because rebuttal of the centerline presumption and the response to rebuttal can present a triable issue.[16]

---

Pls.' Mot. for Partial Summary Judgment and Cross-Mot. for Partial Summary Judgment at 20-26, ECF No. 117. Second, the government notes that the record in *Kaseburg* included a declaration that opined that the price paid by the railroad supported a fee determination. Def.'s Reply in Support of Mot. for Recons. at 7. Again, this court explicitly considered the price paid, noting that the sum was likely "substantial" and stating that this conclusion favored a fee under the sixth *Brown* factor. *Haggart III*, 108 Fed. Cl. at 90. After examining all of the *Brown* factors, however, the court ultimately held that the factors taken together favored an easement. *Id.*

[14]*See* Pls.' Resp. to the United States' Mot. for Recons. of Certain Rulings on the Parties' Cross[-]Mots. for Summary Judgment ("Pls.' Opp'n to Def.'s Mot. for Recons.") at 16 & Ex. A, ECF No. 255. Although the grant by the State of Washington in 1906 was presented to the district court, that court struck the evidence. *Kaseburg II*, 2016 WL 4440959, at *8, *11; Hr'g Tr. 33:19-22 (Mar. 31, 2017).

[15]*See, e.g.*, *Lawson v. State*, 730 P.2d 1308, 1312 (Wash. 1986) (en banc) ("[C]learly, a hiking and biking trail is not encompassed within a grant of an easement for railroad purposes only."); *see also Haggart III*, 108 Fed. Cl. at 81 (citing cases in the State of Washington and Federal Circuit).

[16]The government also asserts that the *Kaseburg* plaintiffs are precluded from litigating their takings claim because the district court held that they did not have a property interest in the railroad corridor. Def.'s Reply in Support of Mot. Regarding *Kaseburg* at 2-4. Plaintiffs first filed suit in this court in 2009, and this court entered its liability rulings and entered final judgment before the district court in Washington considered plaintiffs' claims. The *Kaseburg* decision, rendered *after* the proceedings in this court, does not affect the court's previous determinations and thus falls outside the scope of the issue preclusion doctrine. *See, e.g.*, *Shell Petroleum, Inc. v. United States*, 319 F.3d 1334, 1338 (Fed. Cir. 2003) (noting that issue preclusion prevents a litigant from relitigating particular issues brought in a "first suit") (quoting *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994)); *Beres v. United States*, 92 Fed. Cl. 737, 754 (2010) (applying issue preclusion to a takings claim where plaintiffs first filed suit in Washington and the state court dismissed plaintiffs' claims *before* the Court of Federal Claims addressed the issue).

In any event, whatever the result in *Kaseburg*, that decision does not affect the Settlement Agreement at issue in this case.

### C. Further Proceedings

Because the only aspect of the Settlement Agreement remaining at issue in this case is the allocation of the agreed settlement amount and interest among the Settling Plaintiffs, the most logical and reasonable means of addressing that allocation would be to return to the mediation process that was successful earlier. The court and the previously designated mediation judge are amenable to that mode of further proceedings. If the parties nonetheless are unable to agree to renewed mediation, the court will institute proceedings to hear and consider adjustments to the settlement allocation, through an evidentiary hearing or trial, if necessary. The parties are requested to file a joint status report on or before May 23, 2017, setting out their proposal(s) for further proceedings.

## CONCLUSION

For the reasons stated, plaintiffs' motion to enforce the Settlement Agreement is GRANTED. Plaintiffs' and the government's motions for reconsideration, the government's three motions for summary judgment, and the parties' motions and cross-motions for partial summary judgment on liability for Subclasses One and Three are DENIED. The parties are requested to file a joint status report on or before May 23, 2017.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge