# In the United States Court of Federal Claims

No. 09-103L

(Filed: January 26, 2018)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| **DANIEL and KATHY HAGGART, et al.,** | ) | Rails-to-trails takings case; fairness of |
| **For Themselves and As Representatives** | ) | settlement of class action; RCFC 23(e) |
| **of a Class of Similarly Situated Persons,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Thomas S. Stewart, Stewart Wald & McCulley LLC, Kansas City, Missouri, for plaintiffs Daniel Haggart and Kathy Haggart, et al. With him on the briefs were Elizabeth G. McCulley, Stewart Wald & McCulley LLC, Kansas City, Missouri, Steven M. Wald and Michael J. Smith, Stewart Wald & McCulley LLC, St. Louis, Missouri, and J. Robert Sears, Baker Sterchi Cowden & Rice, LLC, St. Louis, Missouri.

Lucinda J. Bach, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Jeffrey H. Wood, Acting Assistant Attorney General, Environment & Natural Resources Division, and Tyler L. Burgess and Sarah Izfar, Trial Attorneys, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

David C. Frederick, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, D.C., for plaintiffs Gordon A. Woodley and Denise L. Woodley. With him on the briefs were Joanna T. Zhang, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, D.C., and Gordon A. Woodley, Woodley Law, Kirkland, Washington.

Michael R. Scott, Hillis Clark Martin & Peterson P.S., Seattle, Washington for plaintiff Cleveland Square, LLC and twenty-five others. With him on the briefs was Mary Crego Peterson, Hillis Clark Martin & Peterson P.S., Seattle, Washington.

Richard B. Sanders, Goodstein Law Group PLLC, Tacoma, Washington for plaintiffs Faramarz Ghoddoussi and Westpoint Properties, LLC.

## OPINION AND ORDER

LETTOW, Judge.

This rails-to-trails takings class action is once again before the court for approval of a settlement pursuant to Rule 23(e) of the Rules of the Court of Federal Claims ("RCFC").  After extensive proceedings in this court and an appeal to, and remand from, the Federal Circuit, 253 class members again seek approval and enforcement of their settlement agreement entered in 2014 with the government.[1]  The government, in a *volte face*, now opposes the previously executed settlement and raises a number of objections to approval of the settlement.

## BACKGROUND

This action concerns land previously held as a right-of-way by Burlington Northern and Santa Fe Railway Company in the State of Washington. That right-of-way was converted into a recreational trail pursuant to Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 (codified in relevant part at 16 U.S.C. § 1247(d)).[2]  In February 2009, plaintiffs filed a complaint alleging that this conversion constituted a taking of their property without just compensation.  Compl. ¶¶ 14, 18.  A class of 521 members, owning 659 parcels of land, was initially certified, Hr'g Tr. 129:5-6 (Dec. 18, 2017); *see also Haggart I*, 89 Fed. Cl. at 530-31,[3] and then split into six subclasses.  *See Haggart II*, 104 Fed. Cl. 484, 487.  The court then ruled on cross-motions for summary judgment, finding "the government liable to certain class members within Subclass Two and Categories A through D of Subclass Four" while also granting "the government summary judgment as to class claimants in Subclass Four, Category E."  *Haggart VI*, 131 Fed. Cl. at 631 (citing *Haggart III*, 108 Fed. Cl. at 70).  In all other respects, summary judgment was denied: The court reserved some questions of ownership for trial, did not address liability for Subclasses One, Three, Five, or Six, and did not address issues of valuation.  *See Haggart III*, 108 Fed. Cl. at 70.

Starting in April of 2013, the parties engaged in extensive mediation with Senior Judge John Weise, eventually reaching a settlement in February 2014.  *See generally* Joint Mot. for Approval of S[e]ttlement and of Notice to Class Members and Request to Set Date for Public Hearing, ECF No. 161.  Of the 521 claimants and their 659 parcels of land, the settlement would

---

[1]This case has been the subject of seven reported decisions, including six from this court and another from the court of appeals.  *See Haggart v. United States*, 89 Fed. Cl. 523 (2009) ("*Haggart I*"); *Haggart v. United States*, 104 Fed. Cl. 484 (2012) ("*Haggart II*"); *Haggart v. United States*, 108 Fed. Cl. 70 (2012) ("*Haggart III*"); *Haggart v. United States*, 116 Fed. Cl. 131 (2014) ("*Haggart IV*"), *vacated and remanded sub nom. Haggart v. Woodley*, 809 F.3d 1336 (Fed. Cir. 2016) ("*Haggart V*"); *Haggart v. United States*, 131 Fed. Cl. 628 (2017) ("*Haggart VI*"); *Haggart v. United States*, 133 Fed. Cl. 568 (2017) ("*Haggart VII*").

[2]The pertinent Notices of Interim Trail Use were issued by the Surface Transportation Board on October 27, 2008 and November 25, 2008.  *See Haggart I*, 89 Fed. Cl. at 529.

[3]Various hearings have been held over the course of this case, including two fairness hearings. All citations to the hearing transcript in this opinion refer to the fairness hearing held in Seattle, Washington on December 18, 2017.

dismiss the claims of 268 class members and their corresponding 343 parcels, without compensation, and then pay $110 million to the remaining 253 class members as just compensation for the alleged taking of their 316 parcels, plus interest, attorneys' fees, and litigation costs. *See id.*; Hr'g Tr. 131:10-14; Ex. M;[4] *see also* Joint Compromise Settlement Agreement between Pls. and the United States ("Settlement Agreement" or "Agreement"), ECF No. 161-2 & Exs. A, B; Hr'g Tr. 129:5-10; Exs. K, L, M.  The court held a fairness hearing in March 2014, approved the settlement, and entered final judgment.  *See generally Haggart IV*, 116 Fed. Cl. 131.  In so doing, the court awarded attorneys' fees to class counsel through a common fund.  *Id.* at 148-49.

An appeal of this court's final judgment was sought by Mr. and Mrs. Woodley as class members.  *See generally Haggart V*, 809 F.3d 1336.  Although receiving just compensation under the settlement, the Woodleys challenged the court's approval of the settlement on the ground that class counsel had not provided information in written form (oral explanations had been provided) that would enable class members to cross-check calculations of the settlement amount to be received by them individually.  *See id.* at 1343, 1348.  They also challenged the award of attorneys' fees based on a common fund.  *See id.* at 1343, 1351-59.  In the appeal, the government abandoned the position it had taken at the fairness hearing and supported the Woodleys, but it did not itself file an appeal or raise any additional issues on appeal.  *See id.* at 1343; *Haggart VI*, 131 Fed. Cl. at 631.  The Federal Circuit vacated the approval of the Settlement Agreement on the ground that sufficient information in written, as contrasted to oral, form had not been provided to enable the Woodleys and class members generally to comparatively calculate their individual awards, and reversed this court's award of attorneys' fees under the common-fund doctrine.  *Haggart V*, 809 F.3d at 1351, 1359.  The case was remanded for further action by this court.  *Id.* at 1359.

To rectify the deficiency of written notice to the class, the court ordered access to documentary materials and re-opened discovery, ensuring that class members received "all the discovery [they could] possibly . . . want."  *See Haggart VI*, 131 Fed. Cl. at 632.  Of particular interest to the Woodleys were three spreadsheets: a summary spreadsheet "that showed appraisals side-by-side," and "two other spreadsheets that had been used in the mediation process."  *Id.*  All three had not previously been made available electronically; that was rectified during discovery.  *Id.*

Neither in the court of appeals nor initially before this court on remand did the parties consider that the Settlement Agreement itself had been set aside, vacated, or altered, except potentially as to the allocation of individual amounts.  *See Haggart VI*, 131 Fed. Cl. at 641.[5]  The

---

[4]At the fairness hearing, one electronic compilation of documents made available to class members (Ex. F) and five documentary exhibits (Exs. K, L, M, N, and O) were admitted into the record.  Those exhibits will be cited by letter designation without reference to the transcript of the fairness hearing held on December 18, 2017.  One documentary exhibit was provided for the record earlier, and is appended to at Class Counsel's Mot. for Approval of the Settlement and of Notice to Class Members and Request to Set a Date for Public Hearing, Ex. D, ECF No. 299-4.

[5]The Federal Circuit's disposition and mandate necessarily contemplated that an adjustment might have to be made to the attachment to the Settlement Agreement that allocated the overall settlement amount to individual class members, and in any event class members'

Federal Circuit did not address the specific terms of the Settlement Agreement. *Id.* On remand, however, the government further changed its position and filed multiple motions for reconsideration, all seeking invalidation of the Settlement Agreement. *See generally* The United States' Mot. for Reconsideration of Certain Rulings on the Parties' Cross[-]Mots. for Summary Judgment and Mem. in Support Thereof, ECF No. 244; The United States' Mot. for Recons. of May 4, 2017 Order (ECF No. 275) Granting Pls.' Mot. to Enforce Settlement Agreement and Mem. in Support Thereof, ECF No. 291. First, the government asked the court to reconsider determinations made in *Haggart III*. *See Haggart VI*, 131 Fed. Cl. at 633. The government argued "that the vast majority of class members own no property interest in the railroad corridor and are entitled to nothing," *Haggart VII*, 133 Fed. Cl. at 572 (internal brackets and ellipses omitted), relying on a decision by the United States District Court for the Western District of Washington in *Kaseburg v. Port of Seattle*, an indirectly related case.[6] This court denied the government's motion, determining that the *Kaseburg* "decision [did] not affect the Settlement Agreement at issue in this case." *Haggart VI*, 131 Fed. Cl. at 643. Second, the government sought "to negate the unconditional, comprehensive Settlement Agreement that the government executed with the class." *Haggart VII*, 133 Fed. Cl. at 572. That motion was also denied because the court determined that the "Settlement Agreement was and remains a binding and enforceable contract." *Id.* (quoting *Haggart VI*, 131 Fed. Cl. at 643).

After the parties' remand-oriented motions practice had abated, on August 11, 2017, plaintiffs filed a motion for approval of the settlement. *See generally* Class Counsel's Mot. for Approval of the Settlement and of Notice to Class Members and Request to Set a Date for Public Hearing, ECF No. 299. The government responded in opposition, objecting to the Settlement Agreement on the grounds it had raised in its prior post-remand motions. *See generally* United States' Resp. and Obj. to Class Counsel's Mot. for Approval of the Settlement and of Notice to Class Members and Request to Set a Date for Public Hearing ("Def.'s Resp."), ECF No. 310. On September 25, 2017, the court issued a revised draft notice, proposing changes to the draft notice that had been submitted by class counsel. *See generally* Order of Sept. 25, 2017, ECF No. 319. The court's draft was issued in advance of a hearing held on October 20, 2017, at which further revisions and objections to the notice were considered. After incorporating additional changes suggested by the parties to the proffered notice and addressing the objections raised by the government at that hearing, the court preliminarily approved the settlement, scheduled a fairness hearing, prescribed the notice to be issued to the class, and ordered class counsel to provide notice of both the settlement and the fairness hearing to class members. *See* Order of Oct. 27, 2017, ECF No. 329; Amended Order of Oct. 30, 2017 ("Notice"), ECF No. 330. The fairness hearing was held on December 18, 2017 in Seattle, Washington, to enable as many class members as possible to attend and participate in the proceedings.

---

ultimate compensation amounts would change due to the reversal of the award of common-fund attorneys' fees. *See Haggart VI*, 131 Fed. Cl. at 641 & n.10.

[6]*See Kaseburg v. Port of Seattle*, No. C14-784 JCC, 2015 WL 6449305 (W.D. Wash. Oct. 23, 2015) ("*Kaseburg I*"); *Kaseburg v. Port of Seattle*, No. C14-0784 JCC, 2016 WL 4440959 (W.D. Wash. Aug. 23, 2016) ("*Kaseburg II*"), *appeal filed*, No. 16-35768 (9th Cir. Sept. 23, 2016).

All comments submitted by class members have been reviewed, the testimony of class members at the fairness hearing has been received, and the issue of approval has been fully briefed and argued and is ready for disposition.

## STANDARDS FOR DECISION

RCFC 23(e) states that a certified class action "may be settled . . . only with the court's approval" and specifies the requisite procedures for a proposed settlement:

(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4) [Not used.]

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

RCFC 23(e)(1)-(5).[7]  The court directed that notice be mailed to all class members and has held a fairness hearing, in accord with RCFC 23(e)(1) and (2), respectively.  Disclosure of separate agreements was made in accord with RCFC 23(e)(3).  The only remaining inquiry for the court is whether the Settlement Agreement is "fair, reasonable, and adequate."  RCFC 23(e)(2).

When determining the fairness, reasonableness, and adequacy of a class settlement, "two areas of inquiries are paramount:" substantive and procedural fairness.  *See Christensen v. United States,* 65 Fed. Cl. 625, 629 (2005).  Of the two, "[t]he primary concern is the substantive terms of the settlement" and basic to any inquiry into substantive fairness is whether the terms of the settlement reasonably reflect "the likely rewards of litigation."  *Id.* (internal ellipse omitted) (quoting *Weinberger v. Kedrick,* 698 F.2d 61, 73-74 (2d Cir. 1982) (Friendly, J.) (in turn, quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968))).  Because the court's ability to "examin[e] . . . the settlement's substantive terms" is "necessarily limited," "attention [is] also . . . paid to" procedural fairness, including "the negotiating process by which the settlement was reached."  *Id.* (quoting *Weinberger*, 698 F.2d at 73-74).  Procedural fairness depends on whether the settlement resulted from an arms-length negotiation and whether class counsel effectively represented the class by possessing adequate experience and ability and by engaging in sufficient discovery.  *Id.*  Substantive fairness is a case-by-case inquiry with no definitive list of factors a court must apply, but many courts have considered some combination of the following:

(1) The relative strengths of plaintiffs' case in comparison to the proposed settlement, which necessarily take into account:

---

[7]Rule 23 of the Fed. R. Civ. P. is substantially similar to RCFC 23, and decisions by federal courts applying Fed. R. Civ. P. 23 are persuasive in this court.  *See Haggart I*, 89 Fed. Cl. at 529 (citing *Barnes v. United States*, 68 Fed. Cl. 492, 494 & n.1 (2005)).

(a) the complexity, expense, and likely duration of the litigation;
(b) the risks of establishing liability;
(c) the risks of establishing damages;
(d) the risks of maintaining the class action through trial;
(e) the reasonableness of the settlement fund in light of the best possible recovery;
(f) the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation;
(g) the stage of the proceedings and the amount of discovery completed; and
[(h) the ability of the defendants to withstand a greater judgment.][8]

(2) The recommendation of class counsel, taking into account the adequacy of class counsel's representation of the class.
(3) The reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms.
(4) The fairness of the settlement to the entire class.

*Dauphin Island Prop. Owners Ass'n v. United States*, 90 Fed. Cl. 95, 102-03 (2009) (citing cases) (considering also fairness of attorneys' fees); *see also Raulerson v. United States*, 108 Fed. Cl. 675, 677 (2013) (same); *Voth Oil Co. v. United States*, 108 Fed. Cl. 98, 103 (2012) (same). Courts analyze these factors in light of "'the interest in encouraging settlements, particularly in class actions, which are often complex, drawn out proceedings demanding a large share of finite judicial resources.'" *Christensen*, 65 Fed. Cl. at 629 (quoting *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993)).

## ANALYSIS

### I.   PROCEDURAL AND SUBSTANTIVE FAIRNESS OF THE SETTLEMENT AGREEMENT

As in *Haggart IV*, "[t]here is no evidence that the negotiating process was procedurally unfair." 116 Fed. Cl. at 140. There the court determined that "[b]oth parties represent[ed] that negotiations were at arms-length," each party obtained their own appraisal, "[a] compromise between diverging appraisal amounts was achieved through [impartial] mediation," and "[c]lass counsel has extensive experience litigating rails-to-trails cases in this court[] and . . . possessed the requisite experience to be effective counsel." *Id.* Nothing in the intervening years has occurred to alter the court's assessment of the negotiations in this case.

The sole procedural defect in the prior approval of the Settlement Agreement, as determined on appeal, was inadequate provision to the class of written documentation, as contrasted to oral explanations, of the calculations that were made on the basis of appraisals of representative parcels. *See Haggart V*, 809 F.3d at 1351. That defect has been cured. *See Haggart VII*, 133 Fed. Cl. at 575-76. Class counsel made the pertinent documentary materials available by electronic and other means. *See* Ex. F. The court also re-opened discovery to

---

[8]This factor carries little weight in a case such as this one where the defendant is the federal government. The government in theory is understood to be able to "always withstand greater judgment because of Congress's unlimited ability to tax." *Berkley v. United States*, 59 Fed. Cl. 675, 713 (2004) (internal citations omitted).

ensure that all parties "had the opportunity to seek any and all relevant documents," and particularly to "obtain access to the spreadsheets" that were used in the settlement mediation to develop the terms of the Settlement Agreement. *Haggart VII*, 133 Fed. Cl. at 575. All three "spreadsheets are available on class counsel's website for any class member to review," and the government had "attached [them] to its motion for reconsideration, making them a matter of public record." *Id.* at 575-76. In light of this curative action, the court is once again persuaded that this settlement is procedurally fair.

Likewise, the Settlement Agreement is substantively fair. The court previously determined that the "terms of the [S]ettlement [A]greement reasonably reflect the strengths of the plaintiffs' case in comparison to the proposed settlement," and nothing has occurred to alter that determination. *See Haggart IV*, 116 Fed. Cl. at 140-41. At the first fairness hearing in this case, held in Washington, D.C., only three class members participated in the proceedings, and of the three, two objected. *Id.* at 138. At this juncture, all of the class members support the settlement. In response to the renewed notice to the class members, no objections were filed, and 226 of the 253 class members specifically agreed and consented to their individual allocation amounts under the Settlement Agreement. *See generally* Notice of Compliance Concerning Class Members' Responses to Class Action Settlement Notice, ECF No. 333. Additionally, 58 class members appeared or were represented at the second fairness hearing in Seattle, Washington—and all who spoke voiced strong support for the settlement. *See* Hr'g Tr. 7:4 to 10:8, 13:6 to 14:20, 21:7-21, 75:7-19; Hr'g Tr. 77:1 to 82:4, 122:17 to 127:22.

## II.   THE GOVERNMENT'S OBJECTIONS TO THE SETTLEMENT AGREEMEMT

The government has raised numerous objections to the fairness of the Settlement Agreement. These objections are ultimately unconvincing, whether considered individually or taken together.

### A.   Objection to Any Modification of the Settlement Agreement

Three members of the class were included in the Settlement Agreement but own property just outside the area designated in the Notices of Interim Trail Use that gave rise to the takings claims. *See* Hr'g Tr. 57:17-23. These class members appear to have been included by a mistake in maps prepared by a jointly retained consultant. Hr'g Tr. 58:13-15, 130:9-13. Class counsel proposed an amendment of the settlement to eliminate the three class members on grounds that their inclusion was derived from a mutual mistake. Hr'g Tr. 58:15-25. The government objects to any modification to the settlement, claiming that a modified agreement would cease to be binding upon the government and would require a return to negotiations. *See* Def.'s Resp. at 1; Notice at 4. The court simply cannot satisfy this objection in a way that is fair to the rest of the class. Overturning the entire Settlement Agreement to rectify an admitted mutual mistake by the parties would be grossly unfair to the class. So, while the mistaken inclusion of the three class members is unfortunate, the court will not make any changes to the Agreement but will retain the three class members in the group to receive awards. Hr'g Tr. 130:18 to 131:2.

### B.  Objection to Separate Agreements

The government objects to the fairness of the Settlement Agreement due to three separate agreements entered between class counsel and four class members: the Woodleys, Faramarz Ghoddoussi, Westpoint Properties, LLC, and Annop Chaipatanapong.  *See* Hr'g Tr. 101:13 to 103:5.  Pursuant to the agreements, these class members will receive money from class counsel in connection with their acceptance of the Settlement Agreement.  Hr'g Tr. 17:8 to 20:4, 105:14 to 107:25, 119:13 to 120:4, Exs. I, O, and Class Counsel's Mot. for Approval of Settlement, Ex. D.  The government argues that these separate agreements "call for payment of part of the statutory attorneys' fees to four class members, [and therefore] the agreements change a line item in the settlement agreement[, *i.e.*, the line "call[ing] for payment of part of the statutory attorneys' fees,"] and those are material changes."  Hr'g Tr. 112:19-22.  Such changes, in the government's view, require that a new notice be sent to the rest of the class disclosing the separate agreements.  *See* Hr'g Tr. 111:9-14.  The government mischaracterizes the nature of these separate agreements.  The agreements require that the additional compensation will come "directly from class counsel" and not from the $110 million award.  Hr'g Tr. 106:4-5; *see, e.g.*, Exs. I, P, and Class Counsel's Mot. for Approval of Settlement, Ex. D.  As such, the separate agreements have no effect on the allocation of specific awards to the class as set out in the Settlement Agreement and have no effect on the payments the government will make.  Moreover, the class is well aware of the separate agreements.  The separate agreement between the Woodleys and class counsel was explicitly disclosed in the Notice issued to the class, *see* Notice at 3, and the posture of Faramarz Ghoddoussi and Westpoint Properties LLC was also set out in the Notice, *see id*. at 3-4.  The separate agreements were also made part of the record of the fairness hearing, and extensively addressed at the hearing.  *See* Hr'g Tr. 17:8 to 20:4, 105:13 to 107:25, 119:13 to 120:4, Exs. I, O, and Class Counsel's Mot. for Approval of Settlement, Ex. D.

Because these separate agreements do not affect the terms of the Settlement Agreement itself and have been fully disclosed and addressed extensively at the fairness hearing, the court has considered them comprehensively and concludes that they do not render the Settlement Agreement unfair.

### C.  Objection to Individual Contingency Fee Agreements

Many class members have entered contingent fee agreements with class counsel.  *See* Def.'s Resp. at 12.  These agreements were entered on an individual basis, each class member agreeing to pay class counsel 24% of that class member's "gross settlement" award.  *See* Hr'g Tr. 108:10-23 (describing 24% contingent fee agreements entered into by three class members as "consistent with other fee agreements that other class members have entered into"); Def.'s Resp. at 14.  These contingent fee agreements are private contracts that do not directly affect the government's payment of the settlement award.

The court has limited oversight over such contingent fee agreements because it reviews contingent fee agreements only in the context of fairness to the class.  *See* RCFC 23(g)(1)(C)-(D), (h)(1)-(3)).  Jurisdictionally, this court cannot enforce agreements between private parties.  *See* 28 U.S.C. 1491(a).

The government objects to the settlement's fairness in light of the individual contingent fee agreements. While acknowledging the limited role that the court has in reviewing the contingent fee agreements, the government argues that such agreements should be subject to "particularly close scrutiny" because they were entered into "long after the attorney-client relationship commenced." Def.'s Resp. at 15 (citing *Jenkins v. McCoy*, 882 F. Supp. 549, 555 (S.D. W.Va. 1995); *Pete v. United Mine Workers of Am. Welfare & Ret. Fund of 1950*, 517 F.2d 1275 (D.C. Cir. 1975) (additional citations omitted). This argument fails to take into consideration the intervening effect of the Federal Circuit's ruling in *Haggart V*. Before that ruling, class counsel had entered into contingent fee agreements calling for 35% of the awarded amounts, later voluntarily reduced to 30%, to be taken from the common fund. *See Haggart IV*, 116 Fed. Cl. at 138. In its ruling after the first fairness hearing, the court had reduced that percentage to approximately 24%. *Id*. at 148 & nn.19, 20. That common fund fee award was invalidated on appeal under the Uniform Relocation Assistance and Real Property Acquisition Act ("Uniform Relocation Act"), 42 U.S.C. § 4654, the fee-shifting statute at issue. *See Haggart V*, 809 F.3d at 1359. Because class counsel originally entered into contingent fee agreements with class members at the initiation of the attorney-client relationship, and the new contingent fee agreements call for a lesser percentage of participating class members' awards, the history and circumstances obviate some of the traditional concerns attendant to any revised or belatedly entered contingent fee agreements. Additionally, class members voiced support for the extensive work of class counsel on the case over a considerable period of time, without contemporaneous compensation. *See, e.g.*, Hr'g Tr. 77:25 to 78:2 ("I appreciate class counsel, all their hard work, and the years they've put into this."); Hr'g Tr. 78:20-24 (("[M]y client as a member of the class is very appreciative of class counsel, and we just want to echo the sentiment that's already been offered to the [c]ourt. They've worked remarkably hard in this whole process."); Hr'g Tr. 81:6-8 ("[T]hese people are doing a great job. I think we've all been patient, and we're just looking forward to finality on this."); Hr'g Tr. 123:11 to 124:4 ("[My client, a class member] has felt fully informed of this whole proceeding. The information is readily available. Class counsel's made itself available at all times. If you send an email with a question, you'll receive a response literally within 15 minutes every single time. The class has felt extremely well advised throughout the whole process . . . and that's because of class counsel. . . . [T]he company[,a class member,] feels completely comfortable with the contingency-fee agreements. . . . [T]hey've incurred an immense amount of risk in bringing this matter and there's absolutely no problem with . . . the bargain that was struck with class counsel.").

The government objects to the notice provided to the class regarding contingent fee agreements, Hr'g Tr. 94:4 to 95:2, arguing that the notice to the class issued on October 30, 2017 "did[ not] provide the class with sufficient information to assess whether they thought the contingent-fee agreements rendered the entire settlement unfair." Hr'g Tr. 94:14-20. The government asserted that the notice failed to include a warning about "potential ethical problems with the[] agreements" or "anything about the windfall" to class counsel and "how [those concerns] might affect the overall fairness of the overall settlement." *See* Hr'g Tr. 95:17-24. This argument is unpersuasive. As the court indicated at the fairness hearing, "the individual class member settlement disclosure statement talks about [a class member's] share of statutory attorneys' fees," Hr'g Tr. 95:25 to 96:10, and contingent fees have been debated in this case since 2014 and also specifically in the Notice sent to the class in October 2017. *See* Notice at 2, 4, 7-8. The terms of the individual contingency fee agreements entered do not affect the distribution or amount of the settlement. The amount that any one class member would pay to class counsel or other counsel under an individual agreement is a matter of private contract. To

be sure, the court must consider and has considered such agreements in determining the overall fairness of the settlement, but the existence of these agreements was disclosed and was discussed at length at the fairness hearing. Class members manifestly were well aware of the agreements.

The government further objects that the contingent fee agreements result in a windfall to class counsel and are "simply a means of circumventing the Federal Circuit's ruling" in *Haggart V. See* Def.'s Resp. at 14. This objection mistates the Federal Circuit's decision in *Haggart V.* There, the appeals court held that application of the common-fund doctrine was inconsistent with the Uniform Relocation Act in this case, but that ruling did not extend to any private fee agreement, contingent or otherwise. *See Haggart V*, 809 F.3d at 1358-59. Indeed, to rule so broadly would have run the risk of conflicting with the Supreme Court's decision in *Venegas v. Mitchell*, 495 U.S. 82 (1990). In *Venegas*, the Supreme Court stated that fee-shifting statutes, like the Uniform Relocation Act, "control[] what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Venegas*, 495 U.S. at 90. Further, "[w]hat a plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney[s'] fee' that a defendant must pay pursuant to a court order" because "statutory awards of fees can coexist with private fee arrangements." *Id.* at 88, 90. In short, although *Venegas* does not relieve this court of its duty to determine the reasonableness of the 24% contingent fee agreements as they relate to the fairness of the settlement, *see Haggart IV*, 116 Fed. Cl. at 144-45, *Haggart V* could not alter the Supreme Court's holding in *Venegas* that private agreements, including individual, member-by-member arrangements, are consistent with fee-shifting statutes. Here, as to the reasonableness of contingent fees, the court believes, as it did in *Haggart IV*, that a 24% contingent fee is reasonable. *See Haggart IV*, 116 Fed. Cl. at 149 & n.20.

In sum, the court rejects the government's objections to the contingent fee agreements because the class members have been fully informed as to the agreements, as shown both by the renewed notice to the class and in commentary at the fairness hearing. At the fairness hearing, after discussion of the contingent fee agreements, many of the class members commented, noting their approval of the fee arrangements and expressing their concern that class counsel has not been paid despite eight years of work. *See, e.g.*, Hr'g Tr. 125:1-5 ("I've been really impressed by our counsel all through this. I think it's very disingenuous to talk about the bulk big number of their fee without also mentioning they've been working for eight years without compensation."). The sentiment among class members in attendance was not that class counsel would be overpaid or that the class members were being treated unfairly, but rather that the government was seeking to use the issue of contingent fee agreements to stall and work against class members' interests. *See, e.g.*, Hr'g Tr. 124:8-23 ("I'm dismayed to hear a representative of my government say that I'm so incompetent and unable to inform myself, that I need protection . . . . And I feel honored to be represented by counsel at this table. And I don't need every jot and tittle to be publically displayed. I think it's just an attempt at further dragging this proceeding on. And frankly, I resent it."), 125:6-13 ("And I also find it very disappointing that representatives from my government and even [sic] display of incredible arrogance, that they would spend their time talking about how they're defending me and my right to be better informed, when I feel I've been incredibly well informed at the same time that they're delaying. They're certainly not looking out for my rights as they're delaying this [further]."), 126:4-7 ("I, too, am really ticked that the government is spending so much time and energy in delaying this thing, and that's the problem I think that people are really getting ticked off about this. There's

no sense to it.”), 127:6-8 (“I just think that [the government is] just dragging it on, and anyway, that’s all I have to say.”).

*D. Objection to Adjudicating Fairness and Statutory Fees Separately*

The government also objects to any use of RCFC 54(b) to bifurcate the judgments in this case, separating attorneys’ fee determinations from the approval of the Settlement Agreement. The Uniform Relocation Act contemplates the joint resolution of the merits and fees and expenses:

> The court . . . awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such . . . settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c). But “[w]hen an action presents more than one claim for relief,” Rule 54(b) vests courts with discretion to “direct entry of a final judgment as to one or more . . . claims.” RCFC 54(b). The court may do so only if it “expressly determines that there is no just reason for delay.” *Id.* The government objects to bifurcation in this case because it “would like to appeal the issue of attorneys’ fees, in particular, the issue of whether class counsel and other counsel are entitled to additional attorneys’ fees in addition to the statutory fees set forth in the [S]ettlement [A]greement” when it “appeal[s] the approval . . . of the [S]ettlement [A]greement.” Hr’g Tr. 136:5-12.

The court does not find any just reason for delay. The government has made evident that it intends to appeal. *See, e.g.*, Hr’g Tr. 135:3-5, 136:5-12. Efficiency therefore favors addressing fees and merits separately because “attorneys’ fees will continue to accumulate through the appeal,” which would then necessitate multiple, redundant proceedings. *See* Hr’g Tr. 135:6-9. Moreover, class members have been waiting nine years for the resolution of this case and deserve a decision on the merits without having to wait for the disposition of the statutory attorneys’ fees. Therefore, the court will bifurcate the determination of fees from the merits in this case.

## CONCLUSION

For the reasons stated, Class Counsel’s Motion for Approval of the Settlement is GRANTED. The clerk is directed to enter judgment in the total amount of $159,636,521.65, consisting of $110,000,000 in principal and $49,636,521.65 in interest as of December 18, 2017, for prevailing class members. Interest continues to accrue at the rate of 4.2%, compounding annually from the dates of the taking, October 27, 2008 and November 25, 2008, until the date of payment by the government. The judgment is payable to class counsel for distribution to the class according to the terms of the Settlement Agreement and this opinion and order.

Final judgment to this effect shall be entered under Rule 54(b) of the Rules of the Court of Federal Claims because there is no just reason for delay. The clerk shall issue judgment in accord with this disposition.

After all proceedings respecting this settlement have been completed and the court's judgment is final, the court will address attorneys' fees and expenses under Section 304(c) of the Uniform Relocation Act, 42 U.S.C. § 4654(c).

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Judge